**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CYNOSURE, LLC, et al.;

                     Plaintiffs,

     v.

REVEAL LASERS LLC., et al.;

                   Defendants.

Civil Action No. 22-cv-11176

**<u>MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR ENTRY OF
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

Plaintiff Cynosure, LLC ("Cynosure") is a Massachusetts-based manufacturer of top-of-class medical aesthetic treatment devices, including laser hair removal machines, skin revitalization devices, and more, and maintains a substantial market presence in the United States. Cynosure brings this emergency motion for entry of a temporary restraining order and preliminary injunction to stop brazen and unlawful efforts by **Defendants Reveal Lasers LLC** and **Reveal Lasers Ltd.** (together, "Reveal Lasers"), newly-established affiliates of an foreign-based competitor, to break into the U.S. market and raid Cynosure's sales force, steal its trade secrets, and misappropriate its marketing channels, all with the help of former Cynosure employees. Defendants' actions constitute a flagrant violation of federal and state trade secrets law and other torts, as well as confidentiality, non-competition and non-solicitation agreements that these former employees entered into with Cynosure before their sudden joint move to Reveal Lasers.

Reveal Lasers orchestrated its raid through disloyal insiders, including many former Cynosure senior executives and managers. Those insiders included individual defendants **Robert Daley, Christopher Chambers, Brogan Bair-Chambers, Cory Murrell, Joshua Smith, Jason Kalso, Kyle Shapero, Michael Russo, Robert Fiacco, Dean Fiacco, David Krueger,** and **Daniel DeMarco** (together "the Former Employees"), who all resigned from Cynosure in May-June 2022, and took with them over a dozen other employees during that same period. Cynosure has discovered that while still employed by Cynosure, many of the Former Employees already were covertly working hand-in-hand with Reveal Lasers to divert potential business to the startup by secretly exfiltrating thousands of highly confidential Cynosure files and documents, forwarding potential sales leads, moving meetings originally scheduled with Cynosure to occur once Reveal Lasers was launched, and even hijacking Cynosure marketing-related social media accounts.

Immediate injunctive relief is necessary to prevent the ongoing damage Cynosure is suffering, and the future damage Cynosure will continue to suffer.

## I.    FACTUAL BACKGROUND

### A.    Cynosure Invested For Years To Build A North American Sales Organization And Entrusted Them With Access To Its Trade Secrets.

Cynosure is a leader in the medical aesthetic treatment industry.  Its parent is co-plaintiff Lotus Parent, Inc. ("Lotus") (together, except when Lotus is expressly referenced, "Cynosure"). Declaration of Jennifer Roma ("Roma Decl.") ¶ 2.  As set forth in more detail in the Declaration of Lowinn Kibbey ("Kibbey Decl."), its Chief Commercial Officer, Cynosure has invested substantial resources in building a sales organization throughout North America, which is designed to service customers across the United States and Canada and in multiple phases of the sales process—including marketing, field sales, and post-sale relationship building.  Kibbey Decl. ¶¶ 3-29.

Cynosure entrusts its sales employees with access to highly confidential information and trade secrets that enable them to succeed in selling its products, including:   (a) confidential sales lead information that could be used to identify selling opportunities in Cynosure's sales pipeline;[1] (b) confidential customer profile information that Cynosure has developed over the years, including customer lists and other documents containing combinations of detailed contact information compiled by Cynosure, lead tracing, records of its install base, credit approvals, asset reports, and/or consumable product purchasing history; (c) confidential pricing and customized pricing packages for customers; (d) confidential marketing processes, methods, and materials; (e) confidential strategic information related to its product innovation pipeline, i.e., products that the

---

[1] Leads generally come in via numerous ways, including without limitation: marketing channels (such as Cynosure's website or social media accounts), trade shows and events where Cynosure invests in having a presence or hosting, or by actively canvassing new and potential customers.  Kibbey Decl. ¶ 19.

company was developing or looking to develop, market and sell; (f) confidential compilations of information, summary charts and related materials regarding Cynosure's competitors, including their products and product differentiation with Cynosure's products; and (g) confidential information about employees, incentives and compensation. *Id.* ¶¶ 17-25.  The specifics and examples of such trade secrets are described more fully in the Kibbey Declaration.

Cynosure employs safeguards to maintain confidentiality, protect its good will, and protect sensitive information about its business and customers.  Cynosure requires its employees to execute binding contracts obligating them to maintain the confidentiality of confidential information, and other restrictive covenants that prevent misuse of confidential information. *Id.* ¶¶ 26-29; Declaration of Kellie Teal-Guess ("Teal-Guess Decl.") ¶¶ 5-10; Declaration of J. Michael Trogolo ("Trogolo Decl.") ¶ 9.  It also has other policies in place regarding the protection of confidential information.  Teal-Guess Decl. ¶ 11 & Exs. 6-7.

