## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNOSURE, LLC, a Delaware limited liability company; and LOTUS PARENT, INC., a Delaware corporation; | |
| Plaintiffs, | |
| v. | Civil Action No. 22-CV-11176 |
| REVEAL LASERS LLC; a Nevada limited liability company;<br>REVEAL LASERS LTD., a limited company;<br>ROBERT DALEY, an individual;<br>CHRISTOPHER CHAMBERS, an individual;<br>CORY MURRELL, an individual;<br>BROGAN BAIR-CHAMBERS, an individual;<br>JOSHUA SMITH, an individual;<br>MICHAEL RUSSO, an individual;<br>KYLE SHAPERO, an individual;<br>JASON KALSO, an individual;<br>DAVID KRUEGER, an individual;<br>DEAN FIACCO, an individual;<br>ROBERT FIACCO, an individual<br>DANIEL DEMARCO, an individual;<br>TARA (BUSHMAN) KOSOFSKY, an individual;<br>JASON STEINHORN, an individual;<br>COLBY CAMERON, an individual;<br>MATTHEW MALONE, an individual;<br>KRISTOPHER STENNICK, an individual;<br>VICTORIA BAILEY, an individual;<br>ROBERT SMITH, an individual;<br>MARK SARGENT, an individual;<br>SAVANNAH PADRON, an individual;<br>NATE DAHLSTROM, an individual;<br>MATTHEW CALABRESE, an individual;<br>CHASE TOLOSUIC, an individual;<br>ANNA BERGSLIEN, an individual;<br>KALEE GIBBONS, an individual;<br>KATHERINE PHILLIPS, an individual;<br>JESSE MORGAN, an individual;<br>and DOES 1-50; | **FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** |
| Defendants. | |

## Introduction And Summary Of Action

1. Plaintiff Cynosure, LLC ("Cynosure") is a Massachusetts-based manufacturer of sophisticated medical aesthetic treatment devices with a substantial market presence in the United States and abroad. Cynosure brings this action to stop the brazen and unlawful efforts of **Defendants Reveal Lasers Ltd. and Reveal Lasers LLC** (together, "Reveal Lasers"), an Israel-based startup competitor and its newly-established North American affiliate, and **the Individual Defendants**, who are all former Cynosure employees, to break into the U.S. market by raiding Cynosure's sales force, attempting to divert its customers, stealing its trade secrets, and misappropriating its marketing channels. Defendants' actions constitute a flagrant violation of federal and state trade secrets law and other business torts, as well as confidentiality, non-competition, and non-solicitation agreements that the Individual Defendants entered into with Cynosure prior to their sudden and surprise joint move to Reveal Lasers.

2. Rather than invest the time and effort to build its own North American sales operations as Cynosure did over decades, Reveal Lasers instead secretly coordinated the simultaneous resignations of *at least 28 Cynosure sales employees* in May and June of this year—who all resurfaced simultaneously with the announcement of Reveal Lasers' North American launch in July. Reveal Lasers was only able to achieve the near-instantaneous conversion of a large portion of Cynosure's sale staff by covertly working with disloyal inside leadership at Cynosure over the past year to orchestrate the scheme. This effort was first led by Cynosure's former Senior Director of Sales (Defendant **Robert Daley**), who is the newly-announced U.S. CEO and President of Reveal Laser, North America. While Daley was being paid by Cynosure and entrusted to help lead its sales organization, he was secretly working for the benefit of Reveal Lasers for over a year before he resigned from Cynosure.

3.   Daley was eventually joined by other key leaders of Cynosure's sales organization whom Reveal Lasers strategically targeted, including Cynosure's most senior employees in "field" sales (Defendants **Chris Chambers** and **Cory Murrell**), sales marketing (Defendant **Josh Smith**), and post-sales (Defendant **Bair-Chambers**).  Those leaders helped to recruit key Cynosure managers strategically plucked from geographic regions around the country, including Defendants **Tara (Bushman) Kosofsky, Kyle Shapero, Jason Kalso, Michael Russo, David Krueger, Robert Fiacco, Dean Fiacco, Jason Steinhorn, Matthew Malone, and Colby Cameron,** who in turn recruited at least dozen others (including the remaining Individual Defendants) to follow them. (All Individual Defendants are collectively referred to as the "Former Employees.")  Since filing its original Complaint, Cynosure has confirmed via a new witness who has come forward (Dkt. 43) that Daley and Chambers even flew around the country hosting fake Cynosure "Quarter Business Reviews" that were disguised Reveal Lasers recruiting trips which were expensed to Cynosure.  In short, Reveal Lasers brazenly stole a pre-packaged, fully-functioning nationwide sales organization directly from Cynosure.

4.   And Reveal Lasers also did much more than just raid Cynosure's staff.  Cynosure has uncovered evidence that the Former Employees actively diverted business and exported Cynosure trade secret information while still at Cynosure and on their way out the door.  The forensic evidence developed so far establishes that the many of Former Employees were (a) outright copying thousands of files full of Cynosure's trade secret and confidential information; (b) forwarding to their personal email accounts their hottest sales leads and even rescheduling customer meetings secured by Cynosure to be held after their resignation dates so they could be assumed by Reveal Lasers; and (c) literally hijacking social media accounts used as important marketing channels for Cynosure and locking Cynosure out of its own marketing assets.  Indeed,

until it was temporarily deactivated under the Temporary Restraining Order ("TRO") in this matter, a former Cynosure Instagram account was converted into Reveal Lasers' "official" Instagram account—jump-starting its marketing on assets stolen from Cynosure.

5.    Through these and other unlawful acts, Reveal Lasers has sought to hyper-prime its U.S. launch with a ready-made sales organization armed with Cynosure trade secrets and goodwill. With July's launch by Defendants of Reveal Lasers' U.S. operations, the situation has quickly escalated and necessitates preliminary injunctive relief.  Absent such relief, Cynosure will suffer irreparable harm as Reveal Lasers will succeed in using the illegal raid of Cynosure's sales organization and its proprietary information to wrongfully benefit Reveal Lasers at Cynosure's expense and cause harm that cannot be undone.

## PARTIES, JURISDICTION, AND VENUE

6.    Because this action concerns the theft of trade secrets in violation of the Defend Trade Secrets Act (18 U.S.C. § 1836), this Court has subject matter jurisdiction under 28 U.S.C. Sections 1331 and 1367.

7.    Plaintiff **Cynosure LLC** is a limited liability company formed under the laws of Delaware with its headquarters in Westford, Massachusetts.

8.    Plaintiff **Lotus Parent, Inc.** is a corporation formed under the laws of Delaware that is a parent and whole owner of Cynosure, LLC indirectly via other entities.

9.    Defendant **Reveal Lasers LLC** is a corporation formed under the laws of Nevada that claims to be based in Nevada.  However, upon information and belief, its true U.S. headquarters is in Boston, Massachusetts where its Chief Executive Officer, and one of its two Managing Members, Robert Daley, resides.  Moreover, upon information and belief, none of its leadership or any known employees actually resides in Nevada.

10. Upon information and belief, Defendant **Reveal Lasers Ltd.** is a corporation that may be based in Israel that is one of the two Managing Members of Defendant Reveal Lasers LLC.  Upon information and belief, Reveal Lasers Ltd. also has a physical office located somewhere in Boston, Massachusetts, as it is currently advertising on its website in Europe at least two job postings based in Boston.  On the registration information for Reveal Lasers LLC filed with the Secretary of State of Nevada, Reveal Lasers Ltd. provided the following address:  1810 East Sahara Avenue, Suite 212, Las Vegas Nevada 89104.  The website for North American website for Reveal Lasers also lists the exact same address on its "Contact Us" page[1]:



Reveal Lasers, LTD
1810 East Sahara Avenue, STE 212
Las Vegas, NV 89104

**(877) 559-6898**

**info@reveallasers.com**

11. Defendant **Robert (Bob) Daley** is an individual who resides in Massachusetts.  Daley was one of the longest-tenured members of Cynosure's sales team, having started at the company in 2006 and risen to the position of Senior Regional Director of Sales for the Northeast Region (which included Massachusetts).  Daley is now the Chief Executive Officer for Reveal Lasers' U.S.

---

[1] https://us.reveallasers.com/contact-us/

operations, and upon information and belief, has been running its U.S. operations from Massachusetts.

12. Defendant **Christopher Chambers** is an individual who resides in Maryland. Chambers was the North American Vice President of Sales for Cynosure. His responsibilities related to Cynosure's marketing across the entirety of North America, including Massachusetts. Chambers is now the Chief Commercial Officer for Reveal Lasers' U.S. operations.

13. Defendant **Joshua Smith** is an individual who resides in Texas. Smith was the National Field Marketing Manager for North America for Cynosure. His responsibilities related to Cynosure's marketing across the entirety of North America, including Massachusetts. Smith is now a Vice President of Marketing for Reveal Lasers' U.S. operations.

14. Defendant **Cory Murrell** is an individual who resides in Ontario, Canada. Murrell was the Area Vice President of Sales for Canada & the Western & Midwest Regions for Cynosure. Murrell is now an Area Vice President of Sales for Reveal Lasers' U.S. operations.

15. Defendant **Brogan Bair-Chambers** is an individual who resides in Maryland. Bair-Chambers was the Director of Sales Practice Development for North America for Cynosure Her responsibilities related to Cynosure's post-sales activity across the entirety of North America, including Massachusetts. Bair-Chambers is now an Area Vice President of Sales for Reveal Lasers' U.S. operations.

16. Defendant **Michael Russo** is an individual who resides in the state of New York. Russo was a Senior Business Manager at Cynosure who worked across the entirety of Cynosures' Eastern Region (including the Northeast and Massachusetts). Russo is now a Vice President of Business Development for Reveal Lasers.

17. Defendant **Tara (Bushman) Kosofsky** is an individual who resides in the state of North Carolina.  Kosofsky was a Regional Sales Director at Cynosure who worked across the entire Central Region.  Kosofsky is now an Area Vice President of Sales for Reveal Lasers' U.S. operations.

18. Defendant **Dean Fiacco** is an individual who resides in New York.  Dean Fiacco was a District Sales Director for Cynosure for the Northeast district (which included Massachusetts). Dean Fiacco is now a Vice President of Operations for Reveal Lasers' U.S. operations.

19. Defendant **Kyle Shapero** is an individual who resides in the state of Florida.  Shapero was a District Sales Manager for Cynosure for the Florida district.  Shapero is now a Regional Sales Director for Reveal Lasers' U.S. operations.

20. Defendant **Jason Kalso** is an individual who resides in the state of Washington.  Kalso was a District Sales Manager for Cynosure for the Pacific Northwest district.  Kalso is now a Regional Sales Director for Reveal Lasers' U.S. operations.

21. Defendant **David Krueger** is an individual who resides in Illinois.  Krueger was a District Sales Manager for Cynosure in the Midwest district.  Krueger is now a Regional Sales Director for Reveal Lasers' U.S. operations.

22. Defendant **Robert Fiacco** is an individual who resides in New York.  Robert Fiacco was a District Sales Manager for Cynosure for the New York district.  Robert Fiacco is now a Regional Sales Manager for Reveal Lasers' U.S. operations.

23. Defendant **Jason Steinhorn** is an individual who resides in Tennessee.  Steinhorn was a District Sales Manager for Cynosure for the Tennessee/Kentucky/Alabama/Mississippi district. Steinhorn is now a Regional Sales Director for Reveal Lasers' U.S. operations.

