UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CYNOSURE, LLC, *et al*.,

                  Plaintiffs,

    -against-

REVEAL LASERS LLC, *et al*.,

                  Defendants.

Civil Action No. 22-cv-11176-PBS

**<u>OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION</u>**

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

Defendants Robert Daley, Christopher Chambers, Cory Murrell, Brogan Bair, Joshua Smith, Michael Russo, Kyle Shapero, Jason Kalso, David Krueger, Dean Fiacco, Robert Fiacco, Daniel DeMarco (all former employees of plaintiff Cynosure LLC, and collectively, the "12 Former Employees") and defendant Reveal Lasers LLC ("Reveal") (collectively "Defendants") respectfully request that the Court deny plaintiffs Cynosure, Inc. and Lotus Parent, Inc. (collectively "Cynosure") motion for a preliminary injunction.[1]

## I.    INTRODUCTION

Cynosure chose not to pursue any expedited discovery, and instead relies on the sweeping, generalized allegations against all 12 Former Employee in its prior pleadings and submissions  to argue that certain non-compete provisions should be enforced against the 12 Former Employees to prohibit them from working for Reveal, or from working in the aesthetic equipment industry. In so doing, Cynosure makes and ignores that each employee must be considered individually.

Clearly, Cynosure has not met its burden of proving that it is likely to succeed on the merits of its claims against *any* of the 12 Former Employees or against Reveal.[2]  Without any evidentiary support for, or even any good faith basis, Cynosure lumps the 12 Former Employees together in alleging that they (1) misappropriated Cynosure's trade secrets, (2) breached their covenant agreements and (3) engaged in tortious conduct.  However, the FAC does not even allege any particular wrongdoing by most of the 12 Former Employees, and the declarations that Cynosure submits in support of its motion do not include actual factual evidence that would support a finding that Cynosure is likely to succeed on its claims.  Clearly, Cynosure lumps all 12 Former Employees

---

[1] Defendant Reveal Ltd. is moving separately to be dismissed.
[2] Plaintiffs allege Eleven Counts in their First Amended Complaint ("FAC"), *see* ¶¶ 134-205.

together in an improper and legally careless effort to impute the acts of some to others, and obscure that it has no viable claims against most of the 12 Former Employees.

For example, Cynosure includes factual allegations that only 3 of the 12 Former Employees (Daley, Chambers, and Robert Fiacco) solicited Cynosure *employees* in violation of their covenant agreements. Cynosure does not include specific evidence whatsoever that *any* of the 12 Former Employees, including Daley and Chambers, solicited Cynosure *customers* in violation of their covenants. Nor does Cynosure provide evidence that Cynosure has lost a single sale as a result of any alleged solicitation.[3] Moreover, for the reasons stated *infra*, these *customer* non-solicitation provisions are unenforceable. Thus, even if Cynosure had demonstrated such *customer* solicitation, Cynosure has no viable claims arising from this solicitation.

Further, Cynosure alleges that 6 of the 12 Former Employees allegedly copied and misappropriated Cynosure confidential information and trade secrets in the form of documents. Yet, Cynosure does not include a *single document* in support of its motion, filed under seal or otherwise, that allegedly rises to the level of protectable confidential information or trade secrets. Rather, Cynosure merely refers to lists of files that certain Former Employees allegedly copied, and argues, through the Declaration of Lowinn Kibbey ("Kibbey Decl."), that some of the file names on these lists suggest that some files contain secret proprietary information. Moreover,

---

[3] Defense counsel voluntarily disclosed to Cynosure's attorneys that Reveal has made two sales in the past approximately three month period to two providers who apparently also purchased equipment from Cynosure at some point. However, but there is no evidence in this record that any of the 12 Former Employees, or any other former Cynosure employee, solicited these two customers, or that these two customers otherwise would have purchased equipment from Cynosure, as opposed to any other aesthetic laser and energy-based equipment company, and as explained *infra,* there are of plenty of such companies.

there is *no* evidence that *any* of the 12 Former Employees has used or disclosed, or is otherwise in a position to use or disclose, any trade secret or confidential information to Cynosure's detriment.

Cynosure also argues that the 12 Former Employees are breaching enforceable non-competes by working for Reveal.[4]    Cynosure argues that 11 out of the 12 Former Employees should be preliminarily enjoined and displaced from their jobs at Reveal, and prohibited from working at all in the aesthetic laser and energy-based equipment industry, merely because they are engaging in ordinary competition with Cynosure.[5]  For the reasons stated *infra*, these non-compete provisions are unenforceable. The fact that the 12 Former Employees are working for Reveal does not establish that Cynosure will succeed on any viable claim, much less one that would warrant the extraordinary remedy of injunctive relief, particularly without the benefit of discovery.

