**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CYNOSURE, LLC, et al.;

        Plaintiffs,

   v.

REVEAL LASERS LLC., et al.;

        Defendants.

Civil Action No. 1:22-CV-11176-PBS

**REPLY MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR ENTRY OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I.    <u>INTRODUCTION</u>

On July 17, 2022, Reveal Lasers launched in North America.  That day, Defendant Chris Chambers (Reveal Lasers' now Chief Operating Officer) declared on LinkedIn that his new employer had so many "new customers at launch," it was like a "dream."[1]  Ten days later, Reveal Lasers published a photo of the "team of people"—27 of them —who had "brought Reveal to life":



*Id.*, Ex. 2.  Just two months before, ***every single person*** in the picture was working for Cynosure.[2]

This case does not involve "ordinary competition," as Defendants contend.  Instead, it arises from calculated and clandestine efforts undertaken by Cynosure's now-former employees to gain a competitive advantage on behalf of an entity that had no North American operations just two months ago but is now suddenly Cynosure's *direct* competitor.  These individuals—directed by Reveal Lasers—diverted sales leads, downloaded trade secrets, hijacked social media accounts, solicited the most successful sales employees to defect, targeted the most likely customers to poach using the most effective sales strategies, and more.

In opposing preliminary injunction, Defendants seek to distract the court from that big picture with a variety of arguments.  All should be rejected:

---

[1] Supplemental Declaration of Joseph Farris ("Supp. Farris"), Ex. 1.
[2] Supplemental Declaration of Lowinn Kibbey ("Supp. Kibbey") ¶ 3.

First, Defendants say they neither took nor possess any confidential trade secret information. But the thousands of files secretly copied, downloaded or otherwise taken by defecting employees included, among other things, sales leads, extensive compilations of customer information and data, pricing information, marketing materials, comparative product data and analyses, and employee compensation figures. This information is non-public, confidential, and of material value. That is precisely why the departing employees took it. Moreover, the former employees include senior sales executives who were privy to confidential, high level strategic discussions within Cynosure about product innovation plans, sales and marketing strategies, and other competitively significant topics. These individuals, who are now leading Reveal, simply cannot erase or expunge this information from their heads.

Second, Defendants say not all of the former employees engaged in misappropriation and that enjoining all of them (and Reveal) from competing sweeps too broadly. But that reasoning disregards Cynosure's legitimate interest in protecting both its confidential information (even if not trade secret) and the customer goodwill it has developed over considerable time and at substantial expense. Further, even if none of the Defendants had misappropriated *anything* (which is not the case), a raft of binding cases have held that Cynosure would *still* be entitled to enforce the non-compete agreements to protect the company's customer relationships and goodwill. And there is substantial goodwill at stake here; despite Defendants' claims, Cynosure's business does not consist of making "one-off" sales to customers who then purchase nothing more from Cynosure for several years. To the contrary, Cynosure derives substantial annual revenue from repeat sales made to its installed customer base.

Third, Defendants make a series of scattershot challenges to certain of the agreements entered into by some (but not all) of the former employees. These arguments likewise are

meritless.  Many are predicated on Massachusetts law and can be dispatched because the most recent non-competition agreement with each Defendant contains an enforceable *Delaware* choice of law provision.  Others are based on misstatements of the law and/or facts.

Finally, the harm to Cynosure's relationships from the competitive activities of former employees in violation of their contractual agreements is irreparable.  Indeed, in less than two months, the mass defection that Defendants secretly orchestrated to Reveal has caused Cynosure's actual and anticipated revenue for 2022 to drop significantly.  Moreover, it is not enough to require Defendants simply to "return" the trade secret and confidential information they have taken and enjoin them from soliciting more customers or employees.  Putting aside that Defendants have *not* returned this information even as of this date, that remedy amounts to the proverbial closing of the barn door after the horse has left (or was stolen).  There is already evidence since this Court granted the temporary restraining order ("TRO") that Defendants will use tortured readings of the TRO to target Cynosure customers and employees with the very information that they took and, which is still, at a minimum, in their heads.  Given the harm to Cynosure, enforcement of the non-compete agreements is not only an appropriate remedy, it is the *only* appropriate remedy.

## II.    ARGUMENT

### A.    Cynosure Is Likely To Succeed On The Merits On All Claims.

#### 1.    Cynosure Is Likely To Show Misappropriation Of Trade Secrets.

Defendants principally argue that Cynosure's salespeople did not have access to *any* trade secrets. [3]  This is wrong, as shown below.  Compl. ¶¶ 41-48; Kibbey Decl. ¶¶ 18-25.

---

[3] Defendants argue that their affidavits create "factual disputes" and urge the Court not to weigh competing evidence or assess credibility.  But, at the preliminary injunction stage, the Court may draw "plausible inference[s]" regarding competing evidence. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 12 (1st Cir. 2013); *Nat'l Med. Care, Inc. v. Sharif*, 2020 WL 6318922, at *6-7 (D. Mass. Sept. 2, 2020) (granting preliminary injunction enforcing non-competition agreement after "weighing all the evidence.").  It is particularly proper for the Court do so here, given the semantic games played by Defendants in their affidavits. *E.g.,* Daley ¶ 65 (denying that he "recruited" any Cynosure employees to Reveal and claiming he only had "conversations . . . about job opportunities . . ., of which Reveal was one.").

