### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

_____
|                                            )
CYNOSURE LLC, and LOTUS PARENT,              )
INC.,                                        )
                                             )
                 Plaintiffs,                 )
                                             )      Civil Action
v.                                           )      No. 22-11176-PBS
                                             )
REVEAL LASERS LLC, *et al.*                  )
                                             )
                 Defendants.                 )
_____     )

### MEMORANDUM AND ORDER

November 9, 2022

Saris, D.J.

### INTRODUCTION

Plaintiffs Cynosure LLC and Lotus Parent, Inc. (collectively "Cynosure") bring this action against twenty-eight former employees who allegedly violated their noncompetition and non-solicitation agreements and disclosed confidential information when they resigned from Cynosure and went to work for a competitor, Reveal Lasers LLC and Reveal Lasers Ltd. (collectively "Reveal"). Cynosure moves for a preliminary injunction against twelve of the former employees, most of whom were executives and senior managers in the company. Since the initiation of the suit, Cynosure has sought relief against the additional employees who left Cynosure and joined Reveal. The Court will not address the additional employees in this opinion.

1

Cynosure asserts the following causes of action against all defendants: violation of the Defend Trade Secrets Act, the Massachusetts Trade Secrets Act, and M.G.L. c. 93A; conspiracy; and tortious interference with contractual relations and prospective business relations. Against the former employees, Cynosure alleges breaches of contract, duty of loyalty, fiduciary duty, and the implied covenant of good faith and fair dealing. Cynosure also accuses Reveal of aiding and abetting breach of fiduciary duty.

After hearings, and a review of the extensive briefing and record, the Court **ALLOWS IN PART** and **DENIES IN PART** Plaintiffs' motion for a preliminary injunction (Dkt. 3).

## BACKGROUND

### I.   The Raid

Plaintiffs presented evidence to support the following facts.

Cynosure is a Massachusetts-based manufacturer of medical aesthetic treatment devices, such as laser hair removal, skin revitalization, scar reduction, gynecological health, and body contouring machines. Cynosure has thousands of customers in the United States and Canada. At the start of 2022, Cynosure's North American sales organization was composed of approximately 110 employees in North America. A sales transaction typically results in around $100,000 to $500,000 in revenue. The sales process can take weeks or months and involves substantial direct customer contact. The field sales team works directly with customers to sell products and move customers through the

pricing and credit approval process. Cynosure also has a "post-sale" team which supports customers after the initial sale of the capital product and generates goodwill. This post-sales relationship with customers results in additional sales leads for laser products and incremental revenue from consumable components and topical skin care products.

In July 2022, Reveal, an Israeli company, launched a new North American affiliate, which is a direct Cynosure competitor. It will offer aesthetic technology products and services that will compete directly against Cynosure products across many sectors including laser hair removal, skin revitalization, body contouring, scar reduction, and gynecological health. The two companies use the same "energy based" technology. Reveal recruited Cynosure's employees to jumpstart its business.

Altogether, twenty-eight Cynosure employees, including the most senior employees in sales and marketing across the country, resigned to join Reveal. The mass resignation occurred over five weeks from May to June 2022 and resulted in the simultaneous loss of 20% of the sales organization. Three of the defendant employees (Chris Chambers, Robert Daley, and Cory Murrell) were the three most senior field sales leaders at the company, overseeing the North American field sales organization. Others were managers in field sales in different districts in the country. Six of the former employees earned over $500,000 in 2021, and every former employee who worked the entirety of 2021 made over

$200,000. Some of the senior leaders not only helped orchestrate the departure of integral members of Cynosure's salespeople, but also copied and transferred Cynosure files and data onto personal devices and email accounts. Despite being sent an exit package, which included a copy of the restrictive covenants each employee signed, the employees collectively took thousands of Cynosure documents, including sales leads, customer contact information, call lists, and customer agreements and purchase orders. The parties dispute how much confidential information was taken. All of the employees signed noncompetition agreements and non-solicitation of employee and customer agreements.

## II.   **The Twelve Employees**

### A. Robert Daley

Mr. Daley was one of the most senior field sales leaders at Cynosure upon his departure, having worked at Cynosure from 2006 to May 3, 2022. In his seventeen years at Cynosure, Mr. Daley's career progressed from a Field Sales Representative to Regional Sales Manager to Area Business Director for the East Coast to Senior Regional Director of Sales. In his position as Senior Regional Director of Sales, Mr. Daley oversaw the work of Field Sales Representatives who sold Cynosure products in New England, New York, Pennsylvania, New Jersey, Delaware, Washington D.C., Virginia, and Maryland.

Mr. Daley began to work at Reveal on May 9, 2022, as its Chief Executive Officer. At Reveal, Mr. Daley was "responsible for building

all aspects of the business from the ground up" and "oversee[ing] all company operations." Dkt. 82 ¶ 58. This includes working with Reveal's Global CEO to determine the direction of the company, engaging and working with distributors and vendors, communicating with employees on Reveal's product pipelines, addressing employee benefits and compensation, and managing company-related expenses. Id.

Mr. Daley was communicating and working alongside Reveal as early as March 2021. He was even developing Reveal's North American business plan and recruiting plan while employed at Cynosure. He also recruited Cynosure employees to work for Reveal. Mr. Daley performed a complete wipe of his Cynosure-issued computer before resigning.

### B. Cory Murrell

Mr. Murrell is another one of Cynosure's most senior sales leaders. Mr. Murrell currently resides in Ontario, Canada, where he previously worked for Cynosure. He started his work at Cynosure in 2013, beginning as an Area Sales Manager in Ontario, then as the Director of Sales for Canada, and finally, Area Vice President of Sales for Canada and the U.S. Western and Midwest Region. As Area Vice President, Mr. Murrell was responsible for managing sales directors, developing Cynosure's management team, supporting business growth, creating strategy initiatives, and developing products. He resigned in May 2022 after expressing dissatisfaction with the management and quality of products at Cynosure.

Mr. Murrell is now employed as a Vice President of Sales for Reveal. Because the Canadian operations have not been launched, Mr. Murrell has not met with potential customers yet, but he has been evaluating Reveal's products, conducting training, and overseeing some sales representatives. In his role as Vice President of Sales, Mr. Murrell will be responsible for Reveal's Canadian sales force.

As a senior management leader at Cynosure, he was also privy to high level company strategic evaluations and decisions. He had a USB drive that was returned to Cynosure in August 2022.

### C. Christopher Chambers

Mr. Chambers was the North America Vice President of Sales, a senior sales position, at Cynosure. He began working at Cynosure in 2015 as an Area Sales Manager and was consistently promoted during his tenure at the company. He was first promoted to District Sales Manager, then Regional Sales Director Southeast, Regional Sales Director South/Southeast, Area Business Director East, and finally, Vice President of Sales. At Cynosure, Mr. Chambers was "privy to high level company strategic evaluations and decisions concerning the company's innovation pipeline[.]" Dkt. 6 ¶ 48.

