**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CYNOSURE, LLC, et al.;

Plaintiffs,

v.

REVEAL LASERS LLC., et al.;

Defendants.

Civil Action No. 1:22-cv-11176-PBS

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PROTECTIVE ORDER**

## I. INTRODUCTION AND SUMMARY

After nearly 18 months of litigation, multiple extensions to the case calendar, several emergency motions from Cynosure necessitated by Defendants' outright refusal to show up to depositions, on December 20, 2023, the Court extended the discovery cutoff in this case from January 12, 2024 to February 29, 2024. The Court's extension was granted in response to Defendants' claims that their witnesses and counsel were variously "unavailable" for duly noticed depositions, particularly given the holidays and international travel. The Court ordered the parties to meet and confer over a schedule for the 16 then-pending depositions in the case, as well as any other discovery issues, which the parties did at a over three-hour meet an confer on January 4, 2024. The parties then set – and have been operating on – that discovery schedule. Now, Defendants have served three deposition notices that were not contemplated or discussed at any point before December 20, 2023 (or even in the meet-and-confer thereafter) to take place in the final days before the discovery cut-off. The use of a discovery extension in this fashion is facially improper and grounds enough for warranting a protective order prohibiting the requested depositions. But each of the three deposition notices suffer from separate defects that independently justify a protective order prohibiting the depositions:

The first two deposition notices—for current Cynosure Chief Executive Officer Nadav Tomer (who did not work for Cynosure until Spring 2023, nine months *after* the facts giving rise to this litigation) and Cynosure Board Member Michael Davin (a former CEO who retired from employment at Cynosure in 2017, five years *before* the facts giving rise to the claims at issue here)—are improper "apex" depositions of high ranking corporate officials without unique, personal knowledge of relevant facts.

The third deposition notice is an outsized Person Most Knowledgeable deposition notice under Federal Rule of Civil Procedure 30(b)(6) which identifies, in scattershot fashion, ***101***

***separate topics of examination***. Amar Decl. Ex. 1. This PMK deposition notice is improper for a number of reasons, including that it fails to state the matters for examination with reasonable particularity, it was not timely served and there was no prior meet and confer about it, it seeks testimony regarding legal conclusions and/or matters suited for expert discovery, and it seeks testimony regarding irrelevant subject matters.

These deposition notices, individually and taken together, are a poorly disguised attempt to harass Cynosure and put pressure on the company to settle the action on something other than the merits of the claims. And unfortunately, as explained below, these depositions reflect a concerning pattern of litigation tactics for which a protective order is warranted. The Motion should be granted.

## II. RELEVANT FACTUAL BACKGROUND

### A. Recent Procedural History.

On May 30, 2023, the Court extended the close of fact discovery to January 5, 2024 to allow for mediation and settlement efforts. Dkt. 246. Given the futility of such efforts, Cynosure attempted to restart discovery in August, including the scheduling of the deposition of Jim Palastra. Dkt. 314-1. The Court meanwhile dismissed the case, assuming that the parties would ultimately settle. On September 27, 2023, after the parties' settlement talks failed, the Court reopened the case, but did not extend the discovery cutoff. Dkt. 269. After the Court reopened the case, Cynosure pressed to have discovery resume immediately, but Defendants opposed Cynosure's efforts and requested that pending written discovery responses not be due until November 1, 2023. Dkts. 271-272. On October 23, the Court agreed with Defendants and ordered discovery responses to be due on November 1. Dkt. 273. The Court also extended the close of fact discovery to January 12, 2024 so that no discovery would need to be taken "during the holiday week." Dkt. 273.

Accordingly, Cynosure noticed its remaining depositions to be completed by January 12, 2024. *See* Dkt. 313. On December 14, 2023, Defendants announced that they would not produce any additional witnesses on the noticed dates for a variety of reasons, including the fact that ***none*** of the noticed witnesses were allegedly available on the noticed dates. *See* Dkt. 314-1. Given Defendants' claim that none of their witnesses were available to be deposed before the January 12 discovery cutoff date, Cynosure filed a motion to compel the Defendants' attendance at their noticed depositions. Dkt. 313. Defendants' opposed the motion, in part, based on their claim that Cynosure's depositions would "obliterate any holiday for the Defendants and their counsel, rendering the Court's order to preserve the holiday week meaningless." Dkt. 316 at 7. Defendants proceeded not to show up to three depositions (those of Jason Kalso, Jim Palastra and Robert Fiacco).

The parties then met for a conference with Magistrate Judge Cabell to discuss the pending discovery issues on December 20, 2023. During that hearing, Judge Cabell explained that he was prepared to extend the discovery cutoff to the end of February and that, "it would seem to [him], then, that, to the extent people are concerned about the capacity to depose people between now and mid-January, it would take care of that." 2023.12.20 Transcript at 5:23-6:6. Cynosure's counsel expressed his frustrations in Defendants' repeated conduct in refusing to engage in good faith in the scheduling of discovery, and leaving everything to the end of the cut off, to which Judge Cabell explained his intention was to avoid exactly that:

> MR. FARRIS: Thank you, Your Honor. I think – we certainly at this point think as a practical reality we do need some more time, so I think -- we don't object to the idea of extending discovery. I do think it's important that there needs to be some kind of pace involved here. As you've probably seen, we've had a really hard time getting these depositions on schedule for various reasons, and I would not want all of the depositions to therefore occur in February, you know, at the close of discovery yet again. So I would not want an extension

> of time to be used to kind of put everything off for another four weeks so nothing happens in the interim. And I –
>
> THE COURT: I agree. I don't mean to cut you off, but this -- all of this contemplates -- I'm not suggesting anything otherwise, but it contemplates everybody is going to be acting in good faith. Nobody is going to be gaming the system. Nobody is going to be continuing to nickel and dime somebody and then towards the end of the discovery people finding themselves jammed up against the wall.

The same day, the Court extended the time for parties to complete discovery to February 29, 2024. Dkt. 328.

On January 4, 2024, the parties met and conferred about the discovery schedule and the various, competing concerns of those witnesses who had been duly noticed. Despite various disputes on dates and locations, the parties set a schedule to complete all the depositions by February 29.

On January 13, 2024—the day after discovery was set to close before the Court's December 20 order—Defendants served three new subpoenas and deposition notices to take the depositions of Davin, Tomer, and Katie Cheng (Cynosure's former Chief Marketing Officer).[1] Defendants had not previously indicated an intent to depose any of these witnesses, indeed, neither Davin nor Tomer were even included on any party's initial disclosures. (Cheng was not included on either side's initial disclosures; however, *Defendants* added Cheng in a supplemental initial disclosure in November 2023.) Several weeks later, on February 6—ironically, the same date Defendants filed a motion to stay discovery based upon a claim that it would be impossible for them to comply with their discovery obligations by the close of fact discovery on February 29 (Dkt. 358)—Defendants served a Person Most Knowledge deposition notice under Federal Rule of Civil Procedure 30(b)(6), containing 101 separate deposition topics. To date, Defendants have not attempted to

[1] Defendants also served a subpoena to take the deposition of Brandon Romano, another former Cynosure employee; however, Defendants subsequently withdrew the subpoena.

confer with Cynosure regarding the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6). Fed. R. Civ. P. 30(b)(6).

**B. Defendants' Requested Apex Deponents.**

***Nadav Tomer.*** Nadav Tomer became Cynosure's Chief Executive Officer ("CEO") on May 1, 2023—almost a year to the day *after* Defendants Bob Daley and Chris Chambers launched the cascade of resignations from Cynosure and over nine months after Cynosure filed its original Complaint in this action on July 20, 2022. To the best of his knowledge, Tomer has not communicated with any of the Individual Defendants in his life. Tomer Decl. at ¶ 6. Prior to joining Cynosure, Tomer was an officer at Johnson & Johnson and an advisor at several other medical companies. *Id.* at ¶ 3. Since joining Cynosure, Tomer's involvement with this litigation has been limited to (i) attendance at the June 2023 mediation session and (ii) engagement in related settlement talks. *Id.* Accordingly, the information he possesses about the litigation and the underlying facts have been received through either (i) attorney-client privileged communications and (ii) his involvement in attempts to resolve the case. *Id.* at ¶ 7.

***Michael Davin.*** Michael Davin was the CEO of Cynosure from 2003 through 2017. Davin Decl. ¶ 2. During his tenure as CEO, Davin did not directly supervise any of the 10 Defendants who were employed at Cynosure in 2017. *Id.* at ¶ 4. (In fact, Davin only specifically recalls meeting or talking to three of the Defendants. *Id.* at ¶ 3.) The closest supervisory relationship Davin held with any of the Defendants was with Chris Chambers (who was at least two full reporting levels down from Davin). *Id.* at ¶ 4. After 2017, Davin left the medical aesthetics industry for two years. *Id.* at ¶ 5. In January 2020 (around the same time CD&R purchased Cynosure from Hologic), Davin rejoined Cynosure as a member of Cynosure's Board of Directors. *Id.* at ¶ 6. At all times Davin has been on the Cynosure Board of Directors since his return in 2020, Sandi Peterson has been the Chairperson and Derek Strum has also been on the Board of Directors.

*Id.* In his role as a member of the Board of Directors, Davin did not supervise any of the Defendants. *Id.* at ¶ 7. Moreover, Davin has not had any communications with any Cynosure employees or Board Members regarding this litigation outside of the discussions held at Cynosure's Board of Director meetings—all of which involved Cynosure's General Counsel, Sean Flanagan and/or outside counsel. *Id.* at ¶¶ 8-9. The same is true regarding Davin's communications about Cynosure's recent transaction with Lutronic. *Id.*

## III. ARGUMENT

### A. All Three Requested Depositions Are Improper and Should Not Be Allowed.

Defendants' attempt to weaponize the discovery calendar as both a sword and a shield should not be condoned. The reason discovery did not close on January 12, 2024 was ***Defendants' refusal to show up for duly noticed deposition and their position*** that the parties could not complete all of the outstanding discovery by that date due to (i) witness and counsel unavailability around the holidays and (ii) Defendants' then-pending objection to depositions because of their suggestion that Cynosure had not identified its trade secret (which was overruled).[2] Defendants never once suggested that an extension was required to allow them to issue a PMK deposition notice or deposition notices to Tomer and Davin—even though none of these deponents are individuals or entities about whom Defendants have only just learned about the existence of in the period following the December 20 extension. It would be unduly prejudicial to Cynosure to allow Defendants to weaponize the discovery extension by serving burdensome and harassing discovery that Defendants were not able to timely serve under the original scheduling order. *See LKQ Corp. v. General Motors Co.*, 2021 WL 5415152, at *6 (noting that an overbroad 30(b)(6) deposition notice would seem to be "the type of thing plaintiff had in mind to fill the additional two months

[2] Defendants also objected to any depositions over 10, but Cynosure had not reached the 10 deposition limit, and Defendants still refused to show up.

of discovery it requested and which, it would now seem, was improvidently granted"). All three depositions should be prohibited.

### B. The Court Should Also Prohibit the Apex Depositions of Tomer and Davin Under the Apex Deposition Doctrine.

#### 1. The Apex Deposition Doctrine.

The "apex doctrine" is an "analytical framework [sometimes] used by courts in assessing whether to permit the depositions of individuals at the 'apex' of corporations and other entities." *Viscito v. Nat'l Plan. Corp.*, 2020 WL 4274721, at *2 (D. Mass. July 24, 2020) (quoting *United States ex rel. Galmines v. Novartis Pharms. Corp.*, 2015 WL 4973626, at *1 (E.D. Pa. Aug. 20, 2015)). Under the apex doctrine, a court may "limit discovery under Rule 26(b)(2)(C) because the discovery can be obtained from some other source that is more convenient, less burdensome, or less expensive." *Id.* (quoting *United States ex rel. Galmines v. Novartis Pharms. Corp.*, 2015 WL 4973626, at *2 (E.D. Pa. Aug. 20, 2015). "[T]he oral deposition of a high level corporate executive should not be freely granted when the subject of the deposition will be only remotely relevant to the issues of the case." *Folwell v. Hernandez*, 210 F.R.D. 169, 174 (M.D.N.C. 2002) (citation omitted).

#### 2. Neither Witness Has Unique, Personal Knowledge of Relevant Facts.

During meet and confer, Defense counsel stated that the depositions were appropriate because: "Both witnesses are fact witnesses with significant personal and unique knowledge directly relevant to Plaintiff's liability and damages claims and Reveal's defenses. Davin was the CEO of Cynosure and managed several of the individual defendants for 14 years and continues serving as an influential part of the company on the board. Tomer is the current CEO and obviously has direct, unique knowledge relevant to this case." Amar Decl. Ex. 2.

Defendants' conclusory allegations are simply not true. Most importantly, it is incorrect to say that these witnesses have unique knowledge relating to Cynosure's liability and damages claims. As set forth above, it is literally impossible for Tomer to have personal knowledge of Cynosure's underlying claims, as he did not even join the organization until over nine months after Cynosure first filed suit. Moreover, any knowledge Tomer does have regarding the litigation has either come from privileged communications with counsel or through his participation in attempts to settle the action (such as his attendance at the June 2023 mediation), also involving communications with counsel. The same is true for Davin, who resigned from the CEO position more than 5 years before the events giving rise to this lawsuit and whose declaration shows that he has no independent knowledge of the litigation outside of what was discussed in privileged communications with the Board of Directors. Given that Defendants have already deposed Sandi Peterson (the Chairperson of the Board) and will soon depose Derek Strum (another member of the Board of Directors) on February 14, there is no unique information in Davin's possession that Defendants cannot get through their other board-level depositions.

Nor is there any evidence that either Tomer or Davin have unique knowledge relating to Cynosure's damages, which is properly the subject of expert testimony. Neither individual designated in Cynosure's Initial Disclosures as a potential witness on these topics—Chief Commercial Officer Lowinn Kibbey and former Chief Human Resources Officer Kellie Teal-Guess were, and Defendants have already taken both of their depositions.[3]

[3] To the extent Defendants have noticed Davin and Tomer to give testimony regarding the Lutronic transaction, that would be improper for the additional reason that Cynosure's transaction is not relevant to any claims or defenses at issue in the case.

### 3. Defendants' History of Deposition Misconduct Demonstrates that These Depositions were Noticed for an Improper Purpose.

While Tomer and Davin's lack of personal knowledge would be sufficient, on their own, to warrant a protective order, Defendants' history of deposition misconduct further demonstrates that these depositions were noticed for improper purposes—namely to harass the witnesses and to try to pressure Cynosure into settlement.

For example, at the deposition of the Chairperson of Cynosure's Board of Directors, ***six*** individual Defendants—from all across North America—showed up to the deposition in matching "Reveal" branded shirts in an attempt to intimidate and make Peterson uncomfortable.[4] With a full audience of nearly a dozen people in the conference room[5], Peterson was asked numerous questions bearing no relevance to the claims or defenses at issue in the case, such as questions about her willingness to settle the case and about Cynosure's then-unsigned deal with Lutronic . As Judge Cabell subsequently suggested, questions designed simply to evaluate the way an opposing parties assesses settlement are not appropriate for discovery. 2024.01.17 Transcript at 21:7-24:11 ("I can understand how it might bear on the dynamics of any settlement talks, but I don't think that goes to discoverability.").

The conduct of defense counsel towards other witnesses has even considerably more outrageous, in a clear attempt to embarrass and harass. In several cases, defense counsel Madison Dini has asked multiple witnesses whether they had engaged in extramarital affairs or engaged in

---

[4] For example, one of the attendees was Josh Smith (who resides in Texas) and another was Cory Murrell (who resides in Canada). Their attendance at the deposition shows that Defendants' stunt was planned well in advance.

[5] Defendants also brought four different lawyers from the same law firm to the deposition.

inappropriate flirtatious conduct, even though she has no basis for any such claims and even though this case does not relate to any claims of harassment. *See* Amar Decl. Exs. 3–4.

Most egregious was Ms. Dini's conduct toward a Cynosure sales employee. This employee was originally recruited to join Reveal but turned down the offer and submitted a declaration on Cynosure's behalf at the preliminary injunction hearing. He testified that Defendants had made "false" statements about him and were "insulting, demeaning and threatening," when he decided to stay at Cynosure. Amar Decl. Ex. 5. He further testified that Defendant Dean Fiacco had gone so far as to file a fabricated claim against him, which was particularly troubling given that he had saved Fiacco's life by performing the Heimlich maneuver when Fiacco was choking. In response to him saying that he had performed the "Heimlich maneuver," Ms. Dini attempted to humiliate this witness (an openly gay man), repeatedly asking him whether he had "humped" or "groped" anyone at Cynosure:

> **Q: Because you've never humped anybody else at work?**
> Ms. Amar: Hold on. Hold on. Objection. Argumentative. Totally inappropriate. Totally uncalled for.
> A: Humped? I've never humped –
> The WITNESS: Yup.
> Ms. Amar: I mean, that --
> **Q: Have you?**
> A: I don't understand what you mean by humped?
> **Q: Have you ever groped anyone?**
> A: No.
> **Q: Never?**
> A: No.
> **Q: And you've never humped anyone?**
> Ms. Amar: You know what, same objection.

*Id.* Ms. Dini's suggestion that an openly gay man could not have been actually performing the Heimlich maneuver and instead must have been "humping" or "groping" his colleague, was—at best—abusive and entirely improper, and at worse, considerably more. And this was no slip of

the tongue, as she asked him twice over his counsel's objection. It was done to harass and intimidate the witness so as not to participate in the litigation.[6]

The conduct of defense counsel has lost them the benefit of the doubt. Tomer and Davin, who already lack any unique personal knowledge regarding the actual claims and defenses at issue in this litigation, should not be forced to sit for a deposition so that Defendants can intimidate them or ask them about every scandalous or salacious rumor they may have heard about them before, during, or after their tenures with Cynosure.

---

[6] Notably, this exchange followed Ms. Dini explicitly intimidating the witness by making him feel guilty for telling the truth in his declaration:
**Q. Do you understand how this declaration was used in this case?**
A. No.
**Q. Do you understand that this declaration was used as evidence to immediately and emergently stop those individuals, your family, from earning a living in New York? Do you understand that?**
A. They were working, as far as I know.
**Q. In New York?**
A. I don't know.
**Q. So you don't understand that?**
MS. AMAR: Objection.
A. I don't know.
MS. AMAR: Wait, objection. Lacks foundation.
**Q. Okay. So you don't understand the implications that your declaration had on your former family?**
MS. AMAR: Again, objection.
Lacks foundation.
**Q. You can answer.**
MS. AMAR: There's no foundation for the fact that they weren't working, like, absolutely none.
**Q. You can answer.**
A. I wrote the declaration about the facts of how I was informed about Reveal.
The things that happened for me to join by Reveal, and that's it.
**Q. And you have no understanding of how that declaration has impacted these individuals, your family members, do you?**
MS. AMAR: Objection. Calls for speculation. Lacks foundation.
**Q. If the answer is no, it's fine.**
A. I wrote the declaration about how the things happened.
**Q. Without understanding the impact it would have on these individuals and their lives, correct?**
MS. AMAR: Objection. Lacks foundation.
A. I don't have an understanding of the impact on their life.
**Q. Do you care?**
A. I do care. I care about everyone. I think that they also didn't care about --
the implications that they had with their allegations that were false about me, what could happen with my personal life or what kind of damage that might have caused.

Amar Decl. Ex. 5.

**C. <u>The Court Should Also Quash Defendants' PMK Deposition.</u>**

Cynosure is also entitled to a separate protective order regarding Defendants' PMK deposition notice. Amar Decl. Ex. 1. As noted above, while the PMK deposition notice facially contains 101 separate topics, many of the topics contain inherent subparts such that the real number of topics is significantly greater. For example, Topic No. 53 is: "All Cynosure agreements with the Individual Defendants." Not only are there 19 remaining Individual Defendants, but each Individual Defendant signed multiple "agreements" with Cynosure (and the term "agreement" is not defined to be limited to just the restrictive covenant agreements at issue in this litigation). As such, this one Topic is really at least 38 separate topics (but really much more given that each Individual Defendant signed more than two total agreements with Cynosure). And if 101 separate topics was not enough, Defendants compounded the burden by noticing the deposition for February 26, 2024—a mere twelve business days after it was served. *See Nieman v. Grange Mut. Ins. Co.*, 2012 WL 5471949, at *3 (C.D. Ill. 2012) ("Seven business days is not reasonable notice to prepare a witness to testify on all of these [fourteen topics and thirteen sub-] topics."). Given the sheer number of topics, the minimal amount of time given to prepare for the deposition, and the timing of the deposition (only a few days before the close of discovery), Defendants' PMK deposition notice is facially improper. *See In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 320, 327 (N.D. Ill. 2005) (denying a motion to compel the deposition of defendant employees after plaintiff unilaterally noticed depositions with 10 business days' notice just over 2 weeks before the discovery cutoff).

Other aspects of the deposition notice also render it facially improper, such as how the majority of topics improperly seek testimony regarding legal conclusions or premature expert discovery. This includes Topic Nos. 1-21, which ask Cynosure to testify about "[e]ach item of Confidential Information and/or each trade secret that Cynosure alleges was misappropriated,

disclosed, or otherwise misused" by each Defendant. Amar Decl. Ex. 1. Similarly, Topic Nos. 79-80 and 82-83, which ask for the bases of Cynosure's allegations that the defendants are liable for certain causes of action. *See id.* It is well established—including from this very Court—that parties cannot use PMK depositions to seek legal conclusions: "[A] Rule 30(b)(6) witness may not be expected to testify about the factual basis of legal theories." *Cook v. Lynn and William, Inc.*, 344 F.R.D. 149, 157 (D. Mass. 2023) (Cabell, M.J.) (granting motion for protective order) (citations and internal quotations omitted); *see id*. ("Even under the present-day liberal discovery rules, the recipient of a Rule 30(b)(6) request is not required to have counsel marshal[ ] all of its factual proof and prepare a witness to be able to testify on a given defense or claim. [Citation.] Where a party seeks not only facts but an explanation of the legal consequences of said facts, contention interrogatories are a better discovery vehicle than a Rule 30(b)(6) deposition.") (citations and internal quotations omitted); *Neponsent Landing Corp. v. The Nw. Mut. Life Ins. Co.*, 279 F.R.D. 59, 61 (D. Mass. 2011) ("[D]epositions, including 30(b)(6) depositions, are designed to discover facts . . . not legal theories"). The same is true for the topics that seek premature expert discovery, such as Topic Nos. 61-63, which seek testimony regarding revenues and profits Cynosure attributes to the misappropriated trade secrets. *See Trustees of Boston Univ. v. Everlight Elecs. Co., Ltd.*, 2014 WL 5786492, at *4 (D. Mass. Sept. 24, 2014) ("A party may properly resist a Rule 30(b)(6) deposition on the grounds that the information sought is more appropriately discoverable through contention interrogatories and/or expert discovery.") (citation omitted).

Moreover, these topics are not stated with "reasonable particularity." Fed. R. Civ. P. 30(b)(6). For example, Topic 37 states: "The return on investment, if any, that Cynosure believes can be enjoyed by a Third Party if Cynosure's alleged Confidential and/or trade secrets are used."

"Third Party," in turn, is defined to mean "any Person other than any named Plaintiff in this case." Amar Decl. Ex. 1. In other words, Topic 37 asks Cynosure to be prepared to testify regarding the return on investment literally any other individual or corporate entity in the world would enjoy from using its confidential and/or trade secret information. This is even further compounded by the instruction that for each topic, Cynosure is to be "prepared to provide the facts and circumstances concerning the topic, the relevant dates for the topic, the Persons involved with the topic, and the persons with knowledge of the topic." *Id.* As but one other example, Topic. No. 55 asks Cynosure to testify to: "The Individual Defendants' relationships with co-workers, supervisors, and subordinates while employed by Cynosure." *Id.* Facially, this topic seeks testimony regarding the interaction between all 19 Individual Defendants and any other Cynosure employee they ever interacted with during their tenures with the company—an impossible task. Defendants have also not attempted to confer in good faith with Cynosure regarding the topics, as required under the Federal Rules of Civil Procedure. Fed. R. Civ. P. 30(b)(6). In short, Defendants have failed to comply with their obligation to "take care to designate, with painstaking specificity, the particular subject areas that are intended to be questioned." *Sprint Comm'cs Co., L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 528 (D. Kan. 2006).

And still other deposition topics seek information irrelevant to any claim or defense at issue in the litigation—most notably information regarding Cynosure's recent transaction with Lutronic (Topics Nos. 64-68), which, as referenced above, the Court has already suggested is not a proper subject of discovery. 2024.01.17 Transcript at 21:7-24:11. Another deposition topic similarly asks Cynosure to testify regarding its attorney's fees claim (Topic No. 83), even though the Court has already indicated that the "prevailing practice" is to not engage in discovery regarding

attorney's fees until after it has been established that a party is entitled to fees. 2024.01.24 Transcript at 57-59.

This brief is not meant to cover every objection to every topic listed in the notice, as even objecting to each topic is an undue burden. But given just these facial deficiencies alone, it is clear that the PMK deposition notice is designed solely to harass Cynosure and that Cynosure is entitled to an order prohibiting Defendants' PMK deposition in its entirety. Fed. R. Civ. P. 26(c)(1)(A). At minimum, Cynosure is at least entitled to an order limiting Defendants' PMK deposition in time and scope.[7] Fed. R. Civ. P. 26(c)(1)(D). This includes limiting the deposition topics and limiting the deposition to no more than 7 hours total, regardless of the number of designated corporate representatives and to the scope as agreed to by Cynosure. *See In Re Rembrandt Techs.*, 2009 WL 1258761, at *14 (limiting total PMK deposition time to 10 hours total, and noting: "A blanket rule permitting a seven-hour deposition of each designated deponent is unfair (because it rewards broader deposition notices and penalizes corporate defendants who maintain business information in silos and who therefore must either designate multiple individuals to respond or spend time, energy, money and other resources preparing a single individual to respond) and unduly burdensome (because of the manifest increased cost and disruption of preparing more than one person to respond to a deposition notice).").

[7] Cynosure submits that if the Court is inclined to deny its motion as to the PMK Deposition, Cynosure will serve its own PMK Deposition Notice.

**CONCLUSION**

For the foregoing reasons, Cynosure respectfully requests that this Court grant its Motion.

Dated: February 9, 2024

Respectfully submitted,

CYNOSURE, LLC
LOTUS PARENT, INC.
By their attorneys,

*/s/ Dipanwita Deb Amar*
Dipanwita Deb Amar
Joseph Farris
Matthew Diton
ARNOLD & PORTER KAYE SCHOLER LLP
3 Embarcadero Center, 10th Floor
San Francisco, California 94111
dipanwita.amar@arnoldporter.com
joseph.farris@arnoldporter.com
matthew.diton@arnoldporter.com
T: +1 415.471.3100
F: +1 415.471.3400
*Admitted Pro Hac Vice*

Joshua S. Barlow (SBN: 667472)
Fred A. Kelly Jr. (SBN: 544046)
ARNOLD & PORTER KAYE SCHOLER LLP
200 Clarendon Street, 53rd Floor
Boston, MA 02116
Joshua.barlow@arnoldporter.com
Fred.kelly@arnoldporter.com
T: +1 617.351.8050
F: +1 627.226.9199

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) on February 9, 2024.

**ARNOLD & PORTER KAYE SCHOLER LLP**

By: /s/ *Dipanwita Deb Amar*
DIPANWITA DEB AMAR

Attorneys for Plaintiffs CYNOSURE, LLC
and LOTUS PARENT, INC.