**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CYNOSURE, LLC, a Delaware limited liability company; and LOTUS PARENT, INC., a Delaware corporation; | |
| Plaintiffs, | |
| v. | Civil Action No. 1:22-cv-11176-PBS |
| REVEAL LASERS LLC; a Nevada limited liability company, et al. | |
| Defendants. | |

**DEFENDANTS' DAUBERT MOTION TO EXCLUDE THE**
**<u>EXPERT TESTIMONY OF BRUCE MCFARLANE</u>**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     LEGAL STANDARD ........................................................................................... 3

      A.   Admissibility of Expert Opinions ............................................................. 3

      B.   Striking Late Disclosed Opinions ............................................................. 4

III.    ARGUMENT ....................................................................................................... 5

      A.   McFarlane's Trade Secret Opinions are Unreliable and Unfit for the Jury................ 5

              i.     All 3 Trade Secret Theories Fail to Apportion as Required by Law. .......... 5

              ii.    McFarlane Fails to Prove the Panduit Factors Necessary to Support a Lost Profits Theory for Trade Secret Damages. .................................... 7

              iii.   McFarlane Fails to Provide Market Apportionment in his Lost Profits Trade Secret Damages, Rending his Analysis Unreliable........................ 10

      B.   The Court Should Exclude McFarlane's Lost Profits Analysis for the "Various" Other Claims. ..............................................................................11

              i.     McFarlane's Unreliable Opinions Fail to Apportion and Address Other Reasons for Cynosure's Decline in Revenue and Profit. ..........................11

              ii.    McFarlane Ignores Basic Accounting Principles when Assessing Cynosure's Historical Business Performance. .......................................... 12

      C.   McFarlane's Untimely Supplemental Report Should Be Stricken. ......................... 14

              i.     Cynosure Improperly Uses a "Supplemental" Report to Respond to Critiques Leveled by Defendants' Rebuttal Expert. ................................ 14

              ii.    McFarlane's Supplemental Report Relies on Information Available to Both Sides at the Time of his Initial Report. ................................... 16

              iii.   Allowing McFarlane's Supplemental Report to Stand Substantially Prejudices Defendants.......................................................................... 17

IV.    CONCLUSION.................................................................................................. 17

REQUEST FOR ORAL ARGUMENT................................................................... 18

LOCAL RULE 7.1 CERTIFICATION ................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andrew Corp. v. Gabriel Elecs., Inc.*,
    785 F. Supp. 1041 (D. Me. 1992) ......................................................................8, 9

*AVX Corp. v Cabot Corp.*,
    251 FRD 70 (D. Mass. 2008) ...............................................................................17

*Bose Corp. v. JBL, Inc.*,
    *112 F. Supp. 2d 138 (D. of Mass. 2000)* ......................................................10, 11

*Coles v. Perry*,
    217 F.R.D. 1 (D.D.C. 2003)....................................................................................4

*Congressional Air. Ltd. v. Beech Aircraft Corp.*,
    176 F.R.D. 513 (D.Md. 1997)...............................................................................16

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).................................................................................................3

*Ford Motor Co. v. Versata Software, Inc.*,
    2018 WL 10733561 (E.D. Mich. Jul. 9, 2018) ......................................................6

*Gagnon v. Teledyne Princeton, Inc.*,
    437 F.3d 188 (1st Cir. 2006)..................................................................................17

*Gallagher v. S. Source Packaging, LLC*,
    568 F.Supp.2d 624 (E.D.N.C.2008).....................................................................16

*Gay v. Stonebridge Life Ins. Co.*,
    660 F.3d 58 (1st Cir. 2011)......................................................................................5

*GE v. Joiner*,
    522 U.S. 136 (1997).................................................................................................4

*Harriman v. Hancock Cnty.*,
    627 F.3d 22 (1st Cir. 2010)....................................................................................17

*Hartford Ins. Co. v. Gen. Elec. Co.*,
    526 F.Supp.2d 250 (D.R.I.2007) ..........................................................................16

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012).................................................................................11

*Lawes v CSA Architects and Engineers LLP*,
    963 F3d 72 (1st. Cir. 2020).................................................................................3

*LivePerson, Inc. v. [24]7.AI, Inc.*,
    2018 WL 6257460 (N.D. Cal. Nov. 30, 2018) ...............................................5, 6, 7

*Macaulay v. Anas*,
    321 F.3d 45 (1st Cir. 2003)...............................................................................4, 17

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
    No. 06-cv-100-JD, 2010 WL 1427549 (D.N.H. Apr. 2, 2010)...............................16

*Matthews v. Remington Arms Co., Inc.*,
    No. 07-1392, 2009 WL 1490691 (W.D. La. May 27, 2009) ..................................16

*Medidata Soln's, Inc. v. Veeva Sys., Inc.*,
    2021 WL 4243309 (S.D.N.Y. Aug. 25, 2021) .........................................................6

*Minebea Co. v. Papst*,
    *231 F.R.D. 3 (D.D.C. 2005)*.....................................................................................4

*Neural Magic, Inc. v. Meta Platforms, Inc.*,
    659 F Supp 3d 138 (D. Mass. 2023) .....................................................................16

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
    399 F.Supp.2d 1064 (N.D. Cal. 2005) ....................................................................6

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
    575 F. 2d 1152 (Fed. Cir. 1978).................................................................2, 7, 8, 9

*Samaan v. St. Joseph Hosp.*,
    670 F.3d 21 (1st Cir. 2012).....................................................................................3

*Santiago-Lampon v. Real Legacy Assur. Co.*,
    293 FRD 86 (D.P.R. 2013) ....................................................................................15

*State Indus., Inc. v Mor-Flo Indus., Inc.*,
    883 F2d 1573 (Fed Cir. 1989)...........................................................................10, 11

*Texas Advanced Optoelectronic Sol'ns, Inc. v. Renesas Electronics America, Inc.*,
    895 F.3d 1304 (Fed. Cir. Jul. 9, 2018)....................................................................6

*Trustees of Boston Univ. v Everlight Elecs. Co., Ltd.*,
    141 F Supp 3d 139 (D. Mass. 2015) .....................................................................3, 8

*United States v. Monteiro*,
    407 F. Supp. 2d 351 (D. Mass. 2006) .....................................................................4

**Other Authorities**

Fed. R. Civ. P. 26 ..................................................................................................4, 5, 17

Fed. R. Civ. P. 26(a)(2) ......................................................................................................4

Fed. R. Civ. P. 26(a)(2)(D) ................................................................................................4

Fed. R. Civ. P. 26(e) ...........................................................................................................4

Fed. R. Civ. P. 37 ...............................................................................................................5

Fed. R. Civ. P. 37(c) .........................................................................................................17

Fed. R. Civ. P. 37(c)(1) ......................................................................................................4

Fed. R. Evid. 702 ........................................................................................................passim

Fed. R. Evid. 703 ..........................................................................................................2, 5

Miles, Raymond C., *Basic Business Appraisal* (New York: John Wiley & Sons,
    Inc., 1984) .................................................................................................................13

Defendants, by and through their undersigned counsel, and pursuant to Fed. R. Evid. 702 and the Court's Order dated May 10, 2024, hereby move to exclude the testimony of Cynosure's expert Bruce McFarlane ("McFarlane"). In support of their motion, Defendants state as follows.

## I.    INTRODUCTION

The Court should exercise its gatekeeping function to prevent Cynosure from presenting to the jury a hugely inflated damages theory that rejects basic apportionment rules and customary accounting principles.

In his Initial Report, Cynosure's expert Bruce McFarlane, lays out 12 damages theories (1A-11) categorized into "Lost Profits – Various Claims," "Theft of Trade Secrets," and "Other:"



Ex. A (Initial Report) at p. 3, Figure 1. The damages theories for the "Various" claims are all lost profits based. *Id.* The damages theories for the "Theft of Trade Secrets" claims are lost profits, unjust enrichment, and reasonable royalty based. *Id.* The "Other" claims relate to goodwill, tortious interferences, and expenses, among other things. *Id.* Cynosure submitted McFarlane's Initial Report on time on April 12, 2024

Cynosure then submitted a late "Supplemental" Report on May 10, 2024. It attempts to fix various errors in McFarlane's Initial Report and provides improper rebuttal to Reveal's damages expert. The first 22 pages provide "revisions to [McFarlane's] affirmative opinions," while the remaining 29 pages are a running "comment[ary]" regarding Defendants' rebuttal report by Mr. Stephen Dell. Ex. B (Supplemental Report) at pp. i-ii (Table of Contents).

Cynosure's expert testimony on damages is unsupported, methodologically flawed, and unreliable. Each of the trade secrets theories relied upon by McFarlane fail to apportion damages, as required by law. McFarlane likewise fails to establish the *Panduit* factors necessary to support a lost profits theory for the trade secrets claims. And, as both reports make clear, McFarlane fails to apply required market share reductions, rendering Cynosure's claimed damages contrary to law.

Similarly, McFarlane's calculations of the non-trade secrets claims contain numerous fatal errors. Methodological errors in Mr. McFarlane's analysis resulted in his calculation of Cynosure's "but-for" revenue being significantly overstated and unreliable. McFarlane's analysis ignores basic valuation and accounting principles and fails to account for alternative causes of Cynosure's claimed damages. All of these issues are grounds for excluding McFarlane's opinions.

McFarlane's late Supplemental Report fares no better. He uses the cover of a "supplement" to alter his damages calculations by millions, improperly respond to criticisms leveled by Defendants' rebuttal expert, and address evidence available to both parties at the time of his Initial Report. Because Plaintiffs' failure to timely disclose opinions presented in McFarlane's Supplemental Report are neither substantially justified nor harmless, the Supplemental Report should be excluded in its entirety.

As discussed below, the testimony of Plaintiffs' proffered damages expert is improper under Rules 702 and 703, will only serve to mislead and confuse the jury, and should be excluded.

## II.    LEGAL STANDARD

### A.  Admissibility of Expert Opinions

As the party tendering the expert, Cynosure bears the burden of persuasion on the reliability of its expert's opinions. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993). Expert testimony is only admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "[J]udges [have] the responsibility of acting as gatekeepers to exclude unreliable expert testimony." *Id.*, Comm. Notes on Rules, 2000 Amend.; *see also Daubert*, 509 U.S. at 597.

Cynosure bears the burden of demonstrating the reliability of its experts' opinions. *Daubert*, 509 U.S. at 592 n.10. And "[w]hile questions regarding which facts are most relevant for calculating [damages] . . . are properly left to the jury, a critical prerequisite is that the underlying methodology be sound." *Trustees of Boston Univ. v Everlight Elecs. Co., Ltd.*, 141 F Supp 3d 139, 143 (D. Mass. 2015) (quoting *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014)). Rule 702, therefore, "necessitates an inquiry into the methodology and the basis for an expert's opinion." *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012).

The "reliability" bar cannot be met "by an expert's self-serving assertion that his conclusions were derived by the scientific method[;]" rather, "the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Lawes v CSA Architects and Engineers LLP*, 963 F3d 72, 98 (1st. Cir. 2020) (quoting *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1317-90 (9th Cir. 1995)). Indeed, a court may conclude that "there is simply too great an analytical gap

between the data and the opinion proffered." *GE v. Joiner*, 522 U.S. 136, 146 (1997). The Court's vigilant exercise of this gatekeeper role is critical because "an expert's testimony may be given greater weight by the jury due to the expert's background and approach." *United States v. Monteiro*, 407 F. Supp. 2d 351, 358 (D. Mass. 2006).

### B.  Striking Late Disclosed Opinions

The Federal Rules require that plaintiffs disclose their experts' opinions "at the times and in the sequence that the Court orders." Fed. R. Civ. P. 26(a)(2)(D). The purpose of Rule 26 is to prevent trial by ambush, because opposing counsel cannot adequately cross-examine without advance preparation. *Macaulay v. Anas*, 321 F.3d 45, 50, 52 (1st Cir. 2003) (affirming the preclusion of evidence because "[t]he record shows beyond the hope of contradiction that she had ample time to conduct discovery and to submit her expert reports within the period allotted by the district court").

"[T]he very purpose of [Rule 26(a)(2)] is nullified" when an expert supplements his report by addressing new matter after discovery has ended. *See Coles v. Perry*, 217 F.R.D. 1, 4 (D.D.C. 2003). Expert reports can be supplemented under Rule 26(e), but that Rule does not grant a blanket license to supplement an expert report "because a party wants to," and only requires such supplementation if a party discovers that the information supplied is incomplete or incorrect. *Id*. Rule 26 also "prevents experts from 'lying in wait' to express new opinions at the last minute" thereby denying the opposing party the ability to fully test those opinions in discovery. *Minebea*, 231 F.R.D. at 6 (citing *Keener v. United States*, 181 F.R.D. 639, 641 (D. Mont. 1998) (striking expert report where "[t]he nature of the second disclosure is so substantially different from the first that it falls far outside any reasonable notion of correcting an incomplete or inaccurate report").

If a party fails to timely disclose its expert opinions, they cannot use that information at trial unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). *See also*

*Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 62 (1st Cir. 2011) (stating that "[t]ogether Rules 26 and 37 operate to 'prevent the unfair tactical advantage that can be gained by failing to unveil an expert in a timely fashion,'" and noting that a judge has broad discretion in determining sanctions) (quoting *Poulis–Minott v. Smith*, 388 F.3d 354, 358 (1st Cir. 2004)).

## III.    ARGUMENT

McFarlane calculates his alleged damages opinions under three general "categories" of damages: (1) "Various Claims," (2) "Theft of Trade Secrets," and (3) "Other." Ex. A (McFarlane Initial Report) at p. 3, Figure 1. Within these categories, McFarlane provides a total of 12 theories of damages recovery referenced as "1A" to "11." *Id.* This Motion first explains why McFarlane should be precluded from offering certain opinions under theories 1A and 1B ("Various" Claims) and 2-4 ("Theft of Trade Secrets" Claims). This testimony is improper under Rules 702 and 703 and will only serve to mislead and confuse the jury. Second, Defendants request that McFarlane's late Supplemental Report be stricken in its entirety.

### A.    McFarlane's Trade Secret Opinions are Unreliable and Unfit for the Jury.

McFarlane offers a lost profits theory ("2"), an unjust enrichment theory ("3"), and a reasonable royalty theory ("4") in support of his trade secret damages calculations. *Id.* Each of these theories fail to follow established law and accounting principles, and therefore must be stricken for the reasons that follow.

#### i.    *All 3 Trade Secret Theories Fail to Apportion as Required by Law.*

To properly calculate damages under any of McFarlane's trade secret theories, he must "apportion" his damages. This includes isolating or "apportioning" the damages related to each trade secret at issue. In a strikingly similar bellwether-style case, a court excluded damages testimony because it "offer[ed] no methodology for the jury to calculate trade secret misappropriation damages on fewer than all of the 28 alleged trade secrets." *LivePerson, Inc. v.*

*[24]7.AI, Inc.*, 2018 WL 6257460, *2 (N.D. Cal. Nov. 30, 2018); *see also O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1077 (N.D. Cal. 2005) (holding that "[a]fter the jury concluded that [the defendant] did not misappropriate all of [the plaintiff's] trade secrets, [the expert's] testimony regarding damages for misappropriation of all trade secret[s] was useless to the jury."); *Texas Advanced Optoelectronic Sol'ns, Inc. v. Renesas Electronics America, Inc.*, 895 F.3d 1304, 1317 (Fed. Cir. Jul. 9, 2018). This is the pattern across the country, and for good reason:

> [An] all-or-nothing approach [] does not fit well with the jury's task and poses a substantial risk of confusing and/or misleading the jury. Indeed, if the jury were to conclude that [Defendant] misappropriated less than all of [Plaintiff's] trade secrets . . ., then [the expert's] damages calculation would not assist the jury in calculating damages and could only serve to confuse them.

*Ford Motor Co. v. Versata Software, Inc.*, 2018 WL 10733561, *11 (E.D. Mich. Jul. 9, 2018); *see also Medidata Soln's, Inc. v. Veeva Sys., Inc.*, 2021 WL 4243309, *3 (S.D.N.Y. Aug. 25, 2021) (excluding an "all or nothing approach" that was "plainly not helpful to the trier of fact.").

McFarlane offers this same "all-or-nothing" approach. He calculates trade secret damages ranging between ███████████████, no matter how many alleged trade secrets were stolen or who stole which ones.[1] *See* Ex. A at ¶ 186 (stating "it is not possible to apportion Cynosure's lost revenue among each trade secret"). He also alleges that each Defendant had access to different trade secrets, meaning it is virtually certain that a jury could not find the subset of trial Defendants liable for theft of all of Cynosure's trade secrets. *See* Ex. A at pp. 67-68 Figures 55, 57. McFarlane's all-or-nothing opinion is therefore not a principled application of a sound damages methodology. *See, e.g., Ford*, 2018 WL 10733561 at *11; *LivePerson*, 2018 WL 6257460 at *2. Nor does it help the jury assess damages for the subset of Defendants and the subset of trade secrets on trial here.

---

[1] Defendants dispute that Cynosure possesses any trade secrets, that they were stolen, or that they have any value. Defendants simply provide this illustration to show the fallacy of McFarlane's analysis.

*Id.* Thus, paragraphs 139-329 detailing McFarlane's flawed trade secret analysis must be stricken.[2]

     *ii.*    *McFarlane Fails to Prove the Panduit Factors Necessary to Support a Lost Profits Theory for Trade Secret Damages.*

To be entitled to lost profits, Cynosure must prove that ***all four*** of the *Panduit* factors are satisfied. *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F. 2d 1152, 1156 (Fed. Cir. 1978)**;** *see also* Ex. A at ¶ 142. The four *Panduit* factors are: "(1) demand for the patented product, (2) absence of acceptable, non-infringing alternatives to the patented product, (3) manufacturing and marketing capability to exploit the demand for the patented product, and (4) that the patentee would have made a profit if it had made the infringer's sales." *Panduit*, 575 F.2d at 1156. Although the *Panduit* case arose in the context of patent damages, McFarlane applies it in his trade secret analysis by swapping the phrase "patented product" for "Cynosure Trade Secrets." Ex. A at ¶¶ 142-146.

MacFarlane cannot satisfy the first *Panduit* factor (demand for Cynosure's trade secrets), and thus lost profits are not allowable. In particular, McFarlane opines ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[2] The same portions of McFarlane's Supplemental Report should also be stricken if not already stricken in their entirety for the reasons set forth in Section C.

████████████████████████████████████████████ Because McFarlane's assessment of demand for Cynosure's trade secrets is fatally flawed and unreliable, it is improper to present to the jury. *See Trustees of Boston Univ. v Everlight Elecs. Co., Ltd.*, 141 F Supp 3d 139, 143 (D. Mass. 2015) (finding that there was insufficient evidence for plaintiff to establish patented invention was the basis for demand for defendants' products).

McFarlane also cannot prove the second *Panduit* factor (unavailability of acceptable non-infringing alternatives ("NIAs")), again precluding a lost profits damages theory. *Panduit* 575 F.2d at 1156. MacFarlane makes two fundamentally unreliable and unsupported assumptions here. First, he again lumps all of Cynosure's trade secrets together and concludes that because "some" of them may not have acceptable NIAs, he can paint the other trade secrets with that same broad brush. In other words, he makes no effort to differentiate which trade secrets have acceptable NIAs, if any at all, and which do not. But only those that do not can be the basis of a lost profits analysis. *See Andrew Corp. v. Gabriel Elecs., Inc.*, 785 F. Supp. 1041, 1047, 1052 (D. Me. 1992) (product without an acceptable NIA could not be included in lost profits analysis)

Second, he presumes it would be "impossible" or "costly and time-consuming" to independently develop any of Cynosure's trade secrets. Ex. A at ¶ 148. Not so. One of Cynosure's trade secrets (a customer list) was, in fact, purchased from a third party. *See* Ex. C, Deposition Transcripts Excerpts of Yunior Caballero, Robert Daley, and Robert Fiacco. And the vast majority of Cynosure's customer data is ripe for the taking through Cynosure's "Find a Provider" webpage:



This webpage allows anyone to type in a zip code, a treatment, or a particular laser device to locate Cynosure customers. When you hit "SEARCH," the "Find a Provider" webpage lists Cynosure customers matching the selected criteria, along with their address and contact information. As a result, Defendants have acceptable NIAs literally at their fingertips; they are not impossible, costly, or time-consuming to compile.

Finally, if it is proper to use demand for a manufacturer's <u>laser products</u> as a proxy for its <u>trade secrets</u> (as McFarlane does in ¶ 145), then publicly available market data proves there are numerous acceptable NIAs. Cynosure only represents about 9% of the U.S. medical aesthetics market. *See* Ex. B (Dell Report) at p. 5. The other 91% is served by acceptable NIAs from each of InMode (16.6%), Cutera (7.2%), Alma (7.3%), and many others (19.9%). *Id.* Thus, 91% of the market purchases non-Cynosure laser products and finds them to be acceptable NIAs. Since McFarlane fails to properly analyze the second *Panduit* factor, he cannot offer a reliable lost profits analysis for the jury's consideration. *Andrew Corp.*, 785 F. Supp. at 1052. For these same reasons, he also has not offered a reliable reasonable royalty theory, as it also depends on consideration of

acceptable NIAs. *See, e.g.,* Ex. A at ¶¶ 283-89 (admitting necessity of consideration of acceptable NIAs to calculate a reasonably royalty).

> iii.     *McFarlane Fails to Provide Market Apportionment in his Lost Profits Trade Secret Damages, Rending his Analysis Unreliable.*

McFarlane also fails to perform another required apportionment for a sound damages calculation. In a principled analysis, a damages expert must consider whether other competitors would have made some of the sales allegedly diverted due to a defendant's conduct. *See Bose Corp.* 112 F. Supp. 2d at 160 (D. Mass. 2000), *aff'd,* 274 F.3d 1354 (Fed. Cir. 2001) ("the market share approach is not automatically applied, and [] the [plaintiff] must still prove its market share and that it would have captured the infringing sales."). McFarlane acknowledges as much in his report. *See* Ex. A at ¶ 152. In short, in a multi-player industry, a damages expert must allocate lost sales so that the plaintiff only receives its relative market share of those sales in damages. *Id.; see also State Indus., Inc. v Mor-Flo Indus., Inc.*, 883 F2d 1573, 1580 (Fed Cir. 1989) (affirming district court's decision award damages based on plaintiffs' share of the market). As noted above, Cynosure only has 9.3% of the relevant U.S. market. *See* Ex. B at p. 5. So it is entitled to only 9.3% of the lost sales rather than the 100% that McFarlane calculates. Ex. A at ¶ 152.

McFarlane elects not to make this required market share apportionment because it is allegedly "unfair." Ex. A at ¶ 152. He instead presumes that the very existence of a Cynosure customer is a trade secret, and it would be impossible for any competitor to discover that customer and sell them a device. *Id.* This is a bridge too far. Cynosure publicizes its customers on its "Find a Provider" webpage as excerpted and described above. So any laser competitor—including InMode, Cutera, Alma, and others—can locate Cynosure customers, their current product portfolio, and their contact information. As a result, McFarlane cannot absolve himself of apportioning by market share based on the assumption that Cynosure's customer data is

confidential. *Id.* Since McFarlane makes none of the required apportionments, his trade secret methodology is too flawed to present to the jury. *Bose*, 112 F. Supp. 2d at 160.   Defendants therefore request that ¶¶ 135-326 of his report be stricken.[3]

**B.    The Court Should Exclude McFarlane's Lost Profits Analysis for the "Various" Other Claims.**

McFarlane initially calculates an ██████ price tag for the "various" other claims asserted by Cynosure in this case. Ex. A at p. 3, Figure 1. To get this number, McFarlane makes *three* fatal mistakes. First, he fails to provide "but-for causation" under any degree of reasonable certainty for all the same reasons set forth in Section III.A.2. Second, he fails to apportion and account for other reasons for the decline in Cynosure's sales revenues and profits. Third, he fails to apply basic valuation and accounting principles that are required to for accurate and *reliable* growth rates that underlie the damages opinions for the "various" claims. All of these issues are grounds for excluding McFarlane's opinions.

> i.    *McFarlane's Unreliable Opinions Fail to Apportion and Address Other Reasons for Cynosure's Decline in Revenue and Profit.*

Defendants represent only ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████. *Id.*
Yet, McFarlane does nothing to determine how much of any lost profits trial Defendants are allegedly responsible for. This is far from the reliable application of reliable principles and methods to sufficient facts as required by Rule 702. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (finding a "complete lack of economic analysis to qualitatively

---

[3] The same portions of McFarlane's Supplemental Report should also be stricken if not already stricken in their entirety for the reasons set forth in Section C.

support" the apportionment "would alone justify excluding [expert's] opinions in the first trial.").

Moreover, McFarlane fails to account for other reasons behind Cynosure's decline in revenue and profit. For example, the pandemic had a lingering impact on Cynosure, both from a headcount perspective and a supply chain perspective. This was discussed at length by Cynosure's then-CEO Todd Tillemans. He testified ███████████████████████████████████ ██████████████████████████████. *See* Ex. E (Tillemans Dep. Tr. 146:2-147:13). Mr. McFarlane also ignores Cynosure's own *historical* business performance and testimony from current and former Cynosure employees which clearly demonstrate Cynosure's revenues began to decline as early as 2015/2016, were exacerbated by the pandemic and continued through 2021, well before the alleged acts of Defendants in 2022.

As another example, Tillemans explained ████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████. *See* Ex. E at 165:1-166:1. None of these Cynosure-verified impacts on revenue were addressed or accounted by McFarlane. This failure renders McFarlane's opinions at ¶¶ 37-67 unreliable, and they should be stricken by the Court.[4]

ii.   *McFarlane Ignores Basic Accounting Principles when Assessing Cynosure's Historical Business Performance.*

In addition to the fundamental errors discussed above, McFarlane's entire lost profits analysis is built on a single Cynosure document to lend support to his inflated and inaccurate damages claim. *See* Ex. A. pp. 38-44 Figures 26, 27 and Schedule 13.8.  By relying on this single source, and entirely disregarding Cynosure's *actual historic* business performance, the growth rates used by McFarlane are speculative and directly contradicted by the facts and evidence made

---

[4] The same portions of McFarlane's Supplemental Report should also be stricken if not already stricken in their entirety for the reasons set forth in Section C.

available in this case. Moreover, McFarlane does not adequately consider a proper and more reliable period of historical financial performance necessary to reliably estimate Cynosure's future sales. In fact, most alarmingly, McFarlane entirely ignores Cynosure's *actual historic* revenue growth, as reported in its audited financial statements.

The fundamental methodological errors in McFarlane's analysis are highlighted by authoritative literature that guides the methodologies for financial statement analysis in valuations. These authorities, often relied upon by damages experts, emphasize the importance of analyzing past financial performance, including the appropriate period that should be analyzed to adequately determine future financial performance.[5] For example, *Basic Business Appraisal* states: [6]

> [a]s a rule of thumb, the appraiser should obtain copies of financial statements covering a period of at least five years leading up to the date of appraisal. However, **if the business exhibits an unstable or erratic pattern of sales or profits, statements covering a period of more than five years may be needed as part of the effort to identify whatever trends may exist.** Of course, if the business has not been in existence for as long as five years, the appraiser must work from financial statements covering the shorter period.

Additionally, IRS Revenue Ruling 59-60 states that "detailed profit-and-loss statements should be obtained and considered for a representative period immediately prior to the required date of appraisal, *preferably five or more years*" and that *"[p]rior earnings records usually are the most reliable guide as to the future expectancy.*"[7]

McFarlane follows none of these standard accounting practices. Instead, he analyzes only future estimates for an extremely narrow snapshot of time, ignoring clear and direct evidence of Cynosure's historic and continued economic decline in business performance and results. For

---

[5] *See,* Pratt, Shannon P., with Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies (Fifth Edition)* (New York, McGraw Hill, 2008, p. 79.
[6] Miles, Raymond C., *Basic Business Appraisal* (New York: John Wiley & Sons, Inc., 1984), pp. 62-63 (emphasis added).
[7] Internal Revenue Code Revenue Ruling 59-60 (emphasis added).

example, McFarlane ignores Cynosure's past financial decline and applies (1) a growth rate of ████ in estimating Cynosure's 2023 "but-for" revenue and (2) a growth rate of ████ in estimating Cynosure's 2024 "but-for" revenue. McFarlane's methodological error results in significantly overstated and unreliable "but-for" revenue that underpins the rest of his lost profits opinions. Thus, the Court should strike ¶¶ 93-109 of McFarlane's Initial Report since they are based on inaccurate and unreliable growth rates.[8]

### C.   McFarlane's Untimely Supplemental Report Should Be Stricken.

McFarlane's Supplemental Report, produced weeks after the agreed-upon expert discovery deadline, makes significant departures from his Initial Report, improperly uses a "supplemental" report as a vehicle to alter Cynosure's theory of damages in response to criticisms leveled by Defendants' rebuttal expert, and adjusts previous opinions based on evidence available to both parties at the time of his Initial Report. Because Cynosure's failure to timely disclose opinions presented in McFarlane's Supplemental Report are neither substantially justified nor harmless, the Supplemental Report should be excluded in its entirety.

> i.    *Cynosure Improperly Uses a "Supplemental" Report to Respond to Critiques Leveled by Defendants' Rebuttal Expert.*

As an initial matter, McFarlane transparently uses his Supplemental Report to correct numerous errors in his Initial Report highlighted by Stephen Dell, Defendants' rebuttal damages expert. *See* Ex. B at ¶ 11. For example, McFarlane revises his calculation of lost revenue in 2024 and accounts for seasonality, changing his damages estimates from ████████████████ . *Id.* at ¶ 10. The differences between McFarlane's total damage calculations between his two reports are summarized below:

---

[8] The same portions of McFarlane's rebuttal report should also be stricken if not already stricken in their entirety for the reasons set forth in Section C.



Further, McFarlane changed his sources for business expense damage calculations, stating that "I have been asked by counsel to instead include only expenses for the following Bates documents, which I understand are invoices related to recruitment expenses in the Defendants territories" and proceeding to list out 15 documents. All 15 were produced by Cynosure on March 21, 2024 and not mentioned by McFarlane in his Initial Report. *Id.* at ¶ 59. Moreover, all of the opinions expressed in Section 3.3 of the Supplemental Report are *new* opinions based on licenses that McFarlane failed to consider in his Initial Report. *See id.* at ¶¶ 5-20. Beyond this, McFarlane uses his Supplemental Report as a platform to directly attack Defendants' Rebuttal Report and offer new opinions and analysis, relying on new evidence and discussions with Lowinn Kibbey that occurred after the date of his Initial Report. *See* Ex. B, ¶¶ 61-151. This late disclosure of new opinions should be stricken. *See Santiago-Lampon v. Real Legacy Assur. Co.*, 293 FRD 86, 91 (D.P.R. 2013) (striking expert witness reports based on untimely disclosure).

ii.   *McFarlane's Supplemental Report Relies on Information Available to Both Sides at the Time of his Initial Report.*

McFarlane's Supplemental Report relies on sources of information that were not in his Initial Report, including license agreements from 2004 and 2006, a supply agreement from 2020 (produced by Cynosure), and a May 7, 2024 interview with Lowinn Kibbey. *See* Ex. B at ¶ 151. Yet, all of the "new" information now relied on by McFarlane was available to him when drafting his Initial Report. These late opinions should be stricken. *See, e.g., Neural Magic, Inc. v. Meta Platforms, Inc.,* 659 F Supp 3d 138, 163 (D. Mass. 2023) (denying motion to allow supplemental expert report where new report would address information expert had access to at the time of opening report); *Marine Polymer Techs., Inc. v. HemCon, Inc.*, No. 06-cv-100-JD, 2010 WL 1427549, at *2 (D.N.H. Apr. 2, 2010) (stating that "[a] party may not use a supplemental report to disclose information that should have been disclosed in the initial expert report, thereby circumventing the requirement for a timely and complete expert report" (quoting 6 Moore's Federal Practice § 26.131[2]) (internal quotation marks omitted)); *Hartford Ins. Co. v. Gen. Elec. Co.*, 526 F.Supp.2d 250, 253 (D.R.I.2007) ("[T]he purpose of supplementation is not to introduce wholly new opinions."); *Matthews v. Remington Arms Co., Inc.*, No. 07-1392, 2009 WL 1490691, at *1 (W.D. La. May 27, 2009) (stating that "an expert report that contains new opinions based on information available prior to the expiration of the expert report deadline is not supplemental" (citing cases)); *Gallagher v. S. Source Packaging, LLC*, 568 F.Supp.2d 624, 631 (E.D.N.C.2008) (noting that courts have "rejected attempts to ... 'supplement[ ]' an expert report with a 'new and improved' expert report").

McFarlane's weeks-late "Supplemental" Report is nothing more than a vehicle to contradict or rebut Defendants' own rebuttal expert. This is also improper. *See Congressional Air. Ltd. v. Beech Aircraft Corp.*, 176 F.R.D. 513, 515–16 (D.Md. 1997) (despite the expert's decision

to examine additional discovery materials, conduct further examinations and submit an additional report, the court found that the reports of this expert were "intended solely to contradict or rebut" the report prepared by the opposing expert and were thus not "supplemental.").

> iii. *Allowing McFarlane's Supplemental Report to Stand Substantially Prejudices Defendants.*

An unjustifiably delayed disclosure will merit exclusion of the delayed evidence under Rule 37(c) if the delay also causes some harm or prejudice to the opposing party. *See Gagnon v. Teledyne Princeton, Inc.*, 437 F.3d 188, 197 (1st Cir. 2006). Delay is not harmless when the ultimate disclosure occurs "after the close of discovery," leaving the defendant "without the means to explore and challenge the basis of" the late-disclosed evidence. *AVX Corp. v Cabot Corp.*, 251 FRD 70, 78 (D. Mass. 2008) (noting that concept of "harmless" under Rule 26 is a "fairly limited" one (citations omitted)); *see Harriman v. Hancock Cnty.*, 627 F.3d 22 at 31 (1st Cir. 2010) (holding "late disclosure was not a harmless inconvenience" because defendants had "prepared and filed a summary judgment motion premised on evidence submitted before the discovery deadline"). Here, while the parties agreed to forgo expert depositions, they did **not** agree to allow Cynosure the option of new or revised opinions after expert discovery deadlines passed. *See Macaulay v. Anas*, 321 F.3d 45, 52–53 (1st Cir. 2003) (precluding expert testimony involving a new theory of liability disclosed only a week before trial). It is prejudicial and harmful to force Defendants to the expense and time of submitting yet another rebuttal report to respond to McFarlane's new opinions just weeks before trial. His Supplemental Report should be stricken.

## IV.   CONCLUSION

For all the reasons noted above, Defendants request that the Court exclude McFarlane's testimony discussed in Sections A and B as unreliable, and that the Court strike McFarlane's late "supplemental" testimony discussed in Section C in its entirety.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Defendants respectfully request that the Court hold oral argument on this motion, as Defendants believe that oral argument may assist the Court in its resolution of these issues.

## LOCAL RULE 7.1 CERTIFICATION

In accordance with Local Rules of Court 7.1, I hereby certify that counsel for the Defendants have conferred with counsel for the Plaintiffs regarding the filing this Motion.

Dated: May 17, 2024.

Respectfully Submitted,

DEFENDANTS,

By their attorneys,

*/s/ A. Madison Dini*
Gerald B. Hrycyszyn, BBO# 675201
Michael A. Albert, BBO# 558566
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
Telephone: (617) 646-8000
Facsimile: (617) 646-8646
ghrycyszyn@wolfgreenfield.com
michael.albert@wolfgreenfield.com

A. Madison Dini (admitted *pro hac vice*)
MICHELMAN & ROBINSON, LLP
717 Texas Avenue, Suite 3100
Houston, Texas 77002
Telephone: (713) 422-2121
Facsimile: (713) 383-6151
mdini@mrllp.com

Ashley N. Moore (admitted *pro hac vice*)
MICHELMAN & ROBINSON, LLP
300 Crescent Court, Suite 1700

18

Dallas, Texas 75201
Telephone: (214) 273-4050
Facsimile: (214) 853-4113
amoore@mrllp.com

Enrico S. Trevisani (admitted *pro hac vice*)
MICHELMAN & ROBINSON, LLP
605 Third Avenue, 30th Floor
New York, New York 10158
Telephone: (212) 730-7700
Facsimile: (212) 730-7725
etrevisani@mrllp.com

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rules of Court 7.1, I hereby certify that counsel for the Defendants have conferred with counsel for the Plaintiffs and attempted in good faith to resolve these areas of disagreement to the greatest extent possible before filing this Motion.

*/s/ A. Madison Dini*
A. Madison Dini

## CERTIFICATE OF SERVICE

I, A. Madison Dini, hereby certify that on May 17, 2024 a copy of the foregoing document was served on counsel for all appearing parties via the ECF filing system.

*/s/ A. Madison Dini*
A. Madison Dini