**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CYNOSURE, LLC, et al.; | Civil Action No. 1:22-CV-11176-PBS |
| Plaintiffs, | |
| v. | **PUBLIC REDACTED** |
| REVEAL LASERS LLC., et al.; | **VERSION** |
| Defendants. | |

**PLAINTIFFS' TRIAL BRIEF**

Pursuant to Local Rule 16.5(f) and the Court's Order for Pretrial Conference (Dkt. 434), Plaintiffs Cynosure, LLC and Lotus Parent, Inc. (collectively, "Cynosure") submit the following Trial Brief.

## I.     INTRODUCTION AND RELEVANT CASE BACKGROUND

This case is about the brazen corporate raid of Cynosure by a startup competitor, **Reveal Lasers Ltd. and Reveal Lasers, LLC (together "Reveal")**, who, through disloyal Cynosure insiders (**Robert (Bob) Daley** and **Chris Chambers**), meticulously coordinated a mass resignation of sales and marketing staff and attempted to lift-and-shift Cynosure's customer base and proprietary information.  This scheme allowed Reveal to go from a company with a revenue of $0 in the U.S. in mid-June 2022 to one that has publicly touted that it is on pace to do over $100 million in U.S. revenue for 2024.  And Cynosure paid the price for that—losing tens of millions of dollars in revenue during the time it needed to recover from Reveal's tactical strike.

### A.     Cynosure's Business and Sales Organization.

Founded over 30 years ago, Cynosure is a Massachusetts-based company that is an established leader in the "medical aesthetic device" industry.  Cynosure manufactures and sells

FDA-regulated devices for treatments such as laser hair removal, wrinkle reduction, gynecological health, body contouring, and more, which are used in doctor's offices, med-spas, and other healthcare facilities.

At the start of 2022, Cynosure had a North American sales organization that consisted of approximately 110 employees, located in different regions of the United States and Canada. That sales organization was charged with serving thousands of customers throughout North America, including medical practitioners, medical spas, and aesthetic retail owners.

A single "capital" sales transaction for Cynosure devices typically results in somewhere between $100,000 - $500,000 in revenue (depending on the device and number of devices), and also yields further recurring revenues from "consumable" products used with the devices over time (i.e., parts used in the machines that need replacement over time, such as "tips" for microneedling devices). Because Cynosure's equipment is often a significant investment for customers, the marketing and sales process is intensive and can stretch out over months or years. Therefore, Cynosure invests considerable resources to support a sales team and to recruit, hire, train, develop, and manage the performance of its employees throughout the country. Typically, newly-hired salespeople require months to years to learn the company's products and processes and build relationships with its customers.

Cynosure requires its sales employees to enter into contracts with restrictive covenants to protect its trade secret information and customer goodwill. The Defendants each signed one or more such contracts with substantially similar trade secret non-disclosure obligations and restrictive covenants of limited time and scope requiring them not to solicit Cynosure's customers and employees and not to work for a direct competitor. The four primary types of contracts at issue in this litigation are: (i) the Lotus Parent, Inc. Employee Option Agreement ("**Equity**

Agreement"); (ii) the Cynosure Employee Intellectual Property Rights, Confidentiality and Protective Covenant Agreement ("**CEIP**"); (iii) the Hologic, Inc. Employee Intellectual Property Rights, Confidentiality, and Non-Competition Agreement ("**Hologic Agreement**"); and (iv) the Invention, Non-Disclosure, Non-Solicitation and Non-Competition Agreement ("**INNNA**").[1] The chart below summarizes the duration of the post-termination noncompete and nonsolicit obligations in each type of agreement:

| Agreement | Noncompete | Customer Nonsolicit | Employee Nonsolicit |
|---|---|---|---|
| Equity Agreement | 12 months | 24 months | 24 months |
| CEIP | 9 months | 18 months | 18 months |
| Hologic Agreement | 18 months | 18 months | 18 months |
| INNNA | 12 months | 12 months | 12 months |

Of particular relevance to this trial, Daley signed two Equity Agreements and two INNNAs, while Chambers signed two Equity Agreements, one Hologic Agreement, and two INNNAs.[2]

**B.    The Coordinated Raid by Reveal.**

Reveal was only able to achieve a near-instantaneous raid of Cynosure's sales organization by covertly working with inside leadership at Cynosure lay the groundwork for the raid for over a year. This effort was first led by Daley, who began working for the benefit of Reveal for over a year before he resigned from Cynosure, all while being entrusted as one of the top leaders of its sales organization.

---

[1] In its Preliminary Injunction orders (Dkts. 171 and 241), the Court enforced, with some modifications, both the Equity Agreement and the CEIP. The Court did not rule on the Hologic Agreement or the INNNA, as enforcement of the first two agreements was sufficient to enjoin most of the Individual Defendants.

[2] Cynosure was a subsidiary of Hologic, Inc. from approximately 2017 to 2019 and assigned the Hologic Agreements to Cynosure when the companies separated. Thereafter, Lotus Parent, Inc. became Cynosure's parent company.

Daley first began plotting with Reveal Ltd.'s CEO, and Eyal Buchbinder in Israel[3] in March 2021 (*fifteen months* before the mass resignation).   On March 22, 2021, Daley emailed Buchbinder confirming that the two had spoken about "███████████████████████ ██████" and requesting a "██████████" into Reveal's products.  Farris Decl., Ex. 1.  Buchbinder responded the same day, providing Daley with an NDA to sign and asking him to "███████████ ████████████████████████████████████████████"  *Id.*   A little over one week later, Daley started to share confidential information with Buchbinder about: (i) how much it costs Cynosure to put on a  customer sales and marketing programs; (ii) what fees Cynosure pays its speakers; and (iii) the total yearly expenses Cynosure incurs for each sales representative.  *Id.*  Daley also noted that he was already thinking about what Cynosure sales reps he wanted to recruit to Reveal, noting that the "████████████████████████████████████████████████████████████████████" **confirming that his original intent has always been to conduct a targeted raid of Cynosure.** *Id.*  Buchbinder responded that the "████████████████████████████████████████████ ████████████████████████████████" *Id.*

Around the same time, Daley used Cynosure's confidential business plans and compensation plans to draft a plan for "█████████████████████████████████" Farris Decl., Ex. 2. These plans included compensation plans and territories that closely mimicked those of Cynosure. *Id.*  These discussions continued into early 2022; for example, in February 2022, Daley emailed Buchbinder "██████████████████████████████████████████████████████████ ██████." Farris Decl., Exhs. 3-4.  Daley emailed Buchbinder the same month to inform him that he had "████████████████████████████████████████████████████████████████

---

[3] Buchbinder eventually also became a Managing Member of Reveal LLC.



█████████████████████████████████████████████████████" Farris Decl., Ex. 5..

Daley also began covertly recruiting other Cynosure leaders to shift their loyalties to Reveal.  By no later than November 2021, Buchbinder and Daley had recruited Chris Chambers (at the time of his resignation, Cynosure's North America Vice President of Sales) to help design an internal recruiting campaign.  Farris Decl., Ex. 6.  Daley assured Buchbinder that he had already begun "████████████████████████████████████████████████████████

██████████████████████████." *Id.*

In January 2022, Daley again wrote Buchbinder that he and Chambers had developed tailored financial packages to recruit the "████████" at Cynosure.  Farris Decl., Ex. 7.  Daley told Buchbinder: "███████████████████████████████████████████████████████

█████████████████████████████████████████████████" *Id.*

This was all done in blatant disregard of Daley's and Chambers' duties of loyalty and contractual obligations—and with Reveal's knowledge that they were in breach.  For example, in February 2022, Chambers sent Buchbinder his compensation and equity agreements for "███████

██████" Farris Decl., Exhs. 8-10.  Notably, Chambers called out to Buchbinder the presence of "██████████████████████████████" expressly putting Buchbinder (and, therefore, Reveal Lasers) on notice that Cynosure employees had restrictive covenant obligations.  *Id.*[4]  Daley had similarly asked Buchbinder to provide him with indemnification, which he told Buchbinder was

---

[4] After the commencement of the litigation, Reveal Lasers entered into separate Defense and Indemnification Agreements with a number of the former employees of Cynosure who had been sued in this litigation.  Consistent with Chambers' February 2022 emails to Buchbinder, each Indemnification Agreement includes the recital that "████████████████████████████████████████████" by Reveal Lasers, the Former Employee ██████

██████████████████████████████████████████████████████████████████████████████

        *See, e.g.,* Farris Decl., Ex. 11 As such, there can be no dispute that Reveal Lasers was on notice of the Former Employees' various restrictive covenants, and yet nonetheless proceeded to interfere with those contracts.

common "█████████████████████" Farris Decl., Ex. 7.  Unphased, Buchbinder, responded

that "████████" he would make arrangements to "█████████████████████████" *Id.*

      As Daley and Chambers were engaging in these discussions with Buchbinder, they were

also actively soliciting other Cynosure employees.  By at least February 2022, Chambers recruited

**Cory Murrell**, Cynosure's then most senior sales executive for Canada and the Western United

States.  Around that exact time, Murrell made a backup of hundreds of files to a personal USB

storage drive.  There is also every reason to believe that by at least that time Chambers had also

brought into the scheme his wife, Cynosure's then Director of Sales Practice Development for

North America, **Brogan Bair**.  Indeed, at her deposition, when she was asked about that, defense

counsel instructed Bair not to answer—citing marital privilege.  Bair Dep. at 192:20-25 (Q: When

was the first time your husband and you talked about Reveal Lasers?  Ms. Dini:  Don't answer that

question under marital disqualification.").

      Around the same time in February 2022, Daley had also enlisted his direct report, **Dean

Fiacco** (Cynosure's District Sales Manager for New England), who would become Reveal Lasers'

Vice President of Operations.  Fiacco, too, quickly shifted his loyalties.  For example, on a single

day in March 2022, Fiacco and Daley met with seven different vendors on behalf of Reveal Lasers

while working together to set up its operations (despite the fact that neither Daley nor Fiacco would

resign until two months later).  Dkts. 6-17 – 6-22.

      Daley and Chambers also used Cynosure events, such as Cynosure's April 2022 National

Sales Meeting at the Atlantis Resort in the Bahamas, as recruiting stops for other key employees.

      By late April 2022, Daley and Chambers' recruiting efforts became even more audacious,

with the two Cynosure leaders spending countless business hours flying around the country for

internal Reveal Lasers recruiting trips that were (in most cases) fraudulently disguised as Cynosure

"Quarterly Business Reviews" (fully-expensed to Cynosure, of course).[5]   In total, Daley and Chambers attended at least six "QBRs" at hotels around the country: (i) New York, NY; (ii) Atlanta, GA; (iii) Nashville, TN; (iv) Tampa, FL; and (v) Seattle, WA; and (vi) Washington D.C.

Each "QBR" followed a similar pattern, with the team members waiting in a hotel lobby while Daley and Chambers brought employees over—sometimes one-by-one and sometimes in small groups—to recruit them for Reveal.   The recruits were asked to sign a non-disclosure agreement with Reveal to conceal their activities from Cynosure, and then were shown a presentation on Daley's or Chamber's tablet or computer regarding Reveal.   The recruits were told information about Reveal and the products the company sold, as well as how much money the recruits would be paid from Reveal.   Farris Decl., Ex. 12 at 146-149.   The employees were then presented with an employment agreement to sign.   Farris Decl., Ex. 13 at 137.   Daley and Chambers encouraged the recruits to sign the employment agreements.   *Id.* at 140-141.   The recruits were told that Daley and Chambers wanted them to join Reveal.   *See, e.g.*, Farris Decl., Ex. 14 at 104-105; Ex. 16 at 139-141; Ex. 13 at 140; Ex. 12 at 149-150; Ex. 16 at 157.

In total, Daley and Chambers made recruiting trips to the following individuals:

*Washington, D.C.:*   On April 20, 2022, Daley and Chambers met with **Cameron Colby** and **Victoria Bailey** at a QBR in Washington, D.C.

*New York, NY:*   On April 25, 2022, Daley and Chambers met with **Yunior Caballero**, **Mike Russo, Dean Fiacco**, his brother **Bobby Fiacco**, and their cousin **Mark Sargent**, at the NY LaGuardia Airport Marriott for the purpose of recruiting them to join Reveal Lasers (to the extent these individuals had not already agreed to go to the new company).

---

[5] As the name suggests, a Quarterly Business Review (or "QBR") is a meeting each Cynosure territory team holds near the end of each fiscal quarter.

*Atlanta, GA:* On April 26, 2022, Daley and Chambers met with **Savannah Padron**, **Matt Malone**, **Mary Kathleen-Phillips**, and **Tara Kosofsky** at a QBR for the purpose of recruiting these individuals to Reveal Lasers.

*Nashville, TN:* On April 26, 2022, Daley and Chambers met with **Jason Steinhorn** and **Chase Tolusic** at the Tennessee region's QBR.

*Tampa, FL:* On April 27, 2022 Daley and Chambers met with **Kyle Shapero**, **Matt Calabrese**, and **Jesse Morgan** at the Florida region's QBR for the purpose of recruiting them to join Reveal Lasers.

*Burlington, MA:* On April 28, 2022, Daley met with **Danny DeMarco** at the Marriott in Burlington, Massachusetts for the purpose of recruiting him to join Reveal.

*Austin, TX:* On or about May 4, Daley and Chambers flew to Austin to meet with both **Joshua Smith** and **Kris Stennick**.

*Seattle, WA:* On May 5, **Cory Murrell** (who lived in Toronto) flew all the way from Toronto to Seattle for a team meeting, while knowing that Daley and Chambers (who by this point had resigned from Cynosure) would be there to pitch the Pacific Northwest sales team at an in-person meeting at the W Hotel in Seattle. Not coincidentally, all of the attendees of that meeting ended up going to Reveal Lasers—including **Jason Kalso**, **Anna Bergslien**, **Nate Dahlstrom**, and **Kalee Gibbons**.

Chambers and Daley engaged in other, less formal recruiting meetings, too. For example, Daley and Chambers both recruited **David Krueger**, who testified that Daley told him that he would earn at least five times more money at Reveal than he was earning at Cynosure. Farris Decl., Ex. 17 at 53-55.

After the meetings, some of the former employees were instructed to create fake "applications," so as to make it appear as though they had applied to the startup voluntarily. *See* Dkt. 43 ¶¶ 11-12.

**C.   The Former Employees Quickly Shifted Their Loyalties To Reveal Lasers And, Shortly Thereafter, Resigned *En Masse*.**

With the team and plan in place, the new co-conspirators began trying to harm Cynosure from the inside in advance of their departure by laying the foundation to divert business opportunities to their new employer, Reveal:

- On April 29—two days after the April 27 Tampa QBR—**Jesse Morgan** texted **Kyle Shapero** that he had " ███████████████ " with a provider.  Farris Decl., Ex. 18.

- On May 3, **Kyle Shapero** texted **Matthew Calabrese** that he ' ████████ ███ " with a provider and ████████████████ ."  Farris Decl., Ex. 19.

- On May 3, **Dean Fiacco** texted **Danny DeMarco** that they should ███████ ██████████ " to which DeMarco responded, " ████████████ ."  Farris Decl., Ex. 20.

- On May 3, **Nate Dahlstrom** texted **Jason Kalso** that someone was giving him a lead and asked ██████████████████ "  Farris Decl., Ex. 21.  **Dahlstrom** continued to say that he was ████████ ████████████████████████ *Id.*

- On May 5, **Kyle Shapero** told **Matt Calabrese** " ████████████ " and that they should try to sell a prospect " ████████ " i.e., Reveal Lasers.  Farris Decl., Ex. 22.  Calabrese responded: " ████████████████████ ."[6] *Id.* ████████████

- On May 12, **Dean Fiacco** (who had already resigned from Cynosure) sent a text message to his cousin, **Mark Sargent** (who had not resigned yet) and **Yunior Caballero** (who was recruited to Reveal but ultimately declined the offer) containing a voicemail from a provider.  Fiacco told them that the provider was a " ████████████████████████ "  Farris Decl., Ex. 23.

- On May 17, **Mark Sargent** forwarded a text he had received from a provider who had purchased a Cynosure product to **Robert Fiacco**, who advised Sargent to " ████████████████████████

---

[6] "Peter" was a Cynosure sales rep who did not go to Reveal.

█████████████████████████████████████████████ ” Farris
Decl., Ex. 24.

- In late June, after they had already left for Reveal Lasers, **Kyle Shapero** informed
**David Krueger** that he was "████████████████████" Krueger responded:
"████████████████████████████████████████████ Farris Decl., Ex.
25.

When the resignations ultimately did come, they came fast and furious.  Below is a chart

showing the dates of when each Defendant announced his or her resignation:

| Employee Name | Separation Date |
|---|---|
| Chris Chambers | 5/2/2022 |
| Bob Daley | 5/3/2022 |
| Robert Fiacco | 5/3/2022 |
| Dean Fiacco | 5/3/2022 |
| Josh Smith | 5/6/2022 |
| Mark Sargent | 5/9/2022 |
| Brogan Bair-Chambers | 5/14/2022 |
| Tara Kosofsky | 5/16/2022 |
| Robert Scarelli-Smith | 5/16/2022 |
| Anna Bergslien | 5/17/2022 |
| Kalee Gibbons | 5/17/2022 |
| Kyle Shapero | 5/18/2022 |
| Jason Steinhorn | 5/18/2022 |
| Matthew Calabrese | 5/18/2022 |
| Chase Tolusic | 5/18/2022 |
| Daniel DeMarco | 5/20/2022 |

| Michael Russo | 5/20/2022 |
|---|---|
| Jason Kalso | 5/20/2022 |
| Nathan Dahlstrom | 5/20/2022 |
| Matthew Malone | 5/20/2022 |
| Savannah Padron | 5/20/2022 |
| Kris Stennick | 5/20/2022 |
| Cory Murrell | 5/27/2022 |
| Kat Phillips | 6/7/2022 |
| David Krueger | 6/10/2022 |
| Jesse Morgan | 6/15/2022 |
| Victoria Bailey | 6/30/2022 |

**D.    The Former Employees Misappropriate Trade Secrets On Their Way Out The Door.**

At the same time, the Defendants were actively exfiltrating Cynosure trade secrets.  This misappropriation took a number of different forms.  For example, a number of employees engaged in the targeted exfiltration of confidential sales leads they had obtained while at Cynosure:

- On April 18, 2022, **Dean Fiacco** forwarded to his personal email a summary he had received from Mark Sargent containing 16 "*warm [sales] leads*" wherein Sargent had explained that these were "*great leads/warm intros/good targets to go after.*" Farris Decl., Ex. 26.

- On May 3, 2022 (the day after Chambers had resigned and the same day Daley and the Fiacco brothers resigned), **Mark Sargent** forwarded to his personal Gmail an email he had previously sent to **Bobby Fiacco** in January containing "*the lead flow chart with contact information so we can keep track of leads.*"  Farris Decl., Ex. 27. According to Sargent, his "*goal [was] to have EVERY lead from 2021 in this flow chart and constantly updating it by Friday.*"  *Id.*

- On May 9, 2022, **Mark Sargent** emailed himself an email containing four attachments: (i) an Excel spreadsheet titled "Opportunity List for Sales Q1 2022 Feb Sargent Sr. ASM  .xlsx"; (ii) an attendee registration list for a September 2021

event Cynosure hosted in White Plains, NY; (iii) a spreadsheet showing a list of providers in Suffolk and Nassau Counties; and (iv) a sales script for meeting with a provider. Farris Decl., Ex. 28.

- On June 6, 2022, **David Krueger** emailed himself 13 separate confidential sales leads and pricing quotes to his personal Gmail account. Krueger later admitted in response to an Interrogatory that he forwarded this information to himself because he "*was intending to reach out to those customers after [he] left Cynosure.*" Dkt. 78.

Other defendants engaged in large-scale exfiltration of Cynosure confidential information and/or spoliated evidence that likely showed that they did:

- **Robert (Bob) Daley**. As detailed in Cynosure's Motion in Limine No.1, forensic analysis has confirmed that Daley deliberately performed a full wipe of his Cynosure computer (returning it to Windows factory default settings) before returning it to the company in an obvious effort to cover up his tracks. During his deposition, Daley admitted that he performed the wipe intentionally to delete information (though he claimed innocent motives): "*Q: Did you perform a factory reset of your Cynosure computer after that? A: I don't even know what that means, but maybe. I tried – whatever it said to delete information off the computer, I tried to do that.*" Farris Decl., Ex. 30 at 288. Daley also admitted that, before performing the factory reset, he backed up an unknown amount of files onto two personal USB storage devices. Daley further admitted that after his resignation had those USB storage devices ***professionally destroyed*** at a data destruction vendor, thereby obliterating any evidence that would have revealed what files he downloaded and where he moved those files to. Farris Decl., Ex. 31.[7]

- **Chris Chambers and Brogan Bair**. Chambers and Bair (a husband and wife) claim that they ***cannot access files on their own shared personal computer*** due to the fact that the computer was BitLockered—and therefore rendered inaccessible—during a period weeks after this litigation was filed. There are numerous reasons to conclude that this was deliberate spoliation of evidence. *See* Motion *in Limine* No. 1.

- **Cory Murrell:** Pursuant to the TRO, Murrell returned to Cynosure a USB containing Cynosure documents. An analysis of the USB against Murrell's returned, Cynosure computer showed that Murrell had copied over 950 documents to the USB from his Cynosure computer on February 21, 2022—less than a week after Daley and Chambers had approached Murrell about Reveal Lasers at the Austin Sales Meeting. An analysis of the USB against the additional files Murrell returned then showed that 969 of the documents on the USB were uploaded to Murrell's personal computer on June 17, 2022—after Murrell began working for Reveal Lasers. These documents included (i) business strategy plans and revenue

---

[7] As discussed in more depth below and in Cynosure's Motion *in Limine* No. 1, documents produced after discovery appeared to show that Daley – with the help of an IT contact provided by Eyal Buchbinder – also deleted evidence from his cell phone, explaining why Daley did not produce a single text message in this case from before his resignation.

forecasts for Cynosure's Canadian operations; (ii) budgets; (iii) profit and loss statements; (iv) Cynosure commission matrices; and (v) product information about then-unreleased Cynosure products. To illustrate, Plaintiffs have submitted a few examples of the hundreds of documents exfiltrated and returned by Murrell for filing under seal. *See, e.g.*, Exhs. 32-34. As another Cynosure sales leader, Murrell's documents are a good representation of the types of documents that other Cynosure sales leaders like Daley, Chambers, and Bair would have had access to in their jobs (and which there is reason to believe they all spoliated, as detailed in Cynosure's motion *in limine* no. 1).

- **Jason Kalso:** Kalso resigned from Cynosure effective May 31, 2022. That same day, forensic analysis confirmed that Kalso copied at least 15,000 files from his "OneDrive – Cynosure LLC" file to an outside USB storage device. The files included sales "hot lists" tracking potential customers, existing customer purchase sheets, and customer pricing and order histories. To illustrate, Plaintiffs have submitted a few examples of the thousands of document exfiltrated and returned by Kalso for filing under seal. *See, e.g.*, Exhs. 35-37.

- **Joshua Smith:** Smith announced his resignation from Cynosure on May 6, 2022. A week earlier, on April 29, Smith uploaded hundreds of files from his Cynosure computer to a personal Dropbox account—minutes after changing the email account associated with the Dropbox from his Cynosure email to a personal Gmail account. The files included Cynosure's "Onboarding Playbook" for new sales associates, marketing "toolkit" documents, such as competitive market intelligence, and event registration lists showing the attendees at a number of Cynosure's key customer events. An analysis of Smith's computer showed that the Dropbox contained more than 10,000 documents and had been synched to Smith's Cynosure laptop. However, Smith claims that he deleted all of the Cynosure documents "*in early June*," thereby destroying key evidence concerning his misappropriation.[8] To illustrate, Plaintiffs have submitted a few examples of the documents exfiltrated by Smith for filing under seal. *See, e.g.*, Exhs. 39-40.

- **Kyle Shapero:** Shapero announced his resignation from Cynosure on May 18, 2022. Forensic evidence revealed that, two weeks earlier (on May 3), Shapero copied 11 folders to an outside USB device, including (i) "hot lists" and "call lists" that Cynosure used to track current- and potential-customers and "credit approved lists" that tracked what current- and potential-customers had received purchasing credit from lenders and (ii) Cynosure compensation plans. To illustrate, Plaintiffs have submitted a few examples of the thousands of document exfiltrated and returned by Shapero for filing under seal. . *See, e.g.*, Exhs. 41-43.

To avoid making this trial brief unduly long, Cynosure will not go into similar detail

regarding each of the Defendants' conduct. Cynosure does, however, note that ***26 of the 28***

---

[8] This is particularly troublesome given that, despite the TRO requiring the Former Employees to return Cynosure information in their possessions, Smith only returned *3* of the 10,000+ files in his Dropbox.

*Former Employees* returned documents containing Cynosure trade secret information that they had improperly retained following their resignations. In fact, the only two Former Employees who did not return *any* Cynosure documents were Chambers and Bair (the ones who claim that their computer was suddenly inaccessible through BitLockering).

**E.    The Former Employees "Lift and Shift" Cynosure's Business To Quickly Get Reveal Lasers LLC Up And Running.**

Daley was announced as the CEO and President of Reveal Lasers (North America), while Chambers was named the COO. Under them, the rest of the organization was filled out with Cynosure's former employees—in essentially parallel roles at Reveal—as follows:

| Employee Name | Final Job Title at Cynosure | Initial Job Title at Reveal Lasers LLC |
|---|---|---|
| Bob Daley | Senior Regional Director of Sales for the Northeast Region | Chief Executive Officer & President, North America |
| Chris Chambers | Vice President of Sales for North America | Chief Commercial Officer |
| Brogan Bair Chambers | Director of Sales Practice Development for North America | Area Vice President of Sales (Northeastern US) |
| Cory Murrell | Area Vice President, West and Canada | Area Vice President of Sales (Canada) |
| Joshua Smith | National Field Marketing Manager | Vice President of Marketing |
| Michael Russo | Senior Business Manager | Vice President of Business Development |
| Jason Kalso | District Sales Manager – Pacific Northwest District (OR/WA/ID/AK) | Regional Sales Director (PNW/NorCal/Montana/ Wyoming) |
| Kyle Shapero | District Sales Manager – Florida District (FL/Puerto Rico/Caribbean) | Regional Sales Director (FL) |
| David Krueger | District Sales Manager – Midwest District (IL/IN/WI) | Regional Sales Director (Chicago, Greater Midwest) |
| Robert Fiacco | District Sales Manager – New York District (NY/CT) | Regional Sales Director (Northeastern US) |
| Dean Fiacco | District Sales Manager – New England District | Director of Business Operations |
| Daniel DeMarco | Sr. Area Sales Manager – | Senior Area Sales Manager |

| | New England District | (New England and NY) |
|---|---|---|
| Tara (Bushman) Kosofsky | Regional Director of Sales - Southeast Region | Area Vice President of Sales (Southeast US) |
| Jason Steinhorn | District Sales Manager - TN/KY/AL/MS District | Regional Sales Director (NC/TN/KY/OH/IN/MI) |
| Matthew Malone | District Sales Manager – Carolinas & Georgia District | Regional Sales Director (NC/SC/GA/AL/MS) |
| Cameron Colby | District Sales Manager – DC District (DC/MD/VA/WV) | District Sales Manager (FL) |
| Robert Scarelli-Smith | Senior Event Specialist | Events & Creative Manager |
| Kris Stennick | Practice Development Manager - Texas District (TX/LA/OK) | Practice Development Manager – Central & West (Central and Western Half of US) |
| Victoria Bailey | Practice Development Manager - DC District (DC/MD/VA/WV) | Practice Development Manager – East (Eastern Half of US) |
| Mark Sargent | Sr. Area Sales Manager – New York District (NY/CT) | Senior District Sales Manager (NY) |
| Savannah Padron | Area Sales Manager – Carolinas & Georgia District (NC/SC/GA) | District Sales Manager (AL/SC/MS/GA) |
| Nate Dahlstom | Area Sales Manager – Pacific Northwest District (OR/WA/ID/AK) | District Sales Manager (PNW/NorCal/WY/MT) |
| Matthew Calabrese | Area Sales Manager – Florida District (FL/Puerto Rico/Caribbean) | District Sales Manager (FL) |
| Chase Tolusic | Area Sales Manager - TN/KY/AL/MS District | District Sales Manager (TN/KY/AL/MS) |
| Katherine Philips | Territory Manager - Carolinas & Georgia District | Area Sales Manager (GA/AL/MS/SC) |
| Kalee Gibbons | Territory Manager - Pacific Northwest District (OR/WA/ID/AK) | Area Sales Manager (OR/WA/ID/AK/MT/WY/NorCal) |
| Anna Bergslien | Territory Manager - Pacific Northwest District (OR/WA/ID/AK) | Area Sales Manager (PNW/NorCal/WY/MT) |

| Jesse Morgan | Territory Manager - Florida District (FL/Puerto Rico/Caribbean) | Area Sales Manager (FL) |
|---|---|---|

By the time of its North American public launch in July 2022, Reveal's North American arm was composed of approximately 28 former Cynosure employees and only 2 other people (in junior roles).

It cannot be disputed that Reveal did not have any of its own U.S. internal sales and marketing work product or existing customers when the Former Employees defected. To hit the ground running, its new employees simply used or repurposed the materials they took from Cynosure—customer lists, pricing matrices, compensation matrices, market intelligence, and more. And the evidence makes clear that the Former Employees know this was wrong and nonetheless did it in bad faith. For example, on June 9, 2022, **Josh Smith** texted **Robert Scarelli-Smith** and **Kyle Shapero** and offered them " ███████████████████████ " if they needed them to complete a presentation they were preparing for Reveal. Farris Decl., Ex. 44. Several weeks later, on June 30, a large group of the Former Employees had a group chat about making cosmetic modifications to Cynosure purchase agreements and laser-trade-in-program sheets, so there weren't " ███████████████████████ " as Cynosure's contracts. Farris Decl., Ex.45. **Josh Smith** confirmed that he would " ██████████ " the contracts to accomplish that. *Id.* In a separate thread that same day, Dean Fiacco explained to Josh Smith via text that Jim Palastra (another former Cynosure employee) was in the process of changing the "*look*" of a Cynosure sales contract because " ████████████████████████████████

████████████████████████████████████████████████ "

Farris Decl., Ex. 46.[9]  On July 8, **Kyle Shapero** sent **Cory Murrell** a copy of Cynosure's 2020 and 2021 United States Commission Matrices in connection with Murrell's comment that he was: ███████████████████████████████████████████████████."  Farris Decl., Ex. 48.

By wholesale exportation of Cynosure's salesforce and confidential information, Reveal was able to go from start-up to selling lasers in competition with Cynosure in mere weeks.

A number of the Former Employees also misappropriated the access credentials for valuable Cynosure Instagram accounts that had been used to both (i) market Cynosure products to current- and potential-customers and (ii) share advertisements that Cynosure had developed to current Cynosure customers so that they could use the ads to promote their own business.  For example, after he resigned, **Kyle Shapero** locked Cynosure employee Brittney Walton (the post-sales representative for Cynosure's Florida district) out of the Instagram account "@laseraesthetics_florida," which Walton had maintained for the Florida district.  **Robert Fiacco** similarly locked Yunior Caballero out of the account "@BeautifulEnergyNewYork," which was an account that Caballero managed for the New York district.  BeautifulEnergyNewYork was also decidedly a Cynosure account as evidenced by the fact that "Beautiful Energy" itself is Cynosure's tagline/slogan, for its products.  By misappropriating these accounts, whose follower lists had been cultivated by the hard work of their former Cynosure coworkers, Reveal instantaneously obtained direct marketing lines to thousands of Cynosure customers.

### F.      The Defendants Target Cynosure's Customers.

---

[9] In its haste to copy everything they could from Cynosure, Reveal even mistakenly posted a cut-and-pasted job posting for a "Supply chain manager," whose duties included: "*Build out yearly and quarterly business plans to support **Cynosure's** revenue goals*."  Daley was aware of this misappropriation, telling Buchbinder on April 27: "*this job description on the Reveal website mentions Cynosure multiple times.  Can we make sure this gets fixed?*"  Farris Decl., Ex. 47.

Defendants also went right to work soliciting their former Cynosure customers or leads—in a clear effort to convert Cynosure's customer relationships to Reveal throughout the country. For example, on June 9, **Jason Kalso** texted Reveal's management team that his Pacific Northwest team (*i.e.*, himself, Nate Dahlstrom, Kalee Gibbons, and Anna Bergslien—all former Cynosure employees) were "████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████" Farris Decl., Ex. 49.  And in the Midwest and on the East Coast, each of **Kyle Shapero**, **Robert Fiacco**, **David Krueger**, and **Matthew Malone** closed sales in July 2022 *before* Reveal had even officially launched.  100% of those sales were with Cynosure customers.

The Defendants also proved to have a particular focus on the most valuable customer relationships.  For example, while at Cynosure, **Tara Kosofsky** and **Matthew Malone** created a customer list for the Carolinas & Georgia District, wherein they made individual notes about high value customers.   One such provider was the Waccamaw Medspa, operated by Dr. Lucia Covington, about whom they wrote: "***VERY IMPORTANT: Dr. Covington helps us sell a lot of lasers.  Keep her happy she is low maintenance overall*.**"  Farris Decl., Ex. 50.  Another provider on this list was Erinn Harris of Harris Internal Medicine, about whom they wrote: "*Dr. Harris is a good customer who will buy more.  Take care of her-she's building out new location & wants potenza in 2022!*"  *Id.*

On June 20, now at Reveal Lasers, Malone forwarded Kosofsky an email containing an attachment titled "*Doctors to call*."  Farris Decl., Ex. 51.  Unsurprisingly, both Dr. Covington and Dr. Harris were on the list.[10]  In fact, Dr. Covington was practically swarmed by Reveal employees,

---

[10] In fact, almost every provider on this list was either a current Cynosure customer or a lead the Carolinas & Georgia District had been developing while at Cynosure.

as at least **nine** Former Employees have been confirmed to have solicited Dr. Covington within weeks of the Reveal Lasers launch.  They also made sure to destroy any goodwill that Cynosure had developed with those customers in the process.  For example, **Tara Kosofsky** repeatedly texted with Dr. Covington, telling her "███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████"  Farris Decl., Ex. 52.  Within one week of Reveal's public launch on July 19, 2020, both providers had been sold Reveal Lasers products.

Other Defendants also attempted to use information they had learned about customers while at Cynosure to make sales for Reveal.  For example, **Nate Dahlstrom** testified that, before he left Cynosure, the owner of a spa in Oregon told him that she was going to open a second location and what devices she potentially wanted for that location.  Farris Decl., Ex. 15 at 277-281.  Dahlstrom then used that information to try to sell the spa Reveal Lasers products after his resignation.  *Id.*  Similarly, on July 13, **Mark Sargent** texted **Robert Fiacco** that he needed to be in front of "██████████████," to which Fiacco responded: "██████████████████."  Farris Decl., Ex. 53.

All told, there is evidence that nearly every one of the Former Employees was involved in efforts to pitch Cynosure customers on behalf of Reveal in the weeks leading up to its launch and thereafter.

_____

The playbook followed across the country was to leverage Cynosure's goodwill to get in the door with the clients—and then attempt to shift that goodwill to Reveal.  For example, **Anna Bergslien** sent Instagram messages to clients with the following introduction: "█████████ ████████████████████████████████████████████████████████████████ ███████████" Farris Decl., Ex. 54.  **Kyle Shapero** did the same, texting Cynosure customers lead-ins like: "█████████████████████████████████████████████████████ ████████████████████████████████████" and "██████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████" Farris Decl., Ex. 55; 56.  **Jason Kalso** similarly used Cynosure goodwill with his customers, texting one on June 16: "████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████." *Farris Decl., Ex.* 57.  As did **Robert Fiacco**, who sent a "blast text" to dozens of his former Cynosure contacts that said: "████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████" Farris Decl., Ex. 58.

On July 13, **Jason Steinhorn** recorded an audio voice message of a pitch to customers showing exactly how the Former Employees were taking advantage of Cynosure's goodwill (and, in doing so, trying to shift that goodwill to Reveal). Farris Decl., Ex. 59. Steinhorn called it a "training" recording, to teach others how to pitch. In the recording, Steinhorn said:



Indeed, Reveal Lasers' initial business model was based so heavily on soliciting Cynosure customers that it had to re-think its entire sales strategy after the Court issued a TRO on July 26 prohibiting Reveal from soliciting current and prospective Cynosure customers. For example, on August 2, 2022, **Tara Kosofsky** sent an internal group text at Reveal about the need to develop alternative sales strategies: "█████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████" Farris Decl., Ex. 54.

Even entry of the TRO and the later Preliminary Injunction orders did not stop Reveal's efforts to solicit Cynosure's customers and business partners—it only slowed those efforts down. For example, despite the TRO, **Kyle Shapero** repeatedly texted with a Cynosure customer (Dr. Abigail Adams of The MedSpa at New Smyrna Beach) throughout August and September about Reveal Lasers devices he was trying to sell.  *See* Farris Decl., Ex. 60 (Sept. 23, 2022: "████████

████████████████████████████████████").

In total, through 2023, Reveal reported sales to 243 separate customers.[11]  Of the 113 customers about whom Reveal produced sufficient information during discovery,[12] *80% of those customers (90) were former Cynosure customers or leads.*

G.     **The Defendants Also Interfered With Cynosure's International Business Partners.**

Expanding the scope of the harm done to another level, certain executive-level Defendants also targeted Cynosure's international customers and suppliers.

For example, in August 2022, Murrell and Chambers travelled to Korea to meet with the company **Jeisys**—one of Cynosure's largest manufacturing partners and customers for the Asia market.  This meeting was coordinated by **Bruce Byers**—another Cynosure Former Employee (who had left before the mass resignation) hired by Reveal to be its "Asia Pacific CEO."  Notably, in a November 8, 2022 email to Buchbinder setting forth an agenda for a meeting between Reveal

---

[11] This includes customers to who originally signed purchase orders with Reveal to purchase either the Aura or Vega devices—two devices that Reveal was selling upon its launch even though they had not received FDA clearance.  No Aura or Vega devices were ever delivered to U.S. customers.  However, each of those devices was competitive with a Cynosure device, meaning that, had the Former Employees remained at Cynosure, they likely would have been sales of Cynosure equipment (which did have FDA clearance and therefore could have been delivered).

[12] For the rest of the 243 reported Reveal Sales, Reveal identified the sale only by a single line-item name on chart—with no purchase agreement or other identifying information provided.

(including Buchbinder), Jeisys, and Chinese company SinoPharm, Byers explained that a "███████" of the meeting was to ████████████████████████████████████ "████████" and to ████████████████████████████████████████████." Farris Decl., Ex. 61.  When he was caught red-headed setting up this meeting in emails, Byers denied responsibility at his deposition, repeatedly claiming that the "dates" on emails that he himself drafted must be wrong.

Other Reveal documents confirm their tortious intentions in Asia.  For example, in a November 9, 2022 note to himself, Jason Kalso (acting as Interim CEO of Reveal North America) wrote: "█████████████████████████████████████████████ ████████████████████████████" Farris Decl., Ex. 62.  Around the same time in November 2022, Byers shared a copy of confidential Cynosure's Jeisys contract (which Byers improperly retained following his resignation) with Buchbinder, Daley, Chambers, and Murrell.  Armed with Cynosure's confidential contract, Reveal negotiated and executed its own supply agreement with Jeisys dated July 26, 2023.

Through Byers again, Reveal has also interfered with SinoPharm, a key Cynosure customer in China.  Prior to Reveal's interference, Cynosure and SinoPharm had executed a cooperation agreement by which Cynosure expected to sell at least approximately ████ million worth of capital equipment to SinoPharm.  (As Kalso's notes indicate, SinoPharm told Reveal that they had originally ████████████████████████████" from Cynosure. *Id.*)  However, Reveal began meeting with SinoPharm as early as August 2022,  and discussed a proposed Memorandum of Understanding for a 7-year, exclusive partnership relationship.  In September 2022, SinoPharm sent Reveal an executed Cooperation Framework Agreement.  In October 2022, the parties were

negotiating an agreement by which SinoPharm would become a major investor (for $▮ million) and shareholder of Reveal.

Once again, Kalso's contemporaneous notes show Reveal's involvement and nefarious intent.  For example, on November 9, Kalso wrote in his notes: "████████████████████████ ████████████████████████" *Id.*  A few weeks later, Kalso wrote about Sinopharm's relationship with Cynosure and specifically the Cynosure products that Sinopharm had ordered and how this interference was intended to cause a disruption so significant it would cause Cynosure to be forced to sell the company: "████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████" Farris Decl., Ex. 63.  Similarly, setting up the meeting with Jeisys, Byers and Buchbinder, Byers noted that another purpose of the meeting with Jeisys and SinoPharm was to ████████████████████████████████████████████" Farris Decl., Ex. 61.

After Reveal's interference, SinoPharm did not end up purchasing *any* products from Cynosure despite placing orders for numerous units, resulting in over $▮ million in expected lost profits on the $▮ million in revenue.

## II.   CONCISE SUMMARY OF DAMAGES

The primary sources of Cynosure's damages are its lost profits, both in North America and internationally.  Cynosure calculates that the Defendants' misconduct resulted in over $▮ million in lost North America profit between May 2022 and April 2024.  Its interference with SinoPharm caused another approximately $▮ million in lost international profit.  This time period is an appropriate damages period because Daley and Chambers had enforceable, 24-month employee

non-solicitation agreements with Cynosure (as did all the other Former Employees).[13]  As such, in the "but-for world," where Defendants did not engage in any misconduct, none of the Defendants would have been able to solicit any Cynosure employees to join Reveal until at least May 2024, meaning that the Defendants would have continued making sales for Cynosure through that date. Once the Defendants raided Cynosure, its revenue dropped precipitously, resulting in devastating results, including $█ million in lost profits.

A summary of Cynosure's damages is below:[14]



---

[13] During the preliminary injunction proceedings, the Defendants conceded that their employee non-solicitation provisions were enforceable.  *See* Dkt. 171 at 19.

[14] This summary does not include other sources of damages Cynosure seeks, such as statutory or common law exemplary/punitive damages, attorneys' fees, or prejudgment interest.

## III.   SUMMARY OF CLAIMS & LEGAL ISSUES

The First Amended Complaint states eleven causes of action against Reveal and the Former Employees (including Chambers and Daley).[15]

The crux of the claims is that (i) the Former Employees (including Daley and Chambers) breached their noncompete, non-solicit, and confidentiality agreements with Cynosure at the direction of Reveal, (ii) the Defendants violated federal and state trade secret law, and (iii) the Defendants committed various business torts in conducting their scheme against Cynosure, each of which and certainly taken together, amounted to a wholesale corporate raid and a "lift and shift" of Cynosure's business.

At the outset, the Court should decide that both Reveal Lasers Ltd. and Reveal Lasers LLC, independently and together, have engaged in the wrongdoing alleged in the Complaint.

### A.   Reveal Lasers Ltd. and Reveal Lasers LLC Are Both Liable for the Claims Alleged In The Complaint.

Defendants have made clear that they intend to argue that Reveal Lasers LTD and Reveal Lasers LLC are separate entities that should be treated separately for purposes of trial and damage awards.  Defendants cannot escape, however, the fact that both entities are liable for the conduct giving rise to the claims alleged in the Complaint.  There are several indisputable pieces of evidence that demonstrate their independent liability.  Most notably, Reveal Lasers LLC was not formed until May 4, 2022—*after* Buchbinder recruited Daley and Chambers and *after* Daley and

---

[15] Specifically, Cynosure alleges causes of action for (1) violation of Defend Trade Secrets Act - 18 U.S.C. § 1836 (against all Defendants); (2) violation of Massachusetts Trade Secrets Act - M.G.L. c. 93 §§ 42, *et seq.* (against all Defendants); (3) breach of contract (against Former Employees); (4) breach of duty of loyalty (against Former Employees); (5) breach of fiduciary duty (against Former Employees); (6) aiding and abetting breach of fiduciary duty (against Reveal Lasers); (7) conspiracy (against all Defendants); (8) breach of implied covenant of good faith and fair dealing (against Former Employees); (9) tortious interference with contractual relations (against all Defendants); (10) tortious interference with prospective business relations (against all Defendants); and (11) violation of M.G.L. c. 93A (against all Defendants).

Chambers recruited most of the other Former Employees.  As such, this conduct was necessarily for the benefit of both Reveal Lasers LTD, and for Reveal Lasers LLC, which would not have been founded but for these activities and which immediately hired those employees.

However, even if Reveal Lasers LTD did not have independent liability (which it does), there is also substantial evidence that Reveal Lasers LTD, is the alter ego of Reveal Lasers LLC.

To begin with, it is undisputed that Reveal Lasers LTD has always been the 100% owner of Reveal Lasers LLC, and was a Managing Member of the LLC upon its founding.   The Employment Agreements that Daley and Chambers initially signed were both with Reveal Lasers, LTD, after being recruited to join as CEO and CCO of Reveal Lasers LLC by Buchbinder, who was and remains Reveal Lasers LTD's CEO.   (Daley's and Chambers' later Employment Agreements were with Reveal Lasers, LLC.)  Both Daley and Chambers own equity in Reveal Lasers LTD—not Reveal LLC (as do all the other Former Employees who got equity in Reveal Lasers).

There is also substantial evidence that Reveal LLC and Reveal LTD are entirely co-mingled from a financial perspective—with Reveal LTD pulling all the financial strings.  For example, Jim Palastra, Reveal LLC's "Global Chief Operating Officer" and highest-ranking financial employee, testified that Rotem Palash, Reveal LTD's head of treasury, has the authority to order that Reveal LLC send money to Reveal LTD's accounts.  Farris Decl., Ex. 64 at 265:10-270:5.   Reveal LTD also provides financing to Reveal LLC when needed, such as via "███████" loans.  *Id.* (███████████████████████████████████████████).  When asked about the repayment terms for such loans, Mr. Palastra disavowed knowledge—claiming to be just following orders from the LTD as to the money.  *Id.* ("████████████████

████████████████████████████████████████████████████████



"). Mr. Palastra essentially conceded that Reveal LLC's money is Reveal LTD's money, and that if Ms. Palash asks him to send Reveal LTD up to all of the money in Reveal LLC's bank account, he would "█████████" but to comply and said that "████ █████████████████████." *Id.* Palastra further testified that Reveal LTD's majority owner Tsahi Merkur had also made "█████████" in Reveal LLC via a "████" of "████" worth ████████ that Reveal LTD negotiated on Reveal LLC's behalf. *Id.* at 243:10-245:22.

Mr. Buchbinder similarly testified that Reveal LTD is the only formal investor in Reveal LLC, and that most of those investments have come in the form of loans. Buchbinder 210:16-20, 211:17-212:3. Mr. Buchbinder also testified that Reveal LLC and Reveal LTD have combined financial statements from their accountants. *Id.* 212:10-15.

Such co-mingling of finances shows that Reveal LTD and Reveal LLC are not a "parent" and "subsidiary" in the traditional sense; rather, Reveal LTD calls all of the financial shots for the organization. As such, the Court may "pierce the corporate veil" between the two entities. *See TechTarget, Inc. v. Spark Design, LLC*, 746 F. Supp. 2d 353, 356 (D. Mass. 2010) (court may "disregard corporate formalities 'when there is a confused intermingling of activity of two or more corporations engaged in common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.'") (quoting *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968)). Massachusetts courts use a 12-factor test to determine whether to pierce a corporate veil: "1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate

formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud." *TechTarget*, 746 F. Supp. 2d at 356 (citation omitted).  Nearly every single factor is met here. Given the common ownership, the pervasive control, the intermingling of corporate funds and operations, the absence of corporate records, intermingling of funds (and combined financial statements), the siphoning of funds by Reveal LTD of Reveal LLC's assets, the lack of evidence of payment of dividends, there is no doubt that Reveal LTD is the alter ego of Reveal LLC.

**B.     Plaintiffs Will Prevail On Their Claims For Breach of Contract and Breach of Covenant Of Good Faith And Fair Dealing.**

**1.     Restrictive Covenant Agreements Are Enforceable.**

Defendants previously conceded that their contractual employee non-solicitation provisions are enforceable.  *See* Dkt. 171 at 19 ("Defendants do not dispute that a non-solicitation clause as to Cynosure <u>employees</u> is enforceable, for a reasonable time period.") (emphasis in original).  The Court also previously held that, with some modifications, the (i) non-competition provisions in the Equity Agreement and the CEIP were enforceable and (ii) customer non-solicitation provisions in the CEIP were enforceable.  Dkts. 171 and 241.  The restrictive covenants in the Hologic Agreement and the INNA are similar.  *See* Dkt. 112 at Exs. 1A-2E (all restrictive covenant agreements for Trial Defendants Bob Daley and Chris Chambers).  The Court should therefore rule that, as a matter of law, that these restrictive covenant agreements are enforceable.

In their pretrial statements and submissions, Defendants have made clear that, notwithstanding their prior concessions and the Court's prior ruling, they now intend to argue that, as a matter of law, the restrictive covenant agreements signed by Mr. Daley and Mr. Chambers are

not enforceable for a number of reasons, including (i) lack of acceptance, (ii) lack of consideration, (iii) reasonableness of scope, and (iv) because they were superseded by the Defendants' annual compensation plans.  These arguments are all legally meritless.

The Court has already rejected the first three arguments in its two Preliminary Injunction order, finding that both Daley and Chambers entered into enforceable Equity Agreements.  (Dkt 171 at 14.)  Moreover, the Court also found that the Equity Agreements were supported by adequate consideration and, with some modifications, were reasonable in scope.  *Id.* at 21 ("Defendants raised several challenges during oral argument for why the Equity Agreement was unenforceable under the MNAA as to Mr. Daley (like lack of consideration or a garden leave clause) that were not meritorious.").  These orders establish both the enforceability of the relevant agreements between Cynosure and each of the Trial Defendants Daley and Chambers, as well as the relevant agreements between Cynosure and the other former employees (for purposes of Plaintiffs' tortious interference claim).  These findings are already the "law of the case," and Defendants should not be permitted to relitigate them.  *See Harlow v. Children's Hosp.*, 432 F.3d 50, 55 (1st Cir. 2005) ("As most commonly defined, the [law of the case] doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).

Nor does Defendants' new argument that their annual sales compensation plans superseded the restrictive covenant agreements fare any better.  To begin with, as to Chambers and Daley, the last compensation plan they each signed were from before when they signed Equity Agreements with restrictive covenants in November 2021.  Therefore, there is not even a theoretically logical argument that their compensation plans superseded Equity Agreements they signed ***later*** in time.

Moreover, those sales compensation agreements supersede only "all prior **compensation plans, arrangements and terms** previously in effect, whether oral or written" for Cynosure sales employees.  *See* Farris Decl. Ex. 66 (emphasis added).  They further provide on the signature page that they are "not a contract between any employee and Cynosure, LLC."  *Id*.  The restrictive covenant agreements also all contain limiting language that prevents them being modified so indirectly.  For example, the Equity Agreements provide that the restrictive covenants shall not be superseded by any subsequent agreement "unless such agreement expressly provides (by reference to [the Equity Agreement] by name) that the provisions thereof supersede this [Equity Agreement]."  Put simply, the compensation plans are not restrictive covenant agreements and nothing in the compensation plans indicates that they were intended to supersede any of these restrictive covenant agreements.

There will already be enough moving pieces at this trial without the jury hearing confusing arguments about the enforceability of these contracts that have been disposed of or can be disposed of as a matter of law.  The Court should simplify the matter for the jury and uphold its prior ruling that Cynosure's restrictive covenant agreements are enforceable.

## 2. Cynosure Will Prove That The Restrictive Covenants Were Breached.

As noted above, there is overwhelming evidence that Daley and Chambers breached at least their employee nonsolicit obligations by directly reaching out to former employees.  Daley and Chambers implausibly argue that they did not solicit *any* of the Former Employees and, instead, merely answered questions the Former Employees had about Reveal and where they were headed.  Even if this story was accurate (and the evidence will show it is not), as this Court has already held, such "subtle solicitation" still violates a non-solicitation clause.  *See Washington Trust Advisors, Inc. v. Arnold*, 646 F. Supp. 3d 210, 219 (2022) (Saris, J.) (finding defendants

likely violated non-solicitation clause when interaction with clients "were effectively solicitations wrapped in the thin veneer of an announcement") (citation omitted).

There is also overwhelming evidence that Daley and Chambers violated their non-compete agreements by working for Reveal Lasers.  Finally, there is essentially no doubt that Cynosure will prove that the a variety of Former Employees, on behalf of Reveal Lasers, breached their customer nonsolicit obligations.

**C.      Defendants Breached Their Confidentiality Obligations and Misappropriated Cynosure's Trade Secrets.**

Defendants also engaged in a considerable amount of misappropriation of confidential and trade secret information.  There are three elements to a trade secret misappropriation claim under both the DTSA and the MUTSA: (i) the existence of a trade secret; (ii) the plaintiff took reasonable steps to secure the confidentiality of that trade secret; and (iii) the defendant used improper means to acquire the trade secret.  *Parexel Int'l LLC v. Signant Health Holding Corp.*, No. 1:22-CV-11896-AK, 2023 WL 2938073, at *8 (D. Mass. Apr. 13, 2023) (citation omitted).  The only different between them as relevant here is whether the trade secret claim relates to interstate or foreign commerce (a requirement under the DTSA and not the MUTSA).  As that issue cannot possibly be in reasonable dispute here with a nationwide salesforce and foreign corporate defendant, the Court should find that requirement satisfied as a matter of law to simplify matters for the jury.

As noted above, the Former Employees -- on behalf of Reveal -- misappropriated a number of Cynosure's trade secrets.  The misappropriated information covers a wide range of information, including sales lead information, financial information, customer profile and pricing information, marketing processes, methods, and materials, strategic information related to Cynosure's product pipeline, information about employee compensation and incentives, and more.  *See Allstate Ins.*

*Co. v. Fougere*, 79 F.4th 172, 189 (1st Cir. 2023) ("Rather, we affirm their grant after concluding that the inclusion of some information in compilations which could have been obtained from public sources does not mean the compilations were not trade secrets, and that trade secrets may be found, even as to that information, when it would have been immensely difficult to collect and compile it in the form in which it appeared in the compilation."); *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 239 (D. Mass. 2011) (rejecting argument that a customer list could not be a trade secret where the plaintiff's "public website provide[d] the name and address of [plaintiff's] customers," and recognizing that "even the initial step of compiling a comprehensive list of the names and addresses of [plaintiff's] customers would be difficult; since searches on [plaintiff's] website are limited by zip code, compiling a comprehensive list would require methodically entering each zip code in the country, one at a time."); .

This is, of course, not the sort of information that Cynosure would freely hand to a competitor—as several of the Former Employees themselves admit.  For example, as Dean Fiacco put it during his deposition, most sales reps "*keep their [prospect] lists to themselves.*"  Farris Decl., Ex. 67 at 25.  Similarly, Joshua Smith testified with respect to Cynosure's competitive diagrams: "*I would never send that to a customer. ... Because they don't need to see that we have an entire matrix that kind of, you know, outlines the differences between all of these products. . . .*")  Farris Decl., Ex. 68 at 152-153.  This conduct violated the Former Employees' contractual obligations to Cynosure and, therefore, is direct evidence of trade secret misappropriation.  *See Netcracker Tech. Corp. v. Laliberté*, No. 20-11054-RGS, 2020 WL 6384312, at *4 (D. Mass. Oct. 30, 2020) ("As a matter of law, an individual who breaches a confidentiality agreement in accessing and appropriating trade secrets has used improper means.") (citation omitted).  And because Reveal Lasers directed and benefitted from this misappropriation, it is also liable.  *Optos*,

777 F. Supp. 2d at 240 ("A party who knowingly benefits from the breacher's trade secret bounty is also liable.").

Defendants might quibble whether certain defendants misappropriated trade secrets, whether certain information rises to the level of being a trade secret (as opposed to simply being confidential information), or may argue the amount of damages, but there is incontrovertible direct evidence of some significant degree of misappropriation by many of the Defendants, all of whom are employed by Reveal.

Moreover, given the extensive evidence of willful conduct, Cynosure is highly likely to recover twice its actual damages *and* its attorney's fees.  *See* 18 U.S.C. § 1836(b)(3)(C)-(D) (providing for doubling damages and attorneys' fees for "willful and malicious" misappropriation under the DTSA); M.G.L. c. 93 § 42B(b)-42C (same under Massachusetts law).

### D. The Trial Defendants Tortiously Interfered with Cynosure's Contractual and Prospective Business Relations.

"Under Massachusetts law, a claim for tortious interference with contractual relations requires a plaintiff to show that: (1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 4:21-CV-10572-TSH, 2021 WL 2982866, at *14 (D. Mass. July 15, 2021) (citations omitted).  Similarly, to prove tortious interference with prospective business relations, "a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *BioPoint, Inc. v.*

*Attis*, No. 20-10118-RGS, 2020 WL 1446725, at \*2 (D. Mass. Mar. 25, 2020) (citations omitted). Notably, neither cause of action requires Cynosure to show actual breach of contract.

As discussed above, Reveal Lasers and the Trial Defendants tortiously interfered with Cynosure's contractual relations with its then-current employees, and interfered with Cynosure's prospective business relations with its current- and prospective North America business partners (including SinoPharm).[16]  This is true even if the jury finds that Chambers and Daley did not breach their restrictive covenant agreements.

Reveal Lasers also tortiously interfered with Cynosure's prospective business relations with SinoPharm, resulting in millions of dollars in lost profits.  Once again, Defendants' own words have sealed their fate, as Kalso himself wrote that ███████████████████████████

██████████ " Farris Decl., Ex. 62.

### E.    Defendants Breached Their Fiduciary Duty of Loyalty to Cynosure.

Cynosure alleges that both Daley and Chambers owed Cynosure a fiduciary duty of loyalty. Under Massachusetts law, an employer can establish that employees have a fiduciary duty of loyalty if: (i) they are "[e]xecutives, directors, other senior officers, and partners," **_or_** (ii) if they occupy a position of "trust and confidence." *Advanced Micro Devices, Inc. v. Feldstein*, 951 F. Supp. 2d 212, 220 (D. Mass. 2013); *see also Chelsea Indus., Inc. v. Gaffney*, 389 Mass. 1, 11 (1983).  An employee owing a duty of loyalty "is bound to act solely for his employer's benefit in all matters within the scope of his employment, [and] an executive employee is barred from actively competing with his employer during the tenure of his employment, even in the absence of

---

[16] Indeed, Defendants went out of their way to harm Cynosure's business relationships and goodwill even with customers that they were not actively soliciting.  For example, in June 2022, **Danny DeMarco** texted a sales representative at a competing company who had just lost a sales opportunity to Cynosure.  DeMarco told the competitor to tell the client to " ████████████ " and that " ██████████████████████████████

██████████████ " Farris Decl., Ex. 69.

an express covenant so providing." *Chelsea Indus.*, 389 Mass. at 11.  A "top managerial employee may not solicit the departure of employees to work for a competitor." *Augat, Inc. v. Aegis, Inc.*. 409 Mass. 165, 173-174 (1991) ("The rule is most clearly applicable if the supervisor-manager, as a corporate pied piper, leads all his employer's employees away, thus destroying the employer's entire business.").

The Court should find as a matter of law that both Daley and Chambers satisfy this standard by virtue of their senior leadership roles in the Cynosure sales organization.  For example, Daley admits that he was a Senior Regional Director of Sales for the Northeast Region, who supervised all of Cynosure's sales teams "from Maine down to Virginia."  Farris Decl., Ex. 30 at 25:21-27:4. In this role, regional sales directors, district sales managers, area sales managers, and territory managers all reported to Daley.  *Id.* 27:6-14.  Chambers held an even more senior position as Vice President of Sales, North America (Dkt. 86 ¶ 4), overseeing "every district" in the company.  Farris Decl., Ex. 70 at 249:6-11.  Moreover, both men were on Cynosure's Sales Leadership Team that set policy for the entire salesforce.  Farris Decl., Ex. 30 at 28:12-30:1; Ex. 70 at 163:7-10.

Given their roles as senior leaders and managers, both men, as a matter of law, owed Cynosure a duty of loyalty.  *See Inner-Tite Corp. v. Brozowki,* No. 20100156, 2010 WL 30338330, at *19-20 (Mass. Super. Apr. 14, 2010) (regional sales manager for tire company who "worked independently, was entrusted with sensitive and confidential information, and [was] the public face of [employer]" owed a fiduciary duty to prior employer); *TH Glennon Co. v. Monday*, No. 18-30120-WGY, 2020 WL 1270970, at *18 (D. Mass. Mar. 17, 2020) (holding that a mulch product salesman with access to "proprietary client information" had a duty of loyalty).

Moreover, Daley and Chambers were aided and abetted by Reveal Lasers, who directed and profited from their breach.  *See Spinner v. Nutt*, 417 Mass 549, 556 (1994) ("liability arises

when a person participates in a fiduciary's breach of duty").  This is made all the more clear by the fact that Buchbinder had full knowledge of Daley and Chambers' activities in recruiting employees, had nonetheless allowed it to continue.  Moreover, Reveal provided equity in the company to induce them to come, and then included indemnification provisions in each of their *original* employment agreements—thereby assuring them that they would shoulder no financial repercussions for their wrongful conduct.

> **F.    The Trial Defendants Violated M.G.L. c. 93A.**

Defendants also violated M.G.L. chapter 93A.  "Siphoning off customers using proprietary customer information is exactly the type of eyebrow-raising rascality that 93A makes actionable." *Lounge 22, LLC v. Scales*, 680 F. Supp. 2d 343, 347 (D. Mass. 2010); *see also Governo Law Firm LLC v. Bergeron*, 487 Mass. 188, 195-96 (2021). Moreover, if a plaintiff can prove the elements of tortious interference with contract, "then it may also prevail in proving that these same acts constituted an unfair or deceptive act or practice in trade or commerce in violation of [c. 93A]." *Guest-Tek Interactive Entertainment Inc.*, 731 F. Supp. 2d at 91-92 (citation omitted).  Similarly, a competitor who aids and abets a breach of fiduciary duty is also liable under Chapter 93A.  *See Augat*, 409 Mass. at 171-172.  And while Chapter 93A only applies to acts that occurred "primarily and substantially" within Massachusetts, case law holds that Defendants' conduct—causing harm to and siphoning off employees and customers from a Massachusetts-based company (all led by a disloyal insider, Daley, who is a Massachusetts resident)—falls within the geographic ambit of the statute, even though not all of the Defendants were located within Massachusetts.  *See KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, --- F.Supp.3d ---, 2024 WL 1558167, at *19-20 (D. Mass. Apr. 10, 2024) (Chapter 93A applied where plaintiff, a Massachusetts-based corporation,

"maintain[ed] the core of its operations, including databases, email servers, and customer lists and data in Massachusetts," amongst other factors).

Notably, a successful plaintiff who can prove that a defendant's conduct was "willful" or "knowing" is entitled to exemplary (i.e., double or treble) damages under the statute. *See* M.G.L. c. 93A § 11.  Here, given the aforementioned evidence, Cynosure will have little trouble showing that the Defendants' conduct was sufficiently culpable to warrant multiple damages.

Cynosure will also be entitled to attorneys' fees, which are "automatically" awarded to a successful plaintiff under M.G.L. c. 93A § 11 who proves that the defendant's unfair conduct had an "adverse effect" on the plaintiff's business. *Biopoint, Inc. v. Dickhaut,* No. 20-10118-RGS, 2023 WL 3071422, at *8 (D. Mass. Apr. 25, 2023).

## IV.   CONTESTED LEGAL AND EVIDENTIARY ISSUES

The Court will need to address a number of key legal issues before or during trial, many of which have been previously briefed for the Court or are set out in more detail in the parties' motions *in limine*, *Daubert* motions, Joint PreTrial Memorandum, exhibit list, jury instructions, and deposition designations.

### A.   Evidentiary Issues for the Court to Decide at the Pretrial Conference.

Below are short summaries of some of the key evidentiary issues the Court should decide at the pretrial conference:

#### 1.   Testimony from Late-Disclosed Witnesses.

As discussed in Cynosure's Motion *in Limine* No. 3, Defendants failed to timely disclose a number of witnesses, waiting until either the last day of discovery (by which time Cynosure was prohibited from seeking to depose the witnesses or serve discovery requests) or six weeks after the close of discovery.  Cynosure's fears of trial by ambush were confirmed with Defendants' witness list (Dkt. 473), where Defendants identified the following late-disclosed witnesses as witness they

"will call": Andrea Schwab (disclosed on March 21, 2024) and Julie Walsh (disclosed on May 9, 2024) (and there are several more on the "may call" list).  For the reasons discussed in Cynosure's Motion, these witnesses should be excluded due to Defendants' failure to disclose the witnesses before the close of discovery so as to prohibit Cynosure from properly preparing against any testimony they may offer.

The only purpose behind these exhibits and pieces of testimony is to improperly seek to inflame the jury and to try to get them to decide the case based on the allegations in some entirely separate lawsuit.  This is improper and should be excluded under Federal Rule of Evidence 403.

## V.     REQUESTED RULINGS AND INSTRUCTIONS

Cynosure requests a ruling on the subject of its Motions *In Limine*:

1) Cynosure's Motion *in Limine* No. 1, which seeks sanctions for the failure to preserve electronically stored information by Defendants Bob Daley, Chris Chambers, Brogan Bair-Chambers, and Josh Smith.

2) Cynosure's Motion *in Limine* No. 2, which seeks to exclude questioning and evidence regarding inflammatory allegations about Cynosure and its witnesses made by Defendants, their witnesses, and defense counsel.

3) Cynosure's Motion *in Limine* No. 3, which seeks to exclude evidence from late-disclosed witnesses, Cynosure's attorneys, and undisclosed experts.

4) Cynosure's Motion *in Limine* No. 4, which seeks to exclude evidence regarding non-defendants' restrictive covenants and issues regarding the enforceability of non-competition agreements more generally.

5) Cynosure's Motion *in Limine* No 5, which seeks to exclude defense counsel from asking questions that mischaracterize evidence and claims.

Pursuant to Local Rule 16.5, Cynosure requests the following rulings or instructions, in addition to those requested in its motions *in limine* and other pretrial submissions:

Cynosure requests a ruling that Reveal Lasers LLC and Reveal Lasers LTD are alter egos and, as such, they can be tried together as a single entity.

Cynosure requests a ruling that its restrictive covenant agreements with the Defendants are enforceable contracts.

Cynosure requests a ruling that both Daley and Chambers owed fiduciary duties of loyalty to Cynosure.

Cynosure requests a ruling that the trade secrets at issue related to interstate commerce.

Cynosure requests a ruling that the acts of unfair competition giving rise to the claim under M.G.L. chapter 93A occurred primarily and substantially in Massachusetts.

Cynosure requests a ruling that Defendants are prohibited from calling any witness disclosed on Defendants' initial disclosures on or after the last day of discovery (and any related documents).

## VI.   **CONCLUSION.**

For the foregoing reasons, Cynosure respectfully submits that it will prove its case at trial, and it is confident the jury will find Reveal Lasers, Daley, and Chambers liable for the damages they have caused.

Dated: May 21, 2024                             Respectfully submitted,

                                          CYNOSURE, LLC
                                          LOTUS PARENT, INC.
                                          By their attorneys,

                                          */s/ Dipanwita Deb Amar*
                                          Dipanwita Deb Amar
                                          Joseph Farris
                                          Matthew Diton
                                          dipanwita.amar@arnoldporter.com
                                          joseph.farris@arnoldporter.com
                                          matthew.diton@arnoldporter.com
                                          *Admitted Pro Hac Vice*

Joshua S. Barlow (SBN: 667472)
Fred A. Kelly Jr. (SBN: 544046)
ARNOLD & PORTER KAYE SCHOLER
200 Clarendon Street, 53rd Floor
Boston, MA 02116
Joshua.barlow@arnoldporter.com
Fred.kelly@arnoldporter.com
T: +1 617.351.8050
F: +1 627.226.9199

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF on May 21, 2024.

**ARNOLD & PORTER KAYE SCHOLER LLP**

By: /s/ *Dipanwita Deb Amar*
 DIPANWITA DEB AMAR
Attorneys for Plaintiffs CYNOSURE, LLC and
LOTUS PARENT, INC.