**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CYNOSURE, LLC, et al.; | Civil Action No.  1:22-CV-11176-PBS |
| Plaintiffs, | |
| v. | |
| REVEAL LASERS LLC., et al.; | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE
EXPERT TESTIMONY OF  BRUCE MCFARLANE**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   LEGAL STANDARD......................................................................................... 2

III.  ARGUMENT ...................................................................................................... 3

    A.    McFarlane's Trade Secret Opinions are Reliable. ...................................................3

        1.    McFarlane's Trade Secret Theories Do Not Require Apportionment. .................................................................... 3

        2.    McFarlane's *Panduit* Factor Analysis Properly Supports His Lost Profit Theory for Trade Secret Damages. ................................................... 7

        3.    McFarlane's Market Apportionment of Lost Profit Trade Secret Damages is Reliable................................................................................... 10

    B.    McFarlane's Lost Profit Analysis for Other Claims is Valid. .............................12

        1.    McFarlane Properly Addresses Reasons for Cynosure's Decline in Revenue and Profit.................................................................. 12

        2.    McFarlane Assignment of a "Growth Rate" Was Done Based on a Proper Methodology. ................................................................... 14

    C.    McFarlane's Supplemental Report is Timely and Proper.....................................16

IV.   CONCLUSION................................................................................................ 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allscripts Healthcare, LLC v. Andor Health, LLC*,
 No. CV 21-704-MAK, 2022 WL 3021560 (D. Del. July 29, 2022)....................................5, 7

*BladeRoom Grp. Ltd. v. Facebook, Inc.*,
 No. 5:15-CV-01370-EJD, 2018 WL 1611835 (N.D. Cal. Apr. 3, 2018)..................................5

*Brewster Wallcovering Co. v. Blue Mt. Wallcoverings, Inc.*,
 864 N.E.2d 518 (Mass. App. Ct. 2007) .................................................................................3

*Cabi v. Boston Children's Hosp.*,
 No. 15-cv-12306-DJC, 2017 WL 4038393 (D. Mass. Sept. 13, 2017) ..................................16

*Congressional Air, Ltd. v. Beech Aircraft Corp.*,
 176 F.R.D. 513 (D. Md. 1997).............................................................................................17

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
 795 F. Supp. 501 (D. Mass. 1992) .........................................................................................6

*Daubert v. Merrell Dow Pharms, Inc.*,
 509 U.S. 579 (1993)...........................................................................................................2, 8

*Ford Motor Co. v. Versata Software, Inc.*,
 2018 WL 10733561 (E.D. Mich. Jul. 9, 2018) ......................................................................6

*Hartford Ins. Co. v. Gen. Elec. Co.*,
 526 F. Supp. 2d 250 (D.R.I. 2007)........................................................................................18

*Huawei Tehcs. Co., Ltd. v. Yiren Huang*,
 No. 4:17-cv-00893, 2019 WL 2395276 (E.D. Tex. June 6, 2019) ......................................7, 8

*LivePerson, Inc. v. [24]7.AI, Inc.*,
 No. 17-CV-01268-JST, 2018 WL 6257460 (N.D. Cal. Nov. 30, 2018)...............................5, 6

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
 No. 06-cv-100-JD, 2010 WL 1427549 (D.N.H. Apr. 2, 2010)...............................................18

*Medidata Soln's, Inc. v. Veeva Sys., Inc.*,
 2021 WL 4243309 (S.D.N.Y. Aug. 25, 2021)........................................................................5

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
 851 F.3d 1275 (Fed. Cir. 2017).............................................................................................7

ii

*Neural Magic, Inc. v. Meta Platforms, Inc.*,
    659 F. Supp. 3d 138 (D. Mass. 2023) ......................................................................6

*NuVasive, Inc. v. Day*,
    77 F.4th 23 (1st Cir. 2023) .....................................................................................3

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
    399 F.Supp.2d 1064 (N.D. Cal. 2005) ..................................................................6

*Optos, Inc. v. Topcon Med. Syts., Inc.*,
    777 F. Supp. 2d 217 (D. Mass. 2011) ...............................................................6, 10

*Orthofix, Inc. v. Gordon*,
    No. 1:13-cv-01463-SLD-TSH, 2016 WL 1273160 (C.D. Ill. Mar. 31, 2016) ........10

*Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*,
    No. 2:15-CV-512-WCB, 2017 WL 1319553 (E.D. Tex. Apr. 10, 2017) ...............10

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co*,
    161 F.3d 77 (1st Cir. 1998) ..................................................................................2, 9

*State Indus., Inc. v. Mor-Flo Indus.*,
    883 F. 2d 1573 (Fed. Cir. 1989) ...........................................................................9

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*,
    No. 15 CIV. 211 (LGS), 2020 WL 5822058 (S.D.N.Y. Sept. 30, 2020),
    *modified*, No. 15 CIV. 211 (LGS), 2020 WL 8079812 (S.D.N.Y. Oct. 15,
    2020) .......................................................................................................................5

*Sys. Dev. Integration, LLC v. Computer Scis. Corp.*,
    886 F. Supp. 2d 873 (N.D. Ill. 2012) ..................................................................10

*Univ. Computing Co. v. Lykes-Youngstown Corp.*,
    504 F.2d 518 (5th Cir. 1974) ...............................................................................3, 8

*US Gypsum Co. v. Lafarge N. Am. Inc.*,
    670 F. Supp. 2d 737 (N.D. Ill. 2009) ....................................................................8

*Versata Software, Inc. v. SAP Am., Inc.*,
    717 F.3d 1255 (Fed. Cir. 2013) ............................................................................8

*Wellogix Inc. v. Accenture, L.L.P.*,
    716 F.3d 867 (5th Cir. 2013) ................................................................................3

**Other Authorities**

John Skenyon, Christopher Marchese, and John Land, *Patent Damages Law and
    Practice*, 2014 Edition, Fish & Richardson, P.C., Thomson Reuters, § 2:43,
    pp. 154-55 ..................................................................................................................................9

Fed R. Civ. Proc.
    26(2)(D)(ii) ...........................................................................................................................16, 17
    26(e)(1)(A).................................................................................................................................2, 16
    702..............................................................................................................................1, 2, 10, 19

Plaintiffs Cynosure, LLC and Lotus Parent, Inc. (collectively, "Cynosure") respectfully request that this Court deny Defendant's motion to exclude testimony proffered by Plaintiffs' expert Bruce McFarlane pursuant to Fed. R. Evid. ("FRE") 702.

## I.   INTRODUCTION

Plaintiffs produced a report from Bruce McFarlane, Senior Consultant at LitNomics and Senior Advisor at Intensity (which are firms that provide financial, economic, and accounting analysis for litigation), concerning his analysis of damages in this case.  Dkt. 480-3 (Expert Report of McFarlane) ("McFarlane Rep.") ¶¶ 1-3.  Defendants do not challenge McFarlane's qualifications as a damages expert but argue that all of his opinions should be excluded.  First, Defendants contend that McFarlane's trade secret opinions are unreliable for several reasons— none of which are valid.  They argue—contrary to the law—that McFarlane was required to apportion lost profits for trade secrets among different types of trade secrets.  They also take issue with his application of the *Panduit* factors for trade secret lost profits, but they misrepresent his analysis, or their criticisms devolve into arguing that Cynosure will fail to prove merits of the trade secret claims themselves, which, of course, McFarlane is entitled to presume.

Second, Defendants contend McFarlane's lost profits analysis as it relates to other claims in the case is inadmissible because it fails to account for other factors contributing to the decline in Cynosure's revenue and profit; and relies only on a single document (Cynosure's 2022 forecast) as the premise, rather than "basic valuation and accounting principles."  This argument reflects a fundamental misunderstanding of McFarlane's analysis, and even if it did not, at most, would go to the weight of McFarlane's opinion, rather than its admissibility.

Finally, Defendants seek to strike McFarlane's supplemental report, Dkt. 480-4. (Supplemental Report), arguing that McFarlane should not be able to respond to criticisms of its

own rebuttal expert.  There is simply no basis for this, in either the Federal Rules of Civil Procedure or in logic.  To the contrary, Federal Rule of Civil Procedure 26(e)(1)(A) specifically contemplates exactly this type of supplementation.  Nothing in the federal rules allow Defendants' own damages expert to levy whatever attacks he wants at McFarlane while himself remaining immune from criticism.  It is also eminently *more* fair for Defendant to have notice of these opinions before trial—as Defendants would no doubt have objected if Cynosure had tried sit on its criticisms of Defendants' rebuttal expert until trial without providing any notice of these opinions.

None of Defendants' arguments amount to any legitimate reason to exclude McFarlane's testimony under FRE 702.  As such, the Court should deny their motion.

## II.    LEGAL STANDARD

Under FRE 702, trial courts act as gatekeepers to bar unsupported, unreliable, and speculative expert opinions from reaching the jury. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 597 (1993).  The focus of the Court's inquiry is on the principles and methodology utilized by the expert, not the experts' ultimate conclusions.  *Id.* at 595.  Where there are competing experts, it is the role of the jury to assess the experts' credibility.  As such, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596; *see also Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co*, 161 F.3d 77, 85 (1st Cir. 1998) ("As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies"). (citations omitted).

Matters involving misappropriation of trade secrets come with additional guidance for assessing expert testimony.  Once misappropriation is shown, trade secret damages require "a flexible and imaginative approach to the problem of damages…each case is controlled by its own peculiar facts and circumstances. " *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974).  *See also Wellogix Inc. v. Accenture, L.L.P.* 716 F.3d 867, 879 (5th Cir. 2013) ("Under this flexible approach, even [w]here the damages are uncertain … we do not feel that uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown.").  This is consistent with the standard governing damages under Massachusetts and Delaware law, which do not require damages to be proven to a mathematical certainty.  *See NuVasive, Inc. v. Day*, 77 F.4th 23, 30 n.9 (1st Cir. 2023) (applying Delaware law and noting "the fact of expectation of damages must be proven with reasonable certainty, ***but the amount of damages can be an estimate***.") (emphasis added and internal quotations omitted); *Brewster Wallcovering Co. v. Blue Mt. Wallcoverings, Inc.*, 864 N.E.2d 518, 542 (Mass. App. Ct. 2007) (applying Massachusetts law and holding "[e]vidence that enables the jury to arrive at a reasonably approximate estimate of damages is … sufficient.").

## III.    ARGUMENT

### A.  McFarlane's Trade Secret Opinions are Reliable.

#### 1.   McFarlane's Trade Secret Theories Do Not Require Apportionment.

Defendants first argue that all of McFarlane's trade secret theories fail because McFarlane did not "apportion" his damages amongst all trade secrets that Defendants could have misappropriated.  Motion ("Mot.") at 5-7.  But there is no requirement that trade secret damages must always be apportioned amongst different possible trade secrets.  This is particularly true where, as here, the possible scope and permutations of the misappropriated trade secrets (including those embodied in thousands of documents taken by over two dozen people) are so broad and

comingled that doing an apportionment would be entirely impractical (if not impossible), not to mention divorced from the reality of how Reveal's business was founded on the combination of the misappropriated trade secrets.

McFarlane specifically addressed the impracticability of apportioning lost revenue among individuals trade secrets in Section 6.4.2.1 of his report, writing:

> The Cynosure Trade Secrets are described in section 6.1 (p. 53). Among the eight categories of trade secrets listed, Cynosure identifies dozens of "examples" of Cynosure Trade Secrets. The example trade secrets span a variety of disparate data including sales leads, customers, employees, products, strategic, training, social media accounts, and competitive information. The number of possible combinations of Cynosure Trade Secrets the court or jury could conclude constitute valid, misappropriated, and enforceable trade secrets is enormous; thus, calculating Cynosure's lost revenue (and reasonable royalty damages) under each possible combination is impracticable. Accordingly, it is not possible to apportion Cynosure's lost revenue among each trade secret that comprises the Cynosure Trade Secrets.

McFarlane Rep. ¶ 186.[1]  Illustrating this in the referenced Section 6.1, McFarlane lists all the numerous different forms of documents and information that comprise trades secrets at issue. McFarlane ¶ 136, Figs. 43-50.  As McFarlane concludes, quantifying different values for all the possible trade secret misappropriation scenarios the jury could find across this variety of information was simply not realistic.

In any event, even if it was feasible to apportion damages to each individual type of trade secret and then as to all possible combinations of trade secrets (which, as McFarlane noted, it is not under these facts), such an apportionment is simply not required as a matter of law.  Contrary to Defendants' overbroad suggestion, there is no rule that damages must be "isolate[ed]" or

---

[1] For avoidance of confusion, Cynosure notes that McFarlane does do a separate "market apportionment" analysis on the separate question of ensuring that his lost profits calculations and reasonable royalty apportions between Cynosure's lost revenue "attributable to Defendants' wrongful conduct" and that which is not.  *See* McFarlane Rep. ¶¶ 121; 152-53.

"apportioned" in every case.  Indeed, courts have repeatedly found the opposite is true.  "[E]xperts need not apportion damages among different trade secrets." *Allscripts Healthcare, LLC v. Andor Health, LLC*, No. CV 21-704-MAK, 2022 WL 3021560, at *18 (D. Del. July 29, 2022); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, No. 15 CIV. 211 (LGS), 2020 WL 5822058, at *2 (S.D.N.Y. Sept. 30, 2020), *modified*, No. 15 CIV. 211 (LGS), 2020 WL 8079812 (S.D.N.Y. Oct. 15, 2020) ("Syntel's concern -- which boils down to a dispute over the extent of misappropriation -- is an issue for cross-examination at trial to be considered by the jury."); *BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-CV-01370-EJD, 2018 WL 1611835, at *6 (N.D. Cal. Apr. 3, 2018) ("This portion of CUTSA does not require, however, that an expert assign damages amongst the trade secrets for his or her opinion to be admissible.  Nor must an expert provide separate estimations of misappropriation and breach of contract damages for an opinion to assist the jury.").

While Defendants cite examples of cases where an expert's failure to apportion was problematic, the courts in those cases were concerned with inconsistencies between the  expert's opinion and the specific evidence at issue in those specific cases.  For example, Defendants argue that *LivePerson, Inc. v. [24]7.AI, Inc.*, No. 17-CV-01268-JST, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018) is "strikingly similar" to the case at bar, but that is not true.  In *LivePerson* only 15 of 28 alleged trade secrets were at issue in the trial, but the expert report was based on misappropriation of all 28 alleged categories of trade secrets.  Therefore, there was a fundamental disconnect between the expert's report and the facts to be tried—because the jury's verdict would "***necessarily*** encompass fewer than all of the alleged trade secrets."  *Id.* at *2.  There were similar inconsistencies present in Defendants' other cited authorities.  *See Medidata Soln's, Inc. v. Veeva Sys., Inc.*, 2021 WL 4243309, *3 (S.D.N.Y. Aug. 25, 2021) (holding that it was improper for expert

report to include damages for categories of trade secrets that were "eliminated" on summary judgment, but nonetheless permitting expert to amend report); *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1077 (N.D. Cal. 2005) (finding apportionment issue where verdict form had included multiple findings for different categories of trade secrets that were inconsistent); *Ford Motor Co. v. Versata Software, Inc.*, 2018 WL 10733561, *11 (E.D. Mich. Jul. 9, 2018) (same).[2]   Indeed, this court recently distinguished *LivePerson* and *O2 Monolithic* in *Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 193 (D. Mass. 2023), where it rejected an attempt to argue for the exclusion of a trade secrets damages opinion for failure to do "a separate analysis" that assumes only certain trade secrets remained.

Indeed, Defendants show their hand on the game they want to play where they argue that McFarlane "alleges that each Defendant had access to different trade secrets, meaning ***it is virtually certain that a jury could not find the subset of trial Defendants liable for theft of all of Cynosure's trade secrets***."  Mot. at 6.  In other words, with their "apportionment" argument on trade secrets, Defendants are really trying to tee up the false premise that Reveal/Daley/Chambers cannot be liable for the trade secrets misappropriated by the employees of Reveal Lasers as a whole—which is directly contrary to law: "A party who knowingly benefits from the breacher's trade secret bounty is also liable."  *Optos, Inc. v. Topcon Med. Syts., Inc.*, 777 F. Supp. 2d 217, 240 (D. Mass. 2011) (finding that plaintiff was likely to succeed on trade secret misappropriation claim against former employee's new employer based on showing that former employee misappropriated trade secrets); *see Data Gen. Corp. v. Grumman Sys. Support Corp.*, 795 F. Supp. 501, 507 (D. Mass. 1992) ("Under Massachusetts trade secret law, a third party who knowingly benefits from a trade secret which a person in a confidential relationship obtained from the plaintiff

---

[2] In this case, Plaintiffs' Proposed Verdict Form does not distinguish amongst the different types of misappropriated trade secrets.  Dkt. 469 at 6-7.

is liable to the plaintiff for the misappropriation of that trade secret.").  And it is decidedly true that no matter what the combination of trade secrets, Reveal Lasers – itself a defendant in this action and the entity that hired all of the other defendants -- has benefitted from the trade secret misappropriation by any and all of the Defendants.  Thus, Defendants' suggestion the Court should entertain the notion of an endless series of mini-trials over the value of each unique combination of trade secrets misappropriated by each Defendant, which would presumably require McFarlane to continually redo new damages analyses for every possible permutation of misappropriated trade secrets in corpus of thousands of documents across over two dozen total misappropriators who were engaged in a common course of conduct, is contrary to established legal precedent.  The law simply does not require such a Sisyphean task, and this argument is nothing more than an attempt to elevate form over substance at the expense of the ability of Plaintiffs to get a fair trial on the full scope of their trade secret case.

As noted by the court in *Allscripts,* Defendants may well be able to cross examine McFarlane on how the scope of the trade secrets misappropriated impacts his loss profits analysis and can try to convince the jury that he should have segregated multiple "isolated" damages amounts, but his declining to do such an apportionment of damages amongst all trade secrets here is not grounds for exclusion.  2022 WL 3021560, at *18.

## 2. McFarlane's *Panduit* Factor Analysis Properly Supports His Lost Profit Theory for Trade Secret Damages.

"The *Panduit* test provides that a 'patentee is entitled to lost profit damages if it can establish four things: (1) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made.'"  *Huawei Tehcs. Co., Ltd. v. Yiren Huang*, No. 4:17-cv-00893, 2019 WL 2395276, at *4 (E.D. Tex. June 6, 2019) (quoting *Mentor Graphics Corp. v. EVE-USA, Inc.*,

7

851 F.3d 1275 (Fed. Cir. 2017)).   While the *Panduit* factors (which arise from patent cases) can also be used in trade secret cases, their application in trade secret cases is less rigid, as "every misappropriation of trade secrets case 'requires a flexible and imaginative approach' to calculating damages and that 'each case is controlled by its own peculiar facts and circumstances.'"   *Id.* (quoting *Lykes-Youngstown Corp.*, 504 F.2d at 539).   Nonetheless, Defendants' argue that McFarlane's opinions should be excluded because he fails to prove the first and second *Panduit* factors.   Mot. at 7-10.   Defendants are wrong.

Defendants first contend that McFarlane's analysis fails to satisfy the first *Panduit* factor — that there is a "demand for the product [trade secrets]."   *Id*. at 7.   Defendants allege that McFarlane merely "opines that demand for Cynosure's <u>laser devices</u> equates to demand for Cynosure's <u>trade secrets</u>," *id.* (emphasis in original), but this does not accurately describe McFarlane's analysis.   As McFarlane explained, demand for Cynosure's trade secrets is established not by the sale of Cynosure's devices (which goes to the demand for Cynosure's products), but by their value to Cynosure and its competitors, along with their misappropriation and use by Defendants.   McFarlane Rep. ¶ 145.   Indeed, as McFarlane notes, if Cynosure's trade secrets had no value, there would have been no reason for Defendants to misappropriate them on their way out the door.   *Id.* ¶ 145 n.138.   A *Panduit* analysis does not require that McFarlane connect the demand for Cynosure products to any specific trade secret.   *See Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1265 (Fed. Cir. 2013) ("The *Panduit* factors do not require showing demand for a particular embodiment of the patented functionality."); *US Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 742 (N.D. Ill. 2009) (denying *Daubert* motion alleging that expert failed to distinguish "between the patented process at issue in this case and the patented product identified in the first *Panduit* factor" because the jury could find that the infringed process

"had a reasonably probability" of allowing the infringer to "captur[e] greater market share and higher profits").

Defendants also challenge McFarlane's analysis with respect to the second *Panduit* factor—the "absence of acceptable, non-infringing alternative to the [patented] product." Mot. at 8-10. But McFarlane addresses the second *Panduit* factor by using a market share approach—which renders the second *Panduit* factor neutral. *See State Indus., Inc. v. Mor-Flo Indus.*, 883 F. 2d 1573, 1578 (Fed. Cir. 1989) (affirming district court's decision to make the second *Panduit* factor neutral by crediting competitors with their market shares); John Skenyon, Christopher Marchese, and John Land, *Patent Damages Law and Practice*, 2014 Edition, Fish & Richardson, P.C., Thomson Reuters, § 2:43, pp. 154-55 ("Proof of an established market share for the patent owner replaces the absence of an acceptable non-infringing alternative as the second factor in this modified *Panduit* test.").

Unable to rebut this methodology, Defendants' Motion devolves into a half-baked attack on the merits of Cynosure's trade secret case. Mot. at 8-9. Cherry-picking evidence, they falsely suggest to the Court that Cynosure's only customer-related trade secrets were "purchased from a third party" or "ripe for the taking" on Cynosure's "Find a Provider Webpage." *Id.* Cynosure will not waste time here setting forth the many reasons why this characterization is false. (However, should the Court want to see a few illustrations of why this is false, Cynosure's Trial Brief (Dkt. 510 at 32-34) sets forth in more detail why Cynosure's customer information is not all just "ripe for the taking" as Defendants suggest and provide examples of "customers lists" containing data that was certainly not available online on that "Find a Provider" locator. And, even it were,

Defendants are flat wrong on the law insofar as the public availability of certain information does not render compilations of that information not a trade secret. *See Optos*, 777 F. Supp. 2d at 239.)[3]

In any event, Defendants' arguments attacking the merits are irrelevant here because McFarlane was *entitled to assume* that Cynosure will prevail on proving trade secrecy and this criticism cannot possibly undermine the reliability of his methodology. *See, e.g., Orthofix, Inc. v. Gordon*, No. 1:13-cv-01463-SLD-TSH, 2016 WL 1273160, at *3 (C.D. Ill. Mar. 31, 2016) ("It is entirely appropriate for a damages expert to assume liability for the purpose of his or her opinion. To hold otherwise would be illogical.") (quoting *Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 882 (N.D. Ill. 2012)); *Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, 2017 WL 1319553, at *4-5 (E.D. Tex. Apr. 10, 2017) (holding that a damages expert "is allowed to assume liability and address only the issue of damages. ... This principle has been expressed in numerous cases, and it is beyond serious challenge." (collecting cases)).

Since McFarlane has not failed to meet any of the legal requirements of *Panduit*, Defendants' cannot make a credible argument to exclude his analysis under FRE 702.

### 3. McFarlane's Market Apportionment of Lost Profit Trade Secret Damages is Reliable.

Finally, Defendants contend that McFarlane "fails" to provide a "market apportionment" in his trade secret lost profit analysis. Mot. at 10-11. This simply false.

---

[3] Defendants similarly argue that just because Cynosure does not own 100% of the U.S. medical aesthetics market, it cannot show the presence of non-infringing alternatives. Mot. at 8-9. This is, of course, a facially ridiculous challenge, as no company ever owns 100% of the relevant market. Defendants cannot credibly argue that the secret recipe for Coca-Cola is not a trade secret just because some people in America drink Pepsi.

McFarlane expressly provides an opinion on market apportionment.  First, McFarlane explains that traditional market share analysis would "unfairly penalize" Cynosure because the misappropriation of customer data creates a "bias" in Reveal's sales:

> Apportioning Reveal's sales made using the Cynosure Trade Secrets among competitors in the U.S. aesthetic device market would unfairly penalize Cynosure given that the misappropriated intellectual property is, *inter alia*, Cynosure confidential *customer* data. As such, Reveal's diverted sales would be biased toward Cynosure's customers versus other competitors' customers not included in the Cynosure Trade Secrets.

McFarlane Rep. ¶ 152.  This is logical where former Cynosure employees were in large part using Cynosure trade secrets to target Cynosure customers, as illustrated by substantial amounts of evidence cited by McFarlane.  *Id.* ¶ 172, Figs. 53-60.  Sales diverted to Reveal are therefore more likely to be diverted from Cynosure's customers rather than the customers of other competitors.  And traditional market share analysis does not control for that factor.

Defendants also ignore that McFarlane engaged in further analysis to account for market apportionment and to ensure he did not provide an overly inflated estimate of Cynosure's lost profits.  McFarlane Supp. Rep. ¶ 153 ("In lieu of apportioning Reveal's sales among competitors in the U.S. aesthetic device market, I have instead apportioned Reveal's sales by excluding from Cynosure's lost revenue (1) sales (and later returns) of Reveal's Aura and Vega devices, and (2) Reveal's revenue from sales made by non-Former Employees to non-Cynosure Customers.").

Once the false premise that McFarlane does not do a market apportionment is rejected, Defendants' only remaining criticism of this methodology suffers from the same logical failure as its criticism of his lost profits analysis—as it founded on the argument that Cynosure will be unable to prove that Cynosure has customer-related trade secrets.  *See, e.g.,* Mot. at 10 (complaining that McFarlane cannot "absolve himself of apportioning market share based on the assumption that

Cynosure's customer data is confidential"). This goes to liability and is not a proper basis to critique his methodology for calculating for damages.

### B.  McFarlane's Lost Profit Analysis for Other Claims is Valid.

Defendants present similarly flawed arguments regarding McFarlane's lost profit analysis for Cynosure's other, non-trade secret claims. Mot. at 11. Specifically, Defendants argue that McFarlane's opinions are unreliable because he 1) fails to account for other factors contributing to the decline in Cynosure's revenue and profit; and 2) fails to apply "basic valuation and accounting principles" in his analysis. *Id*. These criticisms are not well-taken, as explained below; however, even if they were, they simply go to the weight of McFarlane's opinions – not its admissibility.

#### 1.  McFarlane Properly Addresses Reasons for Cynosure's Decline in Revenue and Profit.

Defendants' argument that McFarlane's opinion is unreliable boils down to a criticism that McFarlane 1) improperly attributed Cynosure's declines in revenue to the Defendants, and 2) failed to account for other factors that Defendants contend contributed to Cynosure's lost profits. Mot. at 11-12. These two are criticisms that go to the weight and not the admissibility of his opinion.

As to Defendants' first point, Defendants again misstate the facts. Defendants argue that the Cynosure employees that went to Reveal represent only "19 of 135 employees that left Cynosure between September 2021 and December 2022." Mot. at 11. This is wrong on multiple levels. For example, even though there are only 19 current Defendants, as Defendants know, that is only because Cynosure voluntarily dismissed nine other Individual Defendants at the Court's request to narrow the case. Dkt. 270. (Not to mention the several other Cynosure employees who were recruited to Reveal Lasers but were not made Defendants in the first place.) Moreover,

Defendants also conveniently oversimplify by failing to take into account other factors that are pertinent to this analysis, such as whether those departing employees were voluntarily or involuntarily terminated, their seniority levels, and what positions those employees held.  It goes without saying, for example, that the unexpected loss of senior executives and/or a District's entire sales team (like those who went to Reveal) would have a greater impact on revenues than the involuntary termination of a junior marketing or even sales employee for performance reasons.

This is one example of a criticism that McFarlane expressly addressed in his Supplemental Report, where he explained that while Cynosure's revenue forecasts accounted for normal levels of attrition, "the Former Employees' *en masse* departure in May 2022 resulted in an unprecedented loss of senior personnel and their concomitant revenue-generating capacity during the period for which such data are available."  Supplemental Report ¶ 104 & Fig. 17.

Defendants' second criticism focuses on McFarlane's alleged "failure" to account for the reasons that **Defendants themselves** self-servingly contend contributed to Cynosure's revenue losses, such as lingering issues from COVID.  Mot. at 12.  However, once again, Defendants misstate McFarlane's analysis.  First, McFarlane's estimates of lost profits take into account variances between actual revenue and budgeted / forecasted revenue that were put together before the mass exodus—which naturally accounted for then-existing issues such as the impact of the COVID pandemic two years before.  McFarlane Rep. ¶¶ 88-109.  Additionally, McFarlane noted in Section 4.5.4 of that there were "other factors that may have contributed to Cynosure's decline in U.S. product revenue," which he took into account, such as the seasonality of sales, the Defendants sandbagging sales prior to their resignations, and market apportionment.  McFarlane Report ¶¶ 110-121.

13

McFarlane also specifically responds to Defendants' criticism in his Supplemental Report, where he explained that each of the alleged factors Defendants cite in rebuttal to him (*i.e.*, lingering supply chain challenges, normal attrition rates, etc.) were known to Cynosure at the time it prepared its 2022 forecast, and thus baked into that forecast.  Supplemental Report ¶ 116.  In other words, because Cynosure had a track record of reliable forecasting, McFarlane concluded that Defendants' cited factors "are taken into account and controlled for in the damages calculus by their being baked into the forecast that [he] used to estimate 2022 revenue."  *Id.*

It is apparent that Cynosure and Defendants vehemently disagree on what factors caused Cynosure's revenue declines in 2022-2024.  That question will ultimately be decided by the jury. But the fact that McFarlane did not agree with all of Defendants' claimed explanations does not render his analysis inadmissible.

### 2.    McFarlane Assignment of a "Growth Rate" Was Done Based on a Proper Methodology.

Defendants next criticize McFarlane for using a "speculative" "growth rate" in his lost profits analysis allegedly based on a "single Cynosure document."  Mot. at 12-13.   As a starting point, it is form-over-substance argument to claim that it should matter that McFarlane cites a "single document" here, as his Schedule 13.8 is clearly a detailed compilation of data from multiple sources, including Cynosure's original budgeted revenue, mid-year forecasted revenue, and full year results over three different years.  And even if he had relied on a single document, that would not render the analysis methodologically unsound.  However, he also considered much more that Defendants ignore in mischaracterizing his opinion.

To arrive at Cynosure's lost profits for 2023 and 2024, McFarlane necessarily needed to calculate Cynosure's expected growth rate in the "but for" world where Defendants did not breach

their contracts and engage in the other wrongful acts alleged in the First Amended Complaint. McFarlane's report explains how he arrived at the estimated growth rates:

**2023.**   To arrive at the 2023 estimated growth rate, McFarlane considered five possible growth rates: (i) Cynosure's estimated growth rate in 2022 based on its original revenue forecast; (ii) the 2022 growth rate for the U.S. medical aesthetic device industry at large; (iii) the actual growth rate for 2023 that Cynosure experienced in the North American territories unimpacted by Defendants' wrongful conduct; (iv) the estimated 2023 growth rate from Cynosure's August 2022 409A Common Stock Valuation; and (v) the average 2023 growth rate for the U.S. medical aesthetic device industry at large.   McFarlane Rep. ¶¶ 95-101.   McFarlane evaluated each of these options for potential reliability.   *Id.*   After evaluating each option, McFarlane concluded that the "most probative" growth rates for estimating Cynosure's 2023 "but for" growth rate were Cynosure's 2022 estimated growth rate, the 2022 industry average, and the 2023 average.   *Id.* ¶ 102.   McFarlane then estimated Cynosure's 2023 "but for" growth rate by scaling Cynosure's 2022 estimate growth rate by the change in the industry growth rates from 2022 to 2023.   *Id.* ¶ 103.

**2024.**   To arrive at the 2024 estimated growth rate, McFarlane followed the same methodology, scaling Cynosure's 2023 estimated "but for" growth rate by the change in the industry growth rates from 2023 to 2024 (estimates).   *Id.* ¶ 107.

Despite this analysis, Defendants' argue that McFarlane's opinion should be struck because it fails to take into account what Defendants characterize as "Cynosure's historic and continued economic decline in business performance and results."   Mot. at 13.   Specifically Defendants critique McFarlane for not using a five-year lookback period to calculate growth—but that approach fails to take account of the fact that the COVID pandemic (an indisputable Black Swan event) caused significant financial difficulties in 2020 that would not be repeated in 2023 or 2024.

McFarlane's analysis, on the other hand, takes into account the fact that Cynosure's financials *had significantly improved* in the period between the onset of the pandemic and May 2022 when the Defendants resigned.  Supplemental Report ¶ 110 & Figure 20.

In any event, *at best*, this criticism goes to the weight of McFarlane's analysis, not its admissibility.  *See Ruiz-Troche*, 161 F.3d at 85 ("As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies").

### C.  McFarlane's Supplemental Report is Timely and Proper.

Defendants finally argue that McFarlane's Supplemental Report should be stricken, but there is no basis for that.

Federal Rule of Civil Procedure 26(e)(1)(A) provides that an expert report may be supplemented "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect."  To the extent that McFarlane's Supplemental Report corrects calculations and issues that were incorrect, Defendants do not, and cannot, dispute that McFarlane's report was filed in a timely manner.

Separately, Federal Rule of Civil Procedure 26(2)(D)(ii) provides that, in cases such as this where there is no stipulation or court order otherwise, a party must disclose expert reports "intended solely to contradict or rebut evidence on the same subject matter identified by another party" within "30 days after the other party's disclosure."  Fed. R. Civ. P. 26(2)(D)(ii); *see Cabi v. Boston Children's Hosp.*, No. 15-cv-12306-DJC, 2017 WL 4038393, at *1 (D. Mass. Sept. 13, 2017) ("Since the court did not set a deadline for rebuttal reports in its scheduling order, the thirty-day default under Rule 26(2)(D)(ii) applied.").  Again, Defendants cannot dispute that, to the extent the Supplemental Report contradicts or rebuts Dell's Report, the Supplemental Report was

16

filed within 30 days of Dell's Report.[4]  As such, whether viewed as a supplemental report or a rebuttal report, the Supplemental Report is timely.

Defendants' also misconstrue the contents of McFarlane's Supplemental Report.  For example, Defendants argue that the Supplemental Report should be stricken because McFarlane relied on four "sources of information" that were not referenced in his original report yet were, in theory, "available to him."  Mot. at 16.  These sources of information in question are (i) a license agreement from 2004, (ii) a license agreement from 2006, (iii) a supply agreement from 2020, and (iv) a May 7, 2024 interview with Lowinn Kibbey regarding matters raised in the Dell Report.  *Id.* But McFarlane was not in possession of *any* of this information at the time of his first report.  The 2004 license agreement and 2006 license agreement were identified in public sources by ***Defendants' expert*** Stephen Dell and cited for the first time in his report.  Dkt. 483-1 at ¶¶ 229-230.  The 2020 Supply Agreement was originally in Chinese language and a certified copy of the translation was not obtained or provided to McFarlane until May 7, 2024, after his April 12, 2024 initial report.  *See* Farris Decl. Ex. 1 (certification of translation, dated May 7, 2024).  Finally, McFarlane's additional conversation with Kibbey was specifically in response to Dell's report, and therefore was also not something he could have cited before.

Again, to the extent McFarlane discusses these sources of information as a means to rebut Dell's report, McFarlane's Supplemental Report was timely under Federal Rule of Civil Procedure 26(2)(D)(ii).  This is not a case where an expert sought to introduce brand new opinions through an untimely "supplemental report" based on information already in his or her possession.  As such,

---

[4] This fact distinguishes the Supplemental Report from Defendants' cited authority of *Congressional Air, Ltd. v. Beech Aircraft Corp.*, 176 F.R.D. 513, 515-16 (D. Md. 1997), which excluded a report designed to respond to the other side's expert report that was not filed within 30 days of the opposing report.  *Id.* ("Since the subsequent report of Dr. Chisholm is being used to rebut Mr. Morin's report, plaintiff was required to disclose the subsequent report within 30 days of the receipt of Mr. Morin's report.").

McFarlane's Supplemental Report is distinguishable from the stricken reports in Defendants' cited authorities, like *Marine Polymer Techs., Inc. v. HemCon, Inc.*, where the court took issue with the fact that the expert's "supplemental" report contained "new opinions not expressed in the original report" based on information available to the expert before the initial report.  No. 06-cv-100-JD, 2010 WL 1427549, at *4 (D.N.H. Apr. 2, 2010) (citation omitted); *see also Hartford Ins. Co. v. Gen. Elec. Co.*, 526 F. Supp. 2d 250, 253 (D.R.I. 2007) (rejecting expert report that would constitute a "change in the experts' opinion," and noting: "the purpose of supplementation is not to introduce wholly new opinions") (citations omitted).

Finally, Defendants' arguement that they were prejudiced because of the Supplemental Report is not well taken.  Defendants falsely claim that they were not aware that McFarlane was going to submit a Supplemental Report before deciding to forego depositions.  Defendants' ability to play fast and loose with the truth is remarkable.  Defendants themselves proposed foregoing depositions *before* any expert reports were filed, let alone before receiving the Supplemental Report.  Farris Decl. Ex. 2.  After Plaintiffs' initial expert report, Defendants asked Plaintiffs for a one-week extension of time to submit a rebuttal report.  Plaintiffs graciously agreed.  Once Defendants submitted a rebuttal report, the parties participated in a meet and confer on May 7, 2024, during which Cynosure's counsel *expressly disclosed* that McFarlane would be submitting a Supplemental Report within a few days.  Farris Decl. ¶ 2 & Ex. 4.  Nonetheless, Defendants still agreed – *after* that meet and confer – to forego expert depositions, and indeed, in the email serving the report, counsel specifically noted that the report was being sent as discussed earlier in the week. *Id.* at Exs. 3 and 4.  Accordingly, Defendants cannot now plead prejudice from the fact that they were not able to depose McFarlane about the Supplemental Report – that was their choice (just as they chose not to depose him about his original report).  Defendants' related claim that they

suffered prejudice because McFarlane's Supplemental Report was issued "after the close of discovery" (Mot. at 17) is just as frivolous, given that discovery closed on March 21, 2024—and **all** expert reports were submitted after the close of discovery.

In any event, the argument that the Supplemental Report somehow still prejudices Defendants turns logic on its head. By submitting a Supplemental Report, McFarlane has provided Defendants with the background and support for all of his revised calculations, including those revisions he made in response to Defendants' expert's report. For example, the Dell Report criticized the McFarlane Report for considering "travel" to be a fixed selling expense. Dell Report ¶ 124. In his Supplemental Report, McFarlane agreed with Dell and recalculated Cynosure's Incremental Profit Margin (and the resulting Lost Profits calculation). Supplemental Report ¶¶ 11-12. This is a textbook example of Cynosure playing fairly and not trying to "hide the ball" before trial. Defendants' suggestion that Cynosure should have engaged in gamesmanship and hid McFarlane's revisions until trial says more about Defendants' views on litigation than it does about McFarlane's reports.

## IV.   CONCLUSION

For each of the reasons set forth herein, the Court should deny Defendants' Motion to Exclude the Expert testimony of Bruce McFarlane under FRE. 702.

Dated:  May 24, 2024        Respectfully submitted,

CYNOSURE, LLC
LOTUS PARENT, INC.

By their attorneys,


*/s/ Joseph Farris*
Dipanwita Deb Amar
Joseph Farris
Matthew Diton
ARNOLD & PORTER KAYE SCHOLER LLP
3 Embarcadero Center, 10th Floor
San Francisco, California 94111
dipanwita.amar@arnoldporter.com
joseph.farris@arnoldporter.com
matthew.diton@arnoldporter.com
T: +1 415.471.3100
F: +1 415.471.3400
*Admitted Pro Hac Vice*

Joshua S. Barlow (SBN: 667472)
Fred A. Kelly Jr. (SBN: 544046)
ARNOLD & PORTER KAYE SCHOLER LLP
200 Clarendon Street, 53rd Floor
Boston, MA 02116
Joshua.barlow@arnoldporter.com
Fred.kelly@arnoldporter.com
T: +1 617.351.8050
F: +1 627.226.9199

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF on May 24, 2024.

**ARNOLD & PORTER KAYE SCHOLER LLP**

By: /s/ *Joseph Farris*
JOSEPH FARRIS
Attorneys for Plaintiffs CYNOSURE, LLC and
LOTUS PARENT, INC.