```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
_____
                              )
CYNOSURE, LLC, and LOTUS PARENT,)
INC.,                         )
                              )
                Plaintiffs,   )
                              )      Civil Action
v.                            )      No. 22-11176
                              )
REVEAL LASERS LLC, et al.,    )
                              )
                Defendants.   )
_____)
```

## MEMORANDUM AND ORDER

July 31, 2024

Saris, D.J.

Plaintiffs Cynosure, LLC and Lotus Parent, Inc. (collectively, "Cynosure") twenty-eight former sales employees (some of whom have been dismissed) who allegedly violated noncompete and non-solicitation agreements and disclosed trade secrets to their new employer, Defendants Reveal Lasers LLC, and its parent corporation, Reveal Lasers Ltd. (collectively, "Reveal"). Reveal and Cynosure are direct competitors in the nationwide and global market for medical devices used in aesthetic procedures. The court assumes familiarity with the facts of the case. See Dkt. 241.

Reveal moves to exclude the testimony of Bruce McFarlane, an economic consultant, whom Cynosure has engaged to provide a damages

1

evaluation under Fed. R. Evid. 702. Dkt. 485. Defendants have engaged their own expert, Stephen E. Dell, to rebut McFarlane's opinion and to offer their own valuation of damages. Cynosure also moves to exclude portions of Dell's testimony pursuant to Fed. R. Evid. 702. Dkt. 480. For the reasons stated below, the motion to exclude McFarlane's testimony (Dkt. 485) is **DENIED**, and the motion to exclude Dell's testimony (Dkt. 480) is **ALLOWED** insofar as he is precluded from giving an opinion on the legal standard required for proving damages but is otherwise **DENIED**.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admission of expert evidence. It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates . . . that it is more likely than not that:
>    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact at issue;
>    (b) the testimony is based on sufficient facts or data;
>    (c) the testimony is the product of reliable principles and methods; and
>    (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. In its present form, Rule 702 incorporates the Supreme Court's reasoning in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 578 (1993), which explained that Rule 702 "assigns a 'gatekeeping role for the judge' to determine

2

whether 'an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Rodríguez v. Hosp. San Cristobal, Inc., 91 F.4th 59, 70 (1st Cir. 2024) (quoting Daubert, 509 U.S. at 597). On one hand, "an expert's opinion must be supported by appropriate validation and rest on more than subjective belief or unsupported speculation." Id. (cleaned up) (quoting Daubert, 509 U.S. at 590). On the other hand, the strength of the facts underlying an expert's testimony "is a matter affecting the weight and credibility of the testimony," not its admissibility, "and thus a question to be resolved by the jury." See id. (cleaned up) (quoting Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 22 (1st Cir. 2011)). A court may exclude expert opinion where "there is simply too great an analytical gap between the data and the opinion proffered." See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

## BACKGROUND

Plaintiffs assert Defendants stole trade secrets, which included sales leads, customer lists, product information, strategic plans, training materials, and social media accounts. These trade-secrets allegations are brought under the Defend Trade Secrets Act, 18 U.S.C. § 1836, and its state-law parallel, the Massachusetts Uniform Trade Secrets Act, Mass. Gen. Laws ch. 93, §§ 42, et seq. Under both statutes lost profits and unjust enrichment are relevant measures of damages. 18 U.S.C. §

1836(b)(3)(B)(i) (providing for "damages for actual loss caused by the misappropriation of the trade secret; and . . . damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss"); Mass. Gen. Laws ch. 93, § 42B(a) "Damages can include both actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account computing actual loss."). See generally, BioPoint, Inc. v. Dickhaut, et al., No. 23-1575 (1st Cir. July 30, 2024). In the event that neither of these two methods of calculating damages are available, or should they fail to produce equitable results, damages may be calculated by determining a reasonable royalty rate. 18 U.S.C. § 1836(b)(3)(B)(ii); Mass. Gen. Laws ch. 93, § 42B(a).

McFarlane is an independent expert specializing in "analyzing and measuring the financial impact associated with alleged wrongful conduct." Dkt. 480-3 ("McFarlane Rep.") at 1. He holds a bachelor's degree in Business Administration from the University of Washington and was a Certified Public Accountant for 26 years. Reveal does not object to his qualifications as an expert. McFarlane valued damages as calculated by lost profits at $18,487,091; as calculated by unjust enrichment at $16,809,389; and as calculated by a reasonable royalty rate also at $16,809,389. McFarlane Rep. ¶ 9.

To determine lost profits, McFarlane calculated the revenue Cynosure would have made absent Reveal's actions (the "but-for" revenue) and subtracted the revenue Cynosure actually made, making adjustments for other factors. McFarlane Rep. ¶¶ 37-38, 88. To calculate unjust enrichment, McFarlane used the "Standard of Comparison" method, which compares the cost incurred by the defendant to what costs the defendant would have incurred but for the theft of trade secrets. Id. at ¶ 327. McFarlane's unjust enrichment calculation is identical to the calculation of a reasonable royalty rate. Id. at ¶ 329. To calculate a reasonable royalty rate, McFarlane analyzed the set of fifteen factors identified in Georgia-Pacific to hypothesize "[t]he amount that a licensor and a licensee would have agreed upon (at the time the misappropriation began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license . . .". Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). He concludes that a reasonable royalty rate would be forty percent. McFarlane Rep. ¶ 317.

Reveal engaged their own damages expert, Stephen E. Dell. Dell is a Certified Valuations Analyst, and there are no objections to his qualifications. Dell reviewed McFarlane's report and

identified several purported inadequacies in his methodology. See Dkt. 480-2 ("Dell Rep.").

## I. Reveal's Objections to McFarlane's Report

### A. Trade Secrets Damages

#### 1. *Apportionment by Trade Secret*

Reveal argues that McFarlane's calculation of lost profits due to misappropriation of trade secrets is inadmissible because he fails to "apportion" his damages on a trade secret-by-trade secret basis. Dkt. 485 at 5. Some courts have held that where some but not all implicated trade secrets have been proven stolen, a damages expert must apportion damages because an "all or nothing" approach will not be helpful to the trier of fact. See, e.g., Medidata Soln's, Inc. v. Veeva Sys., Inc., No. 17-589, 2021 WL 4243309, *3 (S.D.N.Y. Aug. 25, 2021) (precluding expert testimony that included alleged trade secrets that had been eliminated from the case at summary judgment); LivePerson, Inc. v. [24]7.AI, Inc., No. 17-02168, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018) (precluding expert testimony for failure to apportion damages among particular trade secrets as it "offer[ed] no methodology for the jury to calculate trade secret misappropriation damages on fewer than all the [twenty-eight] alleged trade secrets").

Other courts, though, have held that there is no requirement that experts must allocate among the specific trade secrets at issue. See, e.g., Neural Magic v. Meta Platforms, Inc., 659 F.

6

Supp. 3d 138, 192-93 (D. Mass. 2023); <u>Allscripts Healthcare, LLC v. Andor Health, LLC</u>, No. 21-704, 2022 WL 3021560, at *18 (D. Del. July 29, 2022); <u>BladeRoom Grp. Ltd. v. Facebook, Inc.</u>, No. 15-01370, 2018 WL 1611835, at *6 (N.D. Cal. Apr. 3, 2018).

McFarlane does not apportion Cynosure's lost profits among the individual trade secrets. Cynosure initially sued twenty-eight defendants, each of whom is alleged to have taken different trade secrets (i.e., from different sales regions). The expert has not given the jury a reliable methodology to attribute any lost profits to specific trade secrets stolen by individual defendants. Cynosure concedes as much but argues convincingly that Reveal, as the hiring entity, has benefitted from use of the trade secrets misappropriated by the Defendants. Accordingly, the lost profits methodology is reliable to assess damages at least against Reveal.

2. Panduit *Factors*

Next Reveal argues that McFarlane's valuation of damages caused by theft of trade secrets is inadmissible because he failed to prove all four factors of the <u>Panduit</u> test. In <u>Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.</u>, 575 F.2d 1152, 1156 (6th Cir. 1978), the Sixth Circuit held that to prove damages in the patent context, a plaintiff must show "(1) demand for the patented product, (2) absence of acceptable non-infringing substitutes, (3) [their] manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit [they] would have made."

7

In his report, McFarlane borrows the language of the Panduit test but replaces the phrase "patented product" with "Cynosure Trade Secrets." See McFarlane Rep. at 57-63. Panduit, however, has been applied to infringing products in the patent context, not sales and marketing trade secrets. Panduit Corp., 575 F.2d at 1152. While the Panduit factors may be useful where the trade secrets involve a product, the Court has not been made aware of any case or generally accepted methodology that applies the Panduit factors to a case concerning sales and marketing trade secrets.

### 3.  *Market Share Apportionment*

Defendants also argue that McFarlane should have apportioned damages based on market share: in other words, since Cynosure did not operate a monopoly, it would not have made 100% of the sales that its marketing list had the potential to generate. In his report McFarlane wrote that "courts have made the absence of acceptable substitutes neutral by crediting other competitors a portion of the infringers infringing sales based on their respective market share with the infringer's sales factored out of the market share calculation." McFarlane Rep. ¶ 152. Since McFarlane goes on in the same paragraph to say he will not perform a market evaluation, Reveal argues that his lost profits analysis is inadmissible.

This argument is unavailing. When McFarlane declines to perform a market apportionment, he is discussing it *only* in the

8

context of satisfying the second Panduit factor, the absence of acceptable, non-infringing substitutes. See Dkt. 480-3, ¶ 152. McFarlane's lost profit analysis *does* take market share into account: McFarlane establishes his lost profits valuation by comparing the but-for revenue to the actual revenue. He explains that the but-for revenue takes into account the market share Cynosure held or reasonably expected to hold absent the alleged violations. See Dkt. 480-4 ("McFarlane's Supp. Rep.") ¶ 73.

**B.   Lost Profits Analysis for Other Claims**

In addition to his lost-profits analysis for stolen trade secrets, McFarlane also opines on the damages for Cynosure's other claims. Defendants object to this analysis on the basis that he fails to adequately prove causation and does not apply appropriate valuation and accounting principles in determining damages.

*1.   Causation*

Defendants argue that because they represent only 19 of the 135 employees that left Cynosure between September 2021 and December 2022, McFarlane's opinion is unreliable because he does not discount his damages number to account for how (i) Cynosure's bottom line was impacted by the departure of high-performing employees who did not go to Reveal, and (ii) decreases in profits caused by unrelated issues, such as inventory and supply chain.

McFarlane asserts in his supplementary report that he has in fact taken these issues into account. In McFarlane's estimation,

9

Cynosure had a reliable track record of financial forecasting. McFarlane Supp. Rep. ¶ 73 (referring to "Cynosure's 2021 revenue forecast prepared in late 2020, which as [he] discussed in [his] Initial Report, was quite accurate"). Accordingly, in McFarlane's opinion natural attrition of employees (such as those who left for other companies) were already "baked into" the forecast, as were external factors Cynosure was already aware of, such as profit reductions due to COVID. Id. This objection therefore goes to the weight and not admissibility of McFarlane's opinion.

### 2. Accounting Principles

Defendants argue that McFarlane's analysis should be discounted because he assumed a growth rate "built on a single Cynosure document." Dkt. 485 at 12. Though it is true that McFarlane ultimately chose to rely on Cynosure's own growth projections, this argument goes to weight, not admissibility. See Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998).

### C. Timeliness

Defendants argue that McFarlane's supplemental report should be stricken as untimely. As Defendants themselves explain, the supplement both corrects errors in the initial report and responds to statements made by Defendants' expert.

Each of these purposes for a supplemental report is expressly contemplated by the Federal Rules of Civil Procedure. Expert

10

reports may be supplemented "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). The Rules also specify a thirty-day default deadline for disclosing expert reports "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii).

To the extent that any information contained in the supplement is not covered by these rules, delayed disclosure of evidence will only be excluded under Rule 37(c) if the delay causes harm or prejudice. Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 197-98 (1st Cir. 2006). There is no such harm or prejudice here.

## II. Cynosure's Objections to Dell's Report

Plaintiffs also move to exclude portions of opinion testimony proffered by Defendants' expert, Stephen E. Dell, pursuant to Rule 702 because, they argue, (1) he impermissibly conflates the standard required to prove the fact of damages with the lesser standard required to prove the amount of damages, and (2) his method of calculating a reasonable royalty rate is inadequate.

Dell argues that McFarlane's lost profits calculations should be discounted because they are not performed to a degree of "reasonable certainty." Second, he argues that McFarlane's estimate of a reasonable royalty rate (40%) is incorrect because it "ignore[es] available evidence of third party licensing

11

agreements involving licensing intellectual property in the same market to the very same competitors that compete with both Plaintiffs and Defendants for . . . rates ranging from 3% to 7.5% of revenue." Dell Rep. ¶ 33.

### A. Standard for Proving Damages

Plaintiffs seek to exclude Dell's opinion that McFarlane's opinion does not reflect a calculation of lost profits to a "reasonable certainty." See, e.g., Dell Rep. ¶ 64 ("I understand that every United States jurisdiction has adopted the rule that lost profits must be proved with reasonable certainty. I understand the that burden of 'reasonable certainty' in this matter means that Cynosure must prove that the defendant's wrongful act was the proximate cause of the loss." (citations omitted)).

Both parties point to the First Circuit's holding in NuVasive as establishing the relevant standard. There, the Court noted that in a contract case "the fact of expectation damages must be proven with reasonable certainty, but the amount of damages can be an estimate." NuVasive, Inc. v. Day, 77 F.4th 23, 30 n.9 (1st Cir. 2023) (cleaned up) (construing Delaware law). Defendants also point to Kolb v. Goldring, in which the First Circuit held that a showing of "reasonable certainty" was required to show the amount of lost profits in contract cases. 694 F.2d 869, 873 (1st Cir. 1982) (applying standard of establishing damages in an age discrimination suit). The problem with reliance on both NuVasive

12

and Kalb is that they address the standard for evaluating damages in contract cases, not theft of trade secrets cases. In any event, Dell will be precluded from testifying about the proper standard in a trade secrets case.

### B. Method of Establishing Reasonable Royalty Rate

Plaintiffs seek to exclude Dell's opinion that a reasonable royalty would be three percent, not the forty percent McFarlane calculated. Dell's three percent figure is based on agreements among "a number of market participants and competitors in the relevant industry," including some companies that were acquired by Cynosure after they made the agreements. Dell Rep. ¶ 228. For example, he looked at an agreement made in November 2006 between Cynosure and Palomar (a company that Cynosure later acquired) related to light-based hair removal products, in which Cynosure agreed to pay Palomar royalties of 5.0%-7.5% of net sales of Cynosure hair products. Id. ¶ 229. Dell anchored his 3% figure based on a settlement agreement between Lumenis Ltd. and Syneron, Inc., which resolved patent infringement and trade secret misappropriation claims by agreeing to a running royalty rate of 3.0% net sales of licensed products with a maximum royalty payment cap of $4.2 million. Id. ¶ 230.

The Federal Circuit has noted that the use of settlement agreements as a method of establishing reasonable royalty rates is "questionable" but has allowed it in circumstances where the

13

settlement agreement is 'the most reliable license in [the] record'. LaserDynamics, Inc. v. Quanta Comput., Inc., 694 F.3d 51, 77 (Fed. Cir. 2012) (citing ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 870-72 (Fed. Cir. 2010)). That said, the comparison of licensing agreements generally is an accepted approach when there is a link between the technology in dispute and the technology in the licensing agreements. See, e.g., ResQNet, 594 F.3d at 870. Expert opinions have been excluded when experts fail to establish a link between a purportedly comparable license and the hypothetical license at issue. Id. at 871. Here, Dell established a baseline of comparability by showing (1) the license was agreed to by participants in the same market -- in fact by a company that Cynosure later acquired; (2) that the technology at issue was similar, and (3) that the claims at issue both involved allegations of misappropriated trade secrets. Dell Rep. ¶¶ 228-32. Cynosure is correct to point out the limitations of Dell's method: the agreements he looks at are decades old, involve different and fewer technologies, and it is unclear exactly what kinds of trade secrets were misappropriated. These critiques are all fit for cross-examination, as they go to weight and not admissibility. See Payton v. Abbott Labs, 780 F.2d 147, 156 (1st Cir. 1985) (holding that undercutting some of the research basis of an expert's opinion does not affect the admissibility of those opinions, because it goes to the weight and credibility of their testimony).

Plaintiffs further argue that Dell fails to offer any independent Georgia-Pacific factor analysis to support his affirmative opinion that a three percent reasonable royalty rate would apply in this case. Courts "typically apply some subset of the fifteen 'Georgia-Pacific factors' to analyze the hypothetical negotiation and determining the reasonable royalty calculation." Banhazl v. Am. Ceramic Soc'y, 602 F. Supp. 3d 198, 223 (D. Mass. 2022) (citing Whitserve, LLC v. Comput. Packages, Inc., 694 F.3d 10, 27 (Fed. Cir. 2012)). As Plaintiffs themselves concede, Dell offered an opinion on the effect that four of the fifteen Georgia-Pacific factors would have had on the reasonable royalty rate, and no case law suggests that an expert must provide an analysis of each and every factor.

## ORDER

For the foregoing reasons, the motion to exclude McFarlane's testimony (Dkt. 485) is **DENIED**, and the motion to exclude Dell's testimony (Dkt. 480) is **ALLOWED** insofar as he is precluded from instructing the jury on the legal standard required for proving damages but is otherwise **DENIED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge