# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNOSURE, LLC, et al.; | |
| Plaintiffs, | Civil Action No. 1:22-cv-11176-PBS |
| v. | |
| REVEAL LASERS LLC., et al.; | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFFS ON THEIR CHAPTER 93A CLAIM, FOR PREJUDGMENT INTEREST, AND FOR ATTORNEYS' FEES AND COSTS

## I.      **INTRODUCTION**

Mass. Gen. Laws ch. 93A ("Chapter 93A") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A § 2(a).  Chapter 93A "creates new substantive rights, and in particular cases, makes conduct unlawful which was not unlawful under the common law or any prior statute." *Com. v. Fremont Investment & Loan,* 452 Mass. 733, 742-43 (2008).  The statute "was designed to offer broader and more comprehensive relief to victims of dishonesty than may be available at common law." *Kansallis Finance Ltd. v. Fern*, 421 Mass. 659, 671 (1996).  Toward this broad mandate, Chapter 93A prohibits conduct marked by a "level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce"—regardless of whether it independently rises to a separate, standalone claim. *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979); *see also Kattar v. Demoulas,* 433 Mass 1, 12 (2000) (Chapter 93A does not define unfairness because "there is no limit to human inventiveness in this field").

The conduct of Defendants Robert Daley, Christopher Chambers, Reveal Lasers LLC, and Reveal Lasers LTD[1] more than raises eyebrows.  In fact, there could hardly be a more textbook case of a calculated and deceitful corporate raid.  The evidence at trial established that Daley and Chambers, at the direction of and with assistance from Reveal Lasers, carefully and dishonestly plotted to poach Cynosure's salesforce by seeding discontent among their direct reports, spreading lies about the planned termination of key sales personnel, and orchestrating a whisper campaign about their new startup (which had already advertised Daley as its CEO)—all while falsely portraying to Cynosure that they were rallying the troops (as they were very well-compensated to do).  This culminated in an audacious national recruiting tour on Reveal's behalf—where Daley

---

[1] For purposes of this brief, Cynosure refers to these four specific Defendants collectively as "Defendants" and the two corporate entities together as "Reveal Lasers" or "Reveal."

and Chambers flew around the country meeting with Cynosure's best sales and marketing leaders to get them "signed up" (Ex. 129) to Reveal Lasers while expensing the trips to Cynosure. This was unfair, deceptive, and eyebrow raising in the extreme; indeed, even Defendants' own witness and Reveal executive, Andrea Schwab—herself a 20+ year veteran of the rough-and-tumble world of medical aesthetic sales—testified that it was "common sense" that Defendants' conduct was wrong. Tr. Transcript 17-159:2-7. These unfair and deceptive acts were done not only to benefit Defendants, but to destroy Cynosure; Defendants' stated goal was to "cut revenue of Cynosure by 80 percent" and put Cynosure "in a desperate situation to sell the company." Exs. 164, 165.

Standing alone, these facts would constitute a clear-cut violation of Chapter 93A. However, they do not stand alone. Less than a month ago, after serving for nearly four full weeks, a most diligent and attentive jury weighing the same facts unanimously found that each Defendant was culpable of misconduct, returning a verdict for Cynosure on nearly all of its common law claims. All of the claims that the jury found Defendants' liable on (e.g., breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, misappropriation of trade secrets, interference with contract, conspiracy, and breaches of contracts) were based on *precisely* the same underlying evidence of unfair and deceptive acts and practices at issue in the Chapter 93A claim. ECF 646. To compensate Cynosure, the jury awarded $25,000,000 in damages: $15,000,000 against Reveal Lasers, $5,000,000 against Chambers, and $5,000,000 against Daley (plus additional punitive damages against Daley). *Id.*

Chapter 93A embodies "twin goals of punishment and deterrence," and to that end, *mandates* that a successful plaintiff recover its attorneys' fees and costs. *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, --- F. Supp. 3d ---, 2024 WL 1558167, at *18 (D. Mass. 2024). The statute also *requires* the award of punitive damages for a knowing or willful violation of *no less*

***than double and up to treble*** the actual damages caused by the defendant's unfair or deceptive conduct. *Id.* After the jury began deliberations, the Court stated that its decision on Cynosure's Chapter 93A claim would be "very much influenced by the verdict." Tr. Transcript 18-62:21-63:7. Now that the jury has spoken, Cynosure requests that the Court find Defendants liable under Chapter 93A and award Cynosure its attorneys' fees and costs (the amounts of which Cynosure will separately brief on a schedule set by the Court). Moreover, because the evidence showed that the Chapter 93A violations by Reveal Lasers, Daley, and Chambers were knowing or willful, the Court should also award at least double and up to treble actual damages against each of them.

Finally, and separately, Cynosure requests that the Court, in its final judgment, fix the amount of prejudgment interest to which it is entitled under Massachusetts law. Conservatively calculating the amount of prejudgment interest at the statutory rate of 12 percent per annum from the date of the filing of the original complaint in July 2022, prejudgment interest totals $6,806,984.06 million as of the date of this filing and an additional $8,196.71 each day from now until the entry of final judgment.

## II.    ARGUMENT

### A.    Cynosure Proved Its Chapter 93A Claim at Trial Against Defendants, as Demonstrated by the Jury Verdict in Cynosure's Favor.

#### 1.    Chapter 93A Prohibits Unfair or Deceptive Acts, and Mandates Multiple Damages for Willful or Knowing Violations.

Under Chapter 93A, it is unlawful for a person engaged in trade or commerce to use "unfair methods of competition and unfair or deceptive acts or practices in business transactions with others engaged in trade or commerce." *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55 (1st Cir. 1998) (internal citations and quotations omitted). A practice is "unfair" under Chapter 93A "if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to

competitors or other business people." *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, --- F. Supp. 3d ---, 2024 WL 1558167, at *16 (D. Mass. 2024) (quoting *Morrison v. Toys "R" Us, Inc.*, 441 Mass. 451 (2004)).   A practice is "deceptive" if it "possesses a tendency to deceive." *Id.* (quoting *Aspinall v. Philip Morris Cos.*, 442 Mass. 381 (2004)).

Although Chapter 93A does not require an independent predicate violation (and was explicitly enacted to broaden the scope of acts that might be considered unfair at common law), courts have recognized that a number of the common law causes of action on which Cynosure prevailed can also give rise to liability under Chapter 93A.   For example, it is well-settled that "a finding of tortious interference [with contractual relations] can constitute an unfair or deceptive practice."   *Id.* (citing *People's Choice Mortg., Inc. v. Premium Cap. Funding, LLC*, 26 Mass. L. Rptr. 582, 2010 WL 1267373 (Mass. Super. Ct. Mar. 31, 2010)); *see also Guest-Tek Interactive Entertainment, Inc. v Pullen*, 731 F. Supp. 2d 80, 91-92 (D. Mass. 2010) (same).   Moreover, a company that assists an employee's breach of fiduciary duty may also be liable under Chapter 93A based on the conduct.   *See Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 172 (1991) ("We reject the defendants' suggestion that, because an Isotronics employee could not be liable to Isotronics under [Chapter 93A] [citation], they also may not be liable under [Chapter 93A]."); *Nat'l Econ. Research Assocs., Inc. v. Evans*, 24 Mass. L. Rptr. 436, 2008 WL 4352600, at *13 (Mass. Super. Ct. Sept. 10, 2008) (finding that evidence "that [defendant employer] induced [individual] to commit a breach of fiduciary duty or had the improper motive or means sufficient to support a tortious interference claim, then [plaintiff] indeed would have a viable Chapter 93A claim against [defendant]").   The act of misappropriating trade secrets also constitutes a violation of Chapter 93A.   *KPM Analytics*, 2024 WL 1558167, at *16 (citing cases).

Once a defendant is shown to have violated Chapter 93A, the next inquiry is whether the violation was "willful or knowing." *Id.* at \*17 (citing cases). "If the Plaintiff proves that a 'willful or knowing' violation occurred, 93A **requires** multiple damages" of no less than double (but no more than treble) the actual damages. *Id.* (citations omitted). "Establishing a 'willful or knowing' violation requires a plaintiff to 'prove that defendant had a subjectively culpable state of mind.'" *Id.* "In this context, willfulness 'implies not only intent to do an act, but also intent that the act be unfair or deceptive' and knowing violations occur 'where a defendant is aware that his act is unfair or deceptive or will cause such a result.'" *Id.*

### 2. The Evidence Showed That Defendants Violated Chapter 93A.

As demonstrated by the unanimous jury verdict in Cynosure's favor, the evidence at trial conclusively showed that Defendants engaged in the type of conduct that violates Chapter 93A. Specifically, the jury found—based on the same evidence at issue in the Chapter 93A claim—that Defendants (i) tortiously interfered with Cynosure's contracts (Reveal Lasers, Daley, and Chambers); (ii) aided and abetted Chambers' and Daley's breaches of fiduciary duty (Reveal Lasers); (iii) misappropriated Cynosure's trade secrets (Reveal Lasers and Daley);[2] and (iv) conspired to tortiously interfere with Cynosure's contracts, breach a fiduciary duty to Cynosure, and/or misappropriate Cynosure's trade secrets (Reveal Lasers, Daley, and Chambers). ECF No. 646; *see People's Choice*, 2010 WL 1267373, at \*18 ("Topdot's actions constituted a tortious interference with an advantageous business relationship. Thus, Topdot's actions were within a concept of unfairness established at common law."); *KPM Analytics*, 2024 WL 1558167, at \*16 (misappropriation of trade secrets constitutes a violation of Chapter 93A) (citing cases). The Court

---

[2] While the jury found that Cynosure had not proved harm from Defendants' misappropriation, that does not affect the jury's finding that Defendants had engaged in the unfair and deceptive *act* of misappropriation, and in fact, the jury also explicitly found that the Defendants breached their contracts to keep information confidential. ECF No. 646.

previously stated that its Chapter 93A decision would be "very much influenced by the verdict," (Tr. Transcript 18-62:21-63:7), and given the overwhelming evidence supporting the verdict of this reliable jury, that is eminently reasonable.  *See Makuc v. Am. Honda Motor Co.*, 835 F.2d 389, 394 (1st Cir. 1987) (district court not required to make specific findings of fact for 93A claim where jury verdict "resolved all material, factual issues relating to the 93A claim").

This is particularly true given that the overwhelming evidence that conclusively proved Cynosure's common law claims likewise establishes the 93A violations, *i.e.*, that Defendants' conduct was "unfair" or "deceptive."  For example, the evidence showed that when Daley and Reveal Lasers began communicating in March 2021 (Ex. 101), its CEO, Eyal Buchbinder, knew that Daley was a "sales leader" at Cynosure, as he assuredly was.  Tr. Transcript 10-61:8-62:2.[3] Within weeks, Daley began sharing confidential information with Reveal Lasers about: (i) how much it cost Cynosure to put on a "weekend" customer sales and marketing program; (ii) what fees Cynosure paid its speakers; and (iii) the total yearly expenses Cynosure incurred for each sales representative.  Ex. 125.  Notably, Daley admitted to Buchbinder that he needed to do "some digging around" to acquire the information, thereby confirming it was not the type of information he possessed in the regular scope of his duties.  *Id.*  Buchbinder responded that the information Daley provided was "extremely valuable to build the business plan and P&L for the US operation." *Id.*  By ***April 8, 2021*** (over a year before Daley left Cynosure), Buchbinder offered Daley the position of CEO of Reveal Lasers' U.S. operations.  Ex. 654.  And just several months later, in

---

[3] By the time of his resignation, Daley was the Senior Regional Sales Director for Cynosure's Northeast Region.  Ex. 46.  In this role, he managed "lots" of sales people.  Tr. Transcript 8-178:5-12.  Chambers was even higher in the Cynosure organization, ultimately serving as the Vice President of North American Sales.  Ex. 47.  Both Daley and Chambers no doubt owed fiduciary duties to Cynosure.  *See, e.g.*, *Inner-Tite Corp. v. Brozowski*, No. 20100156, 2010 WL 3038330, at *19-20 (Mass. Super. Ct. Apr. 14, 2010) (regional sales manager who "worked independently, was entrusted with sensitive and confidential information, and [was] the public face of [employer]" owed a fiduciary duty); *In re Golden Distributors, Ltd.*, 134 B.R. 750, (S.D.N.Y. 1991) (emphasis added) ("While still employed by [employer] as a district sales manager, he occupied a position of trust and confidence and owed a duty of loyalty to [employer] to protect the interests of his employer.") (applying Massachusetts law).

August 2021, Reveal Lasers began sending investors materials advertising Daley as the CEO of "Reveal Lasers USA," while simultaneously noting that he was still Cynosure's current "Sr. Director of Sales." Ex. 106.  Daley shared Cynosure's confidential information with Reveal for months as noted in a February 2022 email after he "reached out to [the Cynosure] accounting team to find out what the average US Sales rep expenses are at Cynosure (Hotel, airfare, car rental, gas, meals, oil changes, tolls, internet, printing, uber/taxi service, entertainment, etc.)." Ex. 115.

The evidence also showed that, around the same time, Daley began working to recruit other Cynosure leaders to shift their loyalties to Reveal Lasers.  For example, by no later than November 2021, Daley had recruited Chambers to help design an internal recruiting campaign.  Ex. 110; Tr. Transcript 11-21:17-22:16.  Daley assured Buchbinder that he and Chambers had "a great following with top tier talent" at Cynosure and that he had already begun "do[ing] a lot of behind the scenes work, very carefully, to have these confidential conversations with key individuals." *Id.*  The same month, Daley began participating in calls with Reveal Lasers investors to secure funding for Reveal Lasers' North American operations.  Tr. Transcript 7-97:6-15.  In January 2022, Daley wrote to Buchbinder that he and Chambers had developed tailored financial packages to recruit the "real talent" at Cynosure, noting that "recruit[ing] top talent from day 1" was "imperative" so as to "make the most impact and build the Reveal brand immediately," and that he and Chambers had already "selected the people" at Cynosure they "want[ed] to go after."  Ex. 113.  (Reveal Lasers not only gave Cynosure recruits those requested financial packages, but also gave them equity in Reveal Lasers LLC to induce them to leave.  *See* Exs. 167A-167AA.)

Daley and Chambers executed Defendants' unfair and deceitful plan by aggressive recruiting, aided by discontent that they actively sowed among Cynosure's top sales employees. In January 2022, Chambers brought his wife (Brogan Chambers, the head of Cynosure's post-sales

group) into the Reveal plan.  Tr. Transcript 11-23:20-24:9.  By February 2022, Chambers recruited at least Vice President Cory Murrell (Tr. Transcript 8-40:7-42:7) and Matt Calabrese (Calabrese Dep. 96:10-12, 97:10-17).  By March, Daley conscripted Cynosure District Sales Manager Dean Fiacco to work with him to start setting up operations for Reveal Lasers.  Tr. Transcript 7-115:22-116:18.  During this same period, Daley and Chambers sought to foment discontent in the Cynosure sales force to further their recruiting efforts, such as falsely telling top employees that Lowinn Kibbey was looking to terminate them.  For example, Chambers told Cory Murrell that Kibbey intended to fire him when, in reality, it was ***Chambers himself*** who told Kibbey that he "wouldn't keep" Murrell for the "long haul."  Ex. 857.  Chambers similarly falsely told Daley that Kibbey wanted to fire him, at the same time Chambers was telling Kibbey that *he* thought that Daley was an underperformer.  Tr. Transcript 11-79:1-12.  Chambers also pushed Kibbey to fire his predecessor, Andrea Schwab (Tr. Transcript 3-151:23-152:17), only to then turn around and use Schwab's termination as a rallying cry to encourage his subordinates to join Reveal.

Multiple witnesses testified that, in early April 2022, Reveal Lasers was being openly discussed at Cynosure's all-expenses paid "President's Club" retreat for top salespeople at the Ritz Carlton Hotel in Turks and Caicos.  Tr. Transcript 12-130:22-131: 21 (Kyle Robertson); 13-132:4-133:11 (Jason Kalso).  As Kyle Robertson testified, this Cynosure retreat felt like a celebration of Reveal Lasers, not Cynosure.  Tr. Transcript 12-131:15-21.  At the retreat, Chambers pulled Robertson aside, saying: "Listen, I want to talk to you about an opportunity.  We're building this new company.  We have a war chest of $36 million.  It would be great to have you be a part of this company that we're looking to build, and [ ] there's going to be more information that comes shortly."  Tr. Transcript 12-130:22-131:14.  Chambers even led a cheers amongst the future-Reveal employees, raising a glass to Reveal Lasers' success at Cynosure's expense.  *Id.*

Egregiously, this entire time he was working to benefit Reveal, Chambers was still actively deceiving Cynosure, representing to the company that he was fully committed to his new role leading Cynosure's North American sales organization.  For example, on March 9, 2022, Kibbey told Chambers that he needed him to be "all in. 100% all in," to which Chambers responded: "I've already committed to it."  Ex. 53.  Two days later, on the same day Chambers was formally introduced to the Cynosure salesforce as the new Vice President of Sales, Kibbey received an anonymous text essentially telling him that Chambers was actively recruiting employees to join Reveal Lasers. Ex. 1.  When Kibbey sent the text to Chambers, Chambers responded that the text was "comedy." *Id.*  And on April 13, Chambers texted Kibbey: "I have tons of respect for you and have your back… But I'm in this with you man. … Your [*sic*] a good man Lowinn and I hope we can have a great relationship long after this craziness is over." Ex. 52.

Despite these deceitful claims of loyalty, just days later, Daley and Chambers formally signed their initial employment agreements with Reveal Lasers LTD on April 21 and April 23, 2022, respectively.  Exs. 127-128.  After that, Daley and Chambers put the final phases of their scheme into effect—flying around the country for Reveal Lasers recruiting trips that were (in most cases) fraudulently disguised as Cynosure "Quarterly Business Reviews" (expensed to Cynosure, of course).  Exs. 588Z, 588AA, 588BB, 588CC, 589F, 589H, and 589J.  Incredibly, at trial, Daley and Chambers, even while testifying under penalty of perjury, tried to maintain the outrageous façade that these were legitimate QBRs, not recruiting trips.  However, Daley's testimony was so unbelievable—and contradicted by document-after-document and almost every other witness at the meetings (e.g., Matthew Malone, Savannah Padron, Jason Steinhorn, Matt Calabrese, and Yunior Caballero)—that the Court itself reminded Daley that he was under oath.  Tr. Transcript 8-7:25-8:6 ("The Court: It was – let me put it this way: ***The second thing I was worried about is, I***

*wanted to make sure Mr. Daley knew it was under pains and penalties of perjury, his testimony* … because regardless of what those people said, the emails were damning.") (emphasis added).

In total, Daley and/or Chambers led recruiting trips, including several phony "QBRs," in New York, Atlanta, Nashville, Tampa, Seattle, Austin, Chicago, and Burlington.  Each meeting followed a similar pattern: the recruits were asked to sign an NDA to conceal their activities from Cynosure (though each of these NDAs had "gone missing" by the trial, Tr. Transcript 7-131:7-12), and then were shown a pitch deck which, after mocking Cynosure's "Beautiful Energy" logo, contained information on Reveal's leadership and products (and even a side-by-side comparison of Reveal's health plan to Cynosure's). Tr. Transcript 6-184:12-185:16; Malone Dep. 136:1-15;[4] Padron Dep. 149:10-150:1; Ex. 574 (US Pitch Deck).  Daley and Chambers told the recruits that they were "taking the president club winners with [them]" to Reveal, *i.e.*, the top sales representatives at Cynosure.  Malone Dep. 134:18-135:15. These Cynosure employees were then presented with a Reveal employment agreement and told to sign on the spot.  Malone Dep. 137:11-21; Malone Dep. 139:25-140:20; Padron Dep. 149:10-150:1.  If the recruits did sign the agreement, Daley and Chambers instructed them to not date the agreement—an obvious effort to conceal the fact that these meetings were occurring when the recruits were employed by Cynosure and to create a doctored, deceptive paper trail.  Malone Dep. 151:7-153:1; Tr. Transcript 6-189:24-190:6.

Eyal Buchbinder was closely involved in Daley and Chambers' recruiting efforts, working with them to structure compensation and employment terms, and providing them the pitch materials and Reveal employment agreements.  Tr. Transcript 7-136:8-11; 7-158:8-11.  On April 22, 2022, Daley texted Buchbinder urging him to finalize the equity plan because he and Chambers

---

[4] All deposition citations referenced herein were played into the record at trial.  While the parties' provided the Court with transcripts of the played depositions at the end of trial, Cynosure can re-submit the transcripts upon request.

were planning to have "conversations with people" (*i.e.*, the phony QBRs) the following week. Ex. 651. A few days later, in the middle of the recruiting tour, Daley emailed Buchbinder on April 28 to boast that he and Chambers "had a great week from a recruiting standpoint." Ex. 129.[5] Notably, even after Daley and Chambers resigned, they continued using lies and manipulation to recruit Cynosure employees, such as telling David Krueger that he "needs to understand future at Cynosure is miserable and should not even matter what they offer him." Ex. 136.

As the jury's verdict reflects, the evidence also showed that a number of the former employees misappropriated Cynosure confidential and/or trade secret information on their way out the door. For example, multiple employees exfiltrated substantial numbers of files from their Cynosure devices in the days and weeks before their resignations,[6] including:

- Cory Murrell: copied 960 files from his Cynosure computer to a personal flash drive in February 2022 (the week after being recruited to Reveal Lasers by Chambers at Cynosure's Austin training event) and uploaded them to his personal computer (which he used for Reveal Lasers business) in June 2022. Exs. 230D, 230E. Among the hundreds of files Mr. Murrell took were a highly secret presentation about a product that had not even been released to the market yet, financial presentations and projections about Cynosure's revenue, expenses, and budgets (Exs. 238-239, 243, and 249).

- Jason Kalso: copied 15,000 files from his Cynosure computer to a personal flash drive in May 2022 on his last day of employment (Ex. 230L), including numerous customer and prospect hot lists (Exs. 264, 270-271).

---

[5] It was clear to Reveal Lasers that Chambers and Daley were specifically *targeting* Cynosure employees. For example, the "pitch deck" that Daley and Chambers used to recruit employees included a chart that compared Reveal's health benefits **only** to Cynosure's benefits. Ex. 574. And, as early as January 12, Daley emailed Buchbinder that he and Chambers had "selected the people we want to go after but these individuals are in a very good financial situation *at Cynosure* …" Ex. 113 (emphasis added). A month earlier (December 2021), he wrote "the caliber reps we're *targeting* are currently making healthy 6- and 7-figure salaries". Ex. 112 (emphasis added).

[6] Even before they resigned, the employees had already begun shifting sales opportunities away from Cynosure and to Reveal Lasers. For example, on May 12, 2022, Dean Fiacco (who had already resigned from Cynosure) sent a text message to Mark Sargent (who was still a Cynosure employee) and Yunior Caballero (who was recruited to Reveal) containing a voicemail from a provider. Fiacco told them that the provider was a "damn good prospect for the new thing." Ex. 446. A few days later, Sargent—still a Cynosure employee—forwarded a text message from a provider to Robert Fiacco, who advised Sargent to "schedule a call and let her know that you no longer work for cynosure and then pivot into selling the new opportunity and schedule a follow up for June." Ex. 135.

- Kyle Shapero: copied 90 files from his Cynosure computer to a personal flash drive in May 2022 (a week after he participated in the Tampa, FL "QBR"), Ex. 230II, including a list of hot prospects and a list of customers who had been credit approved (Exs. 287-288).

- Joshua Smith: uploaded 200 files from his Cynosure computer to his personal Dropbox account in April 2022 (a week before he gave his notice of resignation and right after changing the email associated with the Dropbox account from his Cynosure email to a personal Gmail account).  Ex. 230Q; Tr. Transcript 10-96:2-16.  Among the files Smith uploaded were a number of competitive intelligence decks comparing Cynosure products to its competitors.  *See, e.g.*, Ex. 303.  On June 9, 2020, Smith offered to share these decks with his Reveal coworkers for the purposes of building Reveal's presentation materials.  Ex. 141.

Other Cynosure employees engaged in targeted exfiltration of hot sales leads.  Exs. 342-355; 370-372.  In total, 26 of the 28 defendants were forced to return Cynosure information in their possession by the Court's TRO.  Ex. 47.  The only two who didn't were Chambers and his wife (Brogan Chambers), whose computer (which undisputedly held Cynosure information) conveniently became BitLocker encrypted in August 2022, mere weeks after the litigation started.[7]

    Even though the jury found that this misappropriation did not cause Cynosure harm, this conduct supports a violation of Chapter 93A and the resulting attorneys' fees provided under the statute.  *See A2Z Dental, LLC v. Miri Trading, LLC*, 494 F. Supp. 3d 30, 33 (D. Mass. 2020) ("Attorneys fees are allowed for 93A § 11 claims when the court does not award damages.") (citation omitted).  This is particularly true where, as here, the jury likely concluded that Cynosure was not damaged by the misappropriation because Cynosure obtained immediate equitable relief requiring the Defendants to return all of their misappropriated trade secrets.  *See Benchmark Techs. Inc. v. Tu,* 2023 WL 3727913, at *1 (D. Mass. May 30, 2023) ("[T]he target of an unfair or deceptive act or practice who incurs legal expenses in obtaining and defending injunctive relief to safeguard itself against economic loss is entitled to invoke the attorneys' fees provision of Chapter

---

[7] While Cynosure's forensic expert opined that it was likely an intentional act that caused the BitLocker encryption (and not a Microsoft security update, as Chambers opined) (Tr. Transcript 9-156:-157:3), Defendants' forensic expert did not offer any expert opinion as to what caused the Chambers' computer to become BitLocker encrypted.

93A."). There is no doubt the trade secret information that the jury found was misappropriated was deceptively taken and would be useful to any competitor, let alone a startup that had none of the materials in place and would otherwise have had to start from scratch. The running start that Reveal received through its acts (Reveal had this information for six months before its return) is the epitome of "unfair" and "deceptive" conduct prohibited by Chapter 93A. That Cynosure went through the extreme lengths of obtaining a TRO requiring the Defendants to return this information should not allow Defendants to evade the scope of Chapter 93A; if anything, Cynosure's acts only confirm the importance of the information taken and the gravity of Defendants' behavior.

Reveal Lasers compounded its deceptive recruiting of Cynosure's salesforce by hiring almost all of the former Cynosure employees in directly competing roles in the same exact territories and/or roles they worked in while at Cynosure, thereby allowing them use the misappropriated information to destroy Cynosure's goodwill. *See* Ex. 46. Reveal then provided the former Cynosure employees with scripted sales pitches to use that explicitly bashed Cynosure to Cynosure's former customers and prospects. *See* Ex. 477A (Jason Steinhorn: "One thing I will say, though, is, [Cynosure] made a couple of really bad financial decisions that have completely negatively impacted the organization and a ton of people have left Cynosure . . ."); Ex. 497A (Chris Chambers: "Doc, . . . Bob and Chris realized that Cynosure would no longer be leaders in this space an Reveal had taken the throne . . . "). The Steinhorn pitch even included the blatant lie that Reveal Lasers had hired "the lead engineer from Cynosure." *Compare* Ex. 477A at 4:3-5 *with* Steinhorn Dep. 187:3-188:7 ("Q: Where did the idea to say that Reveal hired the lead engineer from Cynosure come from? A: Not me. Q: Did that come from Bob and Chris? A: Potentially."). Steinhorn's pitch also boasted that Reveal had hired "the number 1 through 40 rep[s] in the entire company" and promised providers that "with the top 40 reps in the entire industry, you're going

get a shit ton of [reference] calls immediately." Ex. 477A at 5:15-7:6.  In other words, Reveal was

not content just to tortiously interfere with Cynosure's contracts with its salespeople to get its own

salesforce up and running—it also sought to deceptively leverage its own illegal raid to tell

customers that Cynosure was failing and destroy Cynosure's goodwill.  And it did so for the

express purpose, as stated by Reveal's own internal notes, of cutting Cynosure's revenue by 80

percent and putting it "in a desperate situation to sell the company." Exs. 164, 165.

Just as egregiously, the evidence also showed that, using their leadership positions at

Cynosure, Defendants unfairly intimidated and mistreated subordinate Cynosure employees who

resisted their scheme to join Reveal.  Robertson testified that he was threatened by Chambers

(through Cory Murrell) and told: "Somone's spreading information and we believe it to be you,

and, if this continues, you won't have a job in aesthetic lasers ever again."  Tr. Transcript 12-

132:7-133:16.[8]  The same happened to Yunior Caballero.  After he turned Reveal down, Daley

called him a "POS" (Ex. 65; Tr. Transcript 7-167:12-168:10), and Bobby Fiacco said that

Caballero was "dead to [him]."  Tr. Transcript 11-95:18-20.

Conspiring to start a competing business by raiding Cynosure's salesforce (using

Cynosure's resources and threatening those who refused their overtures), taking Cynosure's

confidential information, and trading directly on Cynosure's goodwill (while lying and bashing

Cynosure to customers) are unfair and deceptive acts that violate Chapter 93A.  *See Juncker*

*Assocs. & Co., Inc. v. Enes*, 15 Mass. L. Rptr. 196, 2002 WL 31104013 (Mass. Super. Ct. Sept. 5,

2022) (employee's act of creating competing business while still employed by employer and

appropriating sales opportunities violated Chapter 93A); *Amgen USA, Inc. v. Karyopharm*

*Therapeutics, Inc.*, 35 Mass. L. Rptr. 589, 2019 WL 3552515 (Mass. Super. Ct. June 12, 2019)

---

[8] This was no doubt a credible threat, given that Chambers had said nearly the exact same thing to Paul Kim, another employee who Chambers believed was making comments about him that he did not like.  Ex. 137.

(allegation that competitor "induced the sales managers to breach their employment contracts with [plaintiff]" and obtained plaintiff's confidential information stated claim under Chapter 93A).

### 3.    Defendants' Chapter 93A Violations Were Willful or Knowing.

Once again, the jury's verdict is consistent with a finding of willful and knowing violation, given that its findings (across several counts) ***necessarily required*** jurors to conclude that Defendants acted willfully or knowingly.   For instance, for the tortious interference claim, Cynosure had to prove—and the jury had to find—that Defendants "*intentionally* induced, persuaded, or caused one or all of the employees to break their contracts." Tr. Transcript 18-25:23-26:11 (Jury Instruction No. 22) (emphasis added).   For the aiding and abetting claim, Cynosure had to prove—and the jury had to find—that "Reveal Lasers Ltd. *knew of* the breach or breaches" of fiduciary duty, and "actively participated or substantially assisted in or encouraged the breach or breaches to the degree that they could not reasonably be held to have acted in good faith."  *Id.* at 18-33:3-10 (Jury Instruction No. 33) (emphasis added).   To find an act of misappropriation (which the jury did find), the jury had to find that Defendants "acquired Cynosure's trade secret *with knowledge or reason to know* that the trade secret was acquired by improper means."  *Id.* at 18-38:17-19 (Jury Instruction No. 37) (emphasis added).   For the conspiracy claim, Cynosure had to prove—and the jury had to find—"a common design or agreement" among the Defendants and "substantial assistance or encouragement in furtherance of that agreement." *Id.* at 18-41:6-12 (Jury Instruction No. 40).   Similarly, the jury awarded punitive damages against Daley, which required the jury to conclude that Daley "acted intentionally or recklessly."  Tr. Transcript 18-47:14-16 (Jury Instruction No. 45).   Once again, there is no basis for the Court to depart from the jury's findings.  Tr. Transcript 18-62:21-63:7 ("The second thing is, no matter what happens, I think I have a[n] obligation under the law to do a 93A decision.  I will be very much influenced by the verdict.").

Consistent with the jury's verdict, the evidence introduced at trial (including all the evidence described above) conclusively demonstrated that Defendants' violations of Chapter 93A were willful or knowing.  For example, the evidence showed that not only were Daley and Chambers aware of their own restrictive covenants, but that, as sales leaders at Cynosure, they were responsible for ensuring that other members of the sales and marketing employees signed *their* own restrictive covenant agreements, too.  Tr. Transcript 5-71:15-19.  Moreover, months before the corporate raid, Daley put Reveal Lasers on explicit notice that what they were planning was wrongful and would possibly result in legal action when he emailed Buchbinder about a request for indemnity as a result of the planned actions: "Indemnity – many companies will offer this to protect new employees where there is a mass exodus and will we have this production." Ex. 112; *see* Tr. Transcript 7-101:17-20 ("The Court: No.  Answer his question.  Did you know that if you brought over a Cynosure employee, they could sue you?  The Witness: That would be a potential.").  Several months later, in February 2022, Chambers sent Reveal Lasers copies of two of his restrictive covenants, specifically informing Buchbinder that there was "some non compete info in the equity docs" and that he was sending them over "for legal to review."  Exs. 117, 119.

Notwithstanding this knowledge of Cynosure's contracts and Daley and Chambers', Reveal Lasers not only went through with its plan, but provided indemnity to cover the financial consequences of Daley and Chambers' deceitful actions.  Ex. 113; Tr. Transcript 7-103:9-10; *see Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 242 (D. Mass.), aff'd, 731 F.3d 6 (1st Cir. 2013) (finding the "improper in motive or means" element of tortious interference was satisfied because of promise of indemnity as to violations of the Non–Solicitation and Non–Disclosure Agreement).[9]

---

[9] Even during the litigation itself, Reveal Lasers expressly acknowledged in at least seven different indemnification agreements that multiple other former-Cynosure employees had, ***before accepting employment with Reveal,*** "disclosed that he or she [was] a party to non-compete, non-solicit, other restrictive covenants and confidentiality

As already noted, there is ample evidence that Daley and Chambers destroyed all the Reveal NDAs they required the employees to sign and then doctored contracts during this time period to falsify the dates of their employment.  Tr. Transcript 7-131:7-12; Malone Dep. 151:7-153:1; Tr. Transcript 6-189:24-190:6.  Buchbinder was also a willing participant in Daley and Chambers' attempts to cover up their wrongful behavior by creating post-hoc job postings on Reveal Lasers' website so the Cynosure employees—who had already signed employment agreements at the phony QBRs—could nominally "apply" to the jobs they already had with Reveal.  Ex. 651.  Daley made this plan explicit, texting Buchbinder that the purpose of these job postings was to "avoid non-solicitation issues."  Ex. 651.  (The recruits, however, were told the truth: that the job applications they were asked to submit did not actually matter.  Tr. Transcript 7-18:14-25; Exs. 133, 440.)  Defendants' repeated attempts to hide the tracks of their misconduct show beyond cavil that their violations were willful or knowing.  *See KPM Analytics*, 2024 WL 1558167, at *10 (defendants' efforts to conceal wrongdoing showed that conduct was willful).

### 4.     Defendants' Unfair and Deceptive Conduct Damaged Cynosure, and the Court Is Required to Issue Multiple Damages.

The jury awarded $25,000,000 total in compensatory damages for Cynosure's lost profits—$15,000,000 against Reveal Lasers, another $5,000,000 against Daley, and another $5,000,000 against Chambers.  ECF 646.  The Court should award the same compensatory damages against Defendants on Cynosure's Chapter 93A claim, which is predicated on the same wrongful actions and conspiratorial conduct as its common law claims.  *See KPM Analytics*, 2024 WL 1558167, at *21 (holding that the jury's findings constituted the plaintiff's "actual damages" for purposes of Chapter 93A, and noting: "As the Supreme Judicial Court has said, 'actual

---

obligations pursuant to one or more covenant agreements with his/her former employer, Cynosure LLC [ ] and/or Cynosure's parent company, Lotus Parent Inc."  Exs. 695A-G.

damages' in the 93A context 'consist[s] *of all damages* foreseeably flowing from an unfair or deceptive act or practice.'") (quoting *Haddad v. Gonzalez*, 410 Mass. 855 (1991)).[10]

The evidence more than supports a finding of at least $25 million in lost profits caused by Defendants' Chapter 93A violations.  As the trial evidence shows, Cynosure missed its 2022 projections for U.S. product revenue by over $60,000,000 as a result of Defendants' wrongful conduct.  Ex. 33.  This is not surprising; Chambers himself lamented while he was at Cynosure that losing a single District Sales Manager would result in $5-6 million in lost revenue.  Ex. 858. Thus, it is not surprising that Defendants' acts to raid Cynosure of *eight* District Sales Managers— plus 20 other employees in critical geographies—would cause at least $25,000,000 in damages.

The jury's damages award is also consistent with the testimony of both parties' expert witnesses.  For example, Bruce McFarlane (Cynosure's expert) told the jury that, using his damages calculation method, the amount of lost profit damages Cynosure suffered through November 9, 2022 (the date of the original preliminary injunction) was $16,000,000.   Tr. Transcript 14-61:21-62:5. Extending that to 2024, Mr. McFarlane reached a total (U.S.) lost profits figure of around $64 million.  Tr. Transcript 14-16:23-17:7.  Defendants' expert, Stephen Dell, opined that Mr. McFarlane's calculations should be corrected to a damages amount of about $20 million.  Tr. Transcript 17-75:17-76:14.  Therefore, there are a number of ways the jury could have arrived at figure of $25 million, none of which is dispositive because it is well-settled that the jury is free to depart from the parties' experts in arriving at its ultimate award.  *See Fredette v. Allied Van Lines*, 66 F.3d 369, 373 n.2 (1st Cir. 1995) ("Under the case law, the jury can depart upward, as well as downward from the opinion of the expert."); *KPM Analytics*, 2024 WL 1558167, at *5 ("When damages experts testify, juries are not mechanically bound by their estimates").

---

[10] Cynosure is not asking for a doubling or trebling of the jury's award of punitive damages against Daley, despite the fact that such an award is probative as to the egregious nature of the misconduct at issue (and how the jury felt).

Moreover, because Defendants willfully or knowingly violated Chapter 93A, the Court "***must*** assess punitive damages against [the Reveal entities] in an amount 'up to three but not less than two times [the amount of 'actual damages'].'" *KPM Analytics*, 2024 WL 1558167, at *18 (quoting Mass. Gen. L. ch. 93A §9(3)) (emphasis altered). Accordingly, Cynosure requests that the Court find Defendants jointly and severally liable for amounts between $50,000,000 to $75,000,000 (*i.e.*, $25,000,000 actual damages, doubled and trebled). Multiple damages are also warranted because Defendants did not interfere with just one of Cynosure's contracts with its employees—they interfered with ***28 of them***. *See Aleo v. SLP Toys USA, Inc.*, 466 Mass. 398, 414-415 (2013) (repetitious misconduct increases punitive damages).

**B.    Cynosure Is Entitled to Its Fees and Costs in an Amount To Be Determined.**

An award of attorneys' fees and costs is ***mandatory*** after a finding of liability under Chapter 93A. Mass. Gen. L. ch. 93A §11(6); *Haddad Motor Grp., Inc. v. Karp, Ackerman, Skabowski & Hogan, P.C.*, 603 F.3d 1, 5 (1st Cir. 2010). Accordingly, Cynosure requests that the Court issue an order that, as a successful Chapter 93A plaintiff, Cynosure is entitled to its attorneys' fees and costs, which Cynosure can then separately brief.

**C.    Cynosure Is Entitled to Prejudgment Interest at the Statutory Rate of 12 Percent Per Annum From the Date of the Commencement of this Lawsuit.**

Finally, Cynosure requests that the Court award it prejudgment interest on the jury's compensatory damages award (and any additional compensatory damages assessed by the Court on the Chapter 93A claims). "Prejudgment interest awarded pursuant to Mass. Gen. Laws ch. 231, § 6B is intended to compensate the prevailing party for the loss of use of money while the lawsuit is pending." *Cardiaq Valve Techs., Inc. v. Neovasc Inc.*, No. 14-cv-12405-ADB, 2017 WL 215961, at *1-2 (D. Mass. Jan. 18, 2017) (citation omitted). "The statute authorizing prejudgment interest contemplates it to be an automatic award which can be added by the clerk of court." *Id.*

-19-

at \*2 (citation omitted).  For each of Cynosure's claims arising under Massachusetts law, the applicable prejudgment interest rate is 12% per annum.  Mass. Gen. Laws ch. 231, §§ 6B-6C.

In their recently filed "Motion for Clarification Of Jury Verdict" (ECF No. 667), Defendants argue that the jury verdict should be "clarified" by the Court to award Cynosure only $15,000,000 in compensatory damages—instead of the $25,000,000 it awards on its face.  As Cynosure will explain more fully in its forthcoming opposition, Defendants' proposed reading of the verdict form is contrary to its plain text, and any objection to the form is long waived because Defendants themselves asked for the separate verdict form questions asking the jury to assign an amount of damages for each by defendant.  It would also override the jury's clear intent to hold Daley and Chambers liable for a significant portion of the harm caused.  Accordingly, Cynosure is entitled to statutory interest of 12% from the date of the filing of the complaint (July 20, 2022) on the jury's entire $25 million compensatory damages award, in addition to the compensatory damages component of its Chapter 93A claim (though, not the exemplary component).[11]  Mass. Gen. L. c. 231, §§ 6B-6C; *see McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 716-717 (1990).  Attached to this brief is a declaration from Bruce McFarlane calculating the amount of interest owed as of this filing and through January 31, 2025.[12]  Specifically, on the jury's $25 million compensatory damages award, prejudgment interest totals $6,806,984.06 as of today plus $8,196.71 per day from now until entry of final judgment.  *See* McFarlane Decl.

## CONCLUSION

For the foregoing reasons, Cynosure respectfully requests that this Court grant its Motion.

---

[11] Although Cynosure may also be entitled to compound interest, Cynosure is only requesting simple interest at the statutory rate of 12% per annum.  Similarly, although Cynosure is also entitled to prejudgment interest on its breach of contract claims beginning on the date of Daley's and Chambers' breaches (Mass. Gen. L. ch. 231 § 6C), it is only requesting interest beginning on the date the original complaint was filed (July 20, 2022).

[12] If judgment is not entered by January 31, 2025, Cynosure will submit a further declaration updating the daily prejudgment interest calculations through some later date.

Dated: October 25, 2024

Respectfully submitted,

CYNOSURE, LLC
LOTUS PARENT, INC.
By their attorneys,

*/s/ Dipanwita Deb Amar*
Dipanwita Deb Amar
Joseph Farris
Matthew Diton
ARNOLD & PORTER KAYE SCHOLER
LLP
3 Embarcadero Center, 10th Floor
San Francisco, California 94111
dipanwita.amar@arnoldporter.com
joseph.farris@arnoldporter.com
matthew.diton@arnoldporter.com
T: +1 415.471.3100
F: +1 415.471.3400
*Admitted Pro Hac Vice*

Joshua S. Barlow (SBN: 667472)
Fred A. Kelly Jr. (SBN: 544046)
ARNOLD & PORTER KAYE SCHOLER
LLP
200 Clarendon Street, 53rd Floor
Boston, MA 02116
Joshua.barlow@arnoldporter.com
Fred.kelly@arnoldporter.com
T: +1 617.351.8050
F: +1 627.226.9199

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) on October 25, 2024.

**ARNOLD & PORTER KAYE SCHOLER LLP**

By: */s/ Dipanwita Deb Amar*
DIPANWITA DEB AMAR

Attorneys for Plaintiffs CYNOSURE, LLC
and LOTUS PARENT, INC.

US 253224461