```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2

 3                                   )
                                     )
 4   Cynosure, LLC et al.,           )
                                     )
 5            Plaintiffs,            )
                                     )   Civil Action
 6   v.                              )   No. 1:22-cv-11176-PBS
                                     )   Pages 1 to 46
 7   Reveal Lasers LLC et al.,       )
                                     )
 8            Defendants.            )
                                     )
 9

10

11            BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT JUDGE
12

13                      MOTION HEARING
                 PROCEEDINGS HELD BY ZOOM
14

15
                      December 18, 2024
16                      11:00 a.m.

17

18            John J. Moakley United States Courthouse
                     Courtroom No. 19
19                   One Courthouse Way
                 Boston, Massachusetts 02210

20

21

22

23            Jessica M. Leonard, CSR, FCRR
                   Official Court Reporter
24         John J. Moakley United States Courthouse
                     One Courthouse Way
25               Boston, Massachusetts 02210
                 JessicaMichaelLeonard@gmail.com
```

```
 1
         APPEARANCES:
 2
         On Behalf of the Plaintiff:
 3
                 ARNOLD & PORTER KAYE SCHOLER LLP
 4               By: Dipanwita Deb Amar
                 Three Embarcadero Center
 5               10th Floor
                 San Francisco, CA 94111
 6               415-471-3141
                 dipanwita.amar@arnoldporter.com
 7
                 By: Joseph Farris
 8               Three Embarcadero Center
                 10th Floor
 9               San Francisco, CA 94111
                 415-471-3454
10               joseph.farris@arnoldporter.com

11               By: Joshua S. Barlow
                 200 Clarendon Street
12               53rd Floor
                 Boston, MA 02116
13               617-351-8052
                 joshua.barlow@arnoldporter.com
14

15         On Behalf of the Defendant:

16         MICHELMAN & ROBINSON, LLP
           By: Andrea Madison Dini
17         717 Texas Avenue
           Suite 3100
18         Houston, TX 77002
           713-422-2121
19         mdini@mrllp.com

20         BECK REED RIDEN LLP
           By:  Nicole Corvini Daly
21         155 Federal Street
           Suite 1302
22         Boston, MA 02110
           617-500-8669
23         ndaly@beckreed.com

24
                         Proceedings reported and produced
25                        by computer-aided stenography.
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  The court calls civil action
 3    1:22-cv-11176, *Cynosure v. Reveal Lasers*.
 4              Counsel, please identify themselves.
 5              MS. AMAR:  Good morning, Your Honor.  Dipanwita Amar
 6    for Plaintiffs.
 7              MR. FARRIS:  Good morning, Your Honor.  Joe Farris for
 8    the plaintiffs.
 9              THE COURT:  Mr. Farris, you're a little muffled.  Is
10    your mic --
11              MR. FARRIS:  I will see if I can fix it.
12              THE COURT:  I don't know if other people are hearing
13    that way, too.
14              MR. BARLOW:   I did.  It sounds better already.
15              THE COURT:  Okay.  Could you state your name again,
16    see if we can all hear you.
17              MR. FARRIS:  Joe Farris.
18              THE COURT:  It's still soft, but it's a little less
19    muffled.
20              Go ahead.
21              MR. BARLOW:  Josh Barlow also for the plaintiffs.
22              MS. DINI:  Sorry.  I was waiting on Mr. Diton, but
23    this is Madison Dini for the defendants.  Also with me is
24    Ashley Moore with Greenberg Traurig and Enrico Trevisani with
25    our firm, Michelman & Robinson.
```

 1          We also have, Your Honor, on the line, Joel Shapiro --
 2   he's bankruptcy counsel and just observing this hearing -- as
 3   well as -- Mr. Chambers and Mr. Daley are on.
 4          THE COURT:  Good.
 5          So I think everyone should turn off their video unless
 6   they're planning on doing any of the oral argument, because I
 7   get confused as to who's who on the squares.
 8          MS. DALY:  Your Honor, I'll just note my appearance --
 9   Nicole Corvini Daly for the FAC defendants -- and then I will
10   mute myself and go off video.  Good morning.
11          THE COURT:  Do you plan on saying anything today?
12          MS. DALY:  I doubt it.  I'm here if anyone needs me.
13   Thank you.
14          THE COURT:  Thank you for appearing.
15          We're a little bit in a time crunch because, as you
16   know, we had the move the hearing from last week to this week,
17   which is fine.  We all have conflicts.  But I do -- I basically
18   have about an hour for you.
19          So we have two separate matters on.  One is the 93A
20   and one is to clarify, if that's the right word, talk about,
21   the verdict.
22          So I don't know if you all have agreed on what should
23   go first?
24          MS. DINI:  We haven't, Your Honor, but I think since
25   they're asking for, essentially, a judgment that would depend

1   on what the final judgment is, we should talk about clarifying

2   that first, through the motion for clarification.

3          THE COURT:  So it doesn't -- I don't feel strongly

4   about it.  So if we went 15 and 15, and then we went to 93A, 15

5   and 15, does that make sense?  There's been extensively -- this

6   brief.  So I think this is just so you can hit your high

7   points.

8          MS. DINI:  I think that's fair.  I think we should

9   leave maybe five minutes at the end, five to ten minutes, to

10  talk about the remaining defendants in the case.

11         THE COURT:  If we can.  If we can.  If not -- I was

12  expecting, actually, to get some sort of a status report on

13  what we wanted to do with them, but I didn't; so that might be

14  worthwhile if we have the time.  So go for it.

15         MS. DINI:  All right, Your Honor.  Since it's

16  Defendant's motion for clarification, I'll begin.

17         The Court's interpretation of the jury's sum of

18  damages against the trial defendants is what's before the Court

19  in this motion.  The verdict form itself, under the law, is not

20  the sole dictator of how the verdict should be interpreted.

21  The Court holds broad discretion to interpret verdicts based on

22  the totality of the record.  So our arguments today are based

23  on and included in the evidence presented at trial, the

24  arguments of counsel, and the jury instructions to the jury.

25         Here, the verdict is properly interpreted as the total

 1    award of 15 million in compensatory damages against all

 2    defendants.  Based on the totality of the record, there's three

 3    main reasons why this interpretation is correct, all of which

 4    I'll get into further detail.

 5         First, the evidence at trial.  Plaintiff's own damages

 6    expert testified that all claims share the same exact loss

 7    profits analysis and explicitly that damages are not to be

 8    added together.

 9         Second, in Plaintiff's own closing argument, Counsel

10    described the damages attributed both to Mr. Daley and to

11    Mr. Chambers as subsets of a total sum award.

12         And lastly, the jury instructions reveals liability

13    encompasses all of its acts of its employees.  That is what it

14    was instructed to the jury and what was kept in mind in

15    awarding the sums of damages to all defendants as the

16    15 million.

17         THE COURT:  Can I ask you -- what you say has a lot of

18    force.  The question I have is -- I had trouble with the

19    verdict form, as you know.  I asked both sides for help on it,

20    and it was evolving even, I don't know, into the day before or

21    whatever.  It was how to word it.

22         I never did give an instruction on joint and several.

23    I think at the last minute, like, the morning of closing

24    arguments, that may have been requested by plaintiff.  I'm not

25    sure if I remember it correctly.

1          But in any event, in your view -- I do agree there's

2   very strong argument that there's subsets, but can I impose as

3   a matter of law a joint and several or is that a jury question?

4          MS. DINI:  Well, they didn't plead it, Your Honor;

5   so -- unfortunately for the plaintiffs, they didn't plead

6   vicarious liability or joint and several liability.  So --

7          THE COURT:  Of course they pled vicarious.  I mean --

8   I may not have given -- I mean, they argued that the two

9   employees were working within the scope of their employment for

10  Reveal.

11         MS. DINI:  They did so factually, but they didn't

12  plead a joint and several liability, and so I don't think the

13  instruction --

14         THE COURT:  Well, no one submitted written

15  instructions for joint and several, and I didn't give it.  I

16  think someone -- maybe it was Mr. Farris, I don't remember --

17  someone -- maybe it was you, Ms. Amar -- mentioned it on the

18  morning of the closings.

19         But in any event, one fair way to read this verdict,

20  one fair way, would be to say everything that Daley and

21  Chambers did was within the scope of their employment for

22  Reveal.  Everything they did is attributable to Reveal.  So one

23  fair way to read it is that Reveal owes 15 million and each of

24  them owes 5 million.

25         You're the one that asked for a separate verdict with

1    respect to each of them.  I granted that.  And I understand

2    why, because otherwise they'd be liable for 15 million.  So it

3    went to their benefit.  You asked for it; I gave it.  You

4    didn't object to the verdict form ever.

5        So the real issue now is whether I should -- whether I

6    have the power to construe the 5 and 5 as joint and several

7    with Reveal.  I'm thinking hard about doing that, because I do

8    think that's really how the case was argued and what the

9    evidence supports.  So the real question is whether I should do

10   that or not.

11       MS. DINI:  Well, Your Honor, just to clarify for the

12   record, we did object to the verdict form extensively, and one

13   thought on that is that --

14       THE COURT:  Excuse me.  I don't remember -- I remember

15   you asking for a separate question with respect to each of the

16   defendants.  I remember Cynosure objecting to that, and you

17   wanted a separate allocation, which I agreed with, because of

18   all these other 28 employees or whatever it is who might be

19   responsible for part of the damages.  And not just them.

20       MS. DINI:  Right, but let me clarify that what

21   happened is not fully what we requested.  We also requested

22   subsets of questions for each cause of action so that you could

23   determine --

24       THE COURT:  Oh, I understand.

25       MS. DINI:  So that caused some of the confusion here

1    as to what individual or entity is responsible and to what

2    extent.

3          THE COURT:  The jury came out against them on almost

4    everything except for Sinopharm.

5          MS. DINI:  And trade secrets which are two very --

6    those are significant positions with respect to 93A as well.

7    So we're really -- at this point, Your Honor, we're looking at

8    an employment case the way things shook out.

9          THE COURT:  No, we're not.  But in any event, that's

10    the 93A issue.

11          But let me ask you this.  Essentially, what you are

12    asking me to do is to find -- it's not a question of

13    inconsistency, that's the wrong way of thinking about it.  It's

14    not inconsistent.  It essentially -- the question is whether I

15    view the 5 and 5 as a subset rather than an increment.  And so

16    I think that's how I'm thinking about it.

17          And I think the way you started off with your three

18    factors makes the most sense here, rather than -- and I think I

19    can do that -- although I'm not sure about it -- as a matter of

20    law, because there's no way in which they caused any damages

21    that were separate and apart from what Reveal caused as a

22    subset.

23          But let me hear from Ms. Amar on this because I know

24    you've argued strenuously for the 25.  But what's the evidence

25    in the record that would even support 25?

1          MS. AMAR:  Your Honor, there's a ton of evidence on

2     the record.  First of all, we start from the plain reading of

3     the verdict form.  I think it says 25.  It's a verdict form, as

4     you just pointed out, that Defendants themselves invited.  In

5     fact, what the Court had drafted was exactly what they are

6     arguing -- initially drafted -- what they are arguing now that

7     the verdict form should be read as, which is that all

8     defendants are lumped together.

9          And over Cynosure's objection, they wanted to separate

10    each defendant; and each defendant was separated with respect

11    to each cause of action, because they wanted the jury to be

12    able to assign specific liability to each defendant.

13         THE COURT:  And that made sense here because there

14    were also many, many employees -- I don't have to list them

15    here -- who were involved who could separately be responsible

16    for some of the damages.  So I thought that was a fair request

17    by Defendants.

18         MS. AMAR:  Understood.  And they got what they wanted.

19    They invited this, and now they can't complain about it.  Now,

20    to answer your substantive questions -- the other thing is, at

21    no point did they object or ask for clarification before the

22    jury was discharged.

23         In fact, Your Honor gave them more opportunities to

24    complain about this than I have ever seen in any trial.  They

25    were allowed to submit a verdict form and jury instructions

1    back in May.  They did that.  Your Honor held two separate

2    pretrial conferences.  They showed up and they never complained

3    about this.  They never said, We want a question that asks

4    about every defendant as if they're all together.

5         You held two separate two-and-a-half-hour jury charge

6    conferences, and even right before the jury deliberated, you're

7    right; we filed objections after closing, before the jury

8    deliberated, which you actually looked at at 7:00 a.m. in the

9    morning, and then you allowed Defendants to page through every

10   single page, including the verdict form, and come up with yet

11   another objection.

12        You allowed all of that, and at no point did they

13   complain that the verdict form was erroneous or misleading or

14   somehow had -- every damage had to be collapsed together.  They

15   didn't say that because that's exactly what they initially

16   didn't want.  And in the First Circuit, there is an ironclad

17   rule that they have now waived any such objection.

18        Now, on the merits.  The reading of -- that Defendants

19   advance right now makes very little sense when you understand

20   the entire context of how this case was brought and litigated.

21   There are a multitudes of claims and causes of action that are

22   alleged only against defendants Chambers and Daley -- I mean,

23   and the other individual defendants, but for purposes of this

24   trial -- that are not even alleged against Reveal Lasers.

25        THE COURT:  Now, I agree with that.  On the other

1    hand -- for example, breach of contract would be the preeminent

2    one against each one of them individually.  On the other hand,

3    Reveal, if I remember correctly, was found liable for

4    intentional interference with contract as well as aiding,

5    abetting, breaches of fiduciary duty, and conspiracy.

6           So there's no damage.  And I will say -- and I'm not

7    going to be -- I'm sure I'll get judgment as a matter of law on

8    this later on -- there was ample evidence to support all the

9    causes of action; so there's no damages that's separate.

10          In other words, let's say they're only liable for the

11   breach of contract, let's say.  But then, Reveal is liable for

12   interference with contract as well as aiding and abetting

13   breach of fiduciary duty, as well as conspiracy.

14          MS. AMAR:  Sure.  But Reveal can't be liable for

15   breach of contract and it can't be liable for breach of

16   fiduciary duty and most importantly --

17          THE COURT:  It can aid and abet.  It can aid and abet.

18          MS. AMAR:  It can and it was.  But Reveal certainly

19   cannot be liable for conspiracy with itself.  It has to be

20   liable for conspiracy with another entity or person, and those

21   entities and persons, in this case, were Mr. Chambers and

22   Mr. Daley.

23          And so the jury, logically, was asked to find -- and,

24   indeed, did find -- that the liability for Mr. Chambers and

25   Mr. Daley was critical and, indeed, instrumental to the

1    findings related to Reveal.

2         And if you interpret the jury verdict inconsistent

3    with not just the plain reading but the evidence in the record,

4    to support liability for all three of these parties, I think

5    that would be reversible error.  Because I think --

6         THE COURT:  Let me just say this.  I just don't see --

7    I was thinking out loud.  If you were to add them all together,

8    it would hit 25.  You had ample evidence for -- I mean, your

9    expert gave two alternative damage measures.  Put aside

10   Sinopharm for one minute.  Two:  One is 64 million and one was

11   16 million, something like that.  So nothing gets you to 25

12   million.

13        MS. AMAR:  Your Honor, juries do all the time -- they

14   basically reason for themselves, What is the amount of

15   liability I attribute to this defendant, that defendant?  Et

16   cetera.  That happens all the time.  And a Court has no power

17   to overturn the jury's verdict in that regard unless it's

18   completely against the weight of the evidence.

19        THE COURT:  Well, I think it is.  I've either got 16

20   or I've got 64.  And you said in your closing -- or someone

21   said -- I forget if it was you or Mr. Farris -- it's a subset.

22        So I guess I'm curious as to whether you've done

23   research on joint and several.  That does strike me as what's

24   appropriate here, because I can't think of any damages that are

25   separately attributable to the two of them on this record that

1    they could have found, based on what the expert talked about,

2    on damages, that would be separate for them.

3            MS. AMAR:  Well, Reveal had no -- Mr. Daley and

4    Mr. Chambers' decision to breach their respective fiduciary

5    duties was not on Reveal.  Now, Reveal could have and, in fact,

6    did aid and abet that, but it was Mr. Daley and Mr. Chambers

7    that decided to breach those fiduciary duties.

8            THE COURT:  Absolutely.  But then --

9            MS. AMAR:  Mr. Daley and Mr. Chambers had to breach

10   their own contracts.  Reveal can't make them do that.  They can

11   aid and abet that.

12           And let me address the subset thing.  I would

13   encourage you to go back and read my closing argument.  To

14   begin with, closing argument is just argument; it's not actual

15   evidence.  But I would encourage you to go back and read that

16   argument.

17           What I said is the entire 64 million is our measure of

18   damages -- actually, 74 million, if you include Sinopharm,

19   roughly.  The causes of action themselves don't create

20   additional or duplicative damages; so the subset is for the

21   damages based on causes of action.

22           Remember, Defendants wanted it broken up by cause of

23   action.  And I said each cause of action is a subset.  I never

24   said and would never say that the liability as to each

25   defendant was a subset of all of Reveal's liability.

 1          THE COURT:  Well, I'll go back and read the closing.

 2          Let me just invite you all -- I do want to spend a

 3   fair amount of time on 93A, which is a substantive second

 4   trial, essentially, based on the record.  But if anyone has

 5   any -- I'm thinking hard, haven't made a final decision -- I'm

 6   thinking hard about making the 5 and 5 as joint and several.

 7   It doesn't get Daley or Chambers off the hook.  I also -- I'm

 8   not sure that the punitives will hold.

 9          MS. AMAR:  Your Honor, can I address that, actually?

10   Because that's a very important point.  The jury could not have

11   found punitive damages against Bob Daley without finding

12   compensatory damages against Bob Daley.

13          THE COURT:  Of course they found compensatory damages

14   against him.  I mean, that's the 5 million.  It's just the

15   question of whether it's joint and several.  They're going to

16   be liable.  I mean, I think you have this image that they're

17   going to be wiped off the face of the verdict form.  They're

18   not.

19          MS. AMAR:  They will if Reveal Lasers alone is

20   liable --

21          THE COURT:  I didn't say that, did I?

22          MS. AMAR:  Okay.  You're saying that Bob Daley and

23   Chris Chambers were jointly and severally liable --

24          THE COURT:  Yes.  Listen.  That's what I'm saying.

25   That's how it's been argued; that's where the evidence points;

1    that's where the expert goes.  I -- what can I say?

2         The only question I have -- if the there's a little

3    brief you wanted to support -- I think I can do that as a

4    matter of law, based on what the evidence supports and the way

5    it was argued.  But I'm not 100 percent positive about that

6    one.  My wonderful law clerk has been trying to do a little

7    research on it.  But if you see something that you think is

8    useful, you may each supplement with a five-page brief each.

9    No more.  I've got more briefing than I can handle.

10        I'm not requiring it, but I wanted to tell you how I'm

11   thinking, because the reason it's important is 93A means a

12   doubling or a tripling.  And I obviously need to figure out

13   what I'm doubling or tripling, if I do that.

14        So let's jump to -- and let me be very clear:  No

15   associate should be working over Christmas week -- I know how

16   these firms work -- no associate, no partner, nobody.  How

17   about having it due, like, January 15th or something -- is that

18   Martin Luther King Day?  I don't even know.  But make it around

19   January 15th, and if that's a weekend, do it the next day.

20   Okay?  Everyone should have a wonderful holiday.  You had a

21   really rough fall.

22        So let's now move on to 93A, which I think is a

23   serious issue here.

24        MS. AMAR:  Sure, Your Honor, since that's our motion.

25        THE COURT:  And that's where I wanted to make sure we

1    had enough time, also leaving five minutes to figure out the

2    other, what is it, 16 defendants or whatever we have left.

3            MS. AMAR:  Yes, Your Honor.  So the 93A motion.  I

4    think Defendants do not seem to dispute that the acts involved

5    would satisfy 93A; and I think the evidence is clear on that,

6    and I don't want to waste your time repeating what we put in

7    our initial opening brief.

8            Their biggest argument is that there were not enough

9    contacts or enough acts to meet the test under 93A for having

10   occurred in Massachusetts.  And with respect to that, there are

11   three factors that the First Circuit has approved.

12           The first is where the defendants committed the

13   deceptive or unfair acts.  The second and the third focus on

14   the plaintiff:  where the plaintiff has received or acted upon

15   the deceptive or unfair statements, and the situs of

16   plaintiff's losses.

17           Now, of the three factors, the first is the least

18   important.  That's the First Circuit's opinion in *Roche*, and it

19   is the least weighty.

20           And, indeed, the second one is the most critical.

21   Here, the two factors -- second and third -- indisputably favor

22   Plaintiffs.  Cynosure is indisputably a Massachusetts company.

23   All of the losses were suffered in Massachusetts.  The conduct

24   at issue was indisputably directed at a Massachusetts company.

25           If you recall, on the first day of trial, we went

1  through painstaking detail with our first witness, describing

2  all of the operations in Massachusetts, the import of what the

3  employees in Massachusetts do, the critical effect that this

4  had on these employees, where Cynosure had to lay off about 50

5  employees.

6       We talked about how Cynosure made and manufactured

7  products in Massachusetts just down the way in a colonial town.

8  We talked about how the sales and marketing strategies were in

9  Massachusetts, how the infrastructure of the information

10  technology group, the computers and servers, and the

11  applications were all managed by the IT team in Massachusetts.

12       Mr. Weikel talked about how -- the sales training

13  where new people, who were hired into the very sales positions

14  that are at issue in this case, were in Massachusetts.

15       And to be sure, all of the deceptive conduct was

16  received in Massachusetts.  That's where Reveal Lasers targeted

17  Cynosure, starting with Bob Daley who himself is a

18  Massachusetts resident -- lives and works in Massachusetts.

19       Mr. Buchbinder did all of his actions -- Reveal Lasers

20  targeted Cynosure through Bob Daley who is, quite literally,

21  the hub of this entire orchestrated raid.  So it all went

22  through Bob Daley.

23       Reveal Lasers said that they wanted to go after

24  employees of Cynosure.  They mocked Cynosure's "Beautiful

25  Energy" slogan to recruit them.  They had employment agreements

1    and non-disclosure agreements that they drafted and planned

2    out.  They compared only to Reveal's health plan when they were

3    pitching employees -- Reveal's health plan was only compared to

4    Cynosure's health plan.

5          And then, even after the raid, there was considerable

6    evidence that Reveal had set out to, quote, "ruin Cynosure's

7    relationships, put the company in a desperate situation."

8          They absolutely recruited employees in Cynosure -- not

9    just Mr. Daley but Mr. Dean Fiacco, Danny DeMarco.  Several of

10   their agreements, including Mr. Chambers' and Mr. Daley's

11   agreements, were governed by Massachusetts law.

12         The one thing that Defendants seem to focus on in

13   their brief is that the raid -- the

14   flying-around-the-country-recruiting tour happened outside the

15   scope of -- outside the state of Massachusetts.

16         And I want to talk about that, but I want to remind

17   Your Honor --

18         THE COURT:  Can I also remind you we have a little bit

19   of a time tether here.

20         MS. AMAR:  Okay.  I just want to make a few points

21   there.

22         Defendants began their opening statement talking about

23   a sales leadership meeting that occurred in Massachusetts which

24   was the essence of where Mr. Chambers breached his fiduciary

25   duty.  He openly said he was supportive of raising quotas, even

1    though he was not; he was planning this raid at the same time

2    with Mr. Daley.

3            With respect to the flying around the country:  Now,

4    Defendants seem to mock our tagline, On Cynosure's time, on

5    Cynosure's dime.  Let's break that down.  What they won't tell

6    you or what they didn't tell you is that the focus of that trip

7    on Cynosure's time -- they repeated, again and again, that they

8    were there to do quarterly business reviews; that is, on

9    Cynosure's behalf.

10           This was not a frolic.  This was not a situation where

11   employees were invited to come to Reveal's offices in Tennessee

12   or, you know, Seattle, et cetera.  They were there on,

13   allegedly, Cynosure's time; and then, they billed all of the

14   expenses back to Cynosure at its Massachusetts headquarters.

15   So even that raid, even that flying around the country, had

16   significant conduct that occurred in Massachusetts.

17           That doesn't even take into account the mass

18   exfiltration of the thousands of files that the jury heard that

19   occurred in Massachusetts.  Remember, this is a case where not

20   only is the plaintiff here, Cynosure, clearly a Massachusetts

21   resident and incorporated -- and based and headquartered, but

22   Mr. Daley himself -- one of the lead defendants, the architect

23   of the scheme and, again, the hub through which all spokes

24   run -- lives and works in Massachusetts.

25           Witness after witness after witness testified --

1          THE COURT:  Can I interrupt this?  I'm not so worried

2    about substantially and primarily in Massachusetts.  So I hate

3    to -- if I find that it is willful unfair trade practice on

4    behalf of Reveal, I do have to make separate determinations

5    with respect to Mr. Daley and Mr. Chambers.  And so I'm -- as I

6    understand it, if it's willful, the law requires me to double

7    it.

8          MS. AMAR:  Yes, Your Honor.

9          THE COURT:  And then there's the question of what's

10   the "it."  And so there is a fair amount of the conduct of both

11   Mr. Chambers and Mr. Daley that are done while employed.

12         MS. AMAR:  Yes.

13         THE COURT:  And in general -- I guess it's called the

14   intracorporate doctrine.

15         MS. AMAR:  Yes.

16         THE COURT:  Which is not ironclad but is still

17   something I need to think about.  So you're asking me to double

18   or triple each one of the different amounts, like 5 to 10, or

19   15 to 30 -- whatever it is -- right?

20         MS. AMAR:  We are, Your Honor.  But I respect what you

21   are saying.  I think the intra-enterprise exception is exactly

22   as its name applies.  It's truly when there is a dispute

23   entirely with the employee and the employer.

24         That is not the case here.  There's a third party,

25   Reveal.  It's like the *Junker* case where you have trade being

1    affected, not just with the misappropriation but because there

2    was a corporate raid involving a third party coming into a

3    company.

4         So I think this is unlike your typical

5    employee/employer situation.  That said, if you're inclined to

6    find that 5 million and 5 million against Mr. Daley and

7    Mr. Chambers should not be doubled because of the

8    intra-enterprise exception, there's no reason why the

9    15 million that the jury found against Reveal Lasers can't be

10   doubled or tripled, because there's no dispute that Reveal

11   Lasers was not an employee of --

12        THE COURT:  Could you just remind me of the facts

13   again?  Because a lot of the conduct, which the jury found

14   troubling, happened while they were employees at Cynosure.

15   What happened -- what did they do after they left that -- I

16   mean, the breach of fiduciary duty is gone; it's already

17   happened or whatever.  The breach of contract is gone because

18   that happened --

19        MS. AMAR:  The breach of contract is not gone because

20   the breach of contract precludes them from both competing with

21   and soliciting employees.

22        THE COURT:  But I enjoined all that.  That's all I'm

23   saying.  So I'm trying to just figure out --

24        MS. AMAR:  By the time you enjoined that, it was six

25   months later.  So there was a lot that happened in those six

1    months.

2            THE COURT:  I think the emergency judge, Judge

3    Saylor -- I remember that I was on vacation when this wonderful

4    case came in the front door, and the emergency judge issued a

5    TRO, I think.

6            MS. AMAR:  No, the emergency judge did not stop them

7    from competing.

8            THE COURT:  I see.  Only I did that?

9            MS. AMAR:  Correct.  You only stopped them from

10   competing in November; moreover, the emergency judge didn't

11   even get to this until August, and the defendants who went to

12   trial in this case left on May 2 and May 3.  So there was a

13   considerable amount of time when Cynosure didn't know what they

14   were up to.

15           THE COURT:  Are you saying that a lot of this

16   conduct -- because I don't remember the record -- happened

17   after they departed?

18           MS. AMAR:  Yes.  Yes.  So for instance, the recruiting

19   in -- of Jason Kalso and his team occurred after they had

20   already resigned from Cynosure.  Some of the misappropriation

21   of trade secrets, which had been downloaded -- if you recall,

22   some of Mr. Daley's wiping of the computer happened before;

23   Mr. Chambers' BitLockering happened considerably later.

24           So there were a lot of facts that came to fruition as

25   they occurred after they left and, certainly, were discovered

1    by us after they left.  So the remedy that we sought -- we

2    worked as quickly as possible, but the remedy that we sought

3    was just not soon enough.  The horse had already left the barn,

4    Your Honor.

5         THE COURT:  Okay.  So I'm trying to think.  There was

6    the employment issue, the substantial and primarily, and then

7    you wanted me to triple.  That seems a bit excessive given how

8    high the money is here.

9         MS. AMAR:  Well, Your Honor, that is something that I

10   think is truly in your discretion.  You know, I said I think it

11   would be reversible for you on the clarification.  It would not

12   be a reversal for you on any basis if you only doubled and not

13   tripled.  That's totally in your discretion, and we leave that

14   to you.

15        We recognize that this is a big verdict, but I will

16   remind you, Your Honor, it is not the full totality of what

17   Cynosure lost here.  I think the jury --

18        THE COURT:  Well, it's what the jury found they lost.

19   And that's hardly -- I started off at some point saying this

20   isn't a blood sport.  I'm not here to destroy this company or

21   these individuals.

22        So let me ask you this:  Do you happen to know, does

23   the 12 percent Mass. rate go only on single damages or on the

24   double damages?  It must be on -- I don't know the answer to

25   that.

1            MS. AMAR:  It should go on the doubles.

2            THE COURT:  Do you know or are you guessing?

3            MS. AMAR:  You know, you know what?  I can brief that

4    for you.  I can brief that for you.

5            THE COURT:  I don't need that right now anyway.  I

6    would like to jump to Ms. Dini because --

7            MS. AMAR:  Actually, my trusted associate Matt Diton

8    would tell you that -- I think it's only -- I misspoke.  It's

9    only on the single damages.

10           THE COURT:  Okay.  Thank you.

11           Okay.  So, Ms. Dini, this is really a critical issue

12   here.

13           MS. DINI:  That's absolutely right, Your Honor.  This

14   is extremely critical.  You just made an important comment that

15   throughout this case you've noted that you don't want it to be

16   a blood sport and that you don't want to destroy individual

17   lives or the company.

18           Cynosure has prevailed in doing all of those things.

19   We are a week from Christmas.  I have no voice because I talk

20   to my clients daily about their lives being destroyed by this

21   case, and I mean that with all -- just genuine emotion because

22   it's been very difficult --

23           THE COURT:  May I say, I gave this -- this great

24   magistrate judge, who's very financially savvy, to try and

25   settle it.  Is that discussion --

1          MS. DINI:  We -- again, the last two months have been

2     extremely difficult.  We've lost funding for the company.

3     We've included bankruptcy counsel.  We brought that bankruptcy

4     counsel to the mediation.  We brought everything we could.  We

5     brought investors.  We put it all on the table.  And we are

6     now -- the company is -- and, you know, I have to be careful

7     what I say with press on here, and I would hope they would

8     respect the lives of some of these individuals, but --

9          THE COURT:  Well, then don't go there.

10          MS. DINI:  Right.  But that's why I can't.  But, yeah.

11     We did everything we possibly could.  So in some way, Your

12     Honor, as much as I want to, and I will fervently argue these

13     points, some of these things may be moot and you may see me

14     again on a motion to withdraw, because I'm not sure if the

15     company can move forward after today.

16          However, let me just go ahead and get to the critical

17     points, because I do believe the defendants are on the right

18     side of the law for 93A.  And I want to start with just

19     reminding the Court -- because Plaintiffs start with this

20     presumption that 93A is applicable in this type of action, but

21     it loses sight of the entire purpose of this state statute.

22          93A is a state law designed to protect consumers

23     against businesses that engage in misleading or dishonest

24     conduct toward consumers in the state of Massachusetts.

25          THE COURT:  It's also business-on-business, by the

1    way.

2         MS. DINI:  Yes.  But there is not a single case that

3    Ms. Amar cited with facts similar to this one, not a single

4    case where there is a finding by a jury for breach of contract

5    of this nature, breach of non-compete, and the resulting

6    damages.

7         There are cases, however, where there is a finding of

8    misappropriation of trade secrets utilized -- and found

9    distinctive harm for -- with identified trade secrets and used

10   in the next business context.

11        That did not happen here; so what you did not hear

12   from Ms. Amar is any legal precedent supporting Cynosure's

13   position, and the reason is because a finding of this magnitude

14   in Cynosure's favor and what they're asking for would thwart

15   the purpose of 93A and it would overly expand the use of 93A as

16   a recoverable claim in Massachusetts for employment-based cases

17   and for other cases.  It would be an unprecedented verdict.

18        So our core position relies on three main points.

19   One -- and I know that you mentioned, Your Honor -- and that

20   you're not as concerned with primarily and substantially, but

21   again, the case law is in our favor.

22        The alleged conduct here did not occur primarily and

23   substantially in Massachusetts.  It was national and global in

24   scope.  The fact that Bob Daley -- case law supports -- lived

25   in Massachusetts is not enough.

1           THE COURT:  Well, the corporate headquarters are here.

2           MS. DINI:  Your Honor, I have a case that says --

3           THE COURT:  And several of the meetings happened here.

4           MS. DINI:  Your Honor --

5           THE COURT:  If you had a sort of --

6           MS. DINI:  If you'll -- sure.  If you'll allow me.

7           THE COURT:  Sure.

8           MS. DINI:  There is a case that distinctively says

9    that the corporate headquarters being in Massachusetts is not

10   enough to invoke -- here it is.

11          THE COURT:  What's the case?  That's helpful.

12          MS. DINI:  The case is -- sorry.

13          THE COURT:  You sound terrible.

14          MS. DINI:  I am terrible.

15          Okay.  So courts have rejected 93A claims where

16   conduct is multijurisdictional.  *Value Partners v. Bain* stands

17   for the proposition that, even where a defendant is

18   headquartered in Massachusetts, the statute does not apply if

19   acts occur elsewhere.  In *Neural Magic v. Meta*, misconduct

20   occurring outside Massachusetts does not satisfy the primarily

21   and substantially requirement.

22          They spent pages and pages in their brief, Your Honor,

23   describing conduct that occurred in Turks and Caicos, in

24   Israel, all over the United States, plane by plane.  You saw it

25   at trial.

1          This is not the type of conduct that equates to

2     business interactions and commerce in Massachusetts that the

3     statute is meant to protect.  Luckily for Cynosure, they

4     asserted many other causes of action that get them to a very

5     large verdict that the jury awarded them.

6          They're covered, Your Honor.  They don't have to tie

7     in and overexpand the use of 93A to get there.  It's not

8     applicable in this case.  So that's the substantially and

9     primarily argument.

10          With respect to the second point, the claims arise in

11     this case from an employment dispute, which is excluded under

12     Chapter 93A's intra-enterprise exception.

13          The only case that gets anywhere close to the types of

14     facts in this case is the *Governo* case; however, in the *Governo*

15     case we're dealing with a group of lawyers that stole trade

16     secrets and started a business in Massachusetts against their

17     Massachusetts employer and engaged in commerce in that manner

18     and were found liable for that act; all occurring in

19     Massachusetts with the misappropriation of trade secrets that

20     were identified and valued.

21          So it is not the same as this case.  What we're

22     looking at here is liability findings stemming directly from

23     breach of non-competes and breach of solicitations of

24     employees.

25          Interestingly, Your Honor, there was no --

1          THE COURT:  Well, no, but it was also interference

2    with contract, breach of fiduciary --

3          MS. DINI:  With employees.  With employees.

4          THE COURT:  Well, do you disagree -- actually, this is

5    helpful.  Do you disagree that some of this happened after they

6    left?

7          MS. DINI:  Some of what happened?

8          THE COURT:  The interference with contract?

9          MS. DINI:  Oh, yes.  Yes, Your Honor.

10         THE COURT:  I mean, after Daley and Chambers left.

11   So --

12         MS. DINI:  Yes, based on evidence in the record,

13   absolutely.

14         THE COURT:  At that point, they could be liable on a

15   93A once they left.

16         MS. DINI:  No, Your Honor.  Again, that goes -- let me

17   give you an instance where they could be liable under 93A based

18   on the case law, which is actually exactly outlined in

19   Plaintiff's motion for a preliminary injunction.

20         When they talk about 93A, the facts that they rely on,

21   when they sought an injunction from this Court, stem from the

22   irreparable harm of Reveal, post-employment, soliciting

23   customers and using trade secrets and the value of their trade

24   secrets, none of which they won in this trial.  There was no

25   breach of solicitation of customers found by the jury.  There

1    was no misappropriation --

2         THE COURT:  Wait, wait, wait.  There was breach of

3    contract found.  That's not true.

4         MS. DINI:  But, Your Honor, my point is that there was

5    there was no breach of contract for solicitation of customers.

6    And that is the act --

7         THE COURT:  That was one of the clauses.

8         MS. DINI:  Your Honor, Question 1 on the -- I'm

9    looking at the verdict form.  Breach of contract.  Question 1a,

10   non-competition provision:  Yes.

11        Customer non-solicitation provision:  No.

12        Employee non-solicitation provision:  Yes.

13        THE COURT:  Oh, that's right.  Right.  Employee.  Take

14   the employee one.  You're right.

15        MS. DINI:  So every single act that they found, that

16   the jury awarded them for, was related to the

17   employment-employee context.  There's not a single case that

18   supports that.

19        In fact, the cases reject instances where the conduct

20   is based on the employment relationship.  This would be

21   different, Judge, if it was before you with a finding of

22   misappropriation of trade secrets or customer solicitation.

23        THE COURT:  They did find they misappropriated.  They

24   just said there was no harm, because I enjoined it all.

25        MS. DINI:  Your Honor, and that's another problem with

1    the verdict form, which we raised in objections through that

2    process, which is that you cannot have a finding of

3    misappropriation of trade secrets without the fourth important

4    element of harm.

5         THE COURT:  Regardless, that's irrelevant now.  They

6    found it; so it doesn't apply.  I mean --

7         MS. DINI:  It doesn't apply in any context.

8         THE COURT:  I agree with that.  I agree with that.

9         MS. DINI:  So there is no -- based on Cynosure's own

10   pleadings and the jury's findings, there is no basis to get

11   them out of the intra-enterprise exception that applies to

12   Reveal in this matter.

13        THE COURT:  I keep coming back to one of the reasons

14   there was -- there was potentially, I guess you could argue --

15   no harm is because I stopped it all.  Made them return

16   the documents.

17        MS. DINI:  Exactly.

18        THE COURT:  I made them return it all.  They took

19   those trade secrets, and then they had to return them because

20   of an injunction.  My thought process in dividing it out, which

21   is, is it relevant in the 93A violation?  They tried; they just

22   failed?

23        MS. DINI:  Right.  And if you get to the third point,

24   Plaintiffs are requesting duplicative and punitive damages far

25   what exceeds what's permissible under established law.

1          So you made a very important distinction here, which

2     is whether or not there was a finding of willful and malicious

3     conduct.  If you look at page 8 of the verdict form, the jury

4     rejected a finding of willful and malicious conduct.  How can

5     you now say that there is --

6          THE COURT:  Willful and malicious -- say it again --

7     conduct with respect to --

8          MS. DINI:  The question -- I'm sorry, guys, I'm trying

9     the best I can.  But it asks whether Cynosure proved by a

10    preponderance of the evidence that the misappropriation of

11    trade secrets was willful and malicious.  And it was

12    unanimously "no" to that question.

13         THE COURT:  Okay.  Okay.  Now I know what you're

14    talking about.

15         MS. DINI:  So there is absolutely no finding anywhere

16    in the verdict form of willful, knowing, or willful in

17    intention, or willful and malicious.  None.  So they can't now

18    shoehorn in conduct to try to recharacterize it to the Court to

19    get to the level of willful and knowing that would be required

20    to double in punitive damages under 93A.

21         THE COURT:  I think that's quite correct, because the

22    trade secret issue is out of the case at this point.  But not

23    the other torts; so --

24         MS. DINI:  Right, but there's no finding of willful

25    and knowing; and it doesn't rise to that level because --

1          THE COURT:  I think it's my finding, isn't it?  It's a

2    bench trial.

3          MS. DINI:  Right, Your Honor, but it's the same

4    analysis that you look to of the acts in question.  And just

5    because you breach your agreement and you have a non-compete --

6    there's not a single case that stands for the proposition that

7    a breach of contract equates to intentional and knowing

8    conduct.  That is not the same.

9          THE COURT:  What about the other torts?  The

10   interference with contract and breach of fiduciary duty --

11         MS. DINI:  Again, they didn't produce a single case

12   that supports, in this context, that applying, Your Honor.

13   They had the opportunity to get punitive damages where they

14   could, and the jury didn't award it.  We know that in the

15   context of Bob Daley, it doesn't apply because there were no

16   harm with respect to --

17         THE COURT:  That's why I asked it separately,

18   actually.  But, okay.  So --

19         MS. AMAR:  Your Honor, may I respond to a few things?

20         THE COURT:  No.  Right now, I actually -- I need her

21   to finish her 93A.

22         And then I need to go to -- I think you're quite

23   correct -- the issue of the other defendants.  Is there

24   anything else you wanted to say?

25         MS. AMAR:  Yes --

```
 1              THE COURT:  Not you.  Not you.

 2              MS. AMAR:  Sorry.

 3              THE COURT:  Reveal.  Anything else?

 4              MS. DINI:  Yes.  I mean, the one part of the argument

 5    that I did not finish is that the Court should be analyzing the

 6    disproportionate relief that, if it were to find 93A, the

 7    request for treble damages is --

 8              THE COURT:  Well, I would categorically -- I can say

 9    that here on the record -- not do treble damages if I go there.

10              MS. DINI:  Even double damages, Your Honor, it does

11    not --

12              THE COURT:  I think if I find willful, then I've got

13    to do -- I thought I had discretion and I don't think I do.

14              MS. DINI:  In the cases that Plaintiff has cited, the

15    jury made those findings about willful and knowing and Your

16    Honor said -- and the reason we agreed to oral arguments and

17    not submitting evidence on that note is because, at that point,

18    Your Honor, if we look at what the jury thought was willful,

19    they've already answered the question, and that's "no."

20              THE COURT:  That's on the trade secrets.

21              MS. AMAR:  Your Honor, she's absolutely wrong about

22    that.  The jury answered willful on many causes of action.

23    There was intentional torts that they absolutely had to find

24    were intentional in order to reach their verdict, and --

25              MS. DINI:  That's not true.
```

 1            MS. AMAR:  And as to Mr. Daley --

 2            THE COURT:  Can I just stop?  That's why I like these

 3    squares, because, unlike at trial, I can just stop everybody.

 4    I understand, Ms. Dini, your point, and at this point I believe

 5    it is in my decision as to whether it's willful or not.  And

 6    I -- but I do take your point that -- at least with respect to

 7    the intentional is not the same as willful or, at least,

 8    there's some little gray area there.  So -- but it's my

 9    finding, not the jury's.

10            Let me ask the -- Ms. -- is it Daly? -- to get on the

11    screen, please -- about the other defendants.  I know we talked

12    about this last time, and I'm so glad you're on the screen.

13    I've been rethinking this all, and I just think I should do

14    what I do and stay it with respect to the rest of them.  I

15    didn't think anybody has the bandwidth or the money to litigate

16    another 28.

17            MS. DINI:  Your Honor, the problem with that -- and

18    I'm speaking because I also represent these individuals and the

19    company and twelve others that -- nine others that haven't been

20    tried.

21            THE COURT:  Is it only nine?  Is it only nine?

22            MS. DINI:  Well, mine are nine.  I think Ms. Daly has

23    more.  There's a lot left.

24            MS. DALY:  I have seven.  I have seven.

25            THE COURT:  Seven.  Okay.

1          MS. DINI:  Sixteen people hanging in the balance, and

2    what I would say to that is, as you see in Cynosure's briefing,

3    they're requesting prejudgment interest.  We've calculated that

4    at almost $250,000 a month for these claims hanging around.

5    These people are going to lose their jobs and they're not going

6    to find anyone to indemnify them, Your Honor.  So this has

7    caused tremendous amount of --

8          THE COURT:  So how do you suggest -- because I could

9    spend the rest of my life doing this case, and I have all these

10   other cases.  And, by the way --

11         MS. DINI:  And I understand, Your Honor, and, believe

12   me, I didn't choose for them to craft their complaint in this

13   manner, but what I can say is --

14         THE COURT:  Well, what are you recommending?

15         MS. DINI:  The record is clear.  They have already

16   sought the total amount of damages and harm suffered in this

17   case.  Anything else --

18         THE COURT:  But that doesn't help these

19   individuals because they may plead jointly --

20         MS. DINI:  It does.

21         THE COURT:  -- and severally with respect to some of

22   it, and so --

23         MS. DINI:  It does, Your Honor, because there's no

24   additional evidence of individualized harm that can be

25   assessed.

 1          THE COURT:  No, but let's say -- I'm just throwing

 2     this out there, and I don't mean to defame him in any way, but

 3     let's say -- well, I won't mention names.  Let's say another

 4     person was a top person -- in fact, wait, there were several

 5     top people.  And let's say that they were responsible; they

 6     were found jointly and severally for, let's say, a million

 7     dollars.

 8          It would be joint and several with the 15 million, but

 9     it would mean, if Reveal went into bankruptcy, that you could

10     get the 1 million from that person.  So it's not completely --

11     I mean, it's fraught.

12          MS. DINI:  Your Honor, that requires expert evidence.

13     We've heard from their experts.

14          THE COURT:  I understand it does.  But I'm not trying

15     16 more cases -- isn't happening.

16          MS. DINI:  You don't have to.

17          THE COURT:  It will give all of us a heart attack.

18          MS. DINI:  You don't have to.  My recommendation, Your

19     Honor, is that we would file a motion to dismiss.  Based on the

20     trial record, it's clear.  There's not -- it's not legally

21     recoverable because there's no individualized harm.  The expert

22     already made it clear.  And Ms. Amar already made it clear.

23     They asked the jury for the entire universe of damages.

24          THE COURT:  Well, let me just ask you this.  What's

25     your position with respect to your clients, Ms. Daly?

1          MS. DALY:  Your Honor, I am going to step away from

2     the legalities for a minute and just try and inject a little

3     bit of humanity here.  These -- particularly my clients, the

4     lower-level folks who were in that second wave, this -- having

5     this kind of sword of Damocles hanging over their head is pure

6     torture.  And I would --

7          THE COURT:  What do you want?

8          MS. DALY:  I think they should be dismissed.

9          THE COURT:  I'm not doing that.  What I would be

10    doing -- let me ask Ms. Amar.

11         Are you willing to waive the prejudgment interests if

12    I stay the rest of the case and then send it up on appeal?

13         MS. AMAR:  Against the new --

14         THE COURT:  Not the new, the --

15         MS. AMAR:  Sorry, against the remaining employees?

16    I'd have to talk to my client about that, but my instinct --

17         THE COURT:  I don't have the bandwidth to do 16

18    motions for summary judgment, 16 motions to dismiss, or 16

19    trials.

20         MS. AMAR:  I understand.  But I think, Your Honor, you

21    could just award partial judgment right now.

22         THE COURT:  No way.  No way.  No way.  Okay?  So

23    here's the issue:  I either have to do it on a motion for

24    summary judgment or I have to do it on a new trial, you know, a

25    different trial.

 1            So I'm inclined to stay the rest of it, because I

 2    think there are going -- I haven't even -- I do understand the

 3    sword of Damocles, but, frankly, if I got rid of the interest,

 4    there would be no additional harm.

 5            And, indeed, there's at least some chance that you're

 6    going to appeal me on absolutely every ruling I ever made, and

 7    there's some chance that I could get reversed, right?  Some

 8    chance I could be affirmed; some chance I could be reversed,

 9    someone has a gotcha on something I did.

10            So for me to then -- to try all these people and then

11    to try it again if I don't get upheld on appeal is a total

12    waste of judicial and attorney and client resources.  So I am

13    trying to figure out a just way to do this.

14            And I do take to heart what you're saying, because I

15    hadn't thought about the prejudgment interest.  One way to do

16    it would be Cynosure waiving the prejudgment interest with

17    respect to these others.  Maybe you could get your client, and

18    then I would stay it with respect to the rest of them, see if

19    this holds on appeal or if it could settle, or if it goes into

20    bankruptcy, which is another -- as Ms. Dini keeps telling me,

21    another real possibility, in which case, you usually stay the

22    whole kit and caboodle.

23            So I just -- I just -- I need to know how to resolve

24    this.

25            MS. AMAR:  Your Honor, there's definitely

1    post-judgment interests on Reveal regardless.  One of the

2    things that would help us --

3            THE COURT:  You know, Cory Murrell and Mrs. Chambers

4    and -- you know, the whole -- you know, I forget all the

5    people.  You named everybody under the sun, so --

6            MS. AMAR:  I understand.  But let's -- what's before

7    you right now are Chris Chambers, Bob Daley, and the Reveal

8    defendants.  If we get a judgment against them based on this

9    verdict and your 93A ruling and we are able to either execute

10   on that judgment or there's a bond posted while they appeal,

11   that would go a very long way towards us dismissing many if not

12   most of the remainder of the defendants.

13           I cannot ethically convince my clients to dismiss

14   these other defendants --

15           THE COURT:  I'm not asking you to do that.  I'm asking

16   you to just agree that if I -- am I right that, no matter what

17   I do here, you're going to appeal this?  Somebody is going to

18   appeal it.  Maybe both of you, for all I know.  Of course.

19   Unless there's a bankruptcy.

20           So all I am asking at this point, and if you could get

21   back to me the first week in January -- I'm not going to be

22   able to write all this up.  This is going to be three to six

23   months by the time I write all this stuff up.  You know?  I

24   mean, I hate to tell you.  I mean, I'm not an ATM machine,

25   right?

1        So if you could tell me the first week in January,

2   each one of you, what you want to have happen.  I asked you to

3   do that at this hearing.  I was sort of expecting an answer.

4   Just a status from each one of you about how to handle the

5   remaining defendants.

6        And I will tell you, if you waive the prejudgment

7   interest, I will be inclined to stay it, pending appeal, on the

8   theory that, as you said, if it all goes your way, you may just

9   drop the others.

10       MS. DINI:  Your Honor, I need to say for the record --

11       MS. AMAR:  Would you still give us the judgment -- I

12  mean, they have to have a judgment to appeal.

13       THE COURT:  And they also still have the right to do

14  post-judgment motions.  I mean, we're not even close to having

15  this on appeal.  We could be two to three years when we're on

16  appeal.  So -- just to give people who are listening on the

17  phone.

18       I mean, let's put it this way:

19       It will take me three months minimum -- minimum -- to

20  write this up.  I issue a judgment.  I am assuming, as day

21  follows night, I will have post-judgment motions and

22  oppositions, maybe another hearing.  I eventually rule.

23       And this is -- there's a notice of appeal, probably

24  cross-motions for appeal, perhaps; and then it will go up to

25  the First Circuit, which frequently takes another year to two

1    years.  And if they reverse me in part, it's starting all over

2    again.

3              So there were real big flaws in how the judicial

4    system works in terms of speed.  And so --

5              MS. DINI:  And, Your Honor --

6              THE COURT:  And so what I'd like to do is I'd like to

7    get it to the First Circuit as soon as possible and not have to

8    hold this whole thing up to resolve 16 other people.

9              But if I can't do it and you don't waive the interest,

10   and you all want to spend the attorneys fees to litigate it one

11   by one, I suppose that's something I'll think about.  You know,

12   I thought we'd do that here today, and I didn't get status

13   reports, but now I'm --

14             What's the end of the first week in January?  Is it

15   January 7th or 8th or something like that?

16             THE CLERK:  January 3rd, Judge.  That's the -- two

17   days after New Year.

18             THE COURT:  Give it the following Monday so that --

19             THE CLERK:  The 6th.

20             THE COURT:  Yeah.  And there's a judicial order that

21   nobody works for this over the long weekends.  So do you need a

22   little bit more time?  I'm going to be working on this.  It's

23   not like it's -- I just need to know what to do with the

24   others.

25             MS. DINI:  So, Your Honor, since I have an audience of

1      two individuals a week from Christmas who -- I can't begin to

2      tell you how this has impacted their private and personal

3      lives -- can you explain to them in lay terms what that means

4      by a three-months-from-now ruling?

5           In other words, they won't expect a judgment next week

6      before Christmas; is that fair?

7           THE COURT:  Absolutely fair.  I'm going away.  I am

8      not going to be taking this with me on my family Christmas

9      week.  Will not be happening.

10          So what will happen is we will work on it January,

11     February-ish.  And I have to write, for their information, a

12     full opinion on a 93A.  I have to write a findings of fact and

13     law.  It's a big deal.  It could be longer.  It could be as

14     long as six months.  I'm pretty efficient in that I almost

15     never go beyond six months, but I have to write a massive

16     opinion.

17          MS. AMAR:  Your Honor, to that end, can I just say in

18     the last one minute that we have, to help your clerk write this

19     opinion, what Ms. Dini said -- that this would be

20     unprecedented -- is absolutely not true. I would point to the

21     Augat case, which is the Massachusetts Supreme Court, and all

22     of the cases listed in our briefs.

23          THE COURT:  Of course you will.  We'll read

24     everything, I promise you.  We always do.

25          MS. AMAR:  *Sentient v. Apollo* is another one.  There's

1    a myriad of cases involving 93A and breach-of-contract- and

2    breach-of-fiduciary-duty cases.  I just --

3            THE COURT:  Thank you very much.  So here it is, now,

4    last but not least -- I don't know --

5            Mary Ellen, can you put us in a breakout room?

6    Because I don't know who's on the line.

7            THE CLERK:  Let me see if I can do that.  Give me one

8    second.  You want just Ms. Dini and Ms. Amar --

9            THE COURT:  That's right.

10           THE CLERK:  -- and the court reporter, or no?

11           THE COURT:  No.

12           THE CLERK:  Okay.  Hold on.

13           (Whereupon the hearing was adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Jessica Leonard, Certified Shorthand Reporter

 4    and Federal Certified Realtime Reporter for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that the foregoing transcript is a true and correct

 7    transcript of the stenographically reported proceedings held in

 8    the above-entitled matter, to the best of my skill and ability.

 9              Dated this 5th day of January, 2025.

10

11

12              /s/ Jessica M. Leonard

13              Jessica M. Leonard, CSR, FCRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```