Cynosure also employs technological measures to protect its confidential information.  It restricts access to employee computers and shared information systems via password and conditional multi-factor authentication controls.  Trogolo Decl. ¶¶ 3-9.  Cynosure also maintains a confidential Salesforce CRM database that is the central repository for sales "lead" information, customer profiles including detailed contact information for buyer contacts, and information on needs and preferences, purchasing history, and asset reports. *Id.*  Access to this Salesforce CRM data is protected and set so that even members of the sales organization who have access to it must get approval to export data from the system. *Id.* Customer pricing and other information is also maintained confidentially via non-disclosure obligations in contracts.  Kibbey Decl. ¶¶ 26-27.

**B.      The Former Employees Signed Agreements With Non-Competition, Non-Solicitation, and Confidential Information Covenants.**

The Former Employees were all highly-compensated and entrusted with access to Cynosure confidential information and trade secrets.  In consideration of that access, each signed at least one agreement with Cynosure or its affiliates containing confidentiality provisions and/or restrictive covenants.  Teal-Guess Decl. ¶¶ 9-10 & Exs. 2-5.

The various contracts they signed over the years (which vary depending on their hire date, tenure, promotions, and other factors) generally fall into four categories: (1) Invention, Non-Disclosure, Non-Solicitation and Non-Competition Agreements ("INNNA Agreements"); (2) Hologic Employee Intellectual Property Rights, Confidentiality and Non-Competition Agreements ("Hologic Agreements"); (3) Cynosure Employee Intellectual Property Rights, Confidentiality and Protective Covenant Agreements ("CEIP"); and (4) Lotus Parent, Inc. Employee Option Agreements ("Equity Agreements").[2]  The specific language of each agreement varies, but they all contain restrictive covenants intended to protect Cynosure's investment in confidential information, trade secrets, and goodwill.  Each agreement expressly restricts the Former Employees' ability to use and disclose confidential information and trade secrets other than for Cynosure's benefit.  Similarly, each agreement prohibits, for a limited period of time after separation, competition, solicitation of employees, and solicitation of customers.  The chart below summarizes the duration of the post-termination non-competition or non-solicitation provisions in each category of agreement (Teal-Guess Decl. ¶¶ 9-10, Exs. 2-5):[3]

---

[2] These Agreements are governed by either Massachusetts or Delaware law, as set forth in the Teal-Guess Declaration. Teal-Guess Decl. ¶ 9.

[3] Defendant Murrell, as a Canadian, entered into contracts on different forms than the other Former Employees. However, his forms also contained restrictive covenants.  Murrell eventually also executed a CEIP and an Equity Agreement that on forms similar to the others.  Teal-Guess Decl. ¶ 9.

| Agreement | Non-Competition | Customer Non-Solicitation | Employee Non-Solicitation |
|---|---|---|---|
| INNNA Agreement | 12 months | 12 months | 12 months |
| Hologic Agreement | 18 months | 18 months | 18 months |
| CEIP | 9 months | 18 months | 24 months |
| Equity Agreements | 12 months | 24 months | 24 months |

### C. Reveal Lasers Covertly Induced A Coordinated Resignation Of Cynosure Sale Staff Facilitated By Cynosure Insiders.

Unbeknownst to Cynosure until very recently, the Former Employees, led by Bob Daley (Cynosure's former Senior Regional Director of Sales), were, for many months, secretly working on behalf of Reveal Lasers from the inside. These efforts came to a head with the sudden *coordinated resignation of over two dozen Cynosure sales employees in May-June 2022*. Teal-Guess Decl. ¶¶ 12-23, 25. The wave of resignations began on May 2, 2022, when Chambers submitted a surprise resignation notice, effective immediately. *Id.* Daley resigned the next day. *Id.* They were shortly followed by the rest of the Former Employees (and more). *Id.*

As of the date of this filing, over two dozen members of the sales organization who resigned since May have just resurfaced—as one—at Reveal Lasers. *Id.*; Declaration of Joseph Farris ("Farris Decl.") ¶¶ 2-3. None of these employees informed Cynosure that they were joining Reveal Lasers, and, indeed, a number expressly denied at the time of their resignations having any concrete future plans in the industry, presumably to continue hiding their coordinated scheme from Cynosure for as long as possible. Teal-Guess Decl. ¶¶ 12-23, 25. These departures left Cynosure with the simultaneous conversion of approximately 20% of employees in its sales organization in North America to Reveal Lasers—including most of its top sales leaders. *Id.* ¶ 25.

Needless to say, the over two dozen coordinated departures to a startup that literally had no U.S. presence until days ago was not some sort of extraordinary coincidence. Rather, Reveal Lasers (working with Daley at first, and then others) targeted Cynosure's most senior leaders

across all sales functions in America and was secretly recruiting them from the inside for months. Daley, Chambers (North American Vice President of Sales) and Murrell (Associate Vice President of Sales for Canada & the Western & Midwest Regions) were **the three most senior field sales leaders** at the company.  Kibbey Decl. ¶ 9.  Bair-Chambers was **the senior leader of Cynosure's "post-sale" team**, which was responsible for building client relationships after initial sales of capital products.  *Id.* ¶ 14.  And Smith (the National Field Sales Marketing Manager) was **the senior leader of sales and event marketing** for Cynosure's sales organization.  *Id.* ¶ 15.  By raiding these key employees, Reveal Lasers was able to poach leaders at every step of Cynosure's entire go-to-market process.  With them came a group of eight of Cynosure's District Sales Managers strategically positioned in regions throughout the country (including Defendants Kalso, Kreuger, Shapero, Dean Fiacco and Robert Fiacco), who, in turn, brought with them other members of field sales in their districts.  Kibbey Decl. ¶ 9-13.  This was one-stop shopping: a soup-to-nuts raid of Cynosure's sales organization—done in secret because all involved knew it was wrong from the start.

###### D.      Reveal Lasers Targets Cynosure's Trade Secrets.

Following the surprise resignation of so many sales employees, Cynosure commenced an investigation that has uncovered extensive evidence of Defendants' unlawful activities.

Cynosure has recently learned that Daley and Reveal Lasers began working together at least as early as the spring of 2021, when Daley appears to have signed a non-disclosure agreement and started business planning with Reveal Lasers executives based in Israel.  From the outset, Reveal Lasers engaged in a variety of **fraudulent** ways to solicit Cynosure's employees.  This included fraudulently impersonating Cynosure customers to target its employees, and then telling them that Daley was "**formerly of Cynosure USA,**" a year before his resignation. *See generally* Declaration of Doug Neuhofer; Kibbey Decl. ¶ 37-40.

By July 2021, Daley's emails show that he had at least a first offer letter in hand to serve as Reveal's CEO and President of the United States and Canada, and had begun to develop Reveal Lasers' North American business plan and recruitment plan. *Id.* at ¶ 42. Daley then expressly disclosed and utilized Cynosure's confidential compensation information (including salaries and perquisites) to develop Reveal Lasers' compensation plan. *Id.* Several months later, Daley forwarded a proprietary list of over 10,000 potential Cynosure customers—with detailed contact information—to his personal Gmail account, presumably to pass that information to Reveal Lasers. *Id.* at ¶ 44.

By January 2022, Daley was coordinating with at least Dean Fiacco (a Cynosure District Sales Manager for the Northeast region) who was retained to run operations for Reveal Lasers. Between January and March 2022, Fiacco met with at least six different operations providers on behalf of Reveal Lasers (before resigning from Cynosure on May 3, the same day as Daley). *Id.* at ¶ 45.

By early 2022, Daley had covertly recruited many other Former Employees to Reveal Lasers, who, in turn, began working against Cynosure from the inside, all while still employed at Cynosure. *Id.* ¶¶ 48-50.  For example, at Cynosure's annual sales meeting in April 2022, the most senior leader of field sales employees in North America, North America Vice President of Sales Chris Chambers (now the Chief Commercial Officer of Reveal Laser under Daley), actively worked with Daley to recruit Cynosure employees for Reveal Lasers—even going so far as to ask recruits to sign non-disclosure agreements to try to prevent Cynosure from discovering his actions. *Id.*  Daley also began traveling with Chambers to Quarterly Business Review meetings with Cynosure teams outside Daley's assigned Northeast Region, apparently for the purpose of recruiting those Cynosure employees to join Reveal Lasers. *Id.* ¶ 47.

Moreover, as detailed in the accompanying Declarations and below, the evidence shows that after being covertly recruited to Reveal Lasers, the Former Employees engaged in systematic efforts to syphon off customers and trade secret information for the benefit of themselves and their secret new employer before they left, in wholesale breach of their duties of loyalty to Cynosure, where they still worked. Cynosure was literally being sent the bill for this activity for months, paying the salaries of the Former Employees as they flew around the country secretly grooming customers to be diverted to Reveal Lasers and actively recruiting inside the company, including using Cynosure's own sales meeting for recruiting purposes.

There is too much forensic evidence to detail in this brief; however, the Declarations of Chad McDonnell (a forensic analyst from FTI Consulting), Michael Trogolo (Cynosure's Head of Infrastructure) and Lowinn Kibbey (Cynosure's Chief Commercial Officer) establish that four separate employees exported massive amounts of Cynosure trade secret information before resigning (Joshua Smith, Jason Kalso, Michael Russo, and Kyle Shapero). Kibbey Decl. ¶¶ 54, 58-62; McDonnell Decl. ¶¶ 23-58; Trogolo Decl. ¶¶ 16-20. At least four other employees (Robert Daley, David Kreuger, Dean Fiacco, and Daniel DeMarco) conducted targeted exfiltration of Cynosure trade secret information and/or took actions to divert specific confidential leads and business opportunities to Reveal Lasers while still at Cynosure. Kibbey Decl. ¶¶ 44, 63-70. Further, at least Robert Daley destroyed evidence before leaving, making it much hard to discern exactly what he did on his way out the door. Trogolo Decl. ¶ 15; McDonnell Decl. ¶¶ 11-16. Others have refused to return Cynosure computers that are almost certainly still loaded with Cynosure trade secret information (Cory Murrell and Daniel DeMarco). Trogolo Decl. ¶¶ 12-13; Teal-Guess Decl. ¶ 26-27. And still others openly recruited employees to work for Reveal Lasers

even before they left Cynosure (Daley, Chambers, and Bair-Chambers, a member of whose team went with her to Reveal Lasers).  Kibbey Decl. ¶¶ 14, 50.

Reveal Lasers and the Former Employees (including at least Shapero and Robert Fiacco) also have stolen valuable Instagram accounts used as marketing channels by Cynosure and have refused to return them despite express requests from Cynosure—in violation of their obligation to return Cynosure property and further confirming an intent to convert Cynosure's customer base by unlawful means. Kibbey Decl. ¶ 61; Declaration of Brittney Walton at ¶¶ 2-9.  In fact, one of these stolen accounts, which was set up with a Cynosure team email address (*teamcarolinas@cynosure*) is now serving as the "official" Instagram account of Reveal Lasers. Farris Decl. ¶¶ 4-7.

## II.   ARGUMENT

To grant a preliminary injunction, the Court should consider four factors: (i) likelihood of success on the merits; (ii) likelihood of irreparable harm absent relief; (iii) a balancing of the harms; and (iv) whether an injunction comports with the public interest. *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 238 (D. Mass. 2011) (citation omitted).  Of these four factors, "likelihood of success is the main, bearing wall of the four-factor framework."  *Corporate Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (citation omitted).

### A.   Cynosure Is Likely To Prevail On Its Claims.

The evidence leaves no doubt that Reveal Lasers conducted a brazen corporate raid.   It orchestrated the secret and coordinated departure of more than ***two dozen Cynosure employees in less than two months,*** including the most senior employees (short of the Chief Commercial Officer) in each of the field sales, marketing, and post-sales functions of the company, key managers strategically located throughout the country, and other employees that followed them. It did so in flagrant disregard of non-competition covenants each of these employees had entered

into with Cynosure.  Moreover, Defendants not only tried to "lift and shift" Cynosure's sales organization but they also stole Cynosure's statutorily and contractually protected trade secrets—ranging from the company's client lists and customer leads to its marketing materials and strategic plans.  The Former Employees did not even wait until they quit to start to divert Cynosure's business to Reveal Lasers, instead using their position as insiders to gain access to and divert confidential information and to groom customers from a position of trust while still at Cynosure.

Cynosure is entitled to equitable relief preventing any further harm flowing from Defendants' unlawful activity. "[I]njunctive relief is warranted to prevent misappropriation and unlawful use of confidential records such as the customer's names and addresses in circumstances in which the former employee and employer entered into a contract that restricts the former employee's use of such material following his employment." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dewey*, 18 Mass. L. Reptr. 49, at *2 (Mass. Super. Ct. 2004); *see also Nat'l Med. Care, Inc. v. Sharif*, No. 20-11460-MBB, 2020 WL 6318922, at *16 (D. Mass. Sept. 2, 2020) (granting preliminary injunction requiring medical services industry executive to cease working for new employer and refrain from using or disclosing confidential information).

### 1.      Defendants Conspired To Misappropriate Cynosure's Trade Secrets.

To succeed on a claim of misappropriation of trade secrets under the Defend Trade Secrets Act or Massachusetts Trade Secrets Act, a plaintiff must show that "1) the information at issue constitutes a trade secret, 2) the plaintiff took reasonable measures to secure the confidentiality of the information and 3) the defendant obtained the trade secret through improper means." *Viken*, 384 F. Supp. 3d at 177 (citation omitted) (standard for misappropriation under the DTSA is "substantially similar to that under Massachusetts law.").

### a.      Cynosure Has Valuable Trade Secret Information.

A trade secret may be "any formula, pattern device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *J.T. Healy & Son v. James A. Murphy  Son, Inc.*, 357 Mass. 728, 736 (1970) (citation omitted).  It may take many forms, including "a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, *or a list of customers*."  *Id.* (emphasis added); *see also Optos*, 777 F. Supp. 2d at 239 (considering customer list a trade secret for purposes of preliminary injunction analysis); *Barney v. Barcomb*, No. 2002-J-0692, 2003 WL 25932298, at *2 (Mass. Ct. App. Jan. 3, 2003) ("the list of plaintiff's clients and the financial data and personal information relating to them, is confidential information entitled to be protected").

Here, and as explained more fully both above (in Section I.A) and the supporting Declarations, Defendants misappropriated a multitude of trade secrets.  All of this information is valuable and provides Cynosure with business advantages over its competitors.  *See, e.g., New England Circuit Sale v. Randall*, No. 1:96CV10840, 1996 WL 1171929, at *2 (D. Mass. June 4, 1996) (content management techniques allowing an employer to effective market products, "should be afforded protection as trade secrets").

### b.      Cynosure Took Reasonable Steps to Secure the Confidentiality of Its Trade Secrets.

Courts look at four factors to determine whether a company took reasonable steps to protect its trade secrets: "1) the existence or absence of a [confidentiality agreement], 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain…." *Optos*, 777 F. Supp. 2d at 239-240.  "[T]he standard is reasonableness, not perfection." *Id.*

Cynosure took more than reasonable steps to protect its trade secrets.  It restricted access to its computers via password controls administered by Cynosure's IT team, its physical buildings are controlled via a badge-based security system, its shared information systems through a multi-factor Single-Sign On, and its central repository of confidential customer information on its Salesforce CRM database ("Salesforce CRM") to those with a need to access it. Trogolo Decl. ¶¶ 3-9; Kibbey Decl. ¶ 29. As a further security measure, the Salesforce CRM has controls so that sales staff at Cynosure cannot export data directly from the system on their own without approval from a database administrator.   Kibbey Decl. ¶ 29. Moreover, Cynosure maintains customer pricing confidentially via non-disclosure obligations in contracts with customers, and with its employees through the various agreements described above, as well as its compensation plans, which expressly state that their provisions are confidential and the property of Cynosure.  *Id.* ¶¶ 27-28. Finally, Cynosure provides all employees upon termination with an Exit Package that includes a reminder of their contractual obligations and instructions to return any Company confidential information, proprietary and trade secret documents and files. Teal-Guess Decl. ¶ 26.

       **c.**       **Defendants Obtained Cynosure's Trade Secrets Through Improper Means.**

Federal law defines misappropriation as the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B).  State law is in accord.  M.G.L. c. 93 § 42(2).  Moreover, "[a]s a matter of law, an individual who breaches a confidentiality agreement in accessing and appropriating trade secrets has used improper means." *Netcracker Tech. Corp. v. Laliberté*, No. 20-11054-RGS,

2020 WL 6384312, at *4 (D. Mass. Oct. 30, 2020) (citation omitted).  "A party who knowingly benefits from the breacher's trade secret bounty is also liable."  *Optos*, 777 F. Supp. 2d at 240.

The forensic evidence indicates that the Former Employees exfiltrated *thousands* of documents in violation of their contractual and legal obligations to Cynosure and actively misused Cynosure trade secrets while employed to divert leads to Reveal Lasers, including the following:

- **Bob Daley**.  Forwarded himself proprietary customer lists, improperly shared confidential Cynosure compensation plan information, and was involved in attempts to move sales leads to Reveal Lasers.  Kibbey Decl. ¶¶ 39-47.

- **Joshua Smith**.  Uploaded to his personal Dropbox thousands of internal files related to product marketing and customer information, including hundreds just days before he resigned.  *Id.* ¶ 54.

- **Jason Kalso**.  Copied thousands of files to USB storage device in the days before he resigned including a broad of array of confidential sales information.  *Id.* ¶ 58.

- **Kyle Shapero**.  Copied hundreds of files to USB storage device in the days before he resigned including a broad of array of confidential sales information.  *Id.* ¶¶ 59-60.

- **Michael Russo**.  Copied hundreds of files to USB storage device in the days before he resigned including a broad of array of confidential sales information.  *Id.* ¶ 62.

- **David Krueger**.  Separately forwarded at least 13 different leads from the Salesforce CRM to himself on his last few days of work.  *Id.* ¶¶ 63-65.

- **Dean Fiacco**.  Forwarded himself at least 17 "warm [sales] leads" before he left during a time he was actively working for Reveal Lasers to set up operations. *Id.* ¶¶ 66-68.

- **Daniel DeMarco**.  Moved at least 5 meeting with customers scheduled before his resignation until the summer using his personal account (and including Dean Fiacco and Bob Daley).  *Id.* ¶¶ 69-70.

And this is just a summary of the misappropriation Cynosure has uncovered to date. Multiple Former Employees appear to have deleted massive amounts of information to cover their tracks.  Daley completely wiped his Cynosure-issued computer to obscure his activities.  Trogolo Decl. ¶ 15; McDonnell Decl. ¶¶ 11-16.   There  is  no  telling  how  many  more  acts  of

misappropriation Cynosure will uncover, but two things are clear—(i) there has already been substantial, actual misappropriation of trade secrets and (ii) there is an imminent threat that even more misappropriation is yet to come.

> **2.    The Former Employees Violated Their Restrictive Covenants.**

For all the same reasons, and others, Cynosure is likely to prevail on its claim that the Former Employees have each breached one or more of their restrictive covenants.  Under Massachusetts law, restrictive covenants will be enforced if they are "(1) necessary to protect the legitimate business interest of the party seeking to enforce it, (2) is supported by consideration, (3) is reasonably limited in all circumstances, including time and space, and (4) is otherwise consonant with public policy." *Primarque Prods. Co. Inc. v. Williams West & Witts Products Co.*, 303 F. Supp. 3d 188, 206 (D. Mass. 2018), *reversed on other grounds by* 988 F.3d 26 (1st Cir. 2021).[4]

Each of the Former Employees' contracts is an enforceable agreement, with restrictive covenants designed to protect Cynosure's goodwill, trade secrets, and confidential information. *See Marine Contractors Co. v. Hurley*, 365 Mass. 280, 287 (1974) (employer's "interest in protecting its accrued good will from possible incursions" was a legitimate business interest); *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995) (employer had legitimate business interest "in protecting against the inevitable use of confidential information"); *Elite Cleaning Co.*, 2006 WL 1565161, at *4 (under Delaware law, "[i]nterests which the law has recognized as legitimate include protection of employer goodwill and protection of employer

---

[4] The same result lies under Massachusetts law or Delaware law (or, in the case of Murrell's 2020 Offer Letter, Canadian law).  Delaware law will enforce a restrict covenant in a valid contract when (1) the purpose of the covenant is to protect the legitimate interest of the employer; (2) the covenant is reasonable in scope; and (3) a balancing of the equities favors enforcement.  *Elite Cleaning Co., Inc. v. Capel*, No. Civ.A. 690-N, 2006 WL 1565161, at *3-9 (Del. Ch. June 2, 2006).  Canadian law is in accord.  *See AgJunction LLC v. Agrian Inc.*, No. 14-CV-2069-DDC-KGS, 2014 WL 3661108, at *9 (D. Kan. July 23, 2014) ("Under Canadian law, a restrictive covenant is enforceable 'only if it is reasonable between the parties and with reference to the public interest.'") (quoting *Elsley v. J.G. Collins Ins. Agencies Ltd.*, [1978] 2 S.C.R. 916, 923 (Can.)).

confidential information from misuse").  This is particularly true given that the Former Employees were previously members of Cynosure's sales organizations with access to trade secret information, as "[a] salesman may be in a position to harm the employer's goodwill if he possesses business secrets or confidential information, or if his close contact with the customer would lead the customer to associate the product with the salesman rather than the former employer."  *IKON Office Solutions, Inc. v. Belanger*, 59 F. Supp. 2d 125, 128 (D. Mass. 1999); *see All Pro Maids, Inc. v. Layton*, No. Civ. A 058-N, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004) ("An employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs.") (citations and internal quotations omitted); *Elsley*, 2 S.C.R. 925-925 (non-competition provision appropriate when employee is "likely to appropriate the employer's trade connection through his acquaintance with the employer's customers").

Courts in the Commonwealth have enforced restrictive covenants, including non-competition agreements, in much less compelling circumstances.  In *National Medical Care, Inc.*, for example, the court entered a preliminary injunction enforcing a one-year non-competition provision against a single former employee (an executive in a medical service company) who began working for a competitor when the employee had developed close relationships with customers and would, through his prior work, have been able "to demonstrate the comparative advantages and disadvantages of working with [former employer] versus [new employer]."  2020 WL 6318922, at *10.  And even though there was no evidence that the former employee had taken any files containing trade secrets, the court was also concerned that, prior to the employee's resignation, his company-issued phone had been reset to factory default settings, which the court noted was "indicative of conduct designed to avoid disclosure of information."  *Id.* at * 7.

Similarly, in *SimpliVity Corp. v. Moran*, 33 Mass. L. Rptr. at *5-6 (Mass. Super. Ct. Aug. 14, 2016), the court enforced a non-competition agreement against a former employee in the IT sales field who would be working the same territory for a new, competing employer and who had, according to forensic evidence, had potentially exfiltrated data to external devices.

Cynosure has forensic evidence showing that the Former Employees collectively exfiltrated *thousands* of Cynosure files on their way out the door—all while part of a knowing, coordinated conspiracy against Cynosure to use this confidential trade secret information at Reveal Lasers.  Defendants' intent to copy everything they can from Cynosure's business is plain; in fact, in at least one case, Reveal Lasers has already been caught literally cut-and-pasting Cynosure material.  Farris Decl. ¶ 8.  Even absent such evidence, the fact that the Former Employees will be serving in the same functions, and competing for the same customers for a direct competitor, coupled with the affirmative steps the Former Employees have already taken to illegally compete with Cynosure would make it highly probable that they inevitably will use Cynosure's confidential materials and trade secrets to compete against Cynosure.  *Nat'l Med. Care*, 2020 WL 6318922, at *12 (citing cases) (defendant's "substantially similar duties and responsibilities" at new employer "render it unlikely that he will refrain from disclosing and/or using [former employer's] confidential information in his new role."); *W.L. Gore & Assocs., Inc. v. Wu*, No. Civ. A 263-N, 2006 WL 2692584, at *14 (Del. Ch. Sept. 15, 2006) (granting injunction when there was "a substantial likelihood of 'inevitable disclosure' of [plaintiff's] trade secrets").

The contractual restrictions Cynosure seeks to enforce are also reasonable in scope, ranging from nine months to two years and limited, where appropriate, to geographic regions. Massachusetts courts have long recognized that restrictive covenants against salespeople of comparable length are not unreasonable.  *See, e.g.*, *IKON Office Solutions, Inc. v. Belanger*, 59 F.

Supp. 2d 125, 129 (D. Mass. 1999) (noting that "two year restrictions are not uncommon") (collecting cases).  And under Delaware law, "[n]on-compete agreements covering limited areas for two or fewer years generally have been held to be reasonable." *Am. Homepatient, Inc. v. Collier*, No. Civ.A 274-N, 2006 WL 1134170, at *2 n.5 (Del. Ch. Apr. 19, 2006) (citing cases). Enforcing these restrictions would be consonant with public policy, as "[a]llowing an individual to disregard such a [contract] would result in behavior which should not be condoned or encouraged." *Randall*, 1996 WL 1171929, at *3; *see All Pro Maids*, 2004 WL 1878784, at *5.

### 3.    Defendants Also Committed Other Tortious Acts.

Defendants are also likely to succeed on their other claims sounding in tort law:

**Tortious Interference with Contract and Prospective Business Relations**. To succeed on a claim for tortious interference with contractual relations, a plaintiff must show that "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Optos*, 777 F. Supp. 2d at 241 (quoting *G.S. Enters., Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991)).  Defendants' participation in the coordinated scheme described above after they switched their loyalties from Cynosure and to Reveal Lasers and continuing after their resignations, constitutes a tortious interference with Cynosure's contractual relations with its then-current employees.  *See KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, No. 4:21-CV-10572-TSH, 2021 WL 2982866, at *15 (D. Mass. July 15, 2021) (citing *Optos*, 777 F. Supp. 2d at 241).

Cynosure will also prevail on its claim that Defendants have interfered with Cynosure's prospective business relations, including with existing and potential customers.  Indeed, Defendants have already begun soliciting Cynosure's customers, at a minimum by diverting leads and customer meetings.  *See Guest-Tek Interactive Entertainment Inc. v. Pullen*, 731 F. Supp. 2d

80, 86 (D. Mass. 2010) (elements of claim are: (i) plaintiff has a business relationship for economic benefit with a third-party; (ii) defendant knew of that relationship; (iii) defendants interfered with that relationship through improper means; and (iv) the plaintiff's loss of the advantage resulted directly from the defendant's conduct) (citation omitted).

**Breach of Fiduciary Duty / Duty of Loyalty**.  Employees who occupy positions of trust and confidence owe their employer a duty of loyalty and must protect their employer's interests. *Chelsea Indus., Inc. v. Gaffney*, 389 Mass. 1, 11 (1983).  Here, each of the Former Employees— all of whom were granted access to Cynosure's trade secret and other confidential information— occupied such positions.  The Former Employees breached their duty of loyalty and their fiduciary duties to Cynosure by actively working against its best interests and for the interests of a competitor.  Moreover, the Former Employers were aided and abetted by Reveal Lasers, who stands to profit from the Former Employees' breach.  *See Spinner v. Nutt*, 417 Mass 549, 556 (1994) ("liability arises when a person participates in a fiduciary's breach of duty").

**Violation of Chapter 93A.**  Defendants also violated M.G.L. chapter 93A.  "Siphoning off customers using proprietary customer information is exactly the type of eyebrow-raising rascality that 93A makes actionable."  *Lounge 22, LLC v. Scales*, 680 F. Supp. 2d 343, 347 (D. Mass. 2010); *see also Governo Law Firm LLC v. Bergeron*, 487 Mass. 188, 195-96 (2021).  Moreover, if a plaintiff can prove the elements of tortious interference with contract, "then it may also prevail in proving that these same acts constituted an unfair or deceptive act or practice in trade or commerce in violation of [ch. 93A]."  *Guest-Tek Interactive Entertainment Inc. v Pullen*, 731 F. Supp. 2d 80, 91-92 (D. Mass. 2010) (citation omitted).

**B.    Cynosure Will Suffer Irreparable Harm Absent Equitable Relief.**

Courts routinely recognize that where, as here, a would-be competitor has misappropriated trade secrets, a plaintiff will suffer irreparable harm absent injunctive relief.  *See, e.g.*, *Picker*

*Intern. Corp. v Imaging Equip. Servs., Inc.*, 931 F. Supp. 18, 44 (D. Mass. 1995) ("The misuse of trade secrets is generally deemed to involve irreparable harm."). Courts also recognize that breach of a non-competition agreement creates a likelihood of irreparable harm because "a defendant in a breach of a non-competition agreement, despite his best intentions, often cannot avoid the inevitable disclosure of confidential information." *National Med. Care., Inc.*, 2020 WL 6318922, at *14 (quoting *SimpliVity Corp. v. Bondranko*, 204 F. Supp. 3d 340, 350-51 (D. Mass. 2016)).

Defendants have not only misappropriated Cynosure's trade secrets, but have also demonstrated that they intend to use those trade secrets to target Cynosure's current and potential customers. And once those customers have gone, the harm will be irreparable. As *Moran* recognized in granting an injunction against a former salesperson who had learned "inside information regarding marketing, operational, sales and competitive strategies, plans for product and business development, and [former employer's] customers and potential customers": "Only by prohibiting employees, like [former employee] who are privy to confidential and proprietary information, from going to work for a direct competitor for a period of time, can [a former employer] protect its confidential information." 33 Mass. L. Rptr. at *11. Moreover, declining to grant a preliminary injunction enforcing Cynosure's restrictive covenants during litigation "would deprive [Cynosure] of much of the covenant's protection." *SimpliVity Corp.*, 204 F. Supp. 3d at 351 (citing *Zona Corp. v. McKinnon*, 2011 WL 1663094, at *2 (Mass. Super. Mar. 14, 2011)).

**C.    The Balance Of Harms Weighs In Favor Of Granting Equitable Relief.**

Every one of the Former Employees agreed to restrictive covenants as a condition of working for Cynosure. Thereafter, they completely disregarded those covenants by working with Reveal Lasers in a systematic and remorseless effort to raid Cynosure's North American sales organization. In doing so, Defendants violated contracts, common law, and federal and state trade secret statutes. Given the high likelihood Cynosure will succeed on its claims and the significant

irreparable harm it will suffer if Defendants are allowed to continue unabated, a preliminary injunction is the only adequate remedy. *See Nat'l Med. Care, Inc.*, 2020 WL 6318922, at *15 (balance of harms favored plaintiff when former employee "freely and knowingly entered into the [restrictive covenant] and received the benefit of a promotion"). Moreover, an injunction here would "[do] little more than enjoin [defendants] from engaging in activities from which they are already contractually barred." *Advanced Micro Devices, Inc. v. Feldstein*, No. 13-40007-TSH, 2013 WL 10944934, at *13 (D. Mass. May 15, 2013) (balance of harms weighed "heavily" in plaintiff's favor when the equitable relief would enjoin conduct already prohibited by contract).

Nothing compelled the Former Employees to work for a direct competitor—especially a competitor that did not even exist in the U.S. until now. If these employees were unhappy with Cynosure, they had many options. They could have used their sales skills in a different industry altogether, or could have even sold medical devices of a different nature to a similar customer base. Likewise, Reveal Lasers could have chosen to enter the U.S. market through lawful means. Instead, however, Defendants worked in concert to steal Cynosure's trade secrets and raid its workforce, with complete indifference to their legal obligations and to Cynosure's irreparable detriment. The balance of harms tips sharply in favor of Cynosure and against Defendants.

## D. An Injunction Would Serve The Public Interest.

Finally, Federal law and Massachusetts both protect trade secret information via statute. Massachusetts also recognizes that contractual obligations designed to protect confidential information and the fiduciary duty of loyalty that key employees owe their employer should be enforced. *See Patriot Funding*, 2006 WL 1704262, at *3 ("Prohibiting the alleged improper use of otherwise confidential information also comports with public interest."). Absent an injunction, Defendants will continue their unlawful acts and Cynosure will be left with the irreparable damage this sabotage has caused to its salesforce, customer base, and goodwill.

### III.    CONCLUSION.

For the foregoing reasons, Cynosure respectfully requests that this Court grant its

Emergency Motion for a Temporary Restraining Order and Preliminary Injunction.

Dated:  July 20, 2022                              Respectfully submitted,

                                                  CYNOSURE, LLC
                                                  LOTUS PARENT, INC.

                                                  By their attorneys,

                                                  */s/ Michael J. Pineault*
                                                  Michael Pineault (BBO No. 555314)
                                                  ANDERSON & KREIGER LLP
                                                  50 Milk Street, 21st Floor
                                                  Boston, MA 02109
                                                  mpineault@andersonkreiger.com
                                                  T: +1 617.621.6578
                                                  F: +1 617.621.6619


                                                  Dipanwita Deb Amar
                                                  Joseph Farris
                                                  Matthew Diton
                                                  ARNOLD & PORTER KAYE SCHOLER LLP
                                                  3 Embarcadero Center, 10th Floor
                                                  San Francisco, California 94111
                                                  dipanwita.amar@arnoldporter.com
                                                  joseph.farris@arnoldporter.com
                                                  matthew.diton@arnoldporter.com
                                                  T: +1 415.471.3100
                                                  F: +1 415.471.3400

                                                  *Admissions for Pro Hac Vice Forthcoming*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2022, a true and correct copy of the foregoing pleading was filed electronically with the Clerk of Court.  A copy will be served upon all named Defendants simultaneously with service of the Summons, Complaint and other pleadings filed today in this matter.

*/s/ Michael J. Pineault*
Michael J. Pineault