24. Defendant **Cameron Colby** is an individual who resides in Tennessee. Colby was a District Sales Manager for Cynosure for the Washington D.C. district. Colby is now a Senior District Sales Manager for Reveal Lasers' U.S. operations.

25. Defendant **Matthew Malone** is an individual who resides in North Carolina. Malone was a District Sales Manager for Cynosure for the North Carolina, South Carolina, and Georgia district. Malone is now a Regional Sales Director for Reveal Lasers' U.S. operations.

26. Defendant **Kristopher Stennick** is an individual who resides in Texas. Stennick was a Practice Development Consultant for Cynosure with responsibilities for Texas, Oklahoma, Louisiana, and Arkansas. Stennick is now a Practice Development Manager for Reveal Lasers' U.S. operations.

27. Defendant **Robert Smith** is an individual who resides in New Hampshire. Smith was a Senior Event Specialist for Cynosure. Smith now has a similar role at Reveal Lasers' U.S. operations.

28. Defendant **Victoria Bailey** is an individual who resides in Maryland. Bailey was a Practice Development Consultant for Cynosure for the with responsibilities for the Washington D.C. district. Bailey is now a Practice Development Manager for Reveal Lasers' U.S. operations.

29. Defendant **Mark Sargent** is an individual who resides in New York. Sargent was a Senior Area Sales Manager for Cynosure for the New York district. Sargent is now a Senior District Sales Manager for Reveal Lasers' U.S. operations.

30. Defendant **Daniel DeMarco** is an individual who resides in Massachusetts. DeMarco was a Senior Area Sales Manager for Cynosure for the Northeast district (which included Massachusetts). DeMarco is now a Senior Area Sales Manager for Reveal Lasers' U.S. operations.

31. Defendant **Savannah Padron** is an individual who resides in Georgia. Padron was an Area Sales Manager for Cynosure for the Carolinas & Georgia district. Padron is now a District Sales Manager for Reveal Lasers' U.S. operations.

32. Defendant **Nate Dahlstrom** is an individual who resides in Washington. Dahlstrom was an Area Sales Manager for Cynosure for the Pacific Northwest district. Dahlstrom is now a District Sales Manager for Reveal Lasers' U.S. operations.

33. Defendant **Matthew Calabrese** is an individual who resides in Florida. Calabrese was an Area Sales Manager for Cynosure for the Florida district. Calabrese is now a District Sales Manager for Reveal Lasers' U.S. operations.

34. Defendant **Chase Tolusic** is an individual who resides in Tennessee. Tolusic was an Area Sales Manager for Cynosure for the Tennessee/Kentucky/Alabama/Mississippi district. Tolusic is now a District Sales Manager for Reveal Lasers' U.S. operations.

35. Defendant **Anna Bergslien** is an individual who resides in Washington. Bergslien was an Territory Manager for Cynosure for the Pacific Northwest district. Bergslien is now an Area Sales Manager for Reveal Lasers' U.S. operations.

36. Defendant **Kalee Gibbons** is an individual who resides in Oregon. Gibbons was a Territory Manager for Cynosure for the Pacific Northwest district. Gibbons is now an Area Sales Manager for Reveal Lasers' U.S. operations.

37. Defendant **Katherine Phillips** is an individual who resides in Georgia. Phillips was a Territory Manager for Cynosure for the Carolinas & Georgia district. Phillips is now an Area Sales Manager for Reveal Lasers' U.S. operations.

38. Defendant **Jesse Morgan** is an individual who resides in Florida.  Morgan was a Territory Manager for Cynosure for the Florida district.  Morgan is now an Area Sales Manager for Reveal Lasers' U.S. operations.

39. Cynosure is informed and believes, and thereon alleges, that with respect to the acts complained of herein, the Former Employees were at all relevant times, the agents, employees or representatives of Reveal Lasers, were acting within the course and scope of such relationship, and are responsible in some manner for the occurrences alleged in the Complaint and that Cynosure's injuries as alleged herein were proximately caused by their respective acts and omissions.

40. Cynosure does not know the true names and capacities of Defendants Does 1 through 50, inclusive, and therefore sues such Defendants by such fictitious names.  Cynosure will amend this Complaint to allege their true names and capacities when ascertained.  Cynosure is informed and believes, and thereon alleges, that each of the Doe Defendants was at all relevant times, the agent, employee or representative of Defendants or other Doe Defendants, was acting within the course and scope of such relationship, and is responsible in some manner for the occurrences alleged in the Complaint and that Plaintiff Cynosure's injuries as alleged herein were proximately caused by their respective acts and omissions.

41. This Court has personal jurisdiction over each of the Former Employees and Reveal Lasers for at least the following reasons:

a. Each of the Former Employees hired by Reveal Lasers worked for Cynosure, a Massachusetts-based company and as part of their job duties, interacted with and took direction from Cynosure's headquarters in Massachusetts.  The Former Employees were part of Cynosure's sales organization and reported up a chain of command to its Chief Commercial Officer, Lowinn Kibbey, who led the sales organization from the company's

Massachusetts headquarters.  At least six of the Former Employees were either based in Massachusetts or were responsible for selling to customers in Massachusetts, including Bob Daley, Chris Chambers, Brogan Bair-Chambers, Michael Russo, Dean Fiacco, and Daniel DeMarco.  The other Former Employees travelled to Massachusetts, took direction from the headquarters in Massachusetts, and/or reported into the Massachusetts office.  The back office personnel management (e.g., payroll processing, administering benefits programs) for Cynosure occurred in Massachusetts.  While working at Cynosure, the Former Employees would need to contact the Massachusetts office to resolve payroll, benefits, or other problems throughout the course of their employment. Medical coverage, medical benefits, and retirement plans were administered from Massachusetts. Timekeeping, each employee's billing of customers, and email were managed by the Massachusetts headquarters.  In short, all of the essential functions that allowed the Former Employees to earn a living were channeled through Massachusetts.

b.      All of the Former Employees (except Shapero) expressly consented to personal jurisdiction in this Court as a condition of their employment in at least one of their contractual agreements.[2]

c.      The actions of all the Former Employees (many of whom were executives or managers while at Cynosure) on behalf of Reveal Lasers were done at the direction of

---

[2] A number of the Former Employees have Mutual Arbitration Agreements ("Arbitration Agreement") with Cynosure.  However, the Arbitration Agreements expressly carve out the right to seek preliminary injunctive relief in court:  "Either party *may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief* in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such relief."  Arbitration Agreement § 2 (emphasis added).

Reveal Lasers and Bob Daley, who resides in Massachusetts and who is running Reveal Lasers U.S. operations out of Massachusetts as its Chief Executive Officer.

d.      The actions of Reveal Lasers and the Former Employees have caused tortious injury in Massachusetts and were intentionally directed at Massachusetts-based Cynosure, the employer of the Former Employees.

42. Venue is proper in the United States District Court, District of Massachusetts for all of the reasons set forth in Paragraph 41, and also because a substantial part of the events or omissions giving rise to the claims occurred here.  Both Cynosure and its North American sales organization are based here.   Indeed, it appears that Daley has been directing the entire scheme out of Massachusetts.   Consequently, much of the relevant activity forming the basis of this lawsuit occurred in Massachusetts.

## GENERAL ALLEGATIONS

### A.  Cynosure's Investment In Its North American Sales Organization And The Raid Of That Organization By Reveal Lasers

43. Cynosure is a leader and innovator in the medical aesthetic treatment industry and employs over 700 people in total, including over 200 people in the Commonwealth of Massachusetts who are based at the company's headquarters.  Cynosure develops and manufactures a diverse range of treatment applications for hair removal, skin revitalization, scar reduction, gynecological health, body contouring, and more.  Cynosure has thousands of customers throughout the United States and Canada that are serviced by its North American sales team, and those customers have diverse profiles, ranging across medical practitioners, physicians, and aesthetic business owners.

44. Over the years, Cynosure has invested substantial resources in building a sales organization based throughout North America.   At the start of 2022, Cynosure's North American sales

organization was composed of approximately 110 employees, located in different regions of the country and in Canada.

45. In addition to payroll expenses of tens of millions of dollars for that sales organization, Cynosure also invests considerable amounts of other resources to support that team, and to recruit, interview, hire, train, retain, develop, and manage the performance of its employees throughout the country.  Significant time and investment is required to create the training and performance management tools that enable sales talent development.  Typically, newly-hired salespeople require several months to several years to learn the company's products and processes and build relationships with its customers, so that they can ramp up their sales volume from initially lower levels.

46. The innovative aesthetic technology that Cynosure sells is top-of-the-line equipment and a sales transaction for equipment typically results in somewhere around $100,000 - $500,000 in revenue.  As an example, a single laser hair removal machine may cost over $150,000.  This is often a significant investment for customers and it can be transformative for their practices and business.

47. The marketing and sales process for these products is intensive and the sales process can stretch out over weeks and months.  As more fully explained below, Cynosure invests considerably in marketing and working to cultivate leads on sales.  Once leads are developed, Cynosure salespeople generally need to engage with a customer many times to close a sale.  Customers typically also need to obtain credit approval to make purchases, which can make or break the selling opportunity.  Pricing is customized and must be assessed on a case-by-case basis, as it may vary according to many circumstances.  If a sale does close, the final sales are effectuated via purchase agreement contracts with customers.

48.    To support this process, Cynosure's sales organization is composed of several core areas.  The majority of the organization are **"field" salespeople** who interface with customers directly to sell products and work with customers through the process explained above.  At the time of the coordinated resignations, the Former Employees **Chris Chambers** (North America Vice President of Sales), **Robert Daley** (a Senior Regional Sales Director for the Northeast Region), and **Cory Murrell** (Area Vice President of Sales for Canada & the Western & Midwest Region) were *the three most senior field sales leaders* at the company, essentially overseeing the entire North American field sales organization.

49.    Several of the other Former Employees occupied management roles in field sales in different regions of the country:

- **Michael Russo** was a Senior Business Manager with broad leadership influence over field sales throughout the entire Eastern region of the country.

- **Tara Kosofsky** was Regional Sales Director for the Southeast Region, and was responsible for leading field sales in several districts within that region.

- **Dean Fiacco** was the District Sales Manager for the New England district (including Massachusetts) and was responsible for leading field sales in that district.  Defendant **Daniel DeMarco** was an Area Sales Manager in that same district.

- **Jason Kalso** was the District Sales Manager for the Pacific Northwest district and was responsible for leading field sales in that district.  One Area Sales Manager (**Nate Dahlstrom**) and two Territory Sales Managers (**Anna Bergslien** and **Kalee Gibbons**) from that District have also resigned and since resurfaced in new roles at Reveal Lasers.

- **Kyle Shapero** was the District Sales Manager for the Florida district and was responsible for leading field sales in that district. One Area Sales Manager (**Matthew Calabrese**) and one Territory Sales Manager (**Jesse Morgan**) from that District have also resigned and since resurfaced in new roles at Reveal Lasers.

- **Robert Fiacco** was the District Sales Manager for the New York district and was responsible for leading field sales in that district. An Area Sales Manager (**Mark Sargent**) from that District has also resigned and since resurfaced in a new role at Reveal Lasers.

- **David Kreuger** was the District Sales Manager for the Midwest district and was responsible for leading field sales in that district.

- ▪ The District Sales Manager for the **Tennessee/Kentucky/Alabama/Mississippi** district. An Area Sales Manager (**Chase Tolusic**) for this district has also resigned and announced a position at Reveal Lasers.

- ▪ **Matthew Malone** was the District Sales Manager for the **North Carolina/South Carolina/Georgia** district. Two Area Sales Managers for this district (**Katherine Phillips** and **Savannah Padron**) have also resigned and announced positions at Reveal Lasers.

- ▪ **Cameron Colby** was the District Sales Manager for the Washington D.C. district.

50.    Each of the District Sales Managers listed above was accountable for $3M to $10M of revenue.

51.    The following map illustrates the geographical scope of these districts (with the District Sales Managers for the red-shaded districts having all moved to Reveal Lasers), and who, upon information and belief, will be covering the same Districts there:



52.    Cynosure also has a separate **"post-sale" team** that focuses on building a continuing relationship and goodwill with customers. By actively supporting existing customers to enable their business success, Cynosure ensures customers are satisfied and succeed with Cynosure technology. The post-sale function is critical in making Cynosure a trusted partner to its customers. This post-sale partnership can also result in additional sales leads for laser products

as well as incremental revenue of "consumable" components and topical skin care products. At the time of the coordinated resignations, Former Employee **Brogan Bair-Chambers** (Director of Practice Development) was the head of the post-sale arm of Cynosure's sales organization. Two employees in Bair-Chambers' organization (**Kris Stennick** and **Victoria Bailey**, Practice Development Consultants) have also resigned and announced a new role at Reveal Lasers.

53.    North American sales are significantly enabled by **field marketing** tools and events. Key marketing tools include sales training materials as well as customized marketing programs provided to customer accounts that enable their business success (return on investment) after purchasing Cynosure equipment. Cynosure invests in developing these programs for its customers to help them succeed, building goodwill with those customers for the future. Highly structured and produced weekend field marketing events also elevate the Cynosure brand and directly contribute to revenue. At the time of the coordinated resignations, Former Employee **Joshua Smith** (National Field Sales Marketing Manager) led Field Marketing partnerships and event marketing for Cynosure's sales organization. Another employee (**Robert Smith**, former Senior Event Specialist) with significant responsibility for sales event-based marketing has also resigned and announced a new role at Reveal Lasers.

54.     The following table summarizes this impact across groups and overall leadership:

| Field Sales | Left Since May and Announced as Reveal Lasers Employees on July 19 |
|---|---|
| Executives and Senior Managers | 5 employees |
| District Sales Managers | 8 employees |
| Area and Territory Managers | 10 employees |
| **Sales Marketing** | |
| Executives and Senior Managers | 2 employees |
| **Post-Sales** | |
| Executives and Employees | 3 employees |
| **TOTAL** | 28 employees |

55.     Additionally, after the TRO issued, Reveal Lasers communicated to Cynosure that it intended to hire two additional Cynosure employees who would have already started had the TRO not entered.  Reveal Lasers refused to identify these employees.

56.     In sum, the depth and scope of the employees who were involved in Reveal Lasers' coordinated raid against Cynosure is staggering.  It included Cynosure's most senior leaders across all sales functions in America, as well as clearly strategically-targeted district managers in important field sales regions throughout the country, who in turn brought with them other members of field sales in their districts.

**B.      Cynosure's Trade Secret Information**

57.     Cynosure benefits from maintaining various types of information related to its business as confidential.  This includes valuable trade secret information that was made available to the Former Employees.

58.     Collectively, the Former Employees had access to at least the following types of trade secret information:

a.   confidential sales lead information that could be used to identify selling opportunities in Cynosure's sales pipeline;

b.   confidential customer profile information that Cynosure has developed over the years, including customer lists and other documents containing combinations of detailed contact information compiled by Cynosure, lead tracing, records of its install base, credit approvals, asset reports, and/or consumable product purchasing history;

c.   confidential pricing and customized pricing packages for customers;

d.   confidential marketing processes, methods, and materials;

e.   confidential strategic information related to Cynosure's product innovation pipeline, i.e., products that the company was developing or looking to develop, market and sell;

f.   confidential compilations of information, summary charts and related materials regarding Cynosure's competitors, including their products and product differentiation with Cynosure's products; and

g.   confidential information about employees, incentives and compensation.

59.     Customer "leads" are valuable trade secrets to salespeople because they are records of known potential selling opportunities.  Leads are developed in various ways.  For example, established clients frequently reach out to known Cynosure contacts and express interest in products or provide referrals, and such leads may in turn be distributed to salespeople to execute on.  Cynosure also receives inquiries from new potential customers via marketing channels (such

as its website or social media accounts), and at trade shows and events where Cynosure invests in having a presence or hosting.  Leads may also be developed by actively canvassing new and potential customers.  Moreover, knowledge that a lead is "warm" or "hot," is particularly valuable because such leads have a higher likelihood of resulting in a closed sale.  A single hot lead is likely to produce better results than dozens (or perhaps hundreds) of cold outreaches to customers.  However they are developed, leads provide the most direct path to a possible sale, and they would self-evidently be valuable to a competitor, who could use that information to undercut Cynosure's work and investment to develop those leads.  Given Cynosure's standard sale sizes, the loss of even a handful of hot leads could easily amount to a loss of over a million dollars in revenue opportunity.

60.    Customer profile information is valuable trade secret information because it allows Cynosure to identity potential selling and cross-selling opportunities and to gauge when and how to engage with customers based on known characteristics of the customer.  This information is frequently reflected in customer lists or compilations of information reflecting combinations of detailed contact information compiled by Cynosure, lead tracing, records of its install base, knowledge of credit approval information obtained by Cynosure during the sales process, asset reports, date and price of purchase of an asset, and/or consumable product purchasing history.  While it may be possible to identify some companies as Cynosure customers based on public materials, the complete lists of Cynosure potential customers and actual customers in various regions and market segments is confidential.  Similarly, while contact information for certain customers is sometimes public, it nonetheless takes Cynosure substantial effort to compile and organize detailed contact information for relevant customers that is tailored to maximize selling success based on Cynosure's suite of products.  Further, detailed records of specific information

about those customers, such as Cynosure's install base records (i.e. records of where Cynosure has already sold certain products, and the date and price of purchase of these products), would allow competitors to easily know where to target efforts for new capital purchases, thereby resulting in significant lost opportunity for Cynosure to continue its existing relationships with customers. Similarly, the information that Cynosure has obtained on which customers have obtained credit approvals would allow competitors to target customers with known purchasing power and interest.

61.    Cynosure pricing and pricing packages are also valuable trade secrets that are maintained as confidential between Cynosure and the customer.  Pricing in the aesthetic technology industry is customized based on customer needs and various other circumstances, such as volume discounts, packages of add-on services purchased with products, or other incentives. These prices are finalized in confidential purchase agreements and recorded internally on purchase sheets at Cynosure that reflect the elements of particular pricing packages.  If a competitor were to obtain knowledge of the pricing and pricing packages that Cynosure was quoting customers, that information could be used to attempt to undercut Cynosure's pricing on competing products.

62.    Cynosure internal plans concerning its confidential marketing processes, methods, and materials are also valuable trade secrets. Cynosure has invested years in developing these processes and materials for marketing its products. This investment has resulted in work product taking various forms, including training materials, playbooks and strategy materials provided to its sales organization, and materials made available to customers to facilitate their revenue from Cynosure products.  If a competitor, and particularly a startup competitor, were to access this information, it would get to skip the years of time and effort to develop those materials by simply repurposing Cynosure's marketing methods and processes as its own.

63.    Confidential strategic information related to its product innovation pipeline are also Cynosure trade secrets.  Cynosure invests substantially in research and development and innovation to identify new product opportunities (and to evaluate product opportunities that it elects not to pursue) and bring innovative products to customers.  Cynosure is also continuously evaluating possible strategic acquisitions and partnerships with other innovators.  If a competitor were to be made aware of those plans, it could enable them to proactively shape their strategy to blunt Cynosure's commercial success by expediting their own product development or strategic partnership or building marketing communication that weakens Cynosure's competitive positioning.  Additionally, Cynosure invests tens of millions of dollars in R&D each year and taking even a small portion of insight from this R&D work would undermine Cynosure's return on investment and give an unfair head start to a competitor.

64.    Confidential compilations of competitive information and related materials regarding Cynosure's competitors, including their products and product differentiation with Cynosure's products are also Cynosure trade secrets.  Cynosure spends considerable resources in compiling information regarding where it stands in the market.  This includes preparing confidential compilations of information, summary charts, and related materials regarding Cynosure's competitors.  This type of information is critical to Cynosure's strategic plans and in educating its salesforce about how Cynosure's products compare with those of its competitors.  Product differentiation is important in explaining to customers why Cynosure's products serve their interests and Cynosure's research into this issue is confidential.

65.    Cynosure's confidential information about employees, incentives and compensation, including commission and incentive structures for its sales organization are also valuable trade secrets that are maintained confidentially because this knowledge could be used by

a competitor to save the time and expense of developing and refining its own commission and compensation structure that Cynosure developed through years of trial and error and learning. Moreover, sales performance data by individual and by region is confidential because it could be used to understand what are the most valuable regions in which to compete in aesthetics and who are the most productive talent to recruit away from Cynosure. All of this information could also be used to target and solicit Cynosure employees.

66. Cynosure requires all employees to enter into contracts with obligations designed to protect its trade secrets and confidential information. These agreements are designed to ensure that Cynosure employees—particularly those at senior levels in the company and entrusted with the most significant confidential information—do not use that information for any purpose other than to further Cynosure's business, and particularly so as not to compete with Cynosure or solicit, encourage or direct Cynosure's customer or employees to other employers.

**C. Contractual Agreements And Other Protections for Cynosure Trade Secrets**

67. As a condition of working at Cynosure and getting the opportunity to be part of its sales organization, each of the Former Employees entered into contracts with Cynosure and its affiliates[3] in which he or she agreed to various covenants protecting Cynosure's investment in the development of its staff, its customer goodwill, and its confidential information and trade secrets. Those covenants included non-disclosure obligations for confidential information and trade secrets, as well as agreements of limited time and scope to not directly compete following the

---

[3] Plaintiff Cynosure, LLC's predecessor was Cynosure, Inc. Around March 2017, Cynosure, Inc. was acquired by Hologic, Inc. and became its wholly-owned subsidiary (and during that time was converted to Cynosure, LLC). Around November 2019, Hologic, Inc. sold Cynosure, Inc., in a transaction in which Plaintiff Lotus Parent, Inc. became the ultimate parent and whole owner of Plaintiff Cynosure, LLC. Certain Former Employees have agreements with Cynosure, Inc., Hologic, Inc., or Lotus Parent, Inc. All relevant contractual rights once held by Cynosure, Inc. or Hologic, Inc. have been assigned to Plaintiff Cynosure, LLC.

termination of their employment, to refrain from solicitation of Cynosure's employees to leave their employment and to refrain from solicitation of Cynosure's customers.

68. The longest-tenured Former Employees who all joined the company before the Hologic acquisition in 2017 (Daley, Chambers, Joshua Smith, Kalso, Russo, Bair-Chambers, Kosofsky, Stennick, and Steinhorn) initially agreed to the following covenants in their respective Invention, Non-Disclosure, Non-Solicitation, and Non-Competition Agreements ("INNNA Agreement") with Cynosure, Inc., each of which protects Cynosure's confidential information and trade secrets and goodwill:

   a.    To "not disclose any Proprietary Information to any person or entity other than employees of, or consultants to, the Company or use the same for any purposes (other than in the performance of his/her duties as an employee of the Company) . . . either during or after his/employment with the Company. . . ." Proprietary Information is defined to include "all information . . . of a private, secret, or confidential nature concerning the Company's business, business relationships, of financial affairs," and includes without limitation "customer and supplier lists and contract at or knowledge of customers and prospective customers of the Company." INNNA Agreement § I.A.

   b.    Upon termination of employment to "deliver" all "tangible material" containing Proprietary Information and to "not retain" any such materials. INNNA Agreement § I.B.

   c.    For a period of one year after termination of employment to not "directly or indirectly" be involved in a company that providing products or service "competitive with" Cynosure. INNNA Agreement § III.B.i.

   d.    During employment and for a period of one year after termination of employment to not "solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any of the client, customers or accounts, or prospective clients, customers or accounts, of the Company which were contracted, solicited, or served by the Employee while employed by the Company." INNNA Agreement § VI.A.

   e.    During employment and for a period of one year after termination of employment to not "recruit, solicit or hire any employee of the Company, or induce or attempt to induce any employee of the Company to terminate his/her employment with, or otherwise cease his/her relationship with, the Company." INNNA Agreement § VI.B.

69. Defendant Murrell was also hired before 2017. As a Canadian, he entered an "Offer Letter," with substantially the same obligations—except he did not have a non-competition agreement in that initial contract.

70. The employees who were hired or received certain promotions during the period that Hologic, Inc. owned Cynosure (Chambers, Shapero, Robert Fiacco, Bair-Chambers, Joshua Smith, Robert Smith, Colby, Steinhorn, Sargent, and Malone) also executed an Employee Intellectual Property Rights, Confidentiality and Non-Competition Agreement with Hologic, Inc., during the period Cynosure was owned by that company (the "Hologic Agreements"). The Hologic Agreements each contained the following restrictive covenants designed to protect Cynosure's confidential information, trade secrets, and goodwill:

    a.    Employees agreed that their employment "involved a relationship of confidence and trust between me and the Company with respect to its intellectual property rights, which include patents, trade secrets, copyrights, and trademarks." Hologic Agreement § 2.

    a.    To "keep in confidence, and [ ] not disclose, any Trade Secrets to anyone, and [ ] not transfer any Trade Secret Material to anyone, including employees of Company, except as authorized by the Company," to "not appropriate [Trade Secrets and Trade Secret Materials] for the benefit of myself or any other person," and to "keep in confidence and [ ] not disclose or transfer any Confidential Information." Hologic Agreement § 3.

    b.    During employment, employees agreed "not to compete with the Hologic Affiliates or engage in conduct that conflicts with the interests of the Hologic Affiliates," including by "divert[ing] customers from the HOLOGIC Affiliates or induc[ing] or attempt[ting] to induce, encourage, or solicit customers or potential customers to purchase any product or service offered by the HOLOGIC Affiliates from a third party." Hologic Agreement § 7(a).

    c.    For a period of one year and six months after termination, to "not, anywhere within the Territory [as defined in the agreement] or for the benefit of a Competing Business's operations or sales within the Territory" provide services that are the same or similar in function to the service the employee provided Hologic during the prior two years. Hologic Agreement § 7(b).

    d.    Both during employment and for a period of one year and six months after termination, to not, without prior written consent, "knowingly participate in soliciting or

communicating with an employee of a HOLOGIC Affiliate for the purpose of persuading the employee to end or modify the employee's employment relationship with the Hologic Affiliate." Hologic Agreement § 8.

e.      For a period of one year and six months after termination, to not either (i) solicit or provide any services to any customer of a Hologic Affiliate as to which the employee provided services or received proprietary information about in the two years prior to termination or (ii) induce any customer to withdraw, curtail, or cancel their business with HOLOGIC, or otherwise modify any actual or potential business relationship with Hologic. Hologic Agreement § 9.

71. Following Cynosure's separation from Hologic, employees that were hired or received certain promotions (20 of 28 Former Employees signed an Employee Intellectual Property Rights, Confidentiality and Protective Covenants Agreement ("CEIP"). This Agreement provides, in relevant part, that:

a.      Because the employee agrees that employee occupies a position of trust with respect to Cynosure, to "devote his/her full time, attention, energies, skills and efforts to the performance of any job duties and responsibilities assigned by" Cynosure and to not "engage in any other business activity . . . which may tend to . . . be competitive with the business activities, products or services of" Cynosure. CEIP § 1.

b.      To "not engage in any use or disclosure of Confidential Information beyond that which is authorized by the Company, necessary for the performance of Employee's employment duties for Company, and conducted in manner that complies with the policies of Company, or required by law or legal mandate (such as court order or subpoena). CEIP § 2.

c.      For a period of nine months after the employee's termination date, to not "(1) provide or manage services to or for a Competing Business that are the same as or similar in function or purpose to the services Employee provided to or managed for the Company during the Look Back Period; or (ii) assist a Competing Business in developing or improving a Competing Product or Service; or (iii) assist a Competing Business by conducting, accepting or servicing competing business activities with any Company customer; or (iv) otherwise provide services to a Competing Business that are likely to result in the use or disclosure of Confidential Information." CEIP § 8(a).

d.      For a period of one year and six months after termination, to "not solicit, or assist in soliciting, a Covered Customer for the purpose of (i) selling or providing a Competing Product or Service to the Covered Customer, (ii) moving or diverting the patronage of a Covered Customer to a Competing Business, or (iii) interfering with an existing or

prospective business relationship the Company has or is pursuing with a Covered Customer."  CEIP § 8(b).

e.      For a period of two years after termination to "not, for the benefit of a Competing Business, solicit a Covered Employee to leave the employment of the Company, or assist a Competing Business in hiring a Covered Employee."  CEIP § 8(c).

72. Finally, the following senior employees all entered into Equity Agreements with Plaintiff Lotus Parent, Inc. between 2020 and 2022, in which they agreed to similar restrictive covenants in exchange for being granted shares of that company: Daley, Chambers, Joshua Smith, Kalso, Shapero, Russo, Robert Fiacco, Bair-Chambers, Krueger Murrell, Kosofsky, Steinhorn, Colby, Stennick, Malone, and Sargent.  The Equity Agreements each contained the following covenants designed to protect Cynosure's confidential information and trade secrets and goodwill:

a.      To "not disclose confidential or proprietary information or trade secrets related to any business of the Company Group [elsewhere defined to include Cynosure], including without limitation . . all business plans and marketing strategies; information concerning existing or prospective markets, suppliers and customers; financial information; information concerning the development of new products and services; and technical and non-technical data related to software programs, design specifications, compilations, inventions, improvements, patent applications, studies, research, methods, devices, prototypes, procedures and techniques."  Equity Agreement § 1.1.

b.      Upon termination of employment, to "deliver to the Company Group" all "tangible items containing any confidential or proprietary information or trade secrets."  Equity Agreement § 2.1.

c.      For a period of one year after termination of employment to not "provide services that are the same or similar in function or purpose to the services provided to the Company Group . . . or services that are otherwise likely or probably to result in the use or disclosure of the Company Group's proprietary information to a business selling, licensing or developing competing products or services (a "Competing Business"). . . ."  Equity Agreement § 3.1.1.

d.      During employment and for a period of two years after termination of employment to not "participate in soliciting or communicating with an employee of the Company Group for the purpose of persuading such employee to end or modify the employee's employment relationship with the Company Group or hiring such employee . . . ."Equity Agreement § 3.2.1.

e.    During employment and for a period of two years after termination of employment to not "solicit or facilitate the solicitation of, provide, or offer to provide services to customers of the Company Group for the purpose of providing products or services that compete with those of, or involve proprietary information of, the Company Group, or induce or attempt to induce any customer or other person to curtain or cancel its business with the Company Group."  Equity Agreement § 3.2.2.

73. All of these contract related to employment at Cynosure and, while the exact terms of the restrictive covenants in the contracts at issue vary (including the length of time of enforceability of the post-employment covenants), each contract contains substantially similar obligations to protect Cynosure's confidential information and trade secrets provided to them as its employees. Further, under each relevant contract, the obligations regarding non-competition and non-solicitation of employees and customers remain in force for a least a period of 9 months post-employment, as set forth here:

| Agreement | Non-Competition | Customer Non-Solicitation | Employee Non-Solicitation |
| --- | --- | --- | --- |
| INNNA Agreement | 12 months | 12 months | 12 months |
| Hologic Agreement | 18 months | 18 months | 18 months |
| CEIP | 9 months | 18 months | 24 months |
| Equity Agreements | 12 months | 24 months | 24 months |

 A full list of the contracts with each Former Employee is attached to the Complaint as **Appendix 1**.

74. In addition to requiring employees to enter into contracts to protect its confidential information and trade secrets, Cynosure also employs various technological measures to protect and maintain the confidentiality of its sensitive information, including:

a.  Access to Cynosure computers is restricted via password controls administered by Cynosure's IT team.

b.   Access to Cynosure physical buildings is controlled via a badge-based security system.

c.   Access to Cynosure shared information systems is protected by multi-factor Single-Sign On.

d.   Access to Cynosure's central repository of confidential customer information on its Salesforce CRM database ("Salesforce CRM") is restricted to those with a need to access it. As a further security measure, the Salesforce CRM has controls so that sales staff at Cynosure cannot export data directly from the system on their own without approval from a database administrator.

e.   Customer pricing is also maintained confidentially via non-disclosure obligations in contracts with customers.

f.   Compensation plans for Cynosure sales employees, including commission structures as reflected in the terms of those compensation plans, expressly state that their provisions are confidential and the property of Cynosure.

g.   Upon termination of employment, all employees are provided with an Exit Package that includes a reminder of their contractual obligations and instructions to return any Company confidential information, proprietary and trade secret documents and files.

### D.  Reveal Lasers Induced The Coordinated Resignation Of Cynosure Sales Staff Via Disloyal Insiders

75. On May 2, 2022, without prior warning, Chris Chambers (Bob Daley's direct supervisor) submitted his resignation notice, which he stated would be "effective immediately."  Chambers did not disclose what his future business plans were and claimed to be undecided.

76. The very next day, Bob Daley submitted his own surprise resignation notice, telling the company to "consider this [his] last day."  He said he was not sure what he planned to do and was going to "figure out what the next chapter looks like."

77. Two District Sales Managers who reported directly to Daley—Defendants Robert Fiacco and Dean Fiacco—also submitted resignation notices effective immediately that day.

78. On May 6, Defendant Joshua Smith submitted his resignation notice.  He stated that he was going to "take a break from the corporate world" and "focus on some new initiatives that [he was] passionate about."

79. This kicked off a cascade of resignations of Cynosure sales leadership and sales staff.

80. In total, ***28 Former Employees in the sales organization resigned*** in a period of around five weeks without informing Cynosure where they would go.

81. These unmistakably coordinated departures left Cynosure with the simultaneous loss of around 20% of its employees in the North American sales organization—including key leadership from each division and from regions across the country.

82. For several weeks, these employees continued hiding the identity of their new employer, even as they started to post "teaser" announcements about a "confidential" new company. For example, Kalso and Dean Fiacco in early July posted the following messages on their LinkedIn accounts:

 

83. Then, on July 19, each and every one of the Former Employees simultaneously resurfaced as Reveal Lasers employees in conjunction with that company's launch announcement.  At least 28 former Cynosure employees announced that they were joining Reveal Lasers in unison.

**E.  Reveal Lasers Is A Direct Competitor**

84. Although Reveal Lasers has only recently launched in North America, it is clear that it is a direct competitor of Cynosure.  Based its website at https://us.reveallasers.com/, Reveal Lasers offers or intends to offer aesthetic technology products and services that will compete directly against Cynosure products across many sectors, including at least laser hair removal, skin revitalization, body contouring, scar reduction, and gynecological health.

85.    In fact, it appears that Reveal Lasers' product portfolio directly mirrors Cynosure's energy-based product portfolio (that is, medical aesthetic technology that uses photonic technology (i.e., lasers or light-based technology) or radiofrequency technology (i.e., heat-based technology)). The table below illustrates how the products in the Reveal Laser portfolio are directly competitive with examples of products in Cynosure's portfolio:

| Market Sector | Cynosure Product | Reveal Lasers Product |
| --- | --- | --- |
| Laser Hair Removal | Elite iQ<br>Elite Plus<br>Vectus | VegaPRO |
| Skin Revitalization (Radiofrequency Microneedling) | Potenza | Aura |
| Gynecological Health | Mona Lisa Touch<br>TempSure Vitalia | LYRA |
| Body Contouring (Sculpting) | SmartLipo | MicroLift (Charisma)[4]<br>MicroTight (Charisma) |

---

[4] Reveal Lasers' website describe MicroLift, MicroTight, and EVLA products, but it shows a picture of the "Charisma" product on those pages.   It appears that some combination of these products competes with the Cynosure products listed here.

| Scar Reduction / Varicose Veins | Revlight | EVLA (Charisma) |
|---|---|---|

86. As one illustration of this, Cynosure's top-selling laser hair removal products include the Elite iQ, Elite PLUS, and Vectus (Elite iQ is pictured below). These laser hair removal machines are typically purchased by a range of customers, such as medical spas, physicians, and aesthetic retail chains. Sales of these strategic assets account for tens of millions of dollars in Cynosure's annual revenue. Based on its website, Reveal Lasers intends to offer at least two products in this same space—the Vega Comfort and the Vega Supreme. A picture of the VegaPRO is below side-by-side with the Elite iQ:



| Cynosure: Elite IQ (pictured); Elite Plus; Vectus | Reveal Lasers: VegaPRO |
|---|---|

87. As another example, another one of Cynosure's top-selling products is the Potenza Radiofrequency Microneedling machine used for skin revitalization. Sales of these machines also account for tens of millions of dollars in revenue for Cynosure. Potenza microneedling machines have a life expectancy of many years, and require replacement of needles after each individual patient treatment. Ongoing "post-sales" of needles are a type of "consumable" that results in post-

sale revenue for Cynosure. Based on its website, Reveal Lasers intends to offer a product in this same space called "Aura":



| Cynosure: Potenza (pictured) | Reveal Lasers: Aura |
|---|---|

### F. Cynosure's Investigation Uncovers Evidence That The Former Employees Were Acting On Behalf Of Reveal Lasers While Employed At Cynosure.

88. Cynosure has now uncovered evidence that the mass resignation of its sales employees that just occurred in May and June resulted from a long-running scheme directed by Reveal Lasers going back over the past year.

89. Cynosure's ability to investigate Reveal Lasers' scheme has been hampered by the Former Employees' intentional efforts to destroy evidence and conceal their tracks. It is now known that Bob Daley instructed the Former Employees to communicate via WhatsApp instead of email to avoid detection by Cynosure while they were still employed at the company.

90. During recruiting meetings, Daley and Chambers also required the Former Employees to sign non-disclosure agreements with Reveal Lasers to further deter them from tipping off Cynosure about the ongoing surreptitious raid of its staff. The Former Employees were also instructed to

stagger their resignations over time through May and June to disguise the coordinated nature of the departures.

91. Cynosure has also now learned that Bob Daley *performed a complete wipe of his Cynosure-issued computer* before his resignation. Third party forensic analysis of the computer's hard drive shows that Daley executed a command that "reset" his computer on the day that he submitted his resignation. The computer was then returned to Cynosure as a nearly blank slate. Wiping his computer was in direct violation of company policy and his contractual obligation to return Cynosure information upon departure, and was yet another effort by Daley to destroy evidence.

92. Daley and other individuals also deleted and attempted to purge numerous emails related to Reveal Lasers from their Cynosure emails accounts, which have since been recovered from Cynosure's servers.

93. However, notwithstanding these efforts, the evidence that has been emerging tells an unmistakable story. Rather than investing its own resources to develop a sales organization and infrastructure to legitimately compete with Cynosure, Reveal Lasers decided to cheat and get a head start by hiring the leaders of Cynosure's sales organization—in all facets of the organization—who, in turn, would help solicit other Cynosure sales and marketing professionals from the inside to join Reveal Lasers. Further, this scheme was executed over time, so that the Former Employees would have access to Cynosure trade secret information and business opportunities that could be syphoned off and diverted to Reveal Lasers while they waited to time a coordinated departure. During that "waiting period," at least some of the Former Employees only superficially worked on behalf of Cynosure while secretly transferring their loyalties to Reveal Lasers and taking actions to divert business and trade secret information to Reveal Lasers.

94. Cynosure has forensic evidence indicating that Reveal Lasers and Daley were working together as early as March 2021—*over a year before he resigned*.  At that time, the evidence shows that Daley was in direct contact with the CEO of Reveal Lasers in Israel (Eyal Buchbinder) and other Reveal Lasers employees and was presented with a Non-Disclosure Agreement that Reveal Lasers asked him to sign in connection with discussions of its business.

95. Soon after that, in May 2021, one of Cynosure's U.K.-based sales representatives was contacted under false pretenses by a Reveal Lasers employee named Brian Hochman.  Hochman used a phony name ("Laila Reyes") and provided a fake cover story in which he pretended to be a clinical customer to secure a meeting with the U.K.-based sales representative of Cynosure.  At the start of the meeting, Hochman kept up the fraudulent charade that he represented a clinic, but midway through the meeting, Hochman switched gears.  He revealed his true identity and attempted to solicit the Cynosure representative to come work for Reveal Lasers.  In a follow-up email, Hochman *affirmed that Bob Daley was already working for Reveal Lasers*:

> It was a pleasure to meet you today. Your experience and professionalism was evident throughout your presentation and we feel confident that you could lead a team of sales agents in promoting our vision into the marketplace. As I said the key to success is people , product and processes and we feel confident in our product and process and are now looking for the right people. Please look at our website www.reveallasers.com for additional information. Unfortunately our UK website is just being updated to include information on the founders and their history but you should be able to find background information on them. Eyal Buchbinder CEO  formerly at Alma; Yair Leopold formerly at Lumenis and Curelight and Tamir Attias head of Technology *and Bob Daley formerly of Cynosure USA* . . . . (emphasis added).

96. This was not the only time that Reveal Lasers falsely impersonated a Cynosure customer in an attempt to get access to Cynosure's employees.  Cynosure has also learned that in July 2021, the CEO of Reveal Lasers' Indian affiliate, Kuntal Debgupta, filled out a website submission for Cynosure pretending to be a customer interested in purchasing a microneedling product.

97. Deleted emails recovered by Cynosure also confirm that Daley was actively working with Reveal Lasers as early as July 2021 on developing Reveal Lasers' North American business plan and recruiting plan.  As part of that recruiting plan, Daley unlawfully disclosed and utilized Cynosure confidential compensation information to develop Reveal Lasers' compensation plan.

98. This was perhaps the start of Reveal Lasers' attempts to painstakingly copy everything it could about Cynosure's business.  Its efforts to blatantly copy Cynosure's structure continued through its launch—when Reveal Lasers was advertising job postings so hastily cut-and-pasted and copied from Cynosure material that it had forgotten to remove the name "Cynosure" from at least the following posting:



. . .

- Develop an adaptable organization to handle new technologies resulting from alliances from manufacturing and supply chain perspective.

- Build out yearly and quarterly business plans to support Cynosure's revenue goals.

- Create partnerships with world class vendors and 3rd parties.

- Own the inventory management system (SAP).

- Lead and monitor production tracking and quality control systems.

99. Calendar invitations and other recovered emails throughout 2021 and early 2022 show Daley continuing to meet and communicate with other Reveal Lasers employees as the year progressed.  On August 8, 2021, Daley forwarded a Reveal Lasers "Brochure" to his personal Gmail account.  The Brochure identified "Management" at Reveal Lasers as including the following people:

a.   Eyal Buchbinder - Chief Executive Officer
b.   Tamir Attias - Chief Technology Officer
c.   Gilead Grossman - Chief Marketing Officer
d.   Kuntal Debgupta - Chief Executive Offer of Reveal India
e.   Penina Schiffman - Human Resources Manager

100.     Reveal Lasers' North American website now lists its "Leadership" as including Gilead Grossman as CMO and Tamir Attias as CTO (in addition to Daley as CEO and Chambers as COO).

101.     Recovered calendar invitations show Daley meeting with Penina Schiffman in September and November 2021.

102.     In October 2021, another deleted email recovered by Cynosure shows that Daley forwarded a proprietary Cynosure document (***Copy of US Plastic Surgeons_2021.xlsx***) reflecting a list of over 10,000 potential customers with contact information populated in an excel

spreadsheet to his personal Gmail account from his Cynosure email account.  Upon information and belief, Daley did this so he could pass that information to Reveal Lasers.

103.    In January 2022, recovered emails show that Daley was messaging with the Reveal Lasers India CEO Kuntal Debgupta on LinkedIn.

104.    After Daley finally resigned, on May 3, 2022 (effective immediately with no notice), the next day Reveal Lasers LLC registered to do business in Nevada.

**G.  Other Former Employees Join The Scheme In 2022.**

105.    It is not yet known exactly when Daley first started working with other Former Employees on behalf of Reveal Lasers.  However, by at least early 2022 (in some cases, months before the wave of resignations), the evidence confirms that other Former Employees were coordinating with Daley.

106.    **Chris Chambers**.  Chambers was one of the most senior leaders of the sales organization, having been promoted to North American Vice President of Sales in March 2022 after he provided assurances to Cynosure that he was committed to stay at the company in the long term.  He is now the Chief Commercial Officer of Reveal Lasers.  Chambers was privy to high level company strategic evaluations and decisions concerning Cynosure's innovation pipeline, in addition to the trade secret information available to other field salespeople.

107.    It is now known that Chambers was directing much of the recruiting of the employees in the sale organization with Daley and acting as his second-in-command.

108.    Cynosure has also learned that Daley and Chambers were actively recruiting together for Reveal Lasers at the Cynosure annual sales meeting in the Bahamas in April 2022— where Chambers played a critical role as a leader of the organization.  Daley and Chambers ***even went so far as to ask other Cynosure employees to sign non-disclosure agreements with Reveal***

***Lasers to try to conceal this recruiting campaign from Cynosure***.  Numerous employees who reported up to Chambers in his previous role have now gone to Reveal Lasers, including Daley, Russo, Dean Fiacco, Robert Fiacco, and Shapero, plus many others.  Cynosure has been able to recover a meeting invitation that Chambers attempted to "purge" (permanently delete) from his Cynosure email that shows Daley forwarding to him a meeting invitation with Reveal Lasers' CEO Buchbinder to Chambers schedule to occur on April 18, 2022 (the Monday after the Bahamas sales meeting).

109.    During his final weeks of employment at Cynosure, Daley traveled with Chambers to what were ostensibly billed as "Quarterly Business Reviews" with Cynosure teams that were outside Daley's Northeast Region accountability.  These meetings were in districts that were similar to districts that Daley outlined in his email communication with Reveal Lasers in the fall of 2021.  Additionally, these meetings were with some of Cynosure's highest performing District Sales Managers who ultimately left Cynosure to join Reveal Lasers.  It is now apparent that Chambers and Daley were using these trips and Cynosure business meetings for active recruiting on behalf of Reveal Lasers, all while submitting their expenses to Cynosure so that it could literally reimburse them for the out-of-pocket costs they incurred while secretly recruiting its employees.

110.    Since Cynosure filed its original Complaint in this action, one of its employees has come forward and provided a Declaration (Dkt. 43) detailing how Chambers and Daley used one of these "Quarterly Business Reviews" in New York to march Cynosure employees into a room one-by-one to ask them to sign non-disclosure agreements and recruit them for Reveal Lasers.

111.    **Joshua Smith.**  Joshua Smith was also one of Cynosure's most senior leaders in the sales organization as National Field Marketing Manager and is now the Vice President of Marketing for Reveal Lasers.  Based on forensic evidence, on April 29, 2022, just days before he

would announce his resignation from Cynosure on May 6, Smith backed up hundreds of files from his Cynosure computer to a personal Dropbox account—which already contained thousands more Cynosure files.  These files included an array of confidential Cynosure documents stored in folders with names like "Competitive Information," "Marketing Tools," "Practice Operations," "Capital Lead Generation," and "Onboarding Playbook," among others.   These files included without limitation:

- What appears to be Cynosure's entire (or nearly entire) "Onboarding Playbook" for salespeople that provides them with Cynosure's marketing methods, processes, and materials, including without limitation "cheat sheets" for sales, "lead generation" materials, and other materials Cynosure developed over the years for this purpose.

- Marketing "toolkit" documents and customer pitch decks for Cynosure products.

- Competitive information related to Cynosure's marketing of its products, such as Elite iQ laser removal and Potenza microneedling, among others.

- Event registration lists for Cynosure-hosted events that capture contact information for all potential customers who attended those events.

112.     **Brogan Bair-Chambers**.  Bair-Chambers was one of the most senior leaders of the sales organization as Cynosure's Director of Sales Practice Development for North America and is now an Area Vice President of Sales for Reveal Lasers.  At Cynosure, Bair-Chambers was privy to numerous types of particularly sensitive trade secret information. For example, shortly before she resigned Bair-Chambers was granted access to documents reflecting Cynosure's entire installation base for North America.  In order to get access to that document, she affirmatively represented to Cynosure's Chief Commercial Officer that she had no intention to leave the company in the near future.

113.     Cynosure has also learned that Bair-Chambers (who is married to Chris Chambers), actively solicited Cynosure employees to leave, working with Chambers and Daley to do so.

114.     **Cory Murrell**.  Murrell was one of the most senior leaders of Cynosure's sales organization as the Associate Vice President of Sales for Canada and the U.S. Western and

Midwest Region for Cynosure and is now a Vice President of Sales for Reveal Lasers. Like Chambers, Murrell was privy to high level company strategic evaluations and decisions concerning Cynosure's innovation pipeline, in addition to the trade secret information available to other field salespeople.

115.    Cynosure has also learned that Murrell has a USB storage device in his possession that apparently contains Cynosure confidential information that was not returned.[5]

116.    **Jason Kalso**.  Kalso was the District Sales Manager for the Pacific Northwest region at Cynosure and is now a Regional Sales Director for Reveal Lasers.  Based on forensic evidence, on April 25, 2022, Kalso plugged a USB storage device into his computer and then copied hundreds of files from his computer hard drive onto the device.  He plugged in the device multiple times over the next few weeks and copied other files onto it.  On May 31, his last day, Kalso plugged in the device again and copied over 16,000 files, which appeared to nearly mirror the entire contents of his work OneDrive.  These files included without limitation:

- "Hot lists" tracking potential customers, customer contact information, and hot leads; as well as other customer lists for specific regions and market sectors including detailed contact information and lead tracing.

- Customer agreements and purchase orders containing confidential pricing and purchase information for the customers, such as Elite iQ laser removal and Potenza microneedling, among others.

- Internal customer "purchase sheets" that tracked nuanced information on closed sales, including specific pricing packages and details of assets purchased for products such as Elite iQ laser removal and Potenza microneedling, among others.

117.    Since filing the original Complaint, Cynosure has learned that Kalso has attempted to convert at least one confidential Cynosure sales lead to Reveal Lasers after the TRO was entered.

---

[5] In its original Complaint, Cynosure had alleged that Murrell had failed to return his Cynosure computer, iPad, and iPhone.  Cynosure has since learned that although Murrell did not initially return those devices, after Cynosure followed up with him via text on June 14, he did in fact return the devices around that time.

Specifically, Kalso demonstrated a Cynosure Potenza microneedling product to a customer in Oregon in December 2021, but did not consummate a sale because the customer was unable to obtain credit approval at that time. Cynosure has since learned that after defecting to Reveal Lasers and with full knowledge from his time at Cynosure of this customer's interest in a microneedling product, Kalso has approached the customer to sell it a Reveal Lasers "Aura" device, which is Reveal Lasers' competing microneedling product.

118. **Kyle Shapero**. Shapero was the District Sales Manager for the Florida region for Cynosure and is now a Regional Sales Director for Reveal Lasers. Based on forensic evidence, on May 3, 2022 (the same day that Bob Daley resigned), Shapero plugged a USB storage device into his computer. On that day, he copied hundreds of files from his computer hard drive onto the device. These files included without limitation:

- "Hot lists" and "call lists" tracking potential customers, customer contact information, and hot leads.

- Internal customer "purchase sheets" that tracked nuanced information, including specific pricing packages, on closed sales.

- "Credit Approved lists" tracking potential customers based on similar data and also the amount of purchasing credit from lenders that they had secured.

- Selling playbooks and customer pitch decks for Cynosure products.

119. Shapero took other actions to interfere with Cynosure's rights as well. In June 2022, a Cynosure employee discovered that she was locked out of an Instagram account used for marketing by Cynosure's sales team in Florida. This account was one of several similar accounts dedicated to different regions that Cynosure had developed over the years into valuable marketing tools. This Florida account had accumulated thousands of followers including many clients of Cynosure. Knowing that Shapero had access to the account, the Cynosure employee reached out to Shapero to demand that he relinquish the account to Cynosure. However, Shapero refused to hand over the credentials. That account was actively promoting Reveal Lasers until it was

deactivated under the TRO—thus converting that entire marketing channel directly to Reveal Lasers' benefit.

120.    **Michael Russo**. Russo was a Senior Business Manager for Cynosure and now is a Vice President of Practice Development for Reveal Lasers. Based on forensic evidence, on May 20, 2022, Russo plugged a USB storage device into his computer. On that day, he copied over two hundred files from his computer hard drive onto the device. These files included an array of confidential Cynosure documents stored in folders with names like "LEADS," "Powerpoint Presentations," and "Quotes," among others. These files included without limitation:

- A customer list including detailed contact information and lead tracing.

- Internal customer "purchase sheets" that tracked nuanced information, including specific pricing packages, on closed sales.

- Selling playbooks and customer pitch decks for Cynosure products.

121.    **David Krueger**. Krueger was the District Sales Manager for the Midwest Region at Cynosure and is now a Regional Sales Director for Reveal Lasers. In June 2022, in his final days of Cynosure employment, Krueger forwarded to his personal Gmail account information that would allow him to pursue at least 13 separate confidential sales leads that had been provided to him by the company's Salesforce CRM administrator. (Unable to export similar data from the Salesforce CRM directly without administrative approval—which would have brought unwanted attention to his actions—Krueger sent himself emails with the lead information one by one.) In one of the emails he forwarded to himself, Krueger explicitly noted that one potential customer would be "waiting a few weeks"—making it clear that Krueger intended to keep pursuing the lead at his next job at Reveal Lasers. In another instance, he sent confidential pricing proposals for several hundred thousand dollars in potential customer purchases to his Gmail account.

122.      **Dean Fiacco**.  Dean Fiacco was the District Sales Director for the Northeast region at Cynosure and is now a Senior Regional Sales Manager for Reveal Lasers.  Deleted emails recovered by Cynosure show that, as early as January 2022, Fiacco was coordinating with Daley to meet with at least six different vendors that were not within the scope of Fiacco's duties, including, for example, HRIS providers, Salesforce CRM providers, which Cynosure believes was on behalf of Reveal Lasers.  In one of those emails from March 2022, Fiacco stated that he would be "running ops" for a "startup" and that the purpose of the potential meeting would be to work on setting up Reveal Lasers systems.

123.      On April 18, 2022, Dean Fiacco would later send an email summarizing 17 separate "warm leads" to his personal Gmail address.  This email had previously been sent to him by another Cynosure employee in January 2022, and there would have been no need for Fiacco to forward it to his personal email account four months later except to export those leads to Reveal Lasers.  Fiacco did not resign from Cynosure until May 3.

124.      **Daniel DeMarco**.  DeMarco was a Senior Area Sales Manager for Cynosure in the Northeast Region and now holds a similar position at Reveal Lasers.  Deleted emails show that, in April 2022, DeMarco actively moved already-scheduled customer meetings for at least five separate leads (along with notes on the leads) into the summer—*after* his upcoming (but as yet unannounced) resignation date.  Those meetings were rescheduled using his personal Gmail account—and both **Bob Daley** and **Dean Fiacco** were also copied.  Upon information and belief, they were coordinating with DeMarco on these efforts.

125.      DeMarco also failed to return his Cynosure computer, iPad, and iPhone following his resignation, all of which would have contained Cynosure confidential information, despite

instructions from Cynosure to do so and follow up requests, which he ignored. DeMarco finally returned those devices after the original Complaint was filed and TRO was entered.

126.    **Robert Fiacco.** Robert Fiacco was the District Sales Manager for the New York district at Cynosure and now has a similar role at Reveal Lasers. Fiacco also played an active role in recruiting for Reveal Lasers, including bringing over an employee whom he referred to Cynosure only months earlier and also attempting to recruit another Cynosure employee, who has since submitted a Declaration detailing this attempted recruitment (Dkt. 43).

127.    Robert Fiacco was also one of the Cynosure employees that used a Cynosure Instagram account as a marketing channel for the New York region, like the one described above for Florida. That account too was misappropriated and was being used to actively promote Reveal Lasers prior to the entry of the TRO—thus converting that entire marketing channel directly to Reveal Lasers' benefit. There are at least two other Cynosure Instagram accounts for different regions that have been converted in this manner. Indeed, until it was deactivated under the TRO, one of the former Cynosure account was renamed and rebranded as Reveal Lasers' "official" Instagram page.

128.    **Mark Sargent**. Mark Sargent was a Senior Area Sales Manager at Cynosure and now has a similar role at Reveal Lasers. Since filing the original Complaint, Cynosure has learned that Sargent attempted to divert at least one sales lead to Reveal Lasers when still employed at Cynosure—telling a customer who was ready to make a purchase in June to wait for a "month" until a "new product" came out. This was a false representation, as no such "new" product existed. Rather, by delaying, Sargent was attempting to push this business opportunity to Reveal Lasers.

129.    **Jason Steinhorn**. Jason Steinhorn District Sales Manager for the Tennessee/Kentucky/Alabama/Mississippi district at Cynosure and now has a similar role at

Reveal Lasers. Since filing the original Complaint, and after the TRO was entered, Cynosure has learned that Steinhorn made an office visit to solicit one of his former Cynosure leads on behalf of Reveal Lasers. The foregoing demonstrates a clear pattern of Former Employees shifting their loyalties, recruiting Cynosure employees, stealing trade secret and proprietary information for Reveal Lasers, and diverting business opportunities to Reveal Lasers in the weeks and months leading to their exits.

130.    In sum, Cynosure has been the victim of a coordinated raid on the company from multiple fronts by an unscrupulous competitor that has demonstrated a complete indifference to Cynosure's legal rights. Cynosure was literally being sent the bill for this activity for months, paying the salaries of the Former Employees, as they flew around the country grooming customers to be diverted to Reveal Lasers and actively recruiting inside the company, including using its own sales meeting for recruiting purposes.

131.    As alleged above, at least four separate employees are confirmed to have exported massive amounts of Cynosure information (Joshua Smith, Kalso, Russo, and Shapero)[6]. At least six other employees (Daley, Kreuger, Dean Fiacco, DeMarco, Mark Sargent, and Jason Steinhorn) conducted targeted exfiltration of Cynosure information and/or took actions to divert specific confidential leads and business opportunities to Reveal Lasers. Others deleted information before leaving (including Daley) or failed to return Cynosure computers (DeMarco). They have even stolen Instagram accounts and refused to return them despite express requests from Cynosure— further confirming an intent to convert its customer base by unethical means.

---

[6] There are potentially others, including Murrell who is known to have a USB storage device with at least some Cynosure confidential information on it. At the time of the filing of the FAC, Defendants have still not yet identified which Former Employees have confidential information to be returned under the TRO.

132.     The full scope of the involvement of all Former Employees is as yet unknown, but the coordinated nature of this activity is unmistakable, and Cynosure anticipates that additional investigation and discovery will uncover much more.

133.     Cynosure needs the aid of the Court to stop the further execution of this plan to raid its employees and steal its proprietary information, goodwill, and customers.  Immediate injunctive relief is necessary to require the Defendants to cease their illegal conduct, to require the Former Employees to honor their agreements and obligations to Cynosure, and to prevent Reveal Lasers from further profiting from its illicit scheme.

### FIRST CAUSE OF ACTION
### Violation of Defend Trade Secrets Act - 18 U.S.C. § 1836
### (Against All Defendants)

134.     Cynosure hereby realleges and incorporates the allegations in Paragraphs 1-133 above as though fully set forth herein.

135.     As described above, Cynosure is the owner of valuable trade secrets within the meaning of the Defend Trade Secrets Act that it has developed through its efforts and investments in relationships with customers and employees.

136.     Each of these trade secrets was confidential and commercially valuable at the time of the misappropriation because they gave Cynosure a competitive advantage in the market by virtue of not being public.  If a competing aesthetic treatment company obtained this information, that company would be at a competitive advantage over Cynosure because they could target Cynosure's customers and undercut Cynosure's sales using information that would not otherwise be available to the public.

137.     At all relevant times, Cynosure has taken reasonable and necessary measures to safeguard the secrecy and confidentiality of its trade secrets, including, without limitation,

requiring employees to contractually agree not to disclose confidential information, promulgating corporate policies, and employing technological measures.

138.     As alleged above, Cynosure is aware that misappropriation of trade secret customer leads and other customer information by certain departing Former Employees on behalf of Reveal Lasers has already happened.

139.     Moreover, Cynosure is threatened by further misappropriation by those Former Employees and other Former Employees who will inevitably disclose and misuse other trade secrets because of the close competitive position of Reveal Lasers.

140.     Cynosure will suffer irreparable harm unless Defendants are enjoined from the conduct alleged herein.  Cynosure will have no adequate remedy at law for the injuries it will suffer if Defendants are permitted to continue using Cynosure's trade secrets.

141.     Because the Defendants misappropriated the aforementioned trade secrets willfully and maliciously, Cynosure is entitled to an award of exemplary damages under 18 U.S.C. § 1836(b)(3)(D).

## SECOND CAUSE OF ACTION
### Violation of Massachusetts Trade Secrets Act - M.G.L. c. 93 §§ 42, *et seq.*
### (Against All Defendants)

142.     Cynosure hereby realleges and incorporates the allegations in Paragraphs 1-133 above as though fully set forth herein.

143.     As described above, Cynosure is the owner of valuable trade secrets within the meaning of the Massachusetts Trade Secrets Act that it has developed through its efforts and investments in relationships with customers and employees.

144.     Each of these trade secrets was confidential and commercially valuable at the time of the misappropriation because they gave Cynosure a competitive advantage in the market by

virtue of not being public.  If a competing aesthetic treatment firm obtained this information, they would be at a competitive advantage over Cynosure because they could target Cynosure's customers and undercut Cynosure's sales using information that would not otherwise be available to the public.

145.    At all relevant times, Cynosure has taken reasonable and necessary measures to safeguard the secrecy and confidentiality of its trade secrets, including, without limitation, requiring employees to contractually agree not to disclose confidential information, promulgating corporate policies, and employing technological measures.

146.    As alleged above, Cynosure is aware that misappropriation of trade secret customer leads and other customer information by certain departing Former Employees on behalf of Reveal Lasers has already happened.

147.    Moreover, Cynosure is threatened by further misappropriation by those Former Employees and other Former Employees who will inevitably disclose misuse other trade secrets because of the close competitive position of Reveal Lasers.

148.    Cynosure will suffer irreparable harm unless the Defendants are enjoined from the conduct alleged herein.  Cynosure will have no adequate remedy at law for the injuries it will suffer if Defendants are permitted to continue using Cynosure's trade secrets.

149.    Because Defendants misappropriated the aforementioned trade secrets willfully and maliciously, Cynosure is entitled to an award of exemplary damages under M.G.L. c. 93 § 42B(b).

### THIRD CAUSE OF ACTION
### Breach of Contract
### (Against Former Employees)

150.    Cynosure hereby realleges and incorporates the allegations in Paragraphs 1-133 above as though fully set forth herein.

151.    For good and adequate consideration, the Former Employees entered into various contracts with Cynosure or its affiliates, including each of the contracts listed on **Appendix 1**.

152.    All of these contracts prohibited the misuse of Cynosure confidential information and trade secrets and prohibited the employees from holding conflicting employment obligations during their employment.

153.    Further, pursuant to those contracts, at least the following enforceable restrictive covenants relating to non-solicitation and non-competition exist in the last contract signed by each Former Employee :

| Former Employee | Last Signed Agreement | Non-Competition | Customer Non-Solicitation | Employee Non-Solicitation |
|---|---|---|---|---|
| Bob Daley | Equity Agreement | 12 months | 24 months | 24 months |
| Chris Chambers | Equity Agreement | 12 months | 24 months | 24 months |
| Brogan Bair-Chambers | Equity Agreement | 12 months | 24 months | 24 months |
| Robert Fiacco | Equity Agreement | 12 months | 24 months | 24 months |
| Michael Russo | Equity Agreement | 12 months | 24 months | 24 months |
| Kyle Shapero | Equity Agreement | 12 months | 24 months | 24 months |
| Joshua Smith | Equity Agreement | 12 months | 24 months | 24 months |
| Jason Steinhorn | Equity Agreement | 12 months | 24 months | 24 months |
| Cameron Colby | Equity Agreement | 12 months | 24 months | 24 months |
| Matthew Malone | Equity Agreement | 12 months | 24 months | 24 months |
| Tara Kosofsky | Equity Agreement | 12 months | 24 months | 24 months |
| Mark Sargent | Equity Agreement | 12 months | 24 months | 24 months |
| Kris Stennick | Equity Agreement | 12 months | 24 months | 24 months |
| Cory Murrell | CEIP | 9 months | 18 months | 24 months |

| Jason Kalso | CEIP | 9 months | 18 months | 24 months |
|---|---|---|---|---|
| Mark Sargent | CEIP | 9 months | 18 months | 24 months |
| David Kreuger | CEIP | 9 months | 18 months | 24 months |
| Daniel DeMarco | CEIP | 9 months | 18 months | 24 months |
| Dean Fiacco | CEIP | 9 months | 18 months | 24 months |
| Victoria Bailey | CEIP | 9 months | 18 months | 24 months |
| Savannah Padron | CEIP | 9 months | 18 months | 24 months |
| Nate Dahlstrom | CEIP | 9 months | 18 months | 24 months |
| Matthew Calabrese | CEIP | 9 months | 18 months | 24 months |
| Chase Tolusic | CEIP | 9 months | 18 months | 24 months |
| Anna Bergslien | CEIP | 9 months | 18 months | 24 months |
| Kale Gibbons | CEIP | 9 months | 18 months | 24 months |
| Kathleen Phillips | CEIP | 9 months | 18 months | 24 months |
| Jesse Morgan | CEIP | 9 months | 18 months | 24 months |
| Robert Smith | CEIP | 9 months | 18 months | 24 months |

154.    In the alternative, if for any reason any of the above-listed agreements are deemed unenforceable as to any of the Former Employees who entered into them, prior agreements containing restrictive covenants were entered into and are enforceable with respect to the Former Employees as well, as set forth in **Appendix 1**.

155.    These agreements were reasonable, consonant with public policy, and necessary to protect Cynosure's legitimate business interests, including its interests in protecting its goodwill and confidential business information and trade secrets.

156.     Cynosure performed each and every one of its material obligations under the respective agreements.

157.     The Former Employees breached their contractual obligations to Cynosure under the respective agreements by, among other conduct: (i) providing services to and on behalf of Reveal Lasers during and after their employment during the non-competition period; (ii) disclosing Cynosure's confidential information and trade secrets to Reveal Lasers; (iii) failing to return property and materials containing Cynosure's confidential information and trade secrets upon termination of their employment and/or failing to return access credentials to Instagram accounts; (iv) soliciting other Cynosure employees to leave their employment with Cynosure to work for Reveal Lasers; and/or (v) soliciting Cynosure's customers or potential customers to use Reveal Lasers' services instead of Cynosure's services.

158.     Cynosure has suffered, and will continue to suffer, irreparable harm as a result of these breaches and threatened continued breaches.  Cynosure is threatened with losing the value of its trade secrets and confidential information and certain employee and customer relationships and goodwill.  Cynosure has also suffered monetary injury as a result of the Former Employees' breach.

## FOURTH CAUSE OF ACTION
### Breach of Duty of Loyalty
### (Against Former Employees)

159.     Cynosure hereby realleges and incorporates the allegations in Paragraphs 1-133 above as though fully set forth herein.

160.     Each of the Former Employees, as trusted members of Cynosure's sales organization with access to its confidential information and trade secrets, owed fiduciary duties to Cynosure, including a duty of loyalty.

161.    Each of the Former Employees violated his or her duty of loyalty by knowingly soliciting other employees to work at Reveal Lasers in connection with their own departures, thereby seriously damaging Cynosure's business.

162.    Further, upon information and belief, certain of the Former Employees also violated his or her duty of loyalty by misusing Cynosure confidential information and trade secrets.

163.    Further, as alleged above, certain Former Employees also violated their duty of loyalty by working for the benefit of themselves and their new employer, Reveal Lasers, and against the best interests of Cynosure, while still employed by Cynosure.

164.    As a direct and proximate result of these violations, Cynosure has suffered harm and, absent injunctive relief, will continue to suffer general and specific damages.

165.    The Former Employees' conduct was oppressive, malicious, and fraudulent and has subjected and will continue to subject Cynosure to cruel and unjust hardship in conscious disregard of Cynosure's rights, so as to justify an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Against Former Employees)**

166.    Cynosure hereby realleges and incorporates the allegations in Paragraphs 1-133 above as though fully set forth herein.

167.    Each of the Former Employees, as trusted members of Cynosure's sales organization with access to its confidential information and trade secrets, owed fiduciary duties to Cynosure, including a duty of loyalty.

168.    Each of the Former Employees violated his or her duty of loyalty by knowingly soliciting other employees to work at Reveal Lasers in connection with their own departures, thereby seriously damaging Cynosure's business.

169.      Further, upon information and belief, certain of the Former Employees also violated his or her duty of loyalty by misusing Cynosure confidential information and trade secrets.

170.      Further, as alleged above, certain Former Employees also violated their duty of loyalty by working for the benefit of themselves and their new employer, Reveal Lasers, and against the best interests of Cynosure, while still employed by Cynosure.

171.      As a direct and proximate result of these violations, Cynosure has suffered harm and, absent injunctive relief, will continue to suffer general and specific damages.

172.      The Former Employees' conduct was oppressive, malicious, and fraudulent and has subjected and will continue to subject Cynosure to cruel and unjust hardship in conscious disregard of Cynosure's rights, so as to justify an award of punitive damages.

### SIXTH CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty
### (Against Reveal Lasers LLC and Reveal Lasers Ltd.)

173.      Cynosure hereby realleges and incorporates the allegations in Paragraphs 1-133 above as though fully set forth herein.

174.      As alleged above, the Former Employees committed a number of torts against Cynosure, including breach of fiduciary duty.

175.      Reveal Lasers, through its various communications with the Former Employees, knew that they were breaching their fiduciary duties to Cynosure for the benefit of Reveal Lasers.

176.      Upon information and belief, Reveal Lasers actively participated in, or substantially assisted in, these breaches of fiduciary duty by directing those actions.

177.      As a direct and proximate result of Reveal Lasers' aiding and abetting, Cynosure has suffered harm and, absent injunctive relief, may continue to suffer general and specific damages.

## SEVENTH CAUSE OF ACTION
### Conspiracy
### (Against All Defendants)

178.     Cynosure hereby realleges and incorporates the allegations in Paragraphs 1-133 above as though fully set forth herein.

179.     The Former Employees conspired with Reveal Lasers to, among other things, (i) misappropriate Cynosure's confidential and trade secret information for the benefit of Reveal Lasers; (ii) solicit Cynosure employees and induce them to terminate their employment relationship with Cynosure and accept employment opportunities at Reveal Lasers; (iii) solicit Cynosure's current and potential clients to move their business to Reveal Lasers; and/or (iv) breach their fiduciary duties and duties of loyalty (and such duties of others) to Cynosure.  This conduct was done as part of a concerted effort by Reveal Lasers and the Former Employees to raid Cynosure of its trade secrets, key employees, customers, and good will.

180.     As a direct and proximate result of Defendants' actions, Cynosure has been injured and suffered damages in an amount to be proven at trial.

181.     Cynosure has also suffered, and will continue to suffer, irreparable harm, and will continue to suffer such harm absent injunctive relief.

182.     Defendants' conduct was oppressive, malicious, and fraudulent and has subjected and will continue to subject Cynosure to cruel and unjust hardship in conscious disregard of Cynosure's rights, so as to justify an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against Former Employees)

183.     Cynosure hereby realleges and incorporates the allegations in Paragraphs 1-133 above as though fully set forth herein.

184.     For good and adequate consideration, the Former Employees entered into various contracts with Cynosure, including each agreement cited above.

185.     These agreements carried with them an implied covenant of good faith and fair dealing, which the Former Employees breached by, inter alia, their conduct described above.

186.     Cynosure will suffer, and continue to suffer, irreparable harm as a result of these breaches and threatened continued breaches.  Cynosure has also suffered monetary injury as a result of the Former Employees' breach of the implied covenant.

## NINTH CAUSE OF ACTION
### Tortious Interference with Contractual Relations
### (Against All Defendants)

187.     Cynosure hereby realleges and incorporates the allegations in Paragraphs 1-133 above as though fully set forth herein.

188.     Defendants knew of the Former Employees' contractual obligations to Cynosure under their respective agreements cited above, but nonetheless acted in concert to interfere with those contractual obligations for the improper purpose of obtaining Cynosure's trade secrets and/or confidential information, harming Cynosure's goodwill, and attempting to cripple Cynosure's business.

189.     By engaging in such conduct both after the Former Employees shifted their loyalties from Cynosure and to Reveal Lasers and after the Former Employees' resignations, Defendants intentionally, improperly, and maliciously interfered with the existing contractual relationships between Cynosure and the Former Employees.

190.     As a direct and proximate result of Defendants' conduct, Cynosure has suffered and will continue to suffer irreparable harm.  Cynosure is threatened with losing the value of its trade

secrets and confidential information and certain employee and customer relationships and goodwill. Cynosure has also suffered monetary injury as a result of the Reveal Lasers' conduct.

191.    Defendants' conduct was oppressive, malicious, and fraudulent and has subjected and will continue to subject Cynosure to cruel and unjust hardship in conscious disregard of Cynosure's rights, so as to justify an award of punitive damages.

**TENTH CAUSE OF ACTION**
**Tortious Interference with Prospective Business Relations**
**(Against All Defendants)**

192.    Cynosure hereby realleges and incorporates the allegations in Paragraphs 1-133 above as though fully set forth herein.

193.    Prior to Defendants' unlawful actions, Cynosure enjoyed advantageous economic and contractual relations with numerous customers, consultants, and employees, which Cynosure reasonably expected would have continued to result in an economic benefit to Cynosure. Cynosure enjoyed substantial profit from its economic and contractual relationships with said customers, consultants, and employees, and invested significant funds in soliciting, developing, and maintaining these economic and contractual relationships.

194.    Given the relationship of trust and confidence developed between Cynosure personnel and its customers, and Cynosure's investment of time and money to further that effort, Cynosure reasonably expected that its contractual relationships with its customers, consultants, and employees would continue in the future.

195.    Defendants, acting in concert, wrongfully and without justification, interfered with the relationship between Cynosure and its employees by inducing such employees to breach their fiduciary duties, duty of loyalty, and contractual obligations to Cynosure and to solicit other

Cynosure employees and inducing these employees to use confidential information to the detriment of Cynosure.

196.     Defendants acted wrongfully and without justification for the purpose of soliciting Cynosure's customers and consultants for the benefit of Reveal Lasers.

197.     By the above-described acts, Defendants, acting in concert, tortiously interfered with the expected economic advantage between the relationships between Cynosure and its customers, consultants, and employees.

198.     As a direct and proximate result of Defendants' actions, Cynosure has been injured and suffered damages in an amount to be proven at trial.

199.     Cynosure has also suffered, and will continue to suffer, irreparable harm, and will continue to suffer such harm absent injunctive relief.

200.     Defendants' conduct was oppressive, malicious, and fraudulent and has subjected and will continue to subject Cynosure to cruel and unjust hardship in conscious disregard of Cynosure's rights, so as to justify an award of punitive damages.

**ELEVENTH CAUSE OF ACTION**
**Violation of M.G.L. c. 93A**
**(Against All Defendants)**

201.     Cynosure hereby realleges and incorporates the allegations in Paragraphs 1-133 above as though fully set forth herein.

202.     As described above, the Defendants' acts and practices, including wrongfully misappropriating Cynosure's trade secret and/or confidential business information, tortiously interfering with Cynosure's contracts, sabotaging its marketing channels, and engaging in a coordinated raid of its sales organization, were unfair, deceptive and in violation of M.G.L. c. 93A.

203.    The conduct of Reveal Lasers, a direct competitor to Cynosure, was in the course of trade or commerce, was undertaken willfully and knowingly, and occurred primarily and substantially within the Commonwealth of Massachusetts.

204.    The conduct of the Former Employees was also in the course of trade or commerce, in support of their roles at Reveal Lasers, was also undertaken willfully and knowingly, and occurred primarily and substantially within the Commonwealth of Massachusetts.

205.    As a direct and proximate result of Defendants' unfair and deceptive conduct, Cynosure has been injured and suffered damages, and it is entitled to recover three times the damage caused by Defendants' actions, as well as reasonable costs and attorneys' fees incurred in prosecuting this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray that this Court:

206.    Enter a temporary restraining order and preliminary injunction consistent with the forms set forth in Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction, including based on the additional allegations in the First Amended Complaint..

207.    Enter a permanent injunction consistent with the preliminary injunction.

208.    Award Plaintiffs compensatory and/or statutory damages, including exemplary and punitive damages, pre- and post-judgment interest and any other remedy available pursuant to the causes of actions asserted herein, in an amount to be determined at trial.

209.    Award Plaintiffs their attorneys' fees, as supported by law and by contract.

210.    Any such other and further relief that the Court deems equitable and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all claims raised in its Complaint that are so triable.


Dated:  August 19, 2022                      Respectfully submitted,

                                             CYNOSURE, LLC
                                             LOTUS PARENT, INC.

                                             By their attorneys,


                                             */s/ Dipanwita Deb Amar*
                                             Dipanwita Deb Amar (admitted *pro hac vice*)
                                             Joseph Farris (admitted *pro hac vice*)
                                             Matthew Diton (admitted *pro hac vice*)
                                             ARNOLD & PORTER KAYE SCHOLER LLP
                                             3 Embarcadero Center, 10th Floor
                                             San Francisco, California 94111
                                             dipanwita.amar@arnoldporter.com
                                             joseph.farris@arnoldporter.com
                                             matthew.diton@arnoldporter.com
                                             T: +1 415.471.3100
                                             F: +1 415.471.3400

                                             Michael Pineault (BBO No. 555314)
                                             ANDERSON & KREIGER LLP
                                             50 Milk Street, 21st Floor
                                             Boston, MA 02109
                                             mpineault@andersonkreiger.com
                                             T: +1 617.621.6578
                                             F: +1 617.621.6619

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants on August 19, 2022.

Dated:  August 19, 2022.                          **ARNOLD & PORTER KAYE SCHOLER LLP**

                                                  By:   /s/ *Dipanwita Deb Amar*
                                                         DIPANWITA DEB AMAR

                                                         Attorneys for Plaintiffs CYNOSURE, LLC
                                                         and LOTUS PARENT, INC.