Moreover, Cynosure has not shown that it will suffer irreparable harm without injunctive relief before discovery or trial.  Defendants have agreed to be bound by a stipulated order that protects Cynosure from irreparable harm.  Specifically, Defendants have offered to stipulate to an order that:

- Each of the 12 Former Employees shall refrain from disclosing or using any of Cynosure's confidential information or trade secrets to any person or entity or for any purpose whatsoever;

- Each of the 12 Former Employees shall return to Cynosure all confidential Cynosure property, whether in hard copy or electronic form, that remains in his or her possession, custody or control;

---

[4] In the FAC, Cynosure refers to the four documents that include restrictive covenants that some of the Former Employees signed as the "INNNA Agreement," which includes a 12-month non-compete, the "CEIP Agreement," which includes a 9-month non-compete, the "Hologic Agreement," which includes an 18-month non-compete, and the "Equity Agreement," which includes a 12-month non-compete.  To minimize confusion, Defendants use the same terms herein.

[5] Cynosure apparently concedes that there is no enforceable agreement with DeMarco, who signed an agreement after October 1, 2018, and thus Mass. Gen. Laws ch. 149, §24L applies to invalidate it.

- Daley and Chambers each shall refrain from soliciting, or attempting to solicit, any current Cynosure *employee* to work for Reveal or Reveal Ltd for a period of 24 months from the date that the last Former Employee resigned from Cynosure and subsequently joined Reveal; and the remaining 10 Former Employees shall refrain from soliciting, or attempting to solicit, any current Cynosure *employee* to work for Reveal or Reveal Ltd for a period of 12 months from their resignation date from Cynosure; and

- Reveal shall refrain from disclosing or using any of Cynosure's confidential information or trade secrets to any person or entity or for any purpose whatsoever.

## II.    FACTUAL BACKGROUND

Defendants' declarations, with exhibits thereto, establish the following facts[6]:

### A.  The Aesthetic Laser and Energy-Based Equipment Industry is Competitive.

The market to sell lasers and energy-based equipment, *i.e.* devices that radiate waves or electrical currents, to plastic surgeons, dermatologists, other medical practitioners, spas, and laser centers (together, "Providers") in the U.S. is very competitive.[7]  Providers use this equipment to perform aesthetic treatments, such as tattoo removal, scar reduction, hair removal and skin tightening procedures.[8]  A Provider's ability to treat patients depends on the type of laser or energy-based equipment that the Provider has.[9]  It is undisputed that Cynosure and Reveal are competitors

---

[6] Defendants submit Declarations, all dated August 31, 2022, from all of 12 Former Employees: Robert Daley ("Daley Decl.", Christopher Chambers ("Chambers Decl."), Cory Murrell (Murrell Decl."), Brogan Bair ("Bair Decl."), Joshua Smith ("Smith Decl.") , Michael Russo ("Russo Decl."), Kyle Shapero ("Shapero Decl."), Jason Kalso ("Kalso Decl."), David Krueger (Krueger Decl."), Dean Fiacco ("D. Fiacco Decl."), Robert Fiacco ("R. Fiacco Decl.") and Daniel DeMarco ("DeMarco Decl."), and Daniel T. Finnegan, Esq. ("Finnegan Decl.")

[7] *See* Murrell Decl. ¶ 6.  According to the Aesthetic Industry Association (AIA), an industry trade group, the aesthetic beauty treatment business is a 12.5 billion dollar industry.  *See* The Aesthetic Industry Association, *available at* *https://miinews.com/aesthetic-industry-association*.
[8] Murrel Decl. ¶ 6.
[9] *Id.*

4

in this business, along with many other vendors.[10]  The companies that compete in selling this aesthetic treatment equipment are well known to Providers because these companies (1) market their equipment on public websites; (2) have demonstration booths at trade shows and representatives who speak on panels at industry events; (3) reach out to Providers and invite them to product demonstration events; and because (4) many Providers comparison shop.[11]  In addition, sales people frequently move from one competitor to another. (Finnegan Decl., Ex. 1).[12]  For example, numerous Cynosure employees have left for competitors in the past several years. (Finnegan Decl., Ex. 1).

### B. Competitors in this Industry Aggressively and Openly Promote the Features, Functionality and Innovation of their Equipment and Products.

Cynosure and its competitors do not keep product information secret; they disclose such information by, among other things, holding webinars, placing advertisements in magazines, and issuing press releases.[13]  They make extremely detailed information available to anyone accessing their company websites.[14]

### C. The Identity of the Providers that Buy Equipment and Products Is Widely Publicized.

---

[10] In addition to Cynosure and Reveal, numerous other companies compete with Cynosure in selling lasers and aesthetic equipment in the U.S. including Cutera, InMode, Syneron, Lumenis, Zeltiq, Alma, Sciton, Ulthera, and Venus Concept.

[11] Murrell Decl. ¶ 7.

[12] Indeed, in the past five years, at least 75 Cynosure employees have left Cynosure and joined Cynosure competitors, other than Reveal. (Finnegan Decl. Ex. 1.)

[13] Murrell Decl. ¶ 8.

[14] For example, anyone who goes on Cynosure's website can look at Cynosure's "Elite IQ" laser removal machine, pictured on page 31 of the FAC; download an Elite IQ brochure to "see how it works;" watch a video about the Elite IQ and learn what promotional events and/or trade shows that Cynosure is participating in that will feature the Elite IQ. *See* Cynosure, EliteIQ, *available at* *https://www.cynosure.com/product/elite-iq/*.

Cynosure and its competitors do not keep Providers' identities secret.  To the contrary, they provide some version of a "practitioner locator" feature on their websites, which anyone can use to find Providers using Cynosure equipment within a specified distance of any U.S. zip code. (*See* Finnegan Dec. ¶¶ 4-8).   Salespeople typically identify Providers by searching the Internet and accessing other public sources of information and by cold-calling them.  (*See, e.g.,* Murrell Decl. ¶ 16; DeMarco Decl. ¶ 11). Once a sale is made, a salesperson will not attempt to sell the same product to the same Provider for years.  This is because the cost of lasers and other equipment sold by Cynosure and other competitors is typically in the range of $50,000 to $250,000, and has an average purchase price of roughly $150,000.  The lasers are expected to operate for between 5-7 years.[15]  As a result, a Provider that purchases a laser designed for hair removal is unlikely to purchase another, whether from the same company or from a competitor, for at least several years, but that same Provider may purchase a body contouring device, which they may, or may not, purchase from the same company that sold them the hair removal laser.[16]

### D.  Equipment Prices are not Confidential.

The prices for aesthetic laser and other equipment do not rise to the level of a trade secret, for at least four reasons.  <u>One</u>, as previously stated, sales people tend to move from competitor to competitor and thus they know (and share) the range of prices of equipment.[17]  <u>Two</u>, Providers will inform sales representatives about the price that a competitor offered and will ask whether Cynosure, or some other competitor, will match or beat the price.[18]  <u>Three</u>, asking Providers not to discuss or

---

[15] Murrell Decl. ¶ 9.
[16] *Id.*
[17] *Id.* at ¶ 18.
[18] DeMarco Decl. ¶ 13.

disclose pricing would anger the Providers.[19]  <u>Four</u>, Cynosure does not protect the pricing of its equipment, or the terms of purchase.  In fact, Cynosure has publicly filed at least two of its customer purchase agreements which show the customer's name, address and phone number, date of purchase, equipment purchased and the terms and conditions, including the price.[20]

### E.  Cynosure's Marketing  and Business Strategies are not Trade Secrets

Cynosure's marketing strategies are neither secret nor proprietary.  Cynosure markets its products at trade and road shows at which Cynosure publicly discloses its pricing, and current and future products to Providers.  (*See* DeMarco Decl. ¶ 12; Bair Decl. ¶ 13)[21]  Cynosure also publicizes its marketing strategies at industry and events, including "turnkey," (non-bespoke) marketing materials ready for immediate use.[22] In addition, Cynosure's website publicly conveys its marketing strategy.[23]  Further, Cynosure, and other companies in this industry, increasingly rely on social media, often using their own employees as content-creators, to market themselves and their products.[24]  Cynosure encourages and empowers its employees to become influencers, and content creators, using their own ***personal pages***, to market Cynosure products.  In a recent

---

[19] Cynosure's allegedly "customized" pricing is not confidential. There is no magic to offering a discount to a Provider in order to make a sale.

[20] *See* Finnegan Decl. Ex. 5.

[21] For example, Cynosure's website currently promotes two such events in San Diego and Santa Barbara, and Cynosure competitors are also participating in both.

[22] *See* www.cynosure.com/for-providers/partnership-information .

[23] Cynosure markets the PicoSure by describing it as "the first and only FDA-cleared 755nm picosecond laser on the market, the PicoSure Pro device uniquely delivers energy in a trillionth of a second, utilizing pressure instead of heat to provide safe and effective treatments for unwanted pigmentation and skin revitalization for all skin types." Cynosure's CEO goes on to divulge "a 50% increase in energy to new handpieces and an adjustable fluence" to be the performance enhancements to the new PicoSure Pro device, which has two lenses that are used to increase collagen and elastin, and a new user interface and new 5MM handpiece that is ideal for treating discrete lesions, lighter Fitzpatrick skin types and smaller treatment areas.

[24] For example, as recently as June 1, 2022, Cynosure announced the launch of the PicoSure® Pro device on its website. Cynosure's "official" Instagram page has 59,500 followers.

LinkedIn post, Cynosure emphasizes how important employees' posting, ***on their personal pages***, is to Cynosure's marketing success:

> With almost 22% of employees sharing our content on their personal pages, we cannot overstate how impactful this is for our social media presence. Thank you, each and every one of you, for helping us increase the effectiveness of our social media initiatives. We certainly can't do this without your help.  (Finnegan Decl. Ex. 4).

Cynosure's Linkedin page also states that it is "proud to be #3 in the USA's most Active Medical Devices Professionals on Social," when referring to "Medical Devices Professionals."[25] Cynosure is referring to its own employees posting content on their own personal pages). Cynosure disingenuously attempts to lay claim to certain Instagram accounts that the Former Employees used to post content while employed by Cynosure.  These Instagram accounts were created by these Former Employees. (*See* Bair Decl. ¶ 30-31; Shapero Decl. ¶ 29-30; R. Fiacco Decl. ¶ 20.)[26]  These Instagram pages are not confidential or proprietary "marketing channels," subject to seizure by Cynosure.  Cynosure also discusses its business strategies publicly and posts about such strategies on its website, LinkedIn and other social media platforms, using "on demand" webcasts and through its press releases.[27]

**F.  The 12 Former Employees Signed Documents that include Restrictive Covenants That are Purely Anti-Competitive and Therefore Unenforceable**

---

[25] *See* Finnegan Decl. Ex. 4.

[26] Two of the four Instagram pages have less than 500 followers, and the other two each have approximately 2500 followers.

[27] By way of example, Clayton, Dubilier & Rice ("CD&R"), the private equity firm that acquired Cynosure in 2019 announced its and Cynosure's business strategies as follows " …medical aesthetics is a "large market expected to experience continued robust growth…", and "[I]n addition to a targeted tuck-in acquisition strategy, we expect to continue to invest behind the company's strong brand and large global installed base to accelerate growth via expanded sales & marketing efforts and bring new products and technologies to market that both enhance the company's value proposition to its channel partners and improve clinical outcomes for end consumers."

Over the course of May and June 2022, the 12 Former Employees quit their jobs at Cynosure for the reasons described in their declarations: namely, the hostile culture created by the new senior management team put in place after Cynosure was acquired by CD&R.[28]  In addition, the new leadership had little to no experience in the aesthetic equipment market and they also changed sales quotas and commission structures, which many believed would result in lower commissions.  The 12 Former Employees also believed that Cynosure was not doing well financially, as was evidenced by inventory problems, quality control issues, and a lack of new products in the pipeline.

However, each of the 12 Former Employees signed documents that included, among other terms, (1) a confidentiality provision; (2) a customer non-solicitation provision; (3) an employee non-solicitation provision and (4) a non-compete provision.[29]  Defendants do not dispute that a non-solicitation as to Cynosure *employees* is enforceable, for a reasonable time period, and do not dispute that Defendants have an obligation not to use, or disclose, any confidential information belonging to Cynosure on behalf of a new employer.  Consequently, only the non-compete and customer non-solicitation of provisions are scrutinized herein.

## III.  ARGUMENT

## A.  <u>APPLICABLE LEGAL STANDARD</u>

---

[28] Other Cynosure employees moved to other competitors after this senior management team was put in place.

[29] All the employee covenant agreements executed prior to October 1, 2018 include Massachusetts choice-of-law provisions; the employee covenant agreements executed after October 1, 2018 all include Delaware choice-of law provisions, presumably so as to avoid the application of Massachusetts' Noncompetition Agreement Act ("MNAA"), Mass. Gen. Laws c. 149 Sec. 24L.

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). Its purpose "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The party seeking the injunction bears the burden of demonstrating each requisite factor. "The first two factors - likelihood of success on the merits and irreparable harm - are threshold issues; a plaintiff who is unable to demonstrate either must fail in his quest for preliminary injunctive relief." *Max-Planck-Gesellschaft zur Forderung der Wissenschaften E.V. v. Whitehead Inst. for Biomedical Research*, 650 F. Supp. 2d 114, 121 (D. Mass. 2009) (denying preliminary injunction where plaintiffs did not demonstrate a likelihood of success on their claims). In addition, when faced with affidavits in sharp dispute, courts generally do not issue a preliminary injunction. *Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc.*, 759 F. Supp. 2d 110, 125 n. 107 (D. Mass. 2010) ("[W]hen courts are faced with affidavits at odds and must make a credibility determination between them, courts generally do not issue a preliminary injunction, but rather leave the issue for a jury to resolve.")[30]

B.    **CYNOSURE HAS NOT SHOWN THAT IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS**

The Court must deny Cynosure's motion because Cynosure has not met its burden of proving that it will likely succeed on its claims that the 12 Former Employees have

---

[30] *See also Spencer Co. v. Armonk Indus., Inc.*, 489 F.2d 704, 707 (1st Cir.1973) (affirming denial of a preliminary injunction because of a "major factual dispute"); *see also Am. Century Home Fabrics, Inc. v. Ashley Furniture Indus.*, 473 F. Supp. 2d 168, 175 (D. Mass. 2007) ("[W]ithout reliable evidence procured through discovery and cross examination, the court has no meaningful basis from which to conclude that Plaintiff is sufficiently likely to prevail [such] that a preliminary injunction would be justified."); *Upromise, Inc. v. Angus*, No. CIV.A. 13-CV-12363, 2014 WL 212598, at *4 (D. Mass. Jan. 21, 2014) (denying preliminary injunction seeking to sideline employee due to disputes raised in affidavits).

misappropriated Cynosure trade secrets or other protectable confidential information. Nor has Cynosure produced evidence that 9 Former Employees have violated enforceable provisions in their covenant agreements, or that these 9 Former Employees engaged in the tortious conduct or conspiracy. With respect to the other 3 Former Employees, Daley, Robert Fiacco, and Chambers, Cynosure has not shown that it will suffer irreparable harm as a result of their alleged violations of the *employee* non-solicitation provisions, or their alleged breaches of their duty of loyalty.

### 1. CYNOSURE HAS NO TRADE SECRETS AT RISK

Although the 12 Former Employees were exposed to internal information as Cynosure employees, Cynosure has not established that any of this information rises to the level of a trade secret or some other confidential information worthy of protection.[31] To meet its burden of proof, Cynosure must do more than assert, in a conclusory fashion, that the 12 Former Employees "collectively" had "access to" important confidential information belonging to Cynosure. (*See* Kibbey Decl. ¶ 18). Cynosure has not proven that any of the information regarding customers that was allegedly taken[32] is actually proprietary or confidential information. [33] Cynosure merely references file names and lists, with some information inexplicably redacted, and the few "sample" files that Cynosure actually reviewed do not provide the required proof that any of the 12 Former

---

[31] Judge Kenneth W. Salinger, a Justice of the Superior Court of the Commonwealth of Massachusetts, issued a thoughtful and instructive opinion denying a motion for a preliminary injunction that Cynosure filed against several of its former employees and Cutera, a competitor, in *Cynosure v. Detter et al.*, and articulating why Cynosure had no trade secrets to protect. (Finnegan Decl., Ex. 2).

[32] Cynosure alleges that the following took internal information: four Former Employees accused of copying files onto a USB drive, (Kalso, Murrell, Russo, Shapero), one Former Employee who sent files to his Gmail mailbox, (Krueger), one Former Employee who sent files to his Drop Box (Smith), or Daley, who is accused of "wiping" his Cynosure-issued computer before returning it.

[33] Cynosure cites *SimpliVity Corp. v. Moran,* 33 Mass. L. Rptr. at *5-6 (Mass. Super. Ct. Aug. 14, 2016) for the proposition that the court should enforce the non-competes because some documents were placed onto external devices. However *SimpliVity* is distinguishable because the information the employee had access to there was "clearly confidential" and not publicly available as here.

Employees retained confidential information regarding any aspect of Cynosure's business.   And Cynosure does not actually keep the information confidential.[34]  At minimum, there are significant factual issues as to the 12 Former Employees' alleged access to, copying of and/or deletion of files that cannot be decided at this stage.  *See, e.g., Spencer Co*, 489 F.2d at 707 (affirming denial of preliminary injunction where there was a "major factual dispute").

*Equipment/Products*.  Cynosure has failed to prove that the 12 Former Employees know anything about Cynosure's products that any potential Provider could not easily learn from visiting Cynosure's website, speaking with a Cynosure sales representative at a trade show, or reading product brochures that Cynosure distributes to anyone expressing interest in its products. *See, e.g., Folsum Funeral Services, Inc. v. Rodgers,* 6 Mass. App. Ct. 843 (1978) ("That the defendant may have acquired through his employment by the plaintiff skills in and general knowledge of the . . . business does not justify enforcement of the covenant.").

*Providers.*  Cynosure has  failed  to  prove  that  the  12  Former  Employees  have  any confidential  information  regarding  Cynosure's  past  or  potential  Providers.   Cynosure publicizes the identity of its Providers through its own website.  (Finnegan Decl. 4 ).  While Cynosure alleges that it maintains a "central repository of confidential information on its Salesforce CRM database," and restricts access to it to employees with a need to access it, *see* Kibbey Decl. ¶29 and Trogolo Decl. ¶8, Cynosure fail to establish what information is in the database or which, if any, of the 12

---

[34] Cynosure's factual allegations about how it protects its data are, for the most part, merely smoke and mirrors, and, even if true, have no relevance here. For example, Cynosure contends that one needs a badge to access the physical buildings where its computers are, Trogolo Decl., ¶ 6, but the 12 Former Employees primarily worked from home, some who used Cynosure-issued laptops, and some who used their own personal computers. The fact is that Cynosure did nothing to prevent against sales representatives from transferring files to Dropbox accounts, copying documents to USB drives or using their own personal computers and email addresses.

Former Employees actually improperly accessed the Salesforce database, copied or retained information on the database, or otherwise used information on Salesforce to harm Cynosure.

_Pricing_.  Cynosure pricing is not confidential.  The Former Employees' declarations make clear that Cynosure (and their competitors') pricing is widely known in the industry.   In fact, Cynosure itself has publicly filed documents, or has not attempted to stop other parties from publicly filing documents, that include Cynosure's pricing information.  (Finnegan Decl., Ex. 5).[35]

_Future Business_.  When Cynosure was a public company, it discussed its product development and future business plans during presentations and earnings calls that Cynosure's CEO makes to, or when engaged in with, Wall Street analysts.  These presentations and calls were open to any member of the public and were not kept confidential or secret by Cynosure.[36]

**2.  CYNOSURE will not succeed on its breach of contract claims based on the non-compete provisions.**

Under Massachusetts law, a restrictive covenant in an employment agreement is enforceable "only if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest" such as the protection of confidential information, goodwill, and trade secrets."  _Invidia, LLC v. DiFonzo_, 30 Mass. L. Rep. 390 (2012)_; Sodexo Operations, LLC v. Abbe,_ 382 F. Supp. 3d 162, 165 (D. Mass. 2019).  Cynosure has not

---

[35] Cynosure relies heavily on _Nat'l Med. Care, Inc. v. Sharif_, No. 20-11460-MBB, 2020 U.S. Dist. LEXIS 204513, at *7 (D. Mass. Sep. 2, 2020) to argue that a defendant cannot avoid inevitable disclosure of confidential information. However, that case is inapposite.  In _Sharif,_ the employee at issue had an in-depth awareness of confidential information such as patient information, physician practice systems, and software programs tailored to nephrology medical practices.  Moreover, the company in _Sharif_ actively protected its confidential information by, among other things, investing significantly in information technology expenses. By contrast, the information the 12 Former Employees had access to was not confidential and Cynosure certainly did not take active steps to protect such information, despite its arguments to the contrary.

[36] _See_ Seekingalpha.com/symbol/CYNO/earnings/transcripts.

established that enforcement of the non-competes is necessary to protect any legitimate interest of Cynosure's, and these non-competes should be enforced so as to insulate Cynosure from ordinary competition. As a threshold matter, certain of the 12 Former Employees are not even subject to an enforceable non-compete. <u>One</u>, DeMarco entered into a CEIP Agreement, the only covenant agreement that he signed as a Cynosure employee, *after* October 1, 2018, and it does not comply with the MNAA and thus is unenforceable.[37] <u>Two</u>, at least Murrell,[38] Dean Fiacco, and Bair, were subject to material changes in their employment at Cynosure and never subsequently executed new restrictive covenants. Under Massachusetts law, a covenant not to compete is void if there are material changes in the employment relationship. *See AFC Cablesystems Inc. v. Clisham*, 62 F. Supp. 2d 167, 172–173 (D. Mass. 1999).[39] At a minimum, there are factual issues concerning material changes to employment such that the enforceability of the non-compete should not be decided by the Court at this stage. *See Rohm & Haas Elec. Materials, LLC*, 759 F. Supp. 2d at 125 fn. 107. <u>Three</u>, several of the 12 Former Employees, including at least Smith, Dean Fiacco,

---

[37] The MNAA requires a noncompetition agreement to be supported by a garden leave clause or other mutually agreed upon consideration. *See* M.G.L. c. 149, § 24L (b) (vii). The statute divides employees into two categories: those employees terminated without cause against whom the non-compete can never be enforced and those employees who resigned, or were terminated for cause, against whom the non-compete can be enforced if the company pays the employee. As to DeMarco, the MNAA applies to his non-compete and Cynosure did not comply with the MNAA.

[38] After his promotion to Vice President, Murrell subsequently signed two contracts with non-compete provisions, in November 2021, and December 2021. However, when these agreements were signed, the Canadian province of Ontario (where Murrell lives) had banned non-competes, rendering these unenforceable. *See* Ontario Bans Employee Non-Competition Agreements: What Does This Mean For Trade Secret Protection?, *available at* *https://www.lexology.com/library/detail.aspx?g=f5886909-845a-4839-9afe-68f72f2bb96e*.

[39] *See also Akibia, Inc. v. Hood*, 31 Mass. L. Rptr. 489, 2012 WL 10094508 (Mass. Super. Ct. Oct. 9, 2012) Each time an employee's employment relationship with the employer changes materially, such that they have essentially entered into a new employment relationship, a new restrictive covenant must be signed. Specifically, "[f]ar reaching changes in an employment relationship, *such as changes in the rate of compensation* or sales area, suggest that the parties have abandoned their old arrangement and entered into a new employment relationship. *Patriot Energy Grp., Inc. v. Kiley*, No. SUCV2013-04177-BLS1, 2014 WL 880880, at *7 (Mass. Super. Feb. 26, 2014). Cynosure's decision to change commission compensation may also constitute a material change in the employment relationship requiring the execution of a new non-compete agreement.

and Bair, are working at Reveal in *entirely different roles* than they had at Cynosure and thus are not providing "similar services" at Reveal. Four, to the extent that Cynosure seeks to enforce the two-year non-compete provision in the Hologic Agreement against the four Former Employees who signed it, (Bair, Chambers, R. Fiacco, and Shapero), there is no evidence that in accepting employment with Reveal, these four Former Employees is engaged in any business "competitive with the products and services then offered or planned to be offered" by Hologic. *See e.g., Netscout Sys. v. Hohenstein*, 34 Mass. L. Rep. 148 (2017) (Although non-compete was validly assigned, it protected against competitors of the original company selling assets, not competitors of the buyer of those assets who was the assignee). Five, Jason Kalso, an employee based in Washington State, signed restrictive covenants with both Massachusetts and/or Delaware choice of law and venue provisions, which violates Washington law governing Washington based employees (which applies retroactively), and voids *all* of Kalso's non-competes.[40] *See* RCW 49.62.050-100, *see also CVS Pharm., Inc. v. Brown*, 2021 U.S. Dist. LEXIS 49450 (W.D. Wash. Mar. 16, 2021) ("First, the Court finds CVS's non-compete unenforceable because it requires Brown to 'adjudicate a noncompetition covenant outside of' Washington."). And six, David Krueger, who is based in Illinois, did not receive adequate consideration for signing the Equity Agreement because the term of his continued employment and any purported professional and financial benefits were insufficient. *See Fitfield v. Premier Dealer Servs.*, 993 N.E.2d 938 (Ill. Ct. App. 2013).

---

[40] And at the very least, Kalso's contractual claims cannot be resolved in this forum.

Putting aside these enforceability issues, Cynosure also has not shown that any of the 12 Former Employees is in possession of any proprietary information belonging to, and kept confidential by Cynosure, or that any of them could, and is likely to, harm Cynosure's goodwill, if they were to continue to work for Reveal.[41]  Further, the balancing of the interests of the 12 Former Employees and the public support that these non-competes are unenforceable.  Indeed, Cynosure concedes that enforcing them would prevent the 12 Former Employees from working in the aesthetic equipment industry.  (*See* Dkt. No. 4 at p 20.)  Defendants' Declarations demonstrate the harm that they would suffer.  Moreover, the public interest in labor mobility and mitigating monopoly is served by competition.  *See Townsend Oil Co., Inc. v. Tuccinardi*, Nos. 144242, 1984CV04024-BLS2, 2020 Mass. Super. LEXIS 12, at *6 (Jan. 13, 2020) (denying preliminary injunction where employee's right to compete promoted the public interest).  Accordingly, the balancing of interests weighs against preliminary injunctive relief to enforce the non-competes.

3. **CYNOSURE will not succeed on its breach of contract claims based on the customer non-solicitation provisions.**

Regarding the *employee* non-solicitation provisions, Defendants have agreed not to solicit Cynosure employees until the Court enters an order otherwise, rendering additional injunctive relief on these provisions unnecessary.[42]  Regarding the *customer* non-solicitation provisions, these

---

[41] *See Richmond Bros., Inc. v. Westinghouse Broadcasting Co.,* 357 Mass. 106, 110 (1970)(declining to enforce non-compete where the nature of the industry was such that defendant was not in possession of any of the plaintiff's trade secrets or confidential information communicated to defendant during employment); *National Hearing Aid Centers, Inc. v. Avers,* 2 Mass. App. Ct. 285 (1974) (non-compete was invalid where defendant was selling a different brand of hearing aid and there was no indication that defendant used confidential information).

[42] And in any event, Cynosure has only specifically alleged  that 4 of the 12 Former Employees solicited employees. In addition to Daley and Chambers, Cynosure alleges Bair-Chambers must have solicited two former Cynosure employees because the former Cynosure employees, who have since joined Reveal, used to work with Bair-Chambers. (FAC ¶ 52). This is not evidence that Bair-Chambers violated her non-solicitation covenant.  Cynosure also alleges

provisions are over-broad; not reasonably tailored to protect Cynosure's legitimate business interests, and thus are unenforceable.    As recognized by the Massachusetts Superior Court, Cynosure typically makes only <u>one</u> sale of its capital equipment to a Provider, and generally does not make repeated sales to the same Provider for many years.  (*See* Finnegan Decl. Ex. 2.)  Thus, Defendants are not "in a position to exploit customer contacts made while employed by [Cynosure]" and pose no threat to good will that Cynosure has established with past customers. *See National Hearing Aid Centers*, 2 Mass. App. Ct. at 291-292; *accord Folsum Funeral Services*, 6 Mass. App. Ct. 843 (holding that covenant not to compete was "completely unenforceable" where plaintiff company did not make repeated sales to the same customers and where defendant used skills acquired through his employment by plaintiff).[43] The balancing of interests weighs against granting injunctive relief as to the customer non-solicitation provisions.[44]

## C.    CYNOSURE HAS NOT SHOWN IRREPARABLE HARM

Even if Cynosure had demonstrated some reasonable likelihood that it will succeed on the merits of its claims, which it has not, Cynosure has failed to show a "significant risk" of irreparable

---

that R. Fiacco allegedly solicited a Cynosure employee. (Caballero Decl., ¶ 11).   However, according to R. Fiacco, this is untrue.  (R. Fiacco Decl., ¶¶ 23-27).  This presents yet another factual dispute.

[43] And of course, Defendant Reveal did not execute any non-solicitation provision with Cynosure and is free to solicit any Provider to whom Cynosure may have sold equipment, and otherwise compete for business against Cynosure, so long as Reveal does not do so "through improper motive or means." *Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc.*, 68 Mass. App. Ct. 582, 608 (2007).  It is perfectly lawful to try to lure away customers from a competitor out of "a desire for financial or competitive gain" at the competitor's expense. *Id.* at 609 (reversing jury finding that defendant tortiously interfered with customer relationships). Cynosure has not shown that Reveal has interfered with Cynosure's customer relationships in some other improper manner. Thus, Cynosure is highly unlikely to succeed on its claim that Reveal has tortiously interfered with any of the Former Employee's covenant agreements.

[44] Nor is there evidence in the record to establish that Cynosure will succeed on its tort or other claims.  There is no evidence in the record demonstrating that each Defendant interfered with Cynosure's relationship with its employees or customers for an improper motive and using improper means.  It is not enough to say that any Defendant spoke with a Cynosure employee, or might be doing business with a Provider who also did business with Cynosure.  *See G.S. Enters. Inc., v. Falmouth Marine, Inc.,* 410 Mass. 262, 272 (1991).

harm.  *See Am. Science & Eng'g, Inc. v. Kelly*, 69 F. Supp. 2d 227, 235 (D. Mass. 1999).    A

finding of irreparable harm cannot be grounded on "conjecture, surmise, or a party's

unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II*, 370 F.3d

at 162. [45]    Cynosure's allegations are wholly speculative and not of an immediate nature, and

Cynosure has no evidence of actual harm. As stated, *supra*, Cynosure has not established that any

of the 12 Former Employees has access to, or the ability to use or disclose, its "trade secrets" or

any protectable confidential information and even if they had such information, Defendants have

agreed not to use or disclose it. There is no evidence that Defendants have used any knowledge of

Cynosure's equipment, customers, pricing, *etc*. "to undercut Cynosure prices."[46]  Moreover, even

if Reveal was undercutting Cynosure's prices, this claim is for economic harm, which alone will

not suffice as irreparable harm unless "*the loss threatens the very existence of the movant's

business*."[47]   Cynosure has provided no evidence that its entire business is at stake.  In fact, in a

May 17, 2022 press release, which was after 6 of the Former Employees had submitted their

resignations, Cynosure announced a new $60 million investment from CD&R, and represented

---

[45] The First Circuit is clear that mere "[s]peculation or unsubstantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction."  *In re Rare Coin Galleries of America, Inc.*, 862 F.2d 896, 902 (1st Cir.1988).

[46] With the exception of what Reveal disclosed voluntarily, Cynosure has no evidence that any Individual Defendant has solicited (or even spoken to) any customer of Cynosure, and the fact that Reveal has sold equipment to two customers who apparently bought equipment at some point in time from Cynosure is not evidence either that (1) the sale was made based on the improper use of Cynosure's confidential information, or (2) the customer would have otherwise bought equipment from Cynosure.

[47] *See e.g.  Tir-Nel Mgmt. v. Bd. Of* Health, 433 Mass. 217, 227-28 (2001) ("Economic harm alone, however, will not suffice as irreparable harm unless the loss threatens the very existence of the movant's business."); *see also Ikon Office Solutions, Inc. v. Belanger*, 59 F. Supp. 2d 125, 132 (D. Mass. 1999) ("To the extent [defendant] might disparage or lure any customers from [plaintiff]. . . there is no evidence he has done so to date . . . [plaintiff] may pursue money damages at trial.").

18

that its sales "grew by over 45% in 2021 and over 30% year-over-year in the first quarter of 2022." (*See* Finnegan Decl. Ex. 3).

### D.    BALANCING THE HARMS WEIGHS IN FAVOR OF DEFENDANTS.

Cynosure's allegations suggest that it may suffer harm in the form of future lost Provider revenue, which is measurable and compensable.  By contrast, preventing the Former Employees from working for Reveal, or from working in the aesthetic laser and energy-based equipment industry at all, will cause them to lose their sole source of income, shut down Reveal, and put other Reveal employees out of work.  The potential harm to the 12 Former Employees, and other innocent employees of Reveal, is considerable and irreparable.  The balancing of harms weighs decidedly in Defendants' favor.[48]

For all of the reasons set forth above, Defendants respectfully request the Court deny Cynosure' Motion for a Preliminary Injunction on the conditions that Defendants stipulate to: not disclosing Cynosure's Confidential Information, and not soliciting Cynosure employees, as provided in the Order.

---

[48] *See Grease Monkey Int'l, Inc. v. Ralco Lubrication Servs., Inc.,* 24 F. Supp. 2d 120, 125 (D. Mass. 1998) (denying preliminary injunction where defendants' "ability to earn a living in his chosen field would be extinguished or at least substantially curtailed if he were enjoined."); *RE/MAX of New England, Inc. v. Prestige Real Estate, Inc.*, 2014 WL 3058295, at *4 (D. Mass. July 7, 2014) ("Taking the motion [for a TRO and Preliminary Injunction] as a whole, the balance of the hardships and the public interest both weigh heavily in favor of the defendants . . . If enjoined, they would effectively have to go out of business.").

Dated:   August 31, 2022

Respectfully submitted,
**REVEAL LLC, ROBERT DALEY, CHRISTOPHER CHAMBERS, BROGAN BAIR- CHAMBERS, JOSHUA SMITH, MICHAEL RUSSO, DAVID KRUGER,** _____

By their attorneys,


By:   */s/ Christopher J. Marino*
Christopher J. Marino | BBO #655007
Davis Malm
One Boston Place, 37th Floor
Boston, MA 02108
Telephone:  617-367-2500
cmarino@davismalm.com


By: */s/ Maureen McLoughlin*
Maureen McLoughlin
Daniel Finnegan
Davis + Gilbert LLP
1675 Broadway
New York, NY 10019
mmcloughlin@dglaw.com
dfinnegan@dglaw.com
Ph: 212-468-4910

Dated: August 31, 2022


**CERTIFICATE OF SERVICE**

I, Christopher J. Marino, hereby certify that a true copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 31st day of August 2022.


 */s/*
 _____