Sales Leads.  Because Defendants cannot credibly argue that sales leads are not trade secret information, they do not attempt to do so.  *See People's Choice Mortg., Inc. v. Premium Cap. Funding, LLC*, 26 Mass. L. Rptr. 582, at \*15 (Mass. Sup. Ct. Mar. 31, 2010) (finding employer's customer leads constituted trade secrets).  Nor do they deny such information was taken.  Instead, they say that they did not intend to misuse the information or did not end up using it.  But whether something is a trade secret does not turn on whether the misappropriation is done with intent.  For example, David Krueger forwarded himself 13 separate Salesforce leads via email before he left.  Dkt. 6 ¶¶ 63-65; Exs. 39-51.  He ***admits*** that he was "intending to reach out to those customers after [he] left Cynosure," which he calls "common practice," but then says that he ultimately did not because he worried "Cynosure would try to make my life difficult."  Krueger ¶ 26.  Dean Fiacco likewise forwarded himself a list of 16 "warm leads" just days before he departed.  Dkt. 6 ¶¶ 67; Ex. 53.  He now provides the conclusory denial that he "never sent any Cynosure document to [his] Gmail with the intention of exporting those leads to Reveal," but he fails to proffer any "Cynosure business purpose" he may have had.[4]  D. Fiacco ¶ 24.  Proven to have re-scheduled customer meetings to dates that would fall after his secretly-planned departure, Daniel DeMarco downplays these as "preliminary and informational only" and suggests that the leads should have been his to keep because "Cynosure played little to no role in identifying these potential customers."[5]  DeMarco ¶ 26.  As detailed in the Declaration of Yunior Caballero, new Defendant

---

[4] Fiacco forwarded himself the leads several months after he was admittedly holding business meetings setting up Reveal Lasers' operations.  Fiacco dismisses those Reveal business meetings as mere "due diligence" that he did casually during his "downtime" and "without direction from Daley."  D. Fiacco ¶¶ 19-22.  Recently, Cynosure also discovered that Fiacco was using its sales administration employees to conduct Reveal business as late as July 20, 2022.  Supp. Roma ¶¶ 22-25, Exs. 13-15.

[5] Variations of this theme appear throughout Defendants' affidavits:  Defendants seem to suggest that they own and are entitled to keep their Cynosure work product if they did not receive direct assistance from upper management on any given project.  This is, of course, not so.  They were paid by Cynosure to do this work and it never belonged to them.  *See, e.g.*, Equity Agreement § 5.1 (all work product created during work hours at home or elsewhere and with

Mark Sargent lied to a customer about a "new Cynosure product" supposedly coming out to forestall an imminent sale and divert the lead until after Reveal's launch. Dkt. 43 ¶ 17.

Additionally, new evidence has emerged showing that Reveal employees are in fact following up on known Cynosure leads. On August 16 and 18, Cynosure received misdirected emails from a lender showing that Defendant Jason Kalso's team (including two other new Defendants) solicited a customer that was a Cynosure sales lead in Oregon. Cynosure's team had done an in-office demo for the provider just months before but was unable to close the sale because the provider could not obtain credit at the time.[6] Kalso (or his team) apparently contacted the lead and sold her a Reveal device once her credit improved. Supp. Roma ¶¶ 13-16, Ex. 6-8.

Customer Profile Information Including Customer Lists. Multiple Defendants were also found to have exported Cynosure internal customer information, frequently in the form of customer lists or documents reflecting purchase history (such as purchase agreements or "laser purchase sheets"). Defendants contend that such materials are not trade secrets because Cynosure maintains a "Provider Locator" on its website. They are wrong. In *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 239 (D. Mass. 2011), the court rejected the defendants' argument that a customer list could not be a trade secret where the plaintiff's "public website provide[d] the name and address of [plaintiff's] customers," recognizing that "even the initial step of compiling a comprehensive list of the names and addresses of [plaintiff's] customers would be difficult; since searches on [plaintiff's] website are limited by zip code, compiling a comprehensive list would require methodically entering each zip code in the country, one at a time." *Id.* This is exactly how

---

or without the use of Plaintiffs' facilities, materials, and resources "belong solely to [Plaintiffs] from conception as 'works made for hire'"); CEIP § 4 (similar).

[6] Interestingly, knowledge of credit approval here appears to be quite relevant to a sales lead—contradicting Kyle Shapero's sworn statement that the "Credit Approval" lists he copied could never be helpful to him. Shapero ¶ 25.

Cynosure's Provider Locator works, as Defendants well know.  Finnegan Decl. ¶¶ 4-8.[7]

Moreover, Cynosure's trade secrets consist of various subsets of ***internal compilations of customer information*** through which they focus their selling efforts (sometimes from public sources and often not from public sources).[8]  Even Defendants' own affidavits make plain that these lists are work product that reflect substantial effort to compile.  For example, Jason Kalso took dozens of customer sales tracking lists. Dkt. 6 ¶ 58, Ex. 29.  He claims he "built [his] client list through grit and initiative" (Kalso ¶ 6)—but he forgets on whose behalf he was working when he did that and ***who was paying him*** to do it.[9]  Similarly, Daley argues that he did not believe a customer list purchased by Cynosure (Dkt. 6, Ex. 16) was confidential information because "anyone" could purchase it.  Daley ¶¶ 81-82.  How convenient for Reveal, which, on this logic, can avoid ***both*** the time-consuming effort needed to build its own lists ***and*** the cost of buying lists simply by having its new hires take lists developed or purchased by Cynosure.

<u>Pricing</u>.  Defendants also claim Cynosure "publicly discloses its pricing" (Opp. at 8) but submit no supporting documentary evidence, which should have been easy to do if price lists were, in fact, publicly available.[10]  Indeed, their own affidavits acknowledge that Cynosure's pricing is customized and varies by deal.  *See* Daley ¶ 13 ("[S]ales representatives are told that a product can

---

[7] Defendants' counsel says that he found "160 publicly identifiable Cynosure customers" searching in a zip code, but omits that he needed to click through 27 separate pages to do that, as only 6 results return at a time.  Supp. Farris ¶ 5, Ex. 3.  To compare that data to Cutera's provider locator, as he claims to have done, he would have had to manually export that data page by page.  In fact, as Defendants admit, the Provider List is a ***poor way*** for salespeople to identify useful information.  *E.g.,* R. Fiacco ¶ 30 ("Although Cynosure does have a provider locator, it is not kept up to date . . . [and] even if I determine that a provider bought a product from Cynosure, it is possible that this purchase was made more than 10 years ago."); Bair-Chambers ¶ 38 (Provider Locator is "inaccurate and out of date").

[8] Cynosure has submitted examples of the lists copied by Kalso and Shapero (pending motion to seal).  Supp. Farris, Exs. 4-5.

[9] *See also* DeMarco ¶ 11 (claiming he "spent time" building his customer list); D. Fiacco ¶ 11 (describing his "personally curated customer lists").

[10] An example of a non-public pricing and commission matrix is submitted (pending motion to seal).  Supp. Roma ¶ 26, Ex. 16 & 17.

be sold within a certain price range determined by the company . . . ."); Shapero ¶ 13 (" . . . my employers provided me with a list range of prices of the products . . . if I wanted to go below the minimum sales price, I would need authorization from senior management.").  Nor is it true, as Defendants claim, that Cynosure provides pricing information to customers with no expectation of confidentiality.  To the contrary, Cynosure's customer purchase agreements expressly state that pricing is confidential.  Such language is contained in Purchase Agreements and Laser Purchase Sheets that Jason Kalso copied.  Dkt. 6-30; 6-31 (excerpt of list of Kalso copied file); Supp. Farris, Ex. 6 (example of Cynosure standard purchase contract stating under "CONFIDENTIALITY" that "[c]ustomer agrees to respect this relationship by not disclosing any information regarding product pricing and other related terms.").  This is not available to a competitor.

Marketing Processes.  Defendants claim that Cynosure had no marketing processes or playbooks that would be useful to a competitor and that Cynosure provided no support or training to its salespeople.  Not true.  For example, Josh Smith copied a document to his Dropbox titled "CSM Lead Pre-Closing Guide," which provides a playbook for salespeople with strategies, advice, talk tracks, and more on topics like "Lead Generation - New Devices," and "Pre-Close Call Information."  Supp. Farris, Ex. 7.[11]  *Hundreds* of other documents reflecting similar marketing and training materials were copied to the same Dropbox.  Dkt. 6, ¶ 54, Exs. 25 & 26.[12]

Relatedly, Defendants continue to claim that the ***Cynosure team*** Instagram accounts that they used for marketing (now deactivated by the TRO) belonged to them personally.  The purpose of the accounts was to promote Cynosure—not employees' "personal brands"—which is proven

---

[11] Relevant to Defendants' argument about pricing, the guide also instructs salespeople: "***Don't give out pricing!*** A pricing range might be okay, but never quote an exact price." (emphasis added).

[12] Smith attempts to excuse this copying by claiming that he later "deleted" these files but conveniently omits to say *when* he deleted those files.  J. Smith ¶ 13.

by the fact that the accounts were ***shared*** by Cynosure teams.  *See JLM Couture, Inc. v. Gutman*, 2022 WL 2914531, at \*10–11 (S.D.N.Y. July 25, 2022) (granting preliminary injunction in favor of employer in dispute about ownership of social media account and considering factors like the purpose of the account and "whether employees or members of the entity had access to the account and participated in its management").  In fact, in each case, the Defendants who maintained a disputed account admit that they were shared accounts used by other Cynosure employees.  Bair-Chambers ¶¶ 30-32 (admitting that she "shared the log-in" with another "Cynosure coworker" and the other coworkers' phone number was listed on account); Shapero ¶¶ 29-30; R. Fiacco ¶ 20.[13]

  Strategic Information and Innovation Pipeline.  The most senior former employees (Daley, Chambers, Murrell, and Bair-Chambers) also participated in executive-level discussions concerning the company's strategic plans.  Although this group of Defendants now denies having had access to Cynosure strategic information, that is simply untrue.  Supp. Kibbey ¶¶ 4-6.  All occupied high level management positions that afforded them broad insight into Cynosure's business on topics such as what products were selling well across the nation and regions, what customers wanted to see in future innovation, how Cynosure's R&D was responding and developing products, which sales teams were strongest, and how Cynosure was allocating resources in different regions, and making strategic decisions about these topics.  *Id.*  This information, which cannot be deleted from a computer or returned on a USB drive, is exactly the type of information that courts have found most difficult to effectively "set aside" from memory, which particularly justifies the use of non-competition agreements to protect those trade secrets.  *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995).

  Competitive information.  Defendants suggest that Reveal's salespeople never make

---

[13] Each of these people also appears to maintain separate personal Instagram accounts.  Farris Decl. ¶ 6.

comparisons with competing products and that this information would not be "useful" to them. Not true. To illustrate, one of the files copied by Josh Smith (pending motion to seal) was titled "CONSOLIDATED COMPETITIVE OVERVIEW.pdf" and was dated November 2021. Supp. Farris, Ex. 8. The document (which bears the legend in all capital letters "CONFIDENTIAL") contains detailed competitive information for multiple Cynosure products. That this type of work product may contain some "public" data does not undermine its confidential nature, which derives, in part, from the effort required to identify, organize, and compile the information in a useful way. *See Allstate Ins. Cor. V. Fougere*, No. 16-11652-JGD, 2019 WL 4776986, at *20 (D. Mass. Sept. 30, 2019) ("The fact that some of the information can be obtained from public sources does not prevent a business from requiring that it be kept confidential where, as here, the compilation itself would be difficult.") (citing *Optos*, 777 F. Supp. 2d at 239).

<u>Employee and Compensation Information</u>. Finally, Defendants fail to meaningfully address Cynosure's claim to trade secrets regarding its employee and compensation information. But there is direct evidence that Bob Daley copied Cynosure's compensation information when he built Reveal's compensation plan (Dkt. 6 ¶ 42, Ex. 9), and employees are explicitly instructed that this information is confidential. Supp. Roma ¶ 26, Exs. 16 & 17.

### 2. Cynosure Is Likely To Show That The Individual Defendants Breached Enforceable Restrictive Covenants

Separate and apart from the need to protect Cynosure's confidential information, injunctive relief is independently warranted by the former employees' breaches of their various restrictive covenant agreements (and Reveal's involvement with, and benefit from, those breaches). It is well settled that restrictive covenants will be enforced to protect a number of legitimate business interests, including the protection of confidential information, goodwill, and trade secrets. *SimpliVity Corp. v. Bodranko*, 204 F. Supp. 3d 340, 349 (D. Mass. 2016) (citing *Boulanger v.*

*Dunkin' Donuts, Inc.*, 442 Mass. 635, 641 (2004)).  Under this standard, the Court "does not need to find that the confidential information [defendants] had access to qualifies as a trade secret, given that a non-competition agreement may be used to protect both trade secrets <u>and</u> confidential information." *Id.* (emphasis in original).  Perhaps more important, an employer has an independent "legitimate interest" in enforcing its non-competition agreements to protect its investment in developing customer goodwill.[14]  The goodwill developed by Cynosure's salespeople was not personal to them; it was based on Cynosure's investments in their training, support, and payment of expenses for them travel around the country to show its products and entertain clients, for which they were rewarded with salary, commissions, and even equity.  Supp. Kibbey ¶¶ 7-9.

Defendants argue that Cynosure does not in fact develop *any protectable customer goodwill* because, they say, Cynosure "generally does not make repeated sales to the same Provider for many years."  Opp. at 18.  This is demonstrably false.  In fact, Cynosure makes many types of "repeat sales" to customers and this is one of the key metrics that Cynosure tracks to understand its own customer base and develop strategy to maximize sales and revenue.  Supp. Kibbey ¶¶ 11-17.  This data shows that a large percentage Cynosure's capital equipment sales[15] so far in 2022 were made to existing customers that had a made at least one capital purchase between 2018-2021.  *Id.* (exact percentage pending motion to seal).  When the company's "post-sales" practice and "services revenue" is factored in, the importance of repeat customers becomes even more apparent.

---

[14] *All Pro Maids, Inc. v. Layton*, No. CIV.A. 058-N, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004) ("An employer has an interest in the goodwill created by its sales representatives . . . which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs. This is particularly true where, as here, the evidence demonstrates the importance of personal contacts to the success of a company."), *aff'd*, 880 A.2d 1047 (Del. 2005); *Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280, 287 (1974) ("[A]n employer is entitled to have protected as his or her goodwill a customer base which an employee has developed or acquired through the training and resources provided by the employer.").

[15] "Capital equipment sales" refers to the sale of machines that represent a large capital investment by providers. A single capital equipment transaction can be between $100,000-$500,000.  Dkt. 6 ¶ 7.

The very nature of post-sales is to make sales to "repeat" customers for non-capital equipment.  *Id.*  Similarly, Cynosure generates ongoing revenue from services provided to existing customers, such as preventative maintenance or repair services.  *Id.*  Together, revenue from existing customer accounts in these categories accounts for around over 55% of total revenue in North America.

Defendants' own affidavits even repeatedly state that past sales to customers are correlated to future sales opportunities.  *E.g.,* Bair-Chambers ¶ 3 (describing how in her "post-sales role" at Cynosure, she "located providers ***who had purchased Cynosure lasers*** and other energy-based systems . . . and ***tried to sell them*** Cynosure-branded consumable products"); Krueger ¶ 10 (describing his practice of ***circl[ing] back to customers*** to whom [he] had previously made a sale to see if they were interested in making another purchase"); Kalso ¶ 11 ("[I]n some respects focusing on providers who have previously purchased a laser, or other piece of aesthetic equipment, is an efficient sales strategy."); Murrell ¶ 9 (conceding that providers may purchase different types of machines from the same provider or different providers after buying one type of machine); Shapero ¶ 22 ("[C]ustomers who purchase Cynosure equipment are quite likely to purchase other equipment from Cynosure competitors.").  Further, if lists of past sales information was not useful, then why did so many defecting employee take this information before they left?

But perhaps the best evidence proving this point is that Reveal has been systematically targeting ***recent*** Cynosure customers since its launch (even while it has been bound by a TRO intended to prevent that).  As just a few examples known to Cynosure:

- On July 15, Rob Fiacco sent text messages soliciting at least two Cynosure customers that he had shared with Yunior Caballero (who only learned of it because those customers reported it to him and sent him the text message).  Dkt. 43 ¶ 20.  Both of those customers had last purchased capital equipment from Cynosure in 2021. Supp. Roma, Ex. 1 & 2.

- On July 29, new Defendant Jason Steinhorn solicited a Cynosure customer via an office visit in Kentucky.  (The customer reported the visit to Cynosure.)  Holsted Decl. ¶¶ 5-6.

That customer last purchased capital equipment from Cynosure in March 2022. Supp. Roma, Ex. 3.

- On August 11, Cynosure received a misdirected email showing that Victoria Bailey (a new Defendant) met with a Cynosure customer based in Florida on August 10 about an allocation of brochures—presumably related to an already-closed Reveal sale. Supp. Roma, Ex. 4. That customer had purchased capital equipment from Cynosure just months before in March 2022 from Shapero, Russo, and (new Defendant) Matthew Calabrese. *Id.*, Ex. 5.

- On August 23, Jason Steinhorn came in to a Cynosure customer's office in Tennessee for a visit with pamphlets. Holsted Decl. ¶¶ 7-10. That customer last purchased capital equipment in May 2022. Supp. Roma, Ex. 9.

In one particularly striking example, on August 29, one of Cynosure's customers posted on Instagram that her office would be offering a Reveal product "soon." Supp. Roma, Ex. 10. This provider is the very definition of a "repeat" Cynosure customer—having made capital purchases in 2017, 2018 (on two separate occasions) and 2020 (on two separate occasions) for various products including an Icon system, a Tempsure system, a Sculpsure system, and a Picosure. Supp. Roma, Ex. 11. During that time, the provider had contact with multiple Cynosure salespeople who are now Defendants, including Daley, Bair-Chambers, Russo, Bushman, Steinhorn and Malone. In fact, Bushman's notes (sent to Malone) on an internal Cynosure customer list describe this customer as "VERY IMPORTANT" because she helps Cynosure "sell a lot of lasers." Supp. Roma, Ex. 12. (Indeed, the same list, while not one of the documents known to be taken, is an excellent example of an internal customer list that reflects the importance of targeting customers that will "buy more" and tracking which customers to avoid to maximize success). *Id.*[16]

In arguing that Cynosure does not have "repeat" sales, Defendants rely on a 2015 decision by Superior Court Judge Salinger in *Cynosure v. Detter, et. al.*, MICV2015-00724, which they

---

[16] This list describes numerous other customers as valuable because of their potential to be repeat customers (e.g. "will buy more") or to provide referrals, while indicating others that are not worth effort to attempt to sell to (e.g., "do not go here"; "don't waste your time").

claim "recognized" this point.  *Id.*[17]  The *Detter* opinion does not describe what, if any, evidence was presented to the court on that point.  The available record makes clear, however, that the case involved notably different facts.  Among other distinctions, there was no evidence that any defendant in *Detter* "made off with confidential information regarding past Cynosure customers"—conduct that indisputably occurred here.  The court in *Detter* was focused on customer names—not the detailed customer information at issue here (live leads, devices purchased, creditworthiness, etc.).  Further, in assessing the potential threat to Cynosure's goodwill, the court in *Detter* was faced with a much different scenario, involving a handful of employees who had decamped for an established competitor with its own pre-existing customer base—not a situation where, as here, 27 employees left simultaneously to launch a new entrant to the North American market and were charged with creating a customer base out of thin air.

### 3.    Defendants Cannot Show That The Non-Competes Should Not Be Enforced For Any Other Reasons.[18]

There is a well-established body of cases in which courts have enforced non-compete agreements under similar, and typically far less egregious, facts.  *See, e.g., Nuance Commc'ns, Inc. v. Kovalenko*, 2022 WL 2347112 (D. Mass. June 29, 2022) (Casper, J.); *Get in Shape Franchise, Inc. v. TFL Fishers*, LLC, 167 F. Supp. 3d 173 (D. Mass. 2016) (Saris, J.); *Harlan Labs., Inc.  v. Campbell*, 900 F. Supp. 2d 99 (D. Mass. 2012) (Saris, J.).  Defendants raise a host of arguments as to specific individual defendants to try to avoid the effect of these cases.  None has merit:

*First*, Defendants argue that DeMarco's non-compete agreement cannot be enforced under

---

[17] Tellingly, one of the few cases cited by Defendants on "repeat" customers other than *Detter* is *Folsom Funeral Serv., Inc. v. Rodgers*, 6 Mass. App. Ct. 843 (Mass. App. Ct. 1978).  In that case, the court unsurprisingly found no evidence that customers made "repeat" purchases of **undertaking services** offered by a funeral home.

[18] Defendants concede that the employee non-solicitation and confidential information prongs of the various restrictive covenant agreements are enforceable.  Opp. at 9.

the Massachusetts Noncompetition Agreement Act, M.G.L. c. 149 § 24L ("MNAA") because Cynosure did not "pay" DeMarco, via "garden leave," for his non-compete.  Opp. at 14 n. 37.[19] But the MNAA states that, in lieu of garden leave, a non-compete agreement may be supported by "***other mutually-agreed upon consideration*** . . . provided that such consideration is specified in the noncompetition agreement."  MNAA at § 24L(b)(vii) (emphasis added).  In Section 1 of the CEIP (and the recital paragraph), DeMarco and Cynosure memorialized their mutual agreement that the "consideration" for the post-employment "restrictions" included his "employment or continued employment," access to "Confidential Information," "authorization to communicate and develop goodwill with [Cynosure] customers," and/or "specialized training relating to [Cynosure's] business."  Each of these bargained-for types of consideration is suffice to support DeMarco's agreement.  *See Optos, Inc.*, 777 F. Supp. 2d at 232 (access to confidential information "may be additional consideration above and beyond continuing employment" to support restrictive covenant); *NuVasive, Inc. v. Day*, 2019 WL 2287709, at *4 (D. Mass. May 29, 2019).

> ***Second***, Defendants argue that Murrell, Dean Fiacco, and Bair-Chambers were subject to "material changes" in their employment and never executed new restrictive covenant agreements, thus voiding their non-competition agreements under Massachusetts law.  This argument is a red herring; each of these employees last entered into restrictive covenant agreements governed by ***Delaware*** law—not Massachusetts law.  Dkt. 7 ¶ 9.  Defendants do not cite (and Cynosure is not aware of) any Delaware courts that have adopted Massachusetts' material change doctrine.  *See Harlan*, 900 F. Supp. 2d at 108 (declining to enforce material change doctrine to contract governed

---

[19] Contrary to the Defendants' assertion, Cynosure has not conceded that DeMarco's non-compete agreement is unenforceable.  *See* FAC (Dkt. 63) at ¶¶ 150-158.  Additionally, the MNAA expressly exempts customer and employee non-solicitation agreements and confidentiality agreements from its definition of "noncompetition agreement."  M.G.L. c. 149 §24L(a).  Accordingly, even if DeMarco's non-competition provision were unenforceable, his non-solicitation and confidentiality obligations would be unaffected.

by Indiana law). In any event, both Murrell and Bair-Chambers also agreed to non-competition provisions in connection with two separate Equity Agreements that were entirely distinct from their underlying employment agreements—and based on new consideration in the form of the receipt of equity options. *Newell Rubbermaid Inc. v. Storm*, No. 9398-VCN, 2014 WL 1266827 (Del. Ch. Mar. 27, 2014) (equity grant was adequate consideration). They surely did not "mutually abandon[] and rescind[]" the Equity Agreements when taking on new duties. *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 16 (1st Cir. 2009) (material change doctrine applicable when the parties "mutually abandoned and rescinded" the prior employment agreement).[20] As to Dean Fiacco, even if Massachusetts law applied, his "material change" argument would still fail, as he admits that his job change was a standard promotion within the exact same field. D. Fiacco ¶ 12; *see Astro-Med*, 591 F.3d at 7, 16-17 (promotion to district sales manager "does not reflect a mutual abandonment and recission of the non-competition provision").

**Third**, Smith, Dean Fiacco, and Bair-Chambers assert that their non-compete agreements cannot be enforced because they "are working at Reveal in *entirely different roles* than they had at Cynosure and thus are not providing 'similar services' at Reveal." Opp. at 14. But, as noted above, the Court is not required blindly to accept Defendants' assertions that their duties are not similar, particularly when, as here, (i) there is ample reason to doubt their self-serving job descriptions[21], (ii) it is undisputed that the companies directly compete (Opp. at 5), (iii) both Dean

---

[20] Defendants also allege that Murrell executed his CEIP and second Equity Agreement at a time when Ontario (where Murrell resides) had banned non-competition agreements (but not other restrictive covenants, e.g., non-solicitation agreements). Opp. at 14, n. 38. This is another red herring because Murrell executed his *first* Equity Agreement in June 2020, before the ban went into effect in October 2021. Dkt. 7 ¶ 9. Bair-Chambers also previously entered into two separate INNNAs, which provided that "any change or changes in []her duties, salary or compensation after the signing of this Agreement shall not affect the validity or scope of this Agreement." *See A.R.S. Servs., Inc. v. Morse*, 31 Mass. L. Rptr. 227, 2013 WL 2152181, at *9 (Mass. Super. Ct. Apr. 5, 2013).

[21] For example, Smith's final title at Cynosure was National Field Marketing Manager and his current title at Reveal is Vice President of Marketing. ECF 7 ¶ 33. Similarly, while Smith led event marketing for Cynosure's sales organization (ECF 6 at ¶ 15), his current duties for Reveal also include "events and social media strategy." J. Smith

Fiacco and Smith exported relevant, confidential information from Cynosure before going to Reveal, and (iv) each of the three former employees has a leadership role at Reveal—giving them ample opportunity to manage and interact with others in different roles at Reveal (which in any event is clearly composed of a close-knit group of people that will be interacting across roles).

**Fourth**, Defendants argue that Cynosure cannot enforce the restrictive covenants in the Hologic Agreements against Bair-Chamber, Chambers, R. Fiacco, and Shapero because their employment at Reveal Lasers is not competitive with Hologic. Opp. at 15. This is a moot point— each of these employees signed Equity Agreements with Lotus Parent (ECF 63-1), meaning that the Court does not need to enforce the Hologic Agreement to grant the preliminary injunction.[22]

**Fifth**, Defendants argue that Kalso's non-compete agreement is void and/or unenforceable in this Court under Washington law (where he is a resident).[23] RCW 49.62.050-100. This is also wrong. Kalso's Equity Agreement is governed by Delaware law, which he agreed would apply. In any event, the Washington non-competition law would not apply for the separate reason that the consideration for the agreement involved equity options relating to ownership interests in the company. RCW 49.62.010(4)(d) (excluding persons "otherwise . . . acquiring . . . an ownership interest" in the company from non-competition restrictions).

---

¶ 15. Bair-Chambers also appears to hold a similar sales role to the one she held at Cynosure. ECF 7 ¶ 33. And while Fiacco claims to now be in "Operations," his own forwarding of "warm leads" to himself indicates that he was going to find a way to misuse Cynosure information in his new role. Dkt. 6 ¶¶ 67; Ex. 53.

[22] Defendants are also wrong on the merits, as Cynosure was a "Hologic Affiliate" (as defined in the Hologic Agreement (ECF 7, Ex. 5 "Recitals")), and thus, even if Plaintiffs merely "stand in the shoes" of Hologic, the employees would still be prohibited from competing against Cynosure. *Netscout Sys., Inc. v. Hohenstein*, 34 Mass L. Rptr. 148, 2017 WL 1555399, at *5 (Feb. 15, 2017).

[23] Similar to the MNAA, the Washington law expressly does not encompass non-solicitation (both customer and employee) and confidentiality provisions. RCW 49.62.010(4)-(5). Accordingly, those provisions of his agreements would be enforceable against Kalso in this forum in any event.

***Sixth***, Defendants argue that Cynosure cannot enforce Krueger's non-competition agreement because the "term of his continued employment and any purported professional and financial benefits were insufficient" under Illinois law.  Opp. at 15.  Defendants offer no explanation for this claim, other than to cite an Illinois case holding that seven months of continued employment was not sufficient consideration for a non-competition agreement.  *Fifield v. Premier Dealer Servs.*, 993 N.E.2d 938 (Ill. Ct. App. 2013).  But Krueger's agreements are governed by Delaware law, so Illinois law is irrelevant.  Further, even under Illinois law there was sufficient consideration for both Krueger's CEIP[24] and Equity Agreement[25].

### B.    Cynosure Has Shown That It Will Suffer Irreparable Harm.

The record is replete with evidence of irreparable harm to Cynosure in the loss of its goodwill, customers and trade secrets.  *See Picker Intern. Corp. v. Imaging Equip. Servs., Inc.*, 931 F. Supp. 18, 44 (D. Mass. 1995) ("The misuse of trade secrets is generally deemed to involve irreparable harm.");  *Sharif*, 2020 WL 6318922, at *14; *Bondranko*, 20 F. Supp. 3d at 350-51.[26] Defendants' suggestion that the existence of "actual harm" is "wholly speculative" because of an investment by CD&R in Cynosure earlier in 2022 makes no sense.  At the time of the CD&R investment, Cynosure was projecting significant higher revenues for 2022.  Since then, a huge

---

[24] Courts have since rejected *Fifield*'s bright-line rule requiring two years' employment to support a restrictive covenant agreement.  *See Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900, 906 (C.D. Ill. 2015).  Krueger worked for Cynosure for approximately 21 months (Sept. 2020 - June 2022).  Accordingly, even notwithstanding the equity options, this would be an adequate period under Illinois law.  *See id.* at 909 (21-month employment, combined with a voluntary resignation, adequate consideration for restrictive covenant agreement).

[25] *Stericycle, Inc. v. Simota*, No. 16 C 4782, 2017 WL 4742197, at *6 (N.D. Ill. Oct. 20, 2017) (stock options adequate consideration for restrictive covenants even if options never vest or result in monetary payout).

[26] Defendants misstate the law on irreparable harm by arguing that Cynosure cannot obtain injunctive relief to prevent "economic harm" unless "its entire business is at stake."  Opp. at 18.  But this is not the relevant standard.  Defendants extracted that language from a completely inapt case, *Tri-Nel Mgmt., Inc. v. Bd. of Health of Barnstable*, 433 Mass. 217, 228 (2001), which involved a challenge to "governmental actions" in the context of a restaurant smoking ban.

portion of its salesforce defected to Reveal, causing Cynosure not only to suffer a material reduction in revenue but also to incur substantial expenses to replace those employees.[27]

Indeed, in less than two months, the mass defection that Defendants secretly orchestrated to Reveal has caused Cynosure's actual and anticipated revenue for 2022 to drop by a significant amount. Supp. Kibbey ¶¶ 18-21 (pending motion to seal). And the revenue shortfall is directly attributable to those districts where the defecting employees previously worked. For example, in the Carolinas and Georgia district, which was impacted by the loss of 3 employees to Reveal, Cynosure's revenues are down materially against projections. By contrast, in districts in Canada, which did not lose district salespeople to Reveal, revenues have exceeded projections. In FY2022 alone, Cynosure is certain to lose significant revenue as a result of Defendants' actions.

Defendants next argue that there is no threat of irreparable harm because they have "agreed not to use or disclose" trade secrets. Opp. at 19. This is not enough. Courts regularly enforce non-compete agreements to prevent the risk of irreparable harm—even in cases where there is good reason to think that the enjoined party would have made a good faith effort to protect its interests. *See Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 130-31 (D. Mass. 2011); *SimpliVity v. Moran*, 33 Mass. L. Rptr. 587, at *11 (Mass. Sup. Ct. Aug. 14, 2016) ("Only by prohibiting employees, like [defendant], who are privy to confidential and proprietary information, from going to work for a direct competitor for a period of time, can [former employer] protect its confidential information."). The need for injunctive relief and full enforcement of the non-competition agreements is even more compelling where, as here, the conduct both before and during this litigation confirms that Cynosure will suffer irreparable harm without full enforcement

---

[27] Indeed, while Defendants protest that they found 75 former Cynosure employees who allegedly left the company to join one of its competitors without reprisal (Opp. at 5 n. 12), Cynosure's forbearance there only proves its point here. The conduct at issue in this case is *far* from ordinary competition in the industry.

of the non-compete agreements. Even since the litigation commenced and Cynosure obtained a TRO, Defendants have leapt headfirst through every loophole (real or perceived) they could find. As one example (discussed above), days after entry of the initial TRO, Reveal sent Jason Steinhorn (a new Defendant who was not named at the time) into the office of one of his former Cynosure leads to solicit business on behalf of Reveal. Holsted Decl. ¶¶ 5-6. Cynosure accordingly was forced to seek modification of the TRO to make clear that it prohibited Reveal from using *any* former Cynosure employees, whether named as an individual defendant or not, to solicit any of Cynosure's customers. Dkts. 50-52. Even with that modification, as detailed above, Reveal has continued to try to poach Cynosure's customers and business.

Defendants were also ordered to "identify all Cynosure confidential information" in their possession within 7 days of the original TRO and provide it for "forensic examination." TRO ¶ 5. They thereafter failed to comply with these obligations, and, as of the date of this filing, have still not returned a single file or provided an inventory of which Former Employees' devices and accounts contain Cynosure confidential information. Supp. Farris ¶¶ 12-20, Exs. 9-14.[28] Cynosure has absolutely no reason to trust that Defendants will comply with any order containing exceptions and carveouts that would allow them to play a shell game with the definition of "customers," to solicit customers indirectly via their coworkers, or to shuffle roles within the organization by claiming changed job duties, or otherwise parse the injunction until it is meaningless, as they have done to date. This entire litigation was only necessary because Defendants worked in secret for *months* (or, in Daley's case, a year) to concoct a scheme to harm Cynosure and misappropriate its confidential information and personnel. Defendants have lost the benefit of the doubt. Full

---

[28] As reflected in the attached meet and confer correspondence, Defendants have taken the position that no "forensic examination" is required (notwithstanding the language of the TRO that *they* proposed) and, despite insisting on conducting their own return protocol, have failed to actually do anything except stall and delay.

enforcement of the non-competition agreements is necessary.

     **C.**    **Cynosure Has Shown That The Balance Of Harms Weighs In Its Favor And Supports Enforcement Of The Non-Competition Agreements.**

Defendants' sole argument in weighing the balance of harms is their claim that they will suffer financially if they are restricted from working at Reveal. The question of who takes the financial hit as between Reveal and the employees (assuming they wait out the non-competition period) is up to them. Cynosure has no objection to Reveal's paying the employees while they are enjoined from working for it; Cynosure objects only to their providing services to Reveal during the non-competition period. Moreover, it bears repeating that these were highly-compensated employees at Cynosure—most making over $500,000 per year and all making well over $100,000 on an annualized basis. Supp Roma, Ex. 18. All of them had many options for employment outside of Reveal if they were unhappy at Cynosure.[29] Instead, they all chose to help *create* a direct competitor in knowing violation of their non-compete obligations and in a coordinated way that maximized the harm to Cynosure from the collective impact of their violations. The only effective way to stop the bleeding from that staggering collective blow is an injunction enforcing Defendants' non-compete obligations.

---

[29] In fact, many previously worked in different industries. *See* Daley ¶¶ 6-8 (recruiting firm; medical device company; "dental instrument" company); Shapero ¶¶ 4-6 ("ear, nose, and throat" medical device company; Medtronic; cosmetic surgery device company); Murrell ¶ 9 (9 years at Xerox); Russo ¶ 3 (two pharmaceutical companies); D. Fiacco ¶ 5 ("numerous positions, some in sales, for a variety of industries," including a "data science startup" and "software development startup"); J. Smith ¶ 5 ("clinical director" for a physician).

Dated:  September 14, 2022

Respectfully submitted,

CYNOSURE, LLC
LOTUS PARENT, INC.

By their attorneys,

*/s/ Michael J. Pineault*
Michael Pineault (BBO No. 555314)
ANDERSON & KREIGER LLP
50 Milk Street, 21st Floor
Boston, MA 02109
mpineault@andersonkreiger.com
T: +1 617.621.6578
F: +1 617.621.6619

Dipanwita Deb Amar
Joseph Farris
Matthew Diton
ARNOLD & PORTER KAYE SCHOLER LLP
3 Embarcadero Center, 10th Floor
San Francisco, California 94111
dipanwita.amar@arnoldporter.com
joseph.farris@arnoldporter.com
matthew.diton@arnoldporter.com
T: +1 415.471.3100
F: +1 415.471.3400

*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I, Michael J. Pineault, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on September 14, 2022.

*/s/ Michael J. Pineault*
Michael J. Pineault