Mr. Chambers resigned on May 2, 2022, effective immediately. At Reveal, Mr. Chambers is the Chief Commercial Officer, responsible for "growing through innovation and marketing service, creating good margin on deals through negotiating with vendors on parts and transfer prices." Dkt. 86 ¶ 13.

### D. Kyle Shapero

Mr. Shapero is a Florida resident who was the District Sales Manager for the Florida District at Cynosure. He began working at Cynosure in November 2018 as a District Sales Manager and resigned with the same title on May 31, 2022. At Reveal, he is a Regional Sales Director, overseeing a larger territory than he did at Cynosure.

His management role at Reveal includes "establishing commission structures, creating marketing materials, and consulting with engineers about new laser and energy-based aesthetic technologies, which [he] did not do at Cynosure." Dkt. 81 ¶ 20.

Mr. Shapero copied at least 90 files from his Cynosure computer to a personal USB drive on May 3, 2022. These files included information regarding potential customers, customer contact information, internal customer "purchase sheets," lists explaining each customer's creditworthiness, selling playbooks, and customer pitch decks. Dkt. 6 ¶ 60. The USB drive was returned to Cynosure in August 2022.

### E. Michael Russo

Mr. Russo is a New York resident who was the Senior Business Manager at Cynosure. Mr. Russo worked for Cynosure from 2008 until May 2022. In his position as Senior Business Manager, he had "broad leadership influence over field sales throughout the entire Eastern region of the country." Dkt. 6 ¶ 10. Mr. Russo assisted Mr. Daley and Mr. Chambers in managing Cynosure's East Coast sales team and was specifically focused on "resolving issues arising in the pre-sales

phase." Dkt. 79 ¶ 8. At Reveal, he is the Vice President of Business Development and is responsible for post-sales operations and manages the Clinical Support team.

Mr. Russo copied over 200 files from his Cynosure computer onto a USB device on May 20, 2022. Cynosure contends these documents are confidential; Mr. Russo disagrees. The USB drive was returned to Cynosure in August 2022.

### F. Robert Fiacco

Mr. Fiacco worked at Cynosure from October 2019 to May 2022. He began his work as a sales representative for the southeastern region of the United States while living in Florida and was later promoted to District Sales Manager for the New York region, prompting a relocation to New York. As a District Sales Manager, he managed a team of fives sales representatives. At Reveal, he is the Regional Sales Director for the Northeast Region of the United States and manages seven states, including New York.

Cynosure accuses Mr. Fiacco of recruiting for Reveal and misappropriating a Cynosure Instagram account. Mr. Fiacco notes this is a personal Instagram account from which he posted Cynosure content, and he says he never referred any employees to Reveal.

### G. David Krueger

Mr. Krueger was the District Sales Manager for the Midwest Region at Cynosure and is now the Regional Sales Director for Reveal. He worked for Cynosure from September 2020 to June 2022 and resides in Illinois.

At Cynosure, he was responsible for sales operations in Illinois, Wisconsin, and Lake County, Indiana; at Reveal, he is responsible for field sales in twelve states in the Midwest.

Mr. Krueger forwarded thirteen separate "live" sales leads that had been provide to him by Cynosure's Salesforce CRM Administrator to his personal email. Mr. Krueger had planned to reach out to those customers after he left Cynosure, but ultimately decided not use those leads. He disputes Cynosure's characterization of these leads as being promising potential sales opportunities, but admits he spoke with one person which "was a coincidence unrelated to [his] having forwarded Salesforce information related to [the lead] over a month earlier and [the lead] did not purchase anything from Reveal." Dkt. 78 ¶ 27.

### H. Jason Kalso

Jason Kalso was a District Sales Manager for Cynosure's Pacific Northwest District, where he was responsible for leading sales for the region. Mr. Kalso worked for Cynosure from May 2013 to May 2022. He now works as a Regional Sales Director for Reveal, where he has "taken on more responsibility [and] a larger geographic territory". Dkt. 83 ¶ 30. Mr. Kalso lives and works in Washington State.

On May 21, 2022, Mr. Kalso copied over 15,000 files from his Cynosure OneDrive folder to a USB device. Cynosure summarizes some of the files Mr. Kalso copied as "hot lists" that track potential customers, called "hot leads," and other customer lists; customer agreements and purchase orders; and internal customer "purchase sheets"

that track information on closed sales, pricing, and details of assets. Dkt. 6 ¶ 58. The USB drive was returned to Cynosure in August 2022.

### I. Joshua Smith

Mr. Smith began to work at Cynosure in 2015 and resigned in May 2022. He started out as an Account Specialist, then was promoted to a National CSM Trainer, until he was the National Field Sales Marketing Manager. Mr. Smith indicates that he "lacked a clearly-defined role" and "function[ed] as a sort of jack-of-all-trades." Dkt. 84 ¶ 8. He trained employees in post-sales, onboarded new sales representatives, developed relationships with event presenters and speakers, and traveled and hosted road shows.

At Reveal, he is the Vice President of Marketing, and he reports that his role involves responsibilities he did not have at Cynosure. As Vice President of Marketing, Mr. Smith's responsibilities "include brand creation and strategy, photography/videography strategy, influencer outreach, budget planning, website development, events and social media strategy, sales material creation, digital marketing strategy, and patient marketing material creation." Id. ¶ 15.

Two hundred and eight files were "copied or uploaded to a Dropbox account on April 29, 2022." Dkt. 11 ¶ 23. The Dropbox account was synched to Mr. Smith's Cynosure computer and contained over 10,000 files that Mr. Smith could have accessed. The files included the onboarding playbook, marketing documents and customer pitch decks, competitive

information regarding Cynosure's marketing of its products, and event registration lists with attendee contact information.

### J. Brogan Bair[1]

Ms. Bair was the head of the post-sale sales team at Cynosure and was one of Cynosure's most senior employees. At Cynosure, her role was Director of Sales Practice Development for North America, and she is now an Area Vice President of Sales for Reveal. Ms. Bair worked for Cynosure from November 2015 to May 2022. Ms. Bair has worked at Cynosure as a post-sale representative, a sales representative position, the Director of Customer Success, and finally, in February 2022, Director of Sales Practice Development. At Reveal, she is "responsible for managing direct sales employees in the field in New Jersey, New York, Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, and Vermont." Dkt. 75 ¶ 26.

Ms. Bair was privy to numerous types of sensitive documents about Cynosure, including a list of "Cynosure's install base for all customers." Dkt. 6 ¶ 55. Ms. Bair denies any wrongdoing.

### K. Dean Fiacco

Mr. Dean Fiacco was the District Sales Manager for the Northeast Region at Cynosure. Mr. Fiacco worked for Cynosure for just eleven months, from April 2021 to May 2022. As District Sales Manager, he "was primarily responsible for closing sales that Area Sales Managers had

---

[1] In her declaration, Ms. Brogan Bair states that the caption lists her name as Brogan Bair-Chambers, but her last name is Bair. The Court will use her correct last name.

originated, managing a small sales team and ensuring that our team met its sales quota." Dkt. 80 ¶ 12.

As Vice President of Operations at Reveal, Mr. Fiacco is "in charge of operations at Reveal, which includes managing the day-to-day functions of Reveal, such as payroll, IT, software, and vendor management." Id. at ¶ 17.

Mr. Fiacco met with at least six different operation vendors beyond the scope of his duties while employed at Cynosure. In his emails, Mr. Fiacco indicates they are for a "start-up" that he would be "running ops" for, and Cynosure is adamant these meetings were for Reveal. Dkt. 6 ¶ 45. Mr. Fiacco also sent an email summarizing sixteen warm sales leads to his Gmail, and rescheduled customer meetings for after his then-unannounced resignation date.

### L. Daniel DeMarco

Mr. DeMarco, a Massachusetts resident, worked for Cynosure for a mere thirteen months, from May 2021 to May 2022. His position was Senior Area Sales Manager for the New England region and he "was responsible for sales operations in Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, and Vermont." Dkt. 77 ¶ 8. At Reveal, Mr. DeMarco is the Senior Area Sales Manager, and he is responsible for field sales in the Northeast region, New England, and New York.

Cynosure alleges that in April 2022, Mr. DeMarco was "actively moving potential business away from Cynosure" by rescheduling meetings for at least five separate customers for after his upcoming, but

unannounced, resignation date. Dkt. 6 ¶ 70. Mr. DeMarco denies ever contacting these five customers.

## III. <u>Restrictive Covenants</u>

The twelve employees at issue signed contracts which included a noncompetition agreement and a customer and employee non-solicitation agreement. These employees signed a dizzying array of contracts, each with different provisions regarding duration, scope, and choice of law.

The parties focus on two key agreements: the Lotus Parent, Inc. Employee Option Agreement ("Equity Agreement") and the Cynosure Employee Intellectual Property Rights, Confidentiality and Protective Covenants Agreements ("CEIP"). Both the CEIP and Equity Agreement contain Delaware choice of law provisions.

### 1. *Confidentiality Agreements*

Both the CEIP and Equity Agreement contain confidentiality agreements. Under the Equity Agreement, each employee agreed not to

> disclose confidential or proprietary information or trade secrets related to any business of the Company Group, including without limitation, and whether or not such information is specifically designated as confidential or proprietary: all business plans and marketing strategies; information concerning existing and prospective markets, suppliers and customers; financial information; information concerning the development of new products and services; and technical and non-technical data related to software programs, design, specifications, compilations, inventions, improvements, patent applications, studies, research, methods, devices, prototypes, processes, procedures and techniques.

Dkt. 7-3, § 1.1, at 41.

Similarly, under the CEIP, employees may not "engage in any use or disclosure of Confidential Information beyond that which is authorized

by the Company, necessary for the performance of Employee's employment duties for Company, and conducted in manner that complies with the policies of Company, or required by law or legal mandate (such as court order or subpoena)." Dkt. 7-4, § 2(a), at 2–3. Confidential information is

> an item of information or compilation of information in any form (tangible or intangible) related to Company's business that Employee first acquires or gains access to during employment with Company if (i) the Company has not made it public or authorized public disclosure of it, and (ii) it is not, through legal and proper means, readily available to the public or others outside Company who are not obligated to keep the information confidential.

Dkt. 7-4, § 2(b), at 3.

### 2.   *The Equity Agreement*

Ten employees⸺Mr. Daley, Mr. Chambers, Mr. Shapero, Mr. Russo, Mr. Robert Fiacco, Mr. Krueger, Mr. Murrell, Mr. Kalso, Mr. Smith, and Ms. Bair⸺signed the Equity Agreement, among others. As consideration for signing the Equity Agreement, employees are entitled to stock options. The Equity Agreement outlined the consideration for receipt of the stock options:

> Section 2(b). <u>Restrictive Covenants</u>. In consideration of the receipt of the Options set forth in Section 1, the Employee agrees to be bound by the covenants set forth in Exhibit A to this Agreement; it being understood that the Employee shall be required to comply with such covenants even if the Employee has vested in, exercised, or forfeited all of the Options, or sold the Shares underlying the Options.

Dkt. 7-3 at 31, 41.

Additionally, the Equity Agreement contains noncompetition, employee non-solicitation, and customer non-solicitation restrictive covenants:

1. **Noncompetition Clause.** "The Employee agrees that during employment and the 12-month post-employment period, employee shall not, within the United States and each country in which the Company Group is doing business as of the date of the employee's termination, directly or indirectly . . . provide services that are the same as or similar in function or purpose to the services provided to the Company Group during the last two years of employment, or services that are otherwise likely or probable to result in the use or disclosure of the Company Group's proprietary information to a business selling, licensing or developing competing products and/or services . . ."

Dkt. 7-3, § 3.1.1, at 42.

2. **Employee Nonsolicitation Clause.** "During employment and the 24-month post-employment period, the Employee shall not: participate in soliciting or communicating with an employee of the Company Group for the purpose of persuading such employee to end or modify the employee's employment relationship with the Company Group or hiring such employee . . ."

Dkt. 7-3, § 3.2.1, at 42.

3. **Customer Nonsolicitation Clause.** "During employment and the 24-month post-employment period, the Employee shall not: solicit or facilitate the solicitation of, provide, or offer to provide services to customers of the Company Group for the purpose of providing products or services that compete with those of, or involve proprietary information of, the Company Group,                                              or induce or attempt to induce any customer or other person to curtail or cancel its business with the Company Group."

Dkt. 7-3, § 3.2.2, at 42-43.

The Equity Agreement does not define "customer," nor does it specify which entities besides Lotus Parent, Inc. form the "Company."

### 3. CEIP

Mr. Daniel DeMarco and Mr. Dean Fiacco signed one restrictive covenant, the CEIP, upon commencing their employment at Cynosure. Mr. DeMarco signed the CEIP on April 4, 2019, and Mr. Dean Fiacco signed

the CEIP on April 1, 2021. Mr. Krueger, Mr. Murrell, Mr. Robert Fiacco, and Mr. Kalso also signed the CEIP.

The CEIP does not provide stock options or other additional compensation as consideration for signing the restrictive covenants. It provides that it is "in consideration of Employee's employment or continued employment, and the mutual commitments and other consideration described herein, and subject to the State-Specific Modifications provided for in Appendix A . . . " Dkt. 7-4 at 2. Cynosure describes some of these mutual commitments as "access to Confidential Information," "authorization to communicate and develop goodwill with [Cynosure's] customers," and "specialized training related to [Cynosure's] business." Dkt. 103 at 15.

The CEIP contains a noncompetition, customer non-solicitation, and employee non-solicitation agreement, as follows:

a. **Noncompete.** Employee agrees that for a period of nine (9) months after the Termination Date, Employee shall not, for the benefit of a Competing Business, within the Territory, acting individually or as an owner, shareholder, partner, employee, contractor, agent or otherwise: (i) provide or manage services to or for a Competing Business that are the same as or similar in function or purpose to the services Employee provided to or managed for the Company during the Look Back Period; or (ii) assist a Competing Business in developing or improving a Competing Product or Service; or (iii) assist a Competing Business by conducting, accepting or servicing competing business activities with any Company customer; or (iv) otherwise provide services to a Competing Business that are likely to result in the use or disclosure of Confidential Information.

b. **Customer Nonsolicitation.** Employee agrees that for a period of one (1) year and six (6) months after the Termination Date, Employee will not solicit, or assist in soliciting,

a Covered Customer for the purpose of (i) selling or providing a Competing Product or Service to the Covered Customer, (ii) moving or diverting the patronage of a Covered Customer to a Competing Business, or (iii) interfering with an existing or prospective business relationship the Company has or is pursuing with a Covered Customer.

c. **Employee Nonsolicitation.** Employee agrees that for a period of two (2) years after the Termination Date, Employee will not, for the benefit of a Competing Business, solicit a Covered Employee to leave the employment of the Company, or assist a Competing Business in hiring a Covered Employee.

Dkt. 7-4, § 8(a)-(c), at 6.

The customer non-solicitation agreement in the CEIP defines customer. A "Covered Customer"

means a customer of the Company that Employee had **material interaction** with on behalf of a Company or was provided Confidential Information about, in the Look Back Period. Material interaction is presumed present if Employee participated in or supervised communications with the customer or received commissions, bonuses, or other beneficial credit or attribution for business done with the customer. Unless it would make the restriction unenforceable, a customer will be presumed to include any prospect (person or entity) who is in active negotiations or communication with the Company about doing business with it at the time Employee's employment ends. To the extent allowed by applicable law, as used herein, a Covered Customer will not be limited to the end user or purchaser of the Company's products or services, but shall also be understood to include a buying group representative, doctor alliance group, referral source, or comparable intermediary who controls, negotiates or has material role in determining the end-user or purchaser's terms for doing business with the Company.

Dkt. 7-4, § 8 (f)(3), at 7 (emphasis added).

The "Look Back Period"

refers to the last two (2) years of Employee's employment with the Company or however long Employee has been employed with Company if employed less than two years, inclusive of any period of employment with a predecessor entity; or, if

the foregoing period is not enforceable then such lesser
period as would be enforceable under applicable law.

Id. at 8(f)(5).

As with the Equity Agreement's noncompete provision, the CEIP's
noncompete provision does not define "customer." Dkt. 7-4, § 8(a) at 6.

## PROCEDURAL HISTORY

Cynosure brought an action for a temporary restraining order and
preliminary injunction against Reveal and, to date, at least twenty-
eight employees and Does 1-50.

A temporary restraining order was granted on July 26, 2022. In
relevant part, the order restrained Reveal Lasers LLC, Reveal Lasers
Ltd., and Robert Daley, Christopher Chambers, Brogan Bair, Cory Murrell,
Joshua Smith, Kyle Shapero, Jason Kalso, Michael Russo, David Krueger,
Daniel DeMarco, Robert Fiacco, and Dean Fiacco ("Former Employees")
from using confidential information, using Cynosure Instagram accounts,
soliciting Cynosure's current or prospective customers, and soliciting
Cynosure's current or former employees. The temporary restraining order
was extended on August 8, 2022. The Court held hearings on the
preliminary injunction motion on September 22, 2022 and on October 7,
2022.

## DISCUSSION

### I.   Legal Standard

To obtain a preliminary injunction, a plaintiff bears the burden
of showing "(1) a substantial likelihood of success on the merits, (2)
a significant risk of irreparable harm if the injunction is withheld,

(3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." NuVasive, Inc. v. Day, 954 F.3d 439, 443 (1st Cir. 2020) (quoting Nieves-Márquez v. P. R., 353 F.3d 108, 120 (1st Cir. 2003)). While all four factors require the Court's consideration, likelihood of success on the merits is the "main bearing wall" of the preliminary injunction framework. Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 10 (1st Cir. 2013) (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)).

## II.   Analysis

### A. Likelihood of Success on the Merits

Cynosure moved for injunctive relief seeking enforcement of a non-competition agreement, confidentiality agreement, and a customer and employee non-solicitation agreement. "Defendants do not dispute that a non-solicitation clause as to Cynosure employees is enforceable, for a reasonable time period," nor do they contest that the Former Employees have an obligation not "to use, or disclose, any confidential information belonging to Cynosure on behalf of a new employer." Dkt. 87 at 10. However, Defendants dispute what information about Cynosure and the customers they had access to or retained, and whether any of the information, such as a list of plastic surgeons, is confidential. Defendants also challenge the enforcement of the non-compete and customer non-solicitation agreement on multiple grounds.

1. *Massachusetts law*

First, Defendants argue that the restrictive covenants do not comply with the Massachusetts Noncompetition Agreement Act ("MNAA"), Mass. Gen. Laws ch. 149, § 24L. The MNAA applies to non-competition agreements involving employees who, for at least 30 days immediately preceding the cessation of their employment, worked in or resided in Massachusetts at the time of their termination of employment. See Mass. Gen. Laws ch. 149, § 24L(e). Both Mr. Daley and Mr. DeMarco resided in Massachusetts.

The MNAA outlines eight minimum requirements for non-competition clauses. See Mass. Gen. Laws ch. 149, § 24L(b)(i-vii). Although the Equity Agreement has a Delaware choice of law provision, under the MNAA, a choice of law provision is valid only if it does not have the primary effect of voiding Massachusetts law. Mass. Gen. Laws ch. 149, § 24L(e).

Under Delaware law, a restrictive covenant, including a non-compete agreement, is enforceable if "(1) it meets general contract law requirements, (2) is reasonable in scope and duration, (3) advances a legitimate economic interest of the party enforcing the covenant, and (4) survives a balance of the equities." Kan-Di-Ki, LLC v. Suer, C.A. No. 7937-VCP, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015) (citing Tristate Courier & Carriage, Inc. v. Berryman, 20574-NC, 2004 WL 835886, at *10 (Del. Ch. April 15, 2004)); see Mass. Gen. Laws ch. 149, § 24L(b)(iii), (v)-(vi). Here, as required by the MNAA, the Equity Agreement is in writing, see Mass. Gen. Laws ch. 149, § 24L(b)(i),

supported by consideration distinct from continued employment, encourages employees to consult with counsel, id. at § 24L(b)(ii), does not exceed a period of 12 months after employment, id. at § 24L(b)(iv), and has "mutually-agreed upon consideration," that is, the stock options, in lieu of a "garden clause" as permitted by the MNAA, id. at § 24L(b)(vii). Defendants raised several challenges during oral argument for why the Equity Agreement was unenforceable under the MNAA as to Mr. Daley (like lack of consideration or a garden leave clause) that were not meritorious. See NuVasive, Inc. v. Day, 19-cv-10800, 2019 WL 2287709, at *4 (D. Mass. May 29, 2019) (explaining that the MNAA is similar to the Delaware law)), aff'd, 954 F.3d 439 (1st Cir. 2020). Accordingly, the Court concludes that the Equity Agreement is enforceable under Massachusetts law.

The harder question is whether the CEIP is enforceable as to Mr. DeMarco. Defendants argue that the CEIP violates the MNAA because it is not supported by a "garden leave clause" or other "mutually agreed upon consideration." Dkt. 87 at 15 n.37. In Massachusetts, the start of employment is sufficient consideration for a non-competition agreement. Compare Stone Legal Resources Group, Inc. v. Glebus, No. CA025136, 2002 WL 35654421, at *5 (Mass. Super. Dec. 16, 2002) (explaining that there is sufficient consideration at the beginning of employment because the non-competition is signed in exchange for employment)) with Mass. Gen. Laws ch. 149, § 24L(b)(ii) (requiring "fair and reasonable consideration independent from the continuation of employment" if a noncompete is

entered into after the commencement of employment and not in connection with the separation of employment). Because Mr. DeMarco signed the CEIP in conjunction with the commencement of his employment at Cynosure, the CEIP's consideration of employment is sufficient under Massachusetts law.

However, the CEIP is not enforceable against Mr. DeMarco for another reason. Mr. DeMarco, who signed the CEIP in May 2021, after the MNAA became effective in October 2018, states that he "was not advised of [his] right to consult with counsel prior to signing the CEIP Agreement." Dkt. 77 ¶ 32. The CEIP makes no mention of the right to consult with counsel, and the MNAA requires noncompetition agreements to "expressly state that the employee has the right to consult with counsel prior to signing." Mass. Gen. Laws ch. 149, § 24L(b)(i); KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC, CIVIL ACTION NO. 4:21-CV-10572-TSH, 2021 WL 2982866, at *32-33 (D. Mass. July 15, 2021) (concluding that the employee's agreement violates the MNAA because it "does not expressly state that [the employee] has the right to consult with counsel prior to signing, and it does not contain a garden leave clause or another mutually agreed upon form of consideration."). Therefore, the CEIP is unenforceable with respect to Mr. DeMarco's noncompetition agreement.

### 2. Similarity of jobs

Second, Defendants argue that the noncompetition agreement in the Equity Agreement is unenforceable against some of the employees because

their jobs at Reveal are not the "same as or similar in function or purpose" to their previous jobs at Cynosure or do not involve "services that are otherwise likely or probable to result in the use or disclosure of [Cynosure's] proprietary information" to Reveal. Dkt. 7-3, § 3.1.1, at 42.

Based on the record, the Court finds that Cynosure has demonstrated a likelihood of success in proving that all the employees who signed the Equity Agreement are providing services to Reveal that fall within the prohibition. While the services are not exactly the same for some employees (like pre-sales vs. post sales), the services are in sales and marketing, and are likely to involve the use of proprietary information. See Marcam Corp. v. Orchard, 885 F. Supp. 294, 297 (D. Mass. 1995).

However, Mr. Dean Fiacco signed only the CEIP, which prohibits employees from providing or managing services that are "the same or similar in function or purpose" to services they provided for their former employer. Dkt. 7-4, § 8(a), at 6. Mr. Fiacco's last role at Cynosure was District Sales Manager for the Northeast District. In this role, Mr. Fiacco was responsible for "closing sales that Area Sales Managers had originated, managing a small sales team and ensuring that [the] team met its sales quota." Dkt. 80 ¶ 12. Mr. Fiacco "was never responsible for operations at Cynosure" and "did not set up any human resources software, resolve IT systems, or otherwise supervise the day-to-day operational functions of Cynosure." Id. at ¶ 13.

At Reveal, Mr. Fiacco is Vice President of Operations. In this position, he is responsible for Reveal's operations, including "managing the day-to-day functions of Reveal, such as payroll, IT, software, and vendor management." Id. at ¶ 17. The Court finds that Cynosure has not demonstrated a likelihood of success in showing Mr. Fiacco violated the non-competition agreement in the CEIP by providing the same or similar services in function or purpose in his time at Cynosure.

### 3.  Delaware law

Defendants argue that the noncompetition agreement is not enforceable because it does not protect legitimate interests of Cynosure and is instead an effort by Cynosure to use the agreements to stymie competition. Cynosure responds that the agreements are promoting goodwill and protecting confidential information. The analysis must begin with Delaware law.

A restrictive covenant, including a noncompetition agreement and non-solicitation agreement, must meet general contract law requirements, be reasonable in scope and duration, advance a legitimate economic interest, and survive a balance of the equities. Kan-Di-Ki, 2015 WL 4503210, at *19. "To breach a non-solicitation provision, conduct must fall within the prohibition's terms." Id.

Delaware courts have upheld non-compete agreements for up to two years. Del. Exp. Shuttle, Inc. v. Older, No. Civ.A. 19596, 2002 WL 31458243, at *14 (Del. Ch. Oct. 23, 2002); see also Weichert Co. of Pa.

v. Young, C.A. No. 2223-VCL, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007) ("Those few cases holding that two years is an unreasonable duration involve unskilled workers who received no specialized training-clearly not the type of employee in this case.").

"When assessing 'reasonableness,' the court focuses on whether the non-compete is 'essential for the protection of the employer's economic interests.'" FP UC Holdings, LLC v. Hamilton, 2019-1029-JRS, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020) (quoting Norton Petroleum Corp. v. Cameron, 15212-NC, 1998 WL 118198, at *3 (Del. Ch. Mar. 5, 1998). Courts are empowered to modify overly broad geographic restrictions to ensure reasonableness. Both Plaintiffs and Defendants agree that this Court has the authority under Delaware law to "blue pencil" the restrictive covenants so they are reasonable and enforceable. Dkt. 133 at 1-2; Dkt. 162 at 1-2; see Knowles-Zeswitz Music, Inc. v. Cara, 260 A.2d 171, 175 (Del. 1969) (restricting the geographic area in a non-compete agreement to only the areas in which the former employee was a sole representative); WedMD Health Corp. v. Dale, Civil Action 11-5827, 2012 WL 3263582, at *9 (E.D. Pa. Aug 20, 2012)("Delaware courts themselves 'blue pencil' restrictive covenant agreements that may be otherwise unenforceable, if the equities so dictate.").

Noncompetition agreements are enforceable only to the extent necessary to protect a legitimate economic interest. Delaware law categorizes confidential information and employer's goodwill as legitimate economic interests. E.g., Kan-Di-Ki, 2015 WL 4503210, at *19

("'Legitimate interests' recognized by Delaware law include protection of employer goodwill, and protection of employer confidential information from misuse."); Research & Trading Corp. v. Pfuhl, Civ. A. No. 12527, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992) ("Interests which the law has recognized as legitimate include protection of employer goodwill and protection of employer confidential information from misuse . . . Courts have long recognized that an employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs."); see All Pro Maids, Inc. v. Layton, No. Civ.A. 058-N, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004) (noting that goodwill is especially important where "the evidence demonstrates the importance of personal contacts to the success of a company").

Lastly, in balancing the equities, a court "may decline to grant specific enforcement if the interests that the employer seeks to protect are ephemeral in contrast to the grave harm to the employee resulting from enforcing the restriction." Weichert, 2007 WL 4372823, at *5 (quoting Tristate, 2004 WL 835886, at *13).

Cynosure has shown a likelihood of success in demonstrating that the Equity Agreement noncompetition agreement is reasonable in duration as to the senior management employees and executives, but the Court will reform the agreements as to geographic scope. The Equity Agreement provides for a 12-month noncompetition agreement across the "United

States and each country in which the Company Group is doing business as of the date of the employee's termination." Dkt. 7-3, § 3.1, at 42. Cynosure argues that "full enforcement of the non-compete agreements is appropriate here because Cynosure's customer base is nationwide and international." Dkt. 133 at 7. However, the current record does not support that Cynosure's interests as to these senior employees warrants global enforcement. Cynosure's interests in its filings overwhelmingly refer to North America, so the Court will enforce the noncompete for North America.

Cynosure has a legitimate interest in protecting its confidential information from disclosure by these senior employees. Cynosure has introduced evidence demonstrating that these senior executives have detailed knowledge pertaining to Cynosure's business strategies and logistics that is protectable. See TriState, 2004 WL 835886, at *10. Robert Daley, Christopher Chambers, Brogan Bair, and Cory Murrell were Cynosure's most senior field sales leaders who

> occupied high level management positions that afforded them broad insight into Cynosure's business on topics such as what products were selling well across the nation and in certain regions, what customers wanted to see in future innovations, how Cynosure's R&D were responding to customer feedback and developing products, which sales teams were strongest (and weakest), and how Cynosure was allocating sales resources across different regions, making strategic decisions about this topic.

Dkt. 107 ¶ 4-5.

None of these employees denies receiving information on Cynosure's bestselling products, the strength of the sales teams, or how sales resources were allocated amongst different regions.

A case on point is <u>Marcam</u>, where the court found that an employer had a legitimate interest in confidential information where a high-ranking executive had been "privy to information pertaining to all aspects of the development and marketing" of the products and to "significant confidential information concerning other products of" the former employer. 885 F. Supp. at 297. The Court determined that the fact that the former employee had knowledge of marketing strategies and plans for future development was enough to provide that employee with "an advantage to [the competitor] as it contemplates its own strategies regarding future development of products that compete with [the former employer]." <u>Id.</u> Most pertinently, the court explained that

> the harm to the plaintiff cannot be avoided simply by the former employee's intention not to disclose confidential information, or even by his scrupulous efforts to avoid disclosure. The problem for [the former employer] is that when [the former employee] goes to [the competitor] he does not go with *tabula rasa* with respect to [the former employer's] products, its development strategies, its marketing plans, its customers and other significant business information. It is difficult to conceive how all of the information stored in [the former employee's] memory can be set aside as he applies himself to a competitor's business and its products.

<u>Id.</u>

In conclusion, Cynosure has established that it has a legitimate business interest in confidential information as it relates to it's strategic information and innovation pipeline for the senior employees.

Cynosure is also likely to prevail in its argument that it has a legitimate economic interest in its goodwill and that enforcing the noncompete against the sales and marketing employees, Kyle Shapero,

Robert Fiacco, David Krueger, Jason Kalso, Daniel DeMarco, and Joshua Smith, is necessary to protect that interest.

Defendants assert that this non-compete is being used to stifle ordinary competition and that Cynosure lacks employer goodwill because the relationships between its customers and salespeople are not service relationships. See SimpliVity Corp. v. Bondranko, 204 F. Supp. 3d 340, 348 (D. Mass. 2016) (applying Massachusetts law to conclude that a former employee "did not develop protectable good will" because he did not regularly interact with customers and could not remember working with a customer more than once).

Cynosure has shown it has protectable customer goodwill, which is essential to Cynosure receiving referrals and generating repeat sales and post-sales. Cynosure has repeat customers who either repurchase capital equipment or non-capital supplies ("consumables"). Dkt. 107 ¶ 13-15. "A large percentage" of Cynosure's "capital equipment sales" were made "to existing customers that had made at least one capital purchase between 2018-2021." Dkt. 103 at 11. Cynosure generates "ongoing revenue from services provided to existing customers, such as preventative maintenance or repair services. Together, revenue from existing customer accounts in these categories account for around over 55% of total revenue in North America." Id. Accordingly, the Court finds that "the evidence demonstrates the importance of personal contacts to the success of" Cynosure. All Pro Maids, 2004 WL 1878784, at *5.

Kyle Shapero, Robert Fiacco, David Krueger, and Jason Kalso worked as District Sales Managers. In their roles, they were responsible for Cynosure's sales operations in their respective geographic region, including supervising Area and Territory Sales representatives, closing deals that their sales teams initiated, and meeting with customers. Similarly, Mr. DeMarco was a Senior Area Sales manager for the New England region, responsible for the sales operations in that area.

Joshua Smith, the National Field Sales Marketing Manager, "led Field Marketing partnerships and event marketing for Cynosure's sales organization." Dkt. 6 ¶ 15. Some of these duties included hosting road shows to promote Cynosure products. While conducting road shows, Mr. Smith was literally the face of Cynosure to potential customers. For example, he explains that when he hosted the road shows, he would discuss Cynosure's equipment and pricing with potential customers. In sum, Cynosure has a legitimate interest in protecting its economically valuable relationships with these customers that were formed and developed in their time at Cynosure.

However, because the sales employees worked in specific geographic regions, the noncompetition agreement is overbroad in geographic scope. Accordingly, the Court will restrict the noncompete agreements to those regions where the employees generated good will. Therefore, Mr. Shapero's noncompete will be limited to Cynosure's Florida district, which includes South Florida, Puerto Rico, and the Caribbean. Mr. Krueger's will be limited to Illinois, Wisconsin, and Lake County,

Indiana. Mr. Fiacco's is limited to New York; and Mr. Kalso's is limited to the Pacific Northwest. Mr. Smith's noncompete is enforceable across the entirety of North America.

Finally, the non-compete survives a balance of the equities. It is limited in time and the Court has narrowed the geographic scope to reflect each employee's work at Cynosure. See Kan-Di-Ki, 2015 WL 4503210, at *19; Am. Homepatient, Inc. v. Collier, 274-N, 2006 WL 1134170, at *2 (Del. Ch. Apr. 19, 2006) (weighing the duration, geographic scope, and employer interests in determining whether the restrictive covenant was enforceable).

### 4. Individual employees

Defendants raise several miscellaneous arguments regarding the enforceability of the noncompete agreements against a specific subset of employees.

First, Defendants argue that the Cory Murrell, Dean Fiacco, and Brogan Bair "were subject to material changes in their employment at Cynosure," which bars enforceability of the noncompetition agreement against them. Dkt. No. 87 at 15. This argument fails because the restrictive covenants are governed by Delaware law, not Massachusetts law, and Defendants do not cite any Delaware case law in support of this doctrine.

Second, Defendants argue that Mr. Murrell's noncompetition agreements are unenforceable because they violate the Employment Standards Act, S.O. 2000, c. 41, s. 67.2 (Can.) ("ESA"). However, Mr.

Murrell signed an Equity Agreement in June 2020, prior to the enactment of the ESA.

Third, the Defendants raise an argument about the enforceability of the Hologic Agreement, which the Court need not reach as the Equity Agreement and CEIP are enforceable covenants that the employees in question signed.

Fourth, Defendants argue that Mr. Kalso's noncompetition agreement is void under Washington law because of the Equity Agreement's "choice of law and venue provisions." Dkt. No. 87 at 16. Under Washington law, a non-compete agreement is "void and unenforceable" if it requires the employee to "adjudicate a noncompetition covenant outside of this state" and "[t]o the extent it deprives the employee of the protections or benefits of this chapter." Wash. Rev. Code. 49.62.050. The Equity Agreement has a Delaware choice of law provision, but it does not contain a venue or forum selection clause. The CEIP requires litigation in the state where the employee was last employed or within Massachusetts. However, the CEIP also states that for Washington-based residents, "the choice of Delaware law shall not be applied to the extent it . . . require[s] Employee to adjudicate a noncompete covenant outside the state of Washington." Dkt. No. 112-27 at 14. Cynosure's lawsuit is forcing Mr. Kalso to litigate his claim outside of Washington, but this does not necessarily void the non-competition agreement. See Wash. Rev. Code. 49.62.050. Defendants cite favorably to CVS Pharmacy Inc. v. Brown, CASE NO. C21-306 MJP, 2021 WL

977697 (W.D. Wash. March 16, 2021), but this case is distinguishable. In CVS Pharmacy, the court concluded that CVS's noncompete was unenforceable because it required its employees to adjudicate outside of Washington. 2021 WL 977697, at *4. However, unlike Mr. Kalso's agreements, CVS' non-competition agreement had a venue selection clause requiring adjudication in Rhode Island. Here, Mr. Kalso is not required by the agreements to litigate exclusively in Delaware or Massachusetts, but the action is pending here. The case law construing this provision is sparse, and the parties did not brief whether litigating in Massachusetts deprives Mr. Kalso of the protections or benefits of Washington law. One solution might be a motion to sever and transfer venue to Washington.

Lastly, Defendants argue that under Illinois law, Mr. Krueger did not receive sufficient consideration. However, Defendants do not provide any factual or legal rationale as to why Illinois, rather than Delaware, law controls. The argument is waived.

5.  *Non-solicitation agreement*

Cynosure is likely to succeed in proving that Mr. Kalso, Mr. Robert Fiacco, and Mr. Krueger violated the customer non-solicitation agreement in the CEIP.

The CEIP is enforceable under Delaware law because its 18-month customer non-solicitation period is reasonable, the scope is reasonable, and it advances a legitimate economic interest, namely, the employer's goodwill.

Six employees—Mr. Dean Fiacco, Mr. DeMarco, Mr. Krueger, Mr. Murrell, Mr. Robert Fiacco, and Mr. Kalso—signed the CEIP. The CEIP bars these employees from soliciting a "Covered Customer," which is "a customer of the Company that Employee had material interaction with on behalf of a Company or was provided Confidential Information about, in the Look Back Period." Dkt. 7-4, § 8(f)(3). A material interaction is present where the employee "participated in or supervised communications with the customer or received commissions, bonuses, or other beneficial credit or attribution for business done with the customer." Id. The CEIP also includes prospective customers who are "in active negotiations or communication with the Company about doing business with it at the time Employee's employment ends." Id.

Plaintiffs are likely to succeed in demonstrating that Mr. Kalso violated the CEIP customer non-solicitation agreement by attempting to "convert at least one confidential Cynosure sales lead to Reveal Lasers after the TRO was entered." Dkt. 63 ¶ 117. Cynosure received a "misdirected email from a lender showing that Defendant Jason Kalso's team at Reveal . . . was in the process of soliciting a provider based in Oregon." Dkt. 105 ¶ 13. Emails elucidate Mr. Kalso's engagement with a known Cynosure customer. Mr. Kalso does not deny contacting Cynosure customers, instead stating he has only had "very minimal interaction with any prospective customers in Oregon." Dkt. 83 ¶ 29. While Mr. Kalso disagrees that this customer came from a Cynosure lead, the emails he

sent, which say "[w]e looked at this gal a while back," indicate otherwise. Dkt. 105-6 at 3.

Cynosure is similarly likely to succeed in establishing that Mr. Robert Fiacco attempted to solicit a customer in violation of the CEIP. On July 15th, 2022, two Cynosure customers reached out to Mr. Yunior Caballero, a Cynosure sales district manager, to inform him that Mr. Fiacco asked them to set up meetings to begin doing business with Reveal. Mr. Fiacco does not deny these allegations specifically in his affidavit, instead making a general statement that Mr. Caballero's declaration "misstates numerous facts and is misleading." Dkt. 85 ¶ 23.

Lastly, Cynosure is likely to succeed in showing that Mr. Krueger violated the CEIP customer non-compete. Cynosure alleges that Mr. Krueger forwarded 13 confidential sales leads that were provided to him from Cynosure's Salesforce CRM administrator to himself. Mr. Krueger stated he was intending to reach out to Cynosure customers, but ultimately decided not to use those leads after leaving Cynosure. However, Mr. Krueger admits that he spoke with a potential Cynosure customer from one of the emailed leads coincidentally, but this lead "did not purchase anything from Reveal." Dkt. 78 ¶ 27. Thus, he attempted to solicit a customer.

However, the Court will not enforce the customer non-solicitation agreement in the Equity Agreement because the agreement fails to define "customer" and is therefore likely unreasonable in scope. Is a provider who purchased technology seven years ago still considered a "customer"?

The failure of the agreement to define a customer is troubling when customers purchase capital equipment and consumables, which may have different product lifetimes.

Moreover, as the Defendants have highlighted, there are immeasurable challenges associated with determining who is a customer. Several Former Employees noted that Cynosure does not update its publicly available customer list and Cynosure does not take providers off that list, so the Former Employees do not have a verifiable method to identify every client that has ever purchased a Cynosure product.

Thus, the customer non-solicitation in the Equity Agreement is unenforceable as overbroad.

### B. Irreparable Harm

An irreparable harm "in the preliminary injunction context means an injury that cannot adequately be compensated for[,] either by a later issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." SimpliVity, 204 F. Supp. 3d at 350 (quoting Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005)).

Cynosure has a legitimate interest in protecting its confidential information and goodwill. The senior level employees in management such as Mr. Daley, Mr. Chambers, Mr. Murrell, and Ms. Bair worked in positions where they had access to sales, marketing, and strategy development for Cynosure. See Marcam, 885 F. Supp. at 296-97 (issuing a preliminary injunction against a former high level management employee

who was privy to "top-level discussions" about the former employer's research and development, sales, and marketing). Similarly, the employees involved with sales or overseeing sales have knowledge as to Cynosure's customers and may utilize that information to harm Cynosure's relationships with its customers.

The Former Employees' departures from Cynosure "will likely harm that product's reputation in the eyes of [Cynosure's] customers" because they "would be directly or indirectly" disparaging its products. Id. at 298. Whether these employees criticize Cynosure, or promote Reveal, their "association with the competing product would be enough to raise doubts in the eyes of [Cynosure's] customers as to the relative value of [Cynosure's products]." Id. Thus, Cynosure has demonstrated it has suffered irreparable harm.

### C. Balance of the Hardships.

The balance of the relative hardships favors Cynosure.

The employees, management and salespeople alike, face similar harms. Many of these employees are the primary breadwinners for their families. But the restrictive covenants are limited in duration. The noncompete agreement in the Equity Agreement is for twelve months, while the noncompete agreement in the CEIP is only nine months. None of the restrictive covenants prevent the Former Employees from earning a living in adjacent fields or other districts. Moreover, these employees all made near or over six figure salaries.

Enforcing the non-competition and non-solicitation provisions would still allow these employees to earn a living so long as they do not provide the same or similar type of services for a competing company in the aesthetics industry. The employees' ability to find new employment is not outweighed by the harm for Cynosure. See SimpliVity, 204 F. Supp. at 351 (finding that the relative balance of hardships favored the employer where the restrictive covenant was only enforced against the employee for a limited period of time, restrained the employee from working only for one competitor, and the employee had experience outside of the relevant industry).

### D. Public Interest.

The public interest weighs in favor of injunctive relief. "Generally, 'the public interest is served by enforcing contractual obligations, including reasonable restrictive covenants, between consenting parties." SimpliVity, 204 F. Supp. at 351 (quoting Iron Mountain Info. Mgmt., Inc. v. Viewpointe Archive Servs., LLC, 707 F. Supp. 2d 92, 112 (D. Mass. 2010)). The facts as applied to the Former Employees "do not warrant deviation from this general rule." Id. The Former Employees signed these restrictive covenants and "knowingly chose to assume the risk of going to work for [a competitor]" without waiting the requisite time as outlined in the legal agreements. Id. The Court concludes that granting a preliminary injunction is not contrary to the public interest.

### E. Confidential Information

Except for the strategic and innovation information available to the senior employees, the Court is not persuaded that Cynosure has met its burden regarding all the information they claim is confidential, particularly with regards to the ownership of the Instagram accounts. The factual issues involving the Instagram accounts are hotly contested in sworn affidavits by both Cynosure employees and the Defendants. The Court lacks a sufficient record to determine the ownership of the accounts at this stage.

Confidential information is a more challenging issue. While the Defendants agree that the Former Employees may not use or disclose confidential information belonging to Cynosure, they simultaneously, and confusingly, assert that Cynosure has failed to establish that internal information the employees were exposed to "rises to the level of a trade secret or some other confidential information worthy of protection" and that "Cynosure has not proven that any of the information regarding customers that was allegedly taken is actually proprietary or confidential information." Dkt. 87 at 12. Defendants vigorously assert that information the employees have about Cynosure's equipment and products, providers, pricing, and future business is publicly available information via Cynosure's website or employees, brochures, or is widely known within the industry. Id. at 13-14. For example, at the September 22nd hearing, Plaintiffs claimed that Mr. Daley took a confidential list of 10,000 Cynosure customers that listed

the customers' names, addresses, principal contact person at Cynosure, and a "comments" column which provided information regarding each customer's willingness to buy more Cynosure products. Defendants countered by showing that the spreadsheet was merely a list of plastic surgeons, not Cynosure customers. Additionally, the provided exhibits did not contain a "comments" column. Mr. Daley asserts that this list was purchased by another Cynosure employee for approximately $2,000 and he reports he never used this list and deleted it.

Similarly, Cynosure reports that information regarding commission structures is confidential. The Employees report otherwise. Ms. Bair indicates that commission information was "freely available in the marketplace" and that "Cynosure would regularly share details of its commission structure (on capital equipment, consumables, and skincare products) with prospective employees and did nothing to prevent those applicants from disclosing what they learned publicly." Dkt. ¶ 12. Additionally, the Former Employees assert that they found their own customer leads using public searches or brought their own customers from previous jobs. For instance, Mr. DeMarco notes that "because Cynosure hired [him] as a senior sales representative, [he] was expected to bring [his] own book of business to Cynosure." Dkt. 77 ¶ 10]

With dueling affidavits from all parties, the Court lacks a sufficient record to determine what information is likely confidential.

### F. Tolling

Plaintiff urges the court to toll the start date of the restrictive covenants. The Court declines to toll the Equity Agreement. First, the Equity Agreement lacks a tolling provision and specifies that the non-compete and non-solicitation agreements apply to the "post-employment" period. Dkt. 7-3, § 3.1–3.2.

However, the CEIP contains a Tolling Clause. If an employee "fails to comply with a timed restriction in this Agreement, the time period for that restriction will be extended by the greater of either: one day for each day Employee is found to have violated the restriction, or the length of the legal proceeding necessary to secure enforcement of the restriction[.]" Dkt. 7-4 ¶ 19. The Court found that Cynosure is likely to prevail in demonstrating that Mr. Kalso, Mr. Robert Fiacco, and Mr. Krueger violated the customer non-solicitation provision. The customer non-solicitation clause enforcement begins on the date of this Order.

### ORDER

Plaintiffs' motion for preliminary injunction (Docket 3) is **ALLOWED IN PART** and **DENIED IN PART**. In sum, I order that:

1. The following employees shall not violate the noncompete in the Equity Agreement for one year from the date of termination from Cynosure:

    a. Robert Daley

    b. Christopher Chambers

    c. Kyle Shapero

    d. Michael Russo

    e. Robert Fiacco

    f. David Krueger

    g. Cory Murrell

    h. Jason Kalso

    i. Joshua Smith, and

    j. Brogan Bair;

2. The following employees shall not violate the noncompete in the Equity Agreement within the narrowed geographic region for one year from the date of termination from Cynosure:

    a. Mr. Daley: North America;

    b. Mr. Chambers: North America;

    c. Mr. Shapero: South Florida, Puerto Rico, and the Caribbean;

    d. Michael Russo: the Eastern region of the United States;

    e. Mr. Robert Fiacco: New York;

    f. Mr. Krueger: Illinois, Wisconsin, and Lake County, Indiana;

    g. Mr. Murrell: North America;

    h. Mr. Kalso: the Pacific Northwest;

    i. Mr. Smith: North America; and

    j. Ms. Bair: North America;

3. All employees shall not violate the CEIP and Equity Agreement employee non-solicitation agreement for two years from the date of termination of employment from Cynosure;

4. Defendants Reveal Lasers LLC and Reveal Lasers Ltd. shall not solicit or hire any current or former Cynosure employees with enforceable non-competition agreements for substantially similar jobs or roles for the duration specified in that noncompetition agreement;

5. Mr. Kalso, Mr. Robert Fiacco, and Mr. Krueger shall not violate the CEIP customer non-solicitation agreement. The customer non-solicitation agreement for these employees will be tolled to start on the date that this preliminary injunction is entered, and be enforced for 18 months from that date;

6. All Defendants shall comply with the confidentiality agreement to the extent all devices, files, and accounts must be returned to Cynosure immediately; and all employees are barred from disclosing, divulging, furnishing, making available, or using any information that relates to Cynosure's strategic information and innovation pipeline; and

7. The Court does not issue an injunction with respect to the Instagram accounts.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge