UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
CYNOSURE, LLC, and LOTUS PARENT,  )
INC.,                         )
                              )
              Plaintiffs,     )
                              )     Civil Action
v.                            )     No. 22-cv-11176-PBS
                              )
REVEAL LASERS LLC, et al.,    )
                              )
              Defendants.     )
_____)
```

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

August 7, 2025

Saris, J.

**INTRODUCTION**

This fiercely litigated dispute involves the competitive world of medical aesthetic laser sales. Defendants Robert Daley and Chris Chambers were high-level employees in the sales force of Plaintiff Cynosure, LLC ("Cynosure"), a Massachusetts-based medical aesthetics company.[1] In early 2021, Defendant Reveal Lasers Ltd. ("Reveal Ltd."), an Israeli medical aesthetics company, approached Daley about serving as the chief executive officer ("CEO") for its planned expansion into the United States market. Daley brought Chambers into the plan and, while the two were still employed by Cynosure, they began to recruit other members of

---

[1] Following the events at issue in this case, Cynosure merged with a company called Lutronic and is now known as Cynosure Lutronic.

Cynosure's sales force to join the new venture. Daley's and Chambers' recruiting efforts culminated in meetings in late April and early May 2022, during which many Cynosure sales representatives signed employment agreements with Reveal Ltd. Ultimately, Daley, Chambers, and twenty-six other sales and marketing employees -- all of whom had signed restrictive covenant agreements with Cynosure -- resigned in May and June 2022. Within a few months, they publicly launched Reveal Ltd.'s United States subsidiary, Reveal Lasers LLC ("Reveal LLC" and, together with Reveal Ltd., "the Reveal entities").

Immediately after Reveal LLC's launch, Cynosure and its parent company, Plaintiff Lotus Parent, Inc., filed this eleven-count lawsuit against the Reveal entities, Daley, Chambers, and the twenty-six other former employees. The Court convened a nineteen-day jury trial in September 2024 on the claims against the Reveal entities, Daley, and Chambers ("Defendants"). The jury found Defendants liable on various common-law claims, including breach of contract (Daley and Chambers), tortious interference with contract (all four Defendants), breach of fiduciary duty (Daley and Chambers), and aiding and abetting breach of fiduciary duty (Reveal Ltd.). The jury also determined that the Reveal entities and Daley had misappropriated Cynosure's trade secrets but found that this unlawful conduct did not cause Cynosure any harm. As relevant for present purposes, the jury awarded Cynosure

a total of $15 million in compensatory damages against the Reveal entities, with Daley and Chambers each also liable for separate $5 million subsets of that total.

Now before the Court is Cynosure's remaining claim against Defendants for violation of Massachusetts General Laws Chapter 93A ("Chapter 93A"). Based on the following findings of fact and conclusions of law, the Court determines that Defendants' raid of Cynosure's sales force constituted an unfair trade practice in violation of Chapter 93A. Because that violation was willful and knowing, Cynosure is entitled to double damages against Defendants, as well as attorney's fees and costs. The Court also concludes that Daley and the Reveal entities violated Chapter 93A by misappropriating Cynosure's trade secrets, which the Court ordered returned to Cynosure by granting its motions for a temporary restraining order ("TRO") and preliminary injunction. While Cynosure suffered no actual damages from this unlawful conduct, Cynosure is entitled to certain attorney's fees and costs in connection with this aspect of its claim.

Accordingly, Cynosure's motion for entry of judgment on its Chapter 93A claim, for prejudgment interest, and for attorneys' fees and costs (Dkt. 673) is **ALLOWED IN PART** and **DENIED IN PART**.

## FINDINGS OF FACT

The Court makes the following findings of fact based on the

testimony and exhibits presented at the September 2024 jury trial.[2]

## I. __Parties__

Cynosure sells energy-based devices, or "lasers," for the medical aesthetics industry. See Tr. 1-82:22-83:5. Its devices remove tattoos and treat skin laxity, wrinkles, and birthmarks, among other uses. See Tr. 1-83:5-9. Cynosure is headquartered in Westford, Massachusetts. See Tr. 1-83:12-16. About half of its employees work at the headquarters in functions such as engineering, accounting, marketing, and regulatory compliance. See Tr. 1-89:5-18. Cynosure's information security operations, including management of the company's computer networks and servers, were also based at the Massachusetts headquarters. See Tr. 4-24:15-25:7. Cynosure manufactures some of its devices in Massachusetts and serves as a North American distributor for other devices made abroad. See Tr. 1-91:22-24, 92:20-21, 93:12-13, 94:7-10, 95:1-3.

Reveal Ltd. is an Israeli company that also develops lasers for medical aesthetic uses. See Tr. 10-11:3-5, 56:6-57:10; Tr. 16-168:15-19. Reveal Ltd. was founded in 2018 by Eyal Buchbinder, who serves as its CEO. See Tr. 10-11:3-8. Reveal Ltd. sells devices

---

[2] Record citations are to the trial transcripts (e.g., "Tr. 1" is the transcript from the first day of trial), deposition testimony played at trial (e.g., "Steinhorn Dep." is the transcript of the deposition testimony of Jason Steinhorn), or an exhibit admitted at trial (e.g., "Ex. 586").

through distributors in twenty-three countries. <u>See</u> Tr. 10-58:1-11.

Reveal LLC, a Nevada limited liability company, was established in 2022 and is a wholly owned subsidiary of Reveal Ltd. <u>See</u> Tr. 8-34:6-8; Tr. 10-11:9-11; Ex. 586. Reveal LLC sells devices in North America. <u>See</u> Tr. 16-169:7-8. Its products compete with those sold by Cynosure. <u>See</u> Tr. 2-33:9-17, 37:23-38:3; Tr. 5-31:16-17.

As of trial, Daley and Chambers were Reveal LLC's CEO and president/global chief commercial officer ("CCO"), respectively. <u>See</u> Tr. 8-39:6-10; Tr. 10-148:25-149:6.[3] Both were employed in sales at Cynosure before resigning in May 2022 to launch Reveal LLC. <u>See</u> Ex. 46. Daley began working at Cynosure as a sales representative in 2006. <u>See</u> Tr. 9-31:4-12. His final role at Cynosure was as the senior regional director of sales for the Northeast region. <u>See</u> Tr. 8-178:10-12; Ex. 46. Chambers came to Cynosure in 2015 and, by May 2022, had become the company's vice president ("VP") of sales for North America. <u>See</u> Tr. 10-153:9-11, 154:14-17; Ex. 46. At all relevant times, Daley lived near Boston, Massachusetts, and Chambers lived in Maryland. <u>See</u> Tr. 7-149:2-3; Tr. 15-106:18-20.

---

[3] Daley's and Chambers' employment at Reveal LLC ended following the trial.

## II.  **Background on Cynosure's Sales Force**

Cynosure structures its North American sales force in the following manner. At the bottom rung are territory managers ("TMs"), who contact providers of medical aesthetic services to generate interest in Cynosure's devices. See Tr. 3-93:7-12, 94:1-16. Area sales managers ("ASMs"), the second most junior position, speak to leads to convince them to buy a device. See Tr. 3-95:19-96:18. Above ASMs are district sales managers ("DSMs"), who close deals initiated by TMs and ASMs. See Tr. 3-96:22-97:20. Four regional business directors ("RBDs") manage the district-based teams of DSMs, ASMs, and TMs and build strategic relationships within the industry. See Tr. 3-100:21-101:3, 101:24-102:1. Two area VPs of sales supervise the sales teams in their regions. See Tr. 3-102:2-9. Finally, Cynosure's VP of sales for North America oversees the entire sales force, which consisted of around eighty employees in late 2021 and early 2022. See Tr. 3-102:10-103:17.

Cynosure's sales representatives are compensated via both a base salary and commissions for each sale they make. See Tr. 3-110:1-5. Once a district team hits its annual "quota" for sales, it receives higher commissions for the rest of the year. See Tr. 3-114:16-115:11. Cynosure sets these sales quotas yearly. See Tr. 3-115:12-14.

Cynosure has policies governing its employees' use of confidential information and electronic devices. See Exs. 2-3,

6

222J. Employees are required to store confidential information on encrypted laptops or mobile devices. <u>See</u> Ex. 2. In keeping with this policy, Cynosure encrypted its company computers and all emails sent externally and installed security software on cell phones used for company business. <u>See</u> Tr. 4-32:4-33:8, 42:13-43:4. Cynosure bars employees from distributing confidential information unless necessary for work purposes and from using unapproved cloud services, personal email, instant messaging, file storage, or other third-party applications for company business. <u>See</u> Ex. 3. Employees can -- and frequently do -- communicate via text message but are not supposed to text unencrypted confidential information. <u>See</u> Tr. 3-29:17-18, 34:18-24; Tr. 4-39:7-15. Employees are also directed to label all documents containing confidential information, although they do not always do so. <u>See</u> Tr. 3-31:2-11; Tr. 5-180:21-181:6, 182:3-9; Ex. 2. Cynosure gave employees differing access to customer information and other company data based on the needs of their position. <u>See</u> Tr. 4-30:17-31:4, 44:20-45:4. Sales and marketing employees received training on the company's confidential information and electronic device policies. <u>See</u> Tr. 4-44:3-14; Tr. 5-54:4-56:5; Exs. 222B, 223A-B.

### III.  <u>Cynosure's Restrictive Covenants</u>

All Cynosure sales and marketing employees are required to sign agreements containing nondisclosure, noncompetition, and customer and employee nonsolicitation provisions. <u>See</u> Tr. 5-70:9-

24. The individual defendants in this case signed one or more of the following agreements while employed at Cynosure: 1) Cynosure's Invention, Non-Disclosure, Non-Solicitation and Non-Competition Agreement ("INNNA"); 2) the Hologic Inc. Employee Intellectual Property Rights and Non-Competition Agreement ("Hologic Agreement"); 3) the Lotus Parent, Inc. Employee Option Agreement ("Equity Agreement"); and 4) the Cynosure Employee Intellectual Property Rights, Confidentiality and Protective Covenants Agreement ("CEIP").

### A.    INNNA

Chambers and Daley each signed two INNNAs, one upon the commencement of their employment at Cynosure, see Exs. 170C, 171B, and another later in their careers, see Exs. 170A, 171D. The INNNA contains the following restrictive covenants:

1. **Nondisclosure Provision:** "The Employee agrees to maintain in confidence all Confidential Information or Trade Secrets . . . . Employee further agrees . . . not to disclose Confidential Information or Trade Secrets to any person or entity other than to the Company or to use the same other than in the performance of Employee's duties as an employee of the Company."

Ex. 170A § 1(B).[4]

2. **Noncompetition Provision:** "While the Employee is employed by the Company and for a period of one year after the termination or cessation of such employment for any reason, the Employee will not

---

[4] The wording of the nondisclosure provision varies among the INNNAs that Cynosure introduced as exhibits at trial. Neither party has argued that the difference in wording is material to the case.

directly or indirectly: (i) as an individual proprietor, partner, stockholder, officer, employee, director, joint venturer, investor, lender, consultant, or in any other capacity whatsoever . . . , develop, design, produce, market, sell or render (or assist any other person in developing, designing, producing[,] marketing, selling or rendering) products or services competitive with those developed, designed, produced, marketed, sold or rendered by the Company while the Employee was employed by the Company . . . ."

<u>Id.</u> § 3(A).

3. **Customer and Employee Nonsolicitation Provision:** "While the Employee is employed by the Company and for a period of one year after the termination or cessation of such employment for any reason, the Employee will not directly or indirectly: (A) solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company which were contacted, solicited or served by the Employee while employed by the Company; or (B) recruit, solicit or hire any employee of the Company, or induce or attempt to induce any employee of the Company to terminate his/her employment with, or otherwise cease his/her relationship with, the Company.

<u>Id.</u> § 6.

**B.  Hologic Agreement**

Hologic, Inc. ("Hologic"), a women's health company, acquired Cynosure in early 2017. <u>See</u> Tr. 1-95:7-20. Various Cynosure employees signed Hologic Agreements following this acquisition, including Chambers and at least three other former employees who are defendants in this case (Brogan Chambers, Joshua Smith, and Jason Steinhorn). <u>See</u> Exs. 171A, 172B, 177B, 185B. Daley signed a

9

Hologic Agreement too, but the document has been lost. <u>See</u> Tr. 9-50:10-17. When Hologic divested its Cynosure assets in 2019, it assigned the Hologic Agreements to Cynosure. Tr. 5-65:7-15.

The Hologic Agreement contains the following restrictive covenants:

1. **Nondisclosure Provisions:**

   - "At all times, both during my employment by the Company and afterward, I will keep in confidence, and will not disclose, any Trade Secrets to anyone, and will not transfer any Trade Secret Material to anyone, including employees of Company, except as authorized by the Company. I will use any Trade Secrets and Trade Secret Material to which I have access only in the course of my work for the Company and for its benefit and will not appropriate it for the benefit of myself or any other person."

   - "At all times, both during my employment by the Company and afterward, I will keep in confidence and will not disclose or transfer any Confidential Information to any person other than an employee of Company, except as authorized by the Company, and I will not appropriate confidential information for the benefit of myself or any other person."

Ex. 171A § 3(a)-(b).

2. **Noncompetition Provision:** "During the course of my employment and for (2) years after termination thereof for any reason, I will not, directly or indirectly, either by myself or in conjunction with others, be engaged or interested in, or affiliated with or organize or help to organize, or aid or assist in any manner, any business competitive with the products and services then offered or planned to be offered by the Company, in the United States or elsewhere . . . ."

Id. § 13.

3.  **Customer and Employee Nonsolicitation Provision:** "During this same period [as the noncompetition provision], I shall not on behalf of any party or person other than the Company, solicit or induce (or assist or provide information in connection therewith) any (i) then-customer or prospective customer of the Company for any product or service competitive with any product or service then offered or planned to be offered by the Company, or (ii) then-current employee to leave the employ of the Company."

Id.

C.  **Equity Agreement**

Daley and Chambers each signed Equity Agreements in 2020 and 2021 in exchange for stock options in Cynosure's parent company. See Exs. 170B, 170D, 171C, 171E. At least four other former Cynosure employees who are defendants in this case (Brogan Chambers, Cory Murrell, Smith, and Steinhorn) also executed Equity Agreements in 2020 and/or 2021. See Exs. 172D, 172F, 174D, 177C, 177D, 185A, 185E.

The Equity Agreement contains the following restrictive covenants:

1.  **Nondisclosure Provision**: "The Employee agrees that during the Employee's employment with the Company Group, and thereafter, the Employee will not disclose confidential or proprietary information or trade secrets related to any business of the Company Group, including without limitation, and whether or not such information is specifically designated as confidential or proprietary: all business plans and marketing strategies; information concerning existing and prospective markets, suppliers and customers; financial

information; information concerning the development of new products and services; and technical and non-technical data related to software programs, design, specifications, compilations, inventions, improvements, patent applications, studies, research, methods, devices, prototypes, processes, procedures and techniques.

Ex. 170B, Ex. A, § 1.1.

2. **Noncompetition Provision:** "The Employee agrees that during employment and the 12-month post-employment period, employee shall not, within the United States and each country in which the Company Group is doing business as of the date of the employee's termination, directly or indirectly . . . provide services that are the same as or similar in function or purpose to the services provided to the Company Group during the last two years of employment, or services that are otherwise likely or probable to result in the use or disclosure of the Company Group's proprietary information to a business selling, licensing or developing competing products and/or services . . . ."

Id. § 3.1.1.

3. **Employee Nonsolicitation Provision:** "During employment and the 24-month post-employment period, the Employee shall not: participate in soliciting or communicating with an employee of the Company Group for the purpose of persuading such employee to end or modify the employee's employment relationship with the Company Group or hiring such employee . . . ."

Id. § 3.2.1.

4. **Customer Nonsolicitation Provision:** "During employment and the 24-month post-employment period, the Employee shall not . . . solicit or facilitate the solicitation of, provide, or offer to provide services to customers of the Company Group for the purpose of providing products or services that compete with those of, or involve proprietary information of, the Company Group, or induce or

> attempt to induce any customer or other person to curtail or cancel its business with the Company Group."

Id. § 3.2.2.

### D.    CEIP

Many Cynosure employees, including various individual defendants in this case (such as Jason Kalso), signed CEIPs. See Tr. 5-69:25-70:6. The CEIP contains the following restrictive covenants:

1.    **Nondisclosure Provision:** "Employee agrees that during employment and for so long thereafter as the information is maintained as confidential by Company, Employee will not engage in any use or disclosure of Confidential Information beyond that which is authorized by the Company, necessary for the performance of Employee's employment duties for Company, and conducted in manner that complies with the policies of Company, or required by law or legal mandate (such as court order or subpoena)."

Ex. 173D § 2(a).

2.    **Noncompetition Provision:** "Employee agrees that for a period of nine (9) months after the Termination Date, Employee shall not, for the benefit of a Competing Business, within the Territory, acting individually or as an owner, shareholder, partner, employee, contractor, agent or otherwise: (i) provide or manage services to or for a Competing Business that are the same as or similar in function or purpose to the services Employee provided to or managed for the Company during the [last two years of employment] ; or (ii) assist a Competing Business in developing or improving a Competing Product or Service; or (iii) assist a Competing Business by conducting, accepting or servicing competing business activities with any Company customer; or (iv) otherwise provide services to a Competing Business that are likely to

result in the use or disclosure of Confidential Information."

Id. § 8(a).

3. **Employee Nonsolicitation Provision:** "Employee agrees that for a period of two (2) years after the Termination Date, Employee will not, for the benefit of a Competing Business, solicit a Covered Employee [another Cynosure employee] to leave the employment of the Company, or assist a Competing Business in hiring a Covered Employee."

Id. § 8(c).

4. **Customer Nonsolicitation Provision:** "Employee agrees that for a period of one (1) year and six (6) months after the Termination Date, Employee will not solicit, or assist in soliciting, a Covered Customer [a customer with whom Employee had a material interaction or about whom Employee was provided confidential information for the last two years of employment] for the purpose of (i) selling or providing a Competing Product or Service to the Covered Customer, (ii) moving or diverting the patronage of a Covered Customer to a Competing Business, or (iii) interfering with an existing or prospective business relationship the Company has or is pursuing with a Covered Customer."

Id. § 8(b).

## IV. __Cynosure's Sales Force Turnover and the Effects of COVID-19__

Medical aesthetic device companies often poach sales representatives from competitors. See Tr. 6-90:1-4; Tr. 11-157:17-158:2; Tr. 17-113:15-22. Cynosure itself has hired sales representatives directly from competitors. See Tr. 6-92:7-13; Tr. 12-154:22-155:8. Before 2017, however, attrition among Cynosure's sales force was low. See Tr. 17-112:11-23.

That changed with the 2017 Hologic acquisition, shortly after

14

which dozens of sales representatives left Cynosure, some to work at competitors. See Tr. 3-63:4-14; Tr. 9-34:14-25; Tr. 12:158:16-23; Tr. 16-114:11-21; Tr. 17-114:9-12. The company experienced further departures of sales teams for competitors in subsequent years. See Tr. 2-30:11-31:5; Tr. 6-32:10-18; Tr. 9-34:3-9, 35:3-9, 40:25-41:5; Tr. 15-40:14-18; Tr. 16-26:24-27:1; Tr. 17-116:24-117:6, 118:14-22. Cynosure's financial performance suffered between 2016 and 2020, with revenue declining each year. See Tr. 3-129:11. This decline was partly attributable to changes Cynosure made to its marketing for certain top selling products following notification of a U.S. Food and Drug Administration ("FDA") inquiry. See Tr. 3-15:18-22:6. The Hologic acquisition also began a period of rapid turnover in Cynosure's top leadership, with five individuals serving as CEO or division leader between 2017 and 2024. See Tr. 6-79:11-80:20. In 2019, Hologic sold Cynosure to a private equity firm for around $200 million, a far cry from the $1.6 billion Hologic paid to acquire the company two years earlier. See Tr. 2-24:8-12, 24:25-25:2, 25:25-26:4.

The COVID-19 ("COVID") pandemic severely affected Cynosure's business in 2020. See Tr. 3-22:14-23; Tr. 6-80:21-23. While most competitors maintained some manufacturing operations during the peak of the pandemic, Cynosure's CEO opted to shut down the company's factories entirely for months. See Tr. 13-86:19-87:9; Tr. 16-129:20-25, 133:5-18. Cynosure also cancelled purchases of

private-label devices from outside manufacturers and lost its
relationship with a contract manufacturer. See Tr. 16-130:1-12,
131:17-24. Due to the slowdown in its business, Cynosure had to
lay off and furlough employees in 2020. See Tr. 3-56:15-18; Tr.
16-131:6-8; Tr. 17-117:16-20.

Cynosure was not able to immediately bounce back from its
pandemic shutdown. Manufacturing resumed slowly, and the company
faced significant quality issues when it ramped up production. See
Tr. 6-81:9-11; Tr. 16-131:25-132:5, 134:17-23. Although Cynosure's
supply chain issues began to improve in 2021, problems with
manufacturing persisted that year, and even by January 2022,
production was only at between 65% and 70% capacity. See Tr. 3-
128:11-19; Tr. 6-85:2-12; Tr. 16-134:24-135:8. Cynosure also tried
to bring back employees laid off or furloughed in 2020 but was
only able to rehire about 50% of them. See Tr. 16-134:5-24.

These manufacturing issues led to numerous complaints from
customers. See Tr. 6-85:2-12; Tr. 11-128:23-129:9. Many complaints
concerned Cynosure's inability to service devices or provide
consumables (e.g., single-use tips) necessary to operate the
lasers. See Tr. 13-85:18-23; Tr. 16-135:9-23; Padron Dep. 91:12-
92:5. Customers also expressed dissatisfaction with rapid turnover
in the sales force. See Padron Dep. 91:4-11.

Cynosure's supply chain issues caused frustration among sales
employees, who had to respond to unhappy customers and did not

collect commissions until the devices they sold were delivered. See Tr. 8-78:25-79:20; Tr. 11-129:5-14; Tr. 13-85:18-86:9. Recognizing this frustration and attempting to avoid attrition, Cynosure offered retention bonuses and/or granted stock options to certain sales representatives in November 2021, including Chambers and seven other former employee who are defendants in this case. See Tr. 3-155:15-17, 157:16-23, 160:13-16; Tr. 4-89:14-90:4; Tr. 6-39:8-18; Tr. 8-90:17-22, 93:7-17; Tr. 11-57:21-23, 164:22-166:3, 166:17-167:1; Tr. 13-93:15-19, 94:4-8; Exs. 205B, 205E-G, 205I-K. Daley received stock options but not a retention bonus. See Tr. 6-40:3-11; Tr. 9-45:13-21; Ex. 170D.

Cynosure's manufacturing issues affected revenues from capital sales and service contracts. See Tr. 16-136:2-15. Nonetheless, due to improving supply chains and the hiring of new sales representatives who resumed visiting providers in person, Cynosure's revenues grew over 50% in 2021 and in the first quarter of 2022, and the company returned to profitability for the first time in years in the fourth quarter of 2021. See Tr. 3-129:8-20, 130:2-9; Tr. 6-82:13-83:1.

## V. Initial Planning for Reveal Ltd.'s United States Operations

In early 2021, Buchbinder, the CEO of Reveal Ltd., decided that he wanted to expand his company into the United States market. See Tr. 10-58:12-20. He asked industry contacts for suggestions for an American CEO. See Tr. 10-59:7-18. One recommended Daley,

who was then a senior regional director of sales for Cynosure (a position comparable to an RBD) responsible for managing more junior managers and sales representatives and a member of Cynosure's sales leadership team. See Tr. 8-178:5-9, 178:23-179:23; Tr. 9-33:3-13, 61:8-12; Tr. 10:59:22-24; Ex. 46. Buchbinder cold-called Daley in March 2021, and the two spoke about Buchbinder's desire to expand Reveal Ltd. into the United States market. See Tr. 7-82:4-24; Tr. 9-60:15-23; Tr. 10-14:14-17; Ex. 101. Daley had not previously heard of Reveal Ltd., see Tr. 9-61:13-22, but he was intrigued by the possibility of becoming a CEO. See Tr. 9-60:24-61:12. Buchbinder spoke to others about the position but started planning for Daley to become the CEO soon after their first telephone call. See Tr. 10-16:14-17, 59:19-21, 61:8-62:2.

Following that call, Daley emailed Buchbinder to express interest in speaking further about the opportunity at Reveal Ltd. See Ex. 101. Buchbinder set up a meeting to discuss Reveal Ltd.'s products and research and development. See id. Before that meeting, Buchbinder had Daley sign a nondisclosure agreement ("NDA") so that Daley would not tell Cynosure about Reveal Ltd.'s products and business strategy. See Tr. 7-83:4-14; Tr. 10-14:21-15:7; Ex. 125.

Buchbinder and Daley began to plan for Reveal Ltd.'s operations in the United States. On April 2, 2021, Daley told Buchbinder that he had "d[one] some digging around regarding events

18

and expenses at Cynosure" and relayed that Cynosure pays about $150,000 for a weekend marketing event, $2,500-$15,000 for a speaker fee, and $30,000 per year for each sales representative's expenses. Ex. 125; see Tr. 9-62:8-63:1. Daley also advised Buchbinder on the compensation Reveal Ltd. should offer prospective sales representatives, explaining that "having a bit more flexibility on the higher side of the base [salary]" and "an aggressive commission structure" would "help to convince successful reps to join Reveal." Ex. 125. Daley told Buchbinder that "[t]he key [was] landing 3-5 high level individuals who will have a following to get others to join." Id. Buchbinder responded that Daley's "information [was] extremely valuable to build the business plan and P&L [profit and loss] for the US operation." Id.

On April 8, 2021, Buchbinder sent Daley an offer for the role of CEO and president of Reveal Ltd.'s United States operations. See Ex. 654. Two months later, Daley emailed Buchbinder with a proposal for the structure and compensation for Reveal Ltd.'s sales force. See Ex. 105. Daley explained that "many companies in this space [were] doing very well [at the time] and that ma[de] it much more difficult to recruit talented/experienced individuals so [they] need[ed] to be able to entice them to move away from a good situation they [were] currently in." Id. In that same email, Daley proposed October 4, 2021, as his start date at Reveal Ltd. See id. Buchbinder responded that Daley's proposal was "feasible" and that

starting in October made sense. Id. For reasons that are not clear from the record, Daley did not end up starting at Reveal Ltd. until well after October 2021.

Reveal Ltd. started to seek investors to fund its expansion into the United States. In August 2021, a Reveal Ltd. executive asked Daley for input on drafts of spreadsheets and slides for investor presentations. See Ex. 106. The slides included the sales force structure and compensation Daley had proposed to Buchbinder in June and listed Daley as "currently Sr. Director of Sales" at Cynosure and the proposed United States CEO for Reveal Ltd. See Tr. 7-93:20-94:13, 95:9-13; Ex. 106. Two months later, Buchbinder sent potential investors a business proposal for Reveal Ltd. that listed Daley as the United States CEO. See Tr. 10-17:17-18:17; Ex. 108. By November 2021, while still employed at Cynosure, Daley participated in two calls with potential Reveal Ltd. investors. See Tr. 7-97:6-11.

Daley first mentioned the new venture with Reveal Ltd. to Chambers, who was then Cynosure's area VP for the eastern United States, in October or November 2021. See Tr. 3-84:19-24; Tr. 7-96:17-19; Tr. 11-21:13-16, 159:13-20. On November 22, 2021, Daley told Buchbinder that he had "created a lot of excitement with Chris [Chambers]" and that "the two of [them] together ha[d] a great following with top tier talent." Ex. 110. Daley added that he had "done a lot of behind the scenes work, very carefully, to have

20

these confidential conversations with key individuals." Id. Soon
thereafter, Chambers spoke to Buchbinder for the first time about
Reveal Ltd. See Tr. 11-21:17-21, 22:13-16; Ex. 110.

Daley emailed Buchbinder with an update on his recruiting
efforts on December 21, 2021. See Ex. 112. Daley stated that "[i]n
order to retain Chris Chambers and the top reps [they] need[ed] to
recruit, [they] w[ould] need to dial in the budget [they] h[ad] to
work with." Id. He emphasized that they would need "aggressive
investment" and "market driven compensation plans to get these top
tier individuals." Id. He proposed bringing Chambers on as Reveal
Ltd.'s CCO, noting that Chambers would "be instrumental in this
recruitment process." Id. Finally, Daley asked Buchbinder about
the compensation and benefits Reveal Ltd. could offer to sales
representatives. See id. One question read as follows: "Indemnity
-- many companies will offer this to protect new employees when
there is a mass exodus and will we have this protection?" Id. When
he asked this question, Daley knew Cynosure could sue him if he
brought other Cynosure employees to Reveal Ltd. See Tr. 7-101:17-
20. Buchbinder responded that Reveal Ltd. would offer
indemnification. See Ex. 113.

Daley provided Buchbinder with another update on January 12,
2022. See id. Daley explained that he and Chambers had "put A LOT
of thought into building out the US sales force" and determined
that the existing budget for salaries would "make things very

difficult to bring the 'real' talent over to Reveal." Id. Daley
added that he and Chambers had "selected the people [they] want to
go after" but that significant compensation packages would be
necessary to convince them to join Reveal Ltd. because they were
"in a very good financial situation at Cynosure and other
competitor companies." Id. Daley proposed an increased budget for
sales force compensation, to which Buchbinder assented. See id.

Daley and Chambers continued to work with Buchbinder in
February and March 2022 -- while both were still employed by
Cynosure -- to plan for Reveal Ltd.'s launch in the United States.
Daley participated in more investor calls. See Tr. 7-111:5-13; Ex.
114. He asked Cynosure's accounting team for information on annual
expenses incurred by each sales representative and passed along to
Buchbinder that Cynosure pays between $20,000 and $80,000 in
expenses per employee, with an average of $55,000. Ex. 115. Daley
also began speaking to third-party vendors, such as payroll and
benefits managers and companies providing warehouse and order
management services. See Ex. 698. One of Daley's direct reports at
Cynosure helped Daley coordinate with these vendors and
participated in at least one of the calls. See Tr. 7-115:22-116:18;
Exs. 46, 122. For his part, Chambers emailed Buchbinder on February
17, 2022, with copies of the two Equity Agreements he signed with
Cynosure, noting that the documents were "for legal to review" and
that "[t]here [was] some non compete info in the equity docs." Ex.

22

117. See Ex. 119; Tr. 11-27:12-24. Chambers sent Buchbinder his 2021 Cynosure compensation plan too. See Tr. 11-28:8-29:3; Ex. 118.

## VI.  Changes to Cynosure's Sales Leadership, Quotas, and Strategies

While Buchbinder, Daley, and Chambers were making plans for Reveal Ltd.'s United States operations, Cynosure was undergoing changes to its sales force leadership and compensation structure. In January 2021, Andrea Schwab -- who started at Cynosure in 2004 and was then the executive VP of North American sales -- hired Lowinn Kibbey as a temporary consultant to work on marketing and sales strategies, analytics, and a five-year strategic plan. See Tr. 2-27:7-16; Tr. 3-79:11-80:12, 82:8-11, 82:24-83:1; Tr. 11-162:11-23; Tr. 17-86:8-14, 88:18-22, 90:18-91:2. Kibbey previously worked at Johnson & Johnson and had no prior experience in the medical aesthetics industry. See Tr. 3-77:14-78:22; Tr. 17-91:8-10. As Kibbey's time as a consultant was ending, Schwab and another Cynosure VP advocated for him to be appointed to a permanent position as a liaison between the company's sales leadership and the C-suite. See Tr. 16-108:16-25, 140:4-9; Tr. 17-92:9-94:14. In June 2021, Kibbey was named CCO of Cynosure. See Tr. 2-27:16-17; Tr. 3-75:3-5. Schwab reported to Kibbey in his new role and felt that she received less responsibility from the company after Kibbey was hired. See Tr. 17-94:19-21, 95:2-4.

Upon becoming CCO, Kibbey began mulling changes to the compensation and operations of the sales force. See Tr. 3-130:11-15; Tr. 12-26:24-27:11. One change Kibbey proposed was an increase to the sales force's quotas for 2022. See Tr. 3-130:11-15. Kibbey believed that because Cynosure had lowered quotas during COVID, it was appropriate to raise them to account for growing revenue coming out of the pandemic. See Tr. 3-115:15-23, 132:7-20. Kibbey and Schwab discussed the issue extensively, and Schwab repeatedly warned Kibbey that increasing quotas would lead to significant attrition among the sales force. See Tr. 3-126:22-127:16; Tr. 4-116:23-25; Tr. 6-39:19-40:2; Exs. 896, 898, 900, 901, 940, 942, 950. Schwab also felt the size of the proposed quota increases was not commensurate with the rate at which the industry was growing. See Tr. 17-138:4-15. Kibbey acknowledged to Schwab that many sales representatives could leave Cynosure if he proceeded with the quota increases, telling her that the "journey" to improve Cynosure's business model "w[ouldn't] be for everyone." Ex. 899; see Exs. 898, 900.

Members of Cynosure's sales leadership team, including Schwab and Chambers, met with Kibbey over the course of a few days in early February 2022 at the company's headquarters to discuss the proposed quota increases and other issues concerning product

pricing, customer service, and staffing.[5] See Tr. 3-134:10-17, 135:21-136:14, 137:10-12; Tr. 8-95:16-19. The sales leadership team pushed back against Kibbey's proposed changes, including the quota increases. See Tr. 3-137:23-138:8; Tr. 8-95:20-96:12; Tr. 15-43:2-11; Tr. 17-135:11-20. Although privately frustrated with Kibbey's decision, Chambers expressed his view at the meeting that the sales leadership needed to implement the plan to increase quotas. See Tr. 3-149:3-15; Tr. 8-97:2-9; Tr. 12-18:17-23. When other sales leaders expressed concern that increasing quotas would cause attrition among the sales force, Kibbey stated that attrition was "the cost of doing business" and that he was prepared to lose a significant portion of the sales force. See Tr. 12-17:4-17; Tr. 15-43:12-20, 126:14-22; Tr. 17-135:21-23. Kibbey did agree, however, to give district teams extra credit toward their quotas for sales of certain products. See Tr. 3-142:6-143:5. Kibbey also offered to set lower quotas as long as Schwab, Chambers, and Cory Murrell, Cynosure's other area VP of sales, agreed to give up some of their commissions if the sales force did not reach the targets Kibbey had originally proposed. See Tr. 3-143:5-146:22. The sales leadership rejected this option, and Kibbey imposed the increased quotas for 2022. See Tr. 3-130:11-13, 146:2-3, 146:23-147:8.

Around the same time, Kibbey decided that Chambers would be

---

[5] Although Daley was a member of the sales leadership team, he does not appear to have attended these meetings.

a stronger leader of the sales organization than Schwab. See Tr. 3-153:5-13. Chambers had also expressed frustration with Schwab's leadership and suggested to Kibbey that he take Schwab's job. See Tr. 3-150:5-151:8, 151:23-152:6. In early February 2022, Kibbey told Chambers he was going to terminate Schwab. See Tr. 4-104:4-12. Unbeknownst to Kibbey, Chambers promptly reported Kibbey's plan to Schwab. See Tr. 11-30:25-31:2; Tr. 12-22:1-9. Kibbey fired Schwab over the telephone following a sales training they both attended in Texas during the week of February 14 as Schwab was about to leave on a vacation with her family. See Tr. 4-104:13-105:2; Tr. 17-143:21-144:22. Members of the sales force were upset by the callous way Kibbey terminated their respected colleague. See Tr. 8-99:12-100:24; Tr. 9-36:14-25; Tr. 12-20:11-20, 23:20-24:8; Tr. 15-41:13-42:7.

On March 10, 2022, Kibbey announced Chambers as the new VP of North American sales, albeit in a non-executive capacity. See Tr. 4-105:19-22; Tr. 11-160:12-20. Although Chambers was unhappy with the compensation plan Cynosure offered him, he told Kibbey he was "committed" to the role. Ex. 53. Soon after the announcement, Kibbey received an anonymous text message warning him that Cynosure's "new VP of sales along with many reps and managers across the country [were] planning to leave in the very near future" and that "[t]hey [were] staying on now to recruit employees." Ex. 1; see Tr. 4-108:5-9. Kibbey forwarded the message

26

to Chambers, who responded, "Now that's comedy." Ex. 1. Kibbey did not believe the anonymous message. <u>See</u> Tr. 4-109:19-110:3. The following month, Chambers reiterated to Kibbey that he was "in this with" him despite difficulties Cynosure was facing. Ex. 52.

## VII. <u>Frustrations Among Cynosure's Sales Force</u>

By early 2022, some members of Cynosure's sales force were unhappy with the state of the company. Schwab was a widely respected sales leader, and many employees were upset about her firing. <u>See</u> Tr. 8-99:12-25; Tr. 9-36:14-25, 38:17-25; Tr. 11-131:12-132:3; Tr. 13-95:3-8, 101:8-18, 102:17-19; Tr. 15-44:4-10, 138:16-139:1; Malone Dep. 177:18-178:21; Ex. 857. Some worried about what Schwab's firing portended for their own jobs and for Cynosure's future. <u>See</u> Tr. 8-101:6-18; Tr. 9-39:1-7; Tr. 11-129:15-21, 131:17-132:3. The numerous complaints from customers and Kibbey's changes to sales quotas, pricing, and commissions also frustrated certain sales representatives, who thought they would not be able to earn as much money as they expected. <u>See</u> Tr. 8-78:22-79:20; Tr. 9-45:5-12; Tr. 11-132:4-17; Tr. 13-85:18-86:9, 91:22-92:12, 107:11-21; Padron Dep. 183:18-184:22; Steinhorn Dep. 44:23-45:8; Malone Dep. 181:2-22. Despite this concern about compensation, though, many members of the sales force started 2022 on pace to earn more that year than they had in 2021. <u>See</u> Tr. 4-145:6-12; Ex. 224.

Additionally, certain sales representatives had concerns

about Cynosure's leadership. Some felt Kibbey was a poor communicator, did not value their contributions to the company, and did not listen to their suggestions. See Tr. 8-92:9-15, 96:15-22; Tr. 9-37:7-16; Tr. 15-41:13-42:15 Malone Dep. 178:22-25, 182:17-25. A number of employees also thought that Kibbey and certain other executives were not the right leaders for the company because they came from outside the medical aesthetics industry. See Tr. 9-36:7-13; Tr. 11-128:7-22, 163:23-164:14; Tr. 15-41:1-12; Malone Dep. 183:6-184:10; Steinhorn Dep. 41:14-25; Ex. 857.

Some sales representatives were disappointed with Cynosure's pace of innovation in releasing new products. See Tr. 6-86:23-87:9; Malone Dep. 181:12-15; Padron Dep. 182:12-183:2; Steinhorn Dep. 41:6-9. Under prior leadership, Cynosure had aimed to introduce a new product every year or two. See Tr. 2-166:20-167:18; Tr. 16-111:18-22. But Cynosure had last released an internally developed device in 2017, and the only new device Cynosure subsequently started selling was manufactured by another company. See Tr. 16-160:25-161:2, 181:24-182:9. Various employees believed it was unfair to raise quotas when Cynosure was not providing new products to sell. See Tr. 13-107:11-21.

Certain employees had personal reasons for dissatisfaction with their jobs. For instance, Murrell was unhappy about the terms of the retention bonus he received in November 2021 and engaged an employment attorney after Kibbey proposed moving him to a different

position in early 2022. See Tr. 8-82:3-17, 101:22-103:1; Ex. 757. Kibbey was aware of Murrell's frustrations with Cynosure and recognized that a number of other employees might follow Murrell if he left the company; nonetheless, Kibbey questioned whether it was worth keeping Murrell if he was not committed to the changes Kibbey wanted to implement. See Tr. 6-58:19-25, 61:17-64:14, 64:21-65:2, 66:21-24; Ex. 857. Smith, a national field marketing manager, thought Cynosure had forced him to resume attending in-person sales events during COVID before it was safe to do so. See Tr. 15-62:9-63:1. And Brogan Chambers felt that Cynosure was dragging its feet in finalizing a new post-sales position it had promised her and had concerns about the compensation plan offered to her and her new team. See Tr. 15-113:3-11, 115:9-15, 119:6-10, 119:25-120:12, 122:3-17, 125:13-17, 135:5-11; Tr. 16-19:19-20; Exs. 843, 852.

Coinciding with these frustrations, Cynosure continued to see high levels of attrition among the sales force in 2021 and 2022. See Tr. 9-70:18-25; Tr. 16-34:10-20; Tr. 17-117:20-118:3. Eighty-seven sales employees were terminated or quit in 2021 and early 2022, at least thirteen of whom went to a competitor called BTL. See Ex. 738. Chambers told Kibbey that one of those employees, a DSM, left Cynosure because of the quota increases and supply chain issues. See Tr. 6-92:14-96:7; Ex. 858. Chambers predicted that the departure of this employee would result in lost revenue for

Cynosure of between $5 and $6 million. See Ex. 858. Chambers also fired five members of the sales force following a company meeting in early 2022. See Tr. 12-41:24-42:4. Kibbey was concerned about this high attrition. See Ex. 846. Cynosure experienced significant turnover among its executive ranks during these years too. See Tr. 16-139:17-20; Tr. 17-118:4-13.

## VIII. **Daley's and Chambers' Recruiting of Cynosure Employees**

In early 2022, Daley and Chambers began to spread the word about their new venture with Reveal Ltd. among certain members of Cynosure's sales force. Chambers first mentioned the opportunity to Murrell in February 2022. See Tr. 8-40:7-42:20. The following month, Murrell told Kyle Robertson, a DSM from Canada, about the new venture and suggested that Robertson could lead the Canada team. See Tr. 12-127:9-16, 163:8-164:10. Around the same time, Daley and Chambers spoke to another DSM and an ASM about the new company. See Calabrese Dep. 97:10-98:6; Steinhorn Dep. 67:18-20, 73:2-23.

These discussions continued at two Cynosure sales force events in the Caribbean in April 2022. See Tr. 7-120:3-7; Tr. 8-43:2-5; Tr. 12-130:19-21. Chambers told Robertson that he wanted him to be part of the new company. See Tr. 12-130:22-131:5. Daley and Chambers spoke further with Murrell about the venture and said they wanted him onboard too. See Tr. 8-42:23-43:20. Murrell, in turn, mentioned the opportunity to other sales representatives.

See Tr. 8-51:12-24. After these events in the Caribbean, Murrell told Robertson that he "wo[uldn't] have a job in aesthetic lasers ever again" if he spread information about the new venture. Tr. 12-132:16-24. And a member of Cynosure post-sales team from New York, Yunior Caballero, was approached about the new venture by a colleague. See Tr. 6-174:2-175:3, 178:11-179:1; Tr. 7-50:15-51:10.

No later than April 21, 2022, Daley signed an employment agreement with Reveal Ltd. to be the CEO of its North American operations effective April 22. See Ex. 127. Chambers signed an employment agreement with Reveal Ltd. no later than April 23, which appointed him as CCO effective June 1. See Ex. 128.[6]

On April 22, Daley messaged Buchbinder about hiring employees for Reveal Ltd. See Ex. 651. Daley said that he and Chambers "definitely need[ed] the stock/equity info by end of day Sunday as [they were] having conversations with people on Monday about this." Id. Daley also asked Buchbinder, "When do you think job postings will go up so we can have people start applying to avoid non-solicitation issues?" Id. Buchbinder responded that he was waiting for an attorney to send him a draft of the equity information and

---

[6] The date June 1, 2022, is written next to Chambers' signature on his employment agreement with Reveal Ltd. The employment agreement's metadata, however, shows that the file was created and last modified on April 23, 2022. Given the evidence that other Reveal Ltd. employment agreements were postdated, see infra, the Court finds that Chambers signed his agreement no later than April 23.

that Reveal Ltd. would post job listings over the next week. See id. The next day, Daley created an "Equity and Sign-on spreadsheet" that listed the names of Cynosure sales representatives, with titles and base salaries for each person and empty fields for equity and bonuses. Ex. 512; see Tr. 7-166:14-25.

The week of April 25, Daley and Chambers met with Cynosure sales representatives in New York, Atlanta, Nashville, and Tampa. See Tr. 6-181:3-9; Tr. 7-11:9-11, 137:5-8, 138:7-13, 145:19-146:10, 148:3-8; Tr. 11-42:13-19, 46:11-19, 47:4-10, 48:18-49:2; Malone Dep. 125:3-6; Padron Dep. 133:10-13; Steinhorn Dep. 75:10-13, 77:8-10. They called each gathering a "quarterly business review" ("QBR"), see Tr. 6-181:3-6, which is a regular meeting in which an RBD talks to an entire district sales team about its performance in the prior quarter and how to improve going forward. See Tr. 4-132:4-133:17; Tr. 7-11:12-21. But the meetings Daley and Chambers actually held the week of April 25 were not real QBRs. No Cynosure business was discussed. See Tr. 7-13:13-14; Malone Dep. 125:3-20; Padron Dep. 145:20-146:2; Steinhorn Dep. 77:24-78:4. Daley did not even supervise the sales representatives with whom he and Chambers met in Atlanta, Nashville, and Tampa. See Tr. 7-138:7-24; Malone Dep. 130:10-14; Padron Dep. 133:14-18. Daley and Chambers invited only certain sales representatives from each district to these meetings rather than the entire team as was customary for QBRs. See Tr. 7-128:20-129:6; Padron Dep. 135:9-19.

And Chambers told at least one sales representative in advance that he and Daley were coming to discuss the new venture. See Steinhorn Dep. 75:17-76:9.

Rather than hold a real QBR, Daley and Chambers pitched Cynosure's sales representatives on joining Reveal Ltd. They had the attendees sign NDAs, which went missing between the time of these meetings and trial. See Tr. 6-182:1-183:8; Tr. 7-130:7-18, 131:7-12, 147:22-25, 148:14-15; Malone Dep. 131:24-132:3; Padron Dep. 152:25-153:19. They then spoke about Reveal Ltd. and showed slides from a presentation prepared by Reveal Ltd. describing the company's history and leadership and the lasers it intended to sell, which were competitive with Cynosure's products. See Tr. 6-184:12-185:3, 186:12-188:5, 192:20-193:2; Tr. 7-136:8-11; Tr. 11-90:20-22; Malone Dep. 131:11-15, 132:9-11, 136:1-18; Padron Dep. 147:15-148:12, 149:10-17; Steinhorn Dep. 78:20-79:4; Calabrese Dep. 99:22-100:2, 102:12-103:8; Ex. 574. The presentation included a slide comparing the health insurance plans Reveal Ltd. was offering its employees to those available at Cynosure. See Tr. 7-134:25-135:22; Ex. 574. Daley and Chambers told at least one sales representative that they were taking the "President's Club" winners (i.e., the top performing members of Cynosure's sales force) for the new venture. See Malone Dep. 134:24-135:15.

Daley and Chambers gave each sales representative a written employment offer with a title and salary, which he or she signed

on the spot. See Tr. 6-188:17-25, 190:7-191:17; Tr. 11-89:19-91:4; Malone Dep. 137:11-21; Padron Dep. 147:7-17, 153:20-25; Steinhorn Dep. 85:15-17. However, they told each sales representative not to date the agreement, and a date following each person's resignation from Cynosure was later added beneath the signature. See Tr. 6-188:20-25, 189:24-190:6; Malone Dep. 151:18-153:1; Padron Dep. 156:9-10; Steinhorn Dep. 98:11-13; Calabrese Dep. 125:25-126:20; Exs. 167J, 167P-Q, 167T. At least one employee Daley and Chambers recruited during these meetings was later instructed to submit an employment application to Reveal Ltd. but was told the contents of his resume would not matter. See Tr. 7-16:7-8, 16:22-17:14, 18:19-25; Exs. 133, 440.

Daley flew home to the Boston area on April 28 and met with another Cynosure sales representative in Massachusetts to recruit him for the new venture. See Tr. 7-149:7-150:2. That day, Daley reported to Buchbinder that he and Chambers "had a very successful week getting people signed up on the East Coast" and "a great week from a recruiting standpoint and building a lot of excitement!!" Ex. 129. Cynosure paid for flights, hotels, and other expenses Daley and Chambers incurred in connection with these meetings. See Tr. 4-147:19-151:20; Tr. 11-46:2-10, 46:23-47:3, 48:15-17, 52:16-19; Exs. 42-43, 588Z to CC, 589F, 589H, 589J.[7]

---

[7] At trial, Daley and Chambers offered a starkly different version of what occurred at these meetings in late April 2022. They

On May 1, 2022, Daley informed Buchbinder that he and Chambers were "planning to resign" from Cynosure. Ex. 130. Chambers submitted his resignation the next day. See Ex. 46. Daley followed suit on May 3. See id.

Following their resignations, Daley and Chambers continued to recruit Cynosure employees on behalf of Reveal Ltd. On May 4, they met with two more Cynosure employees in Texas and pitched them on joining their new venture. See Tr. 7-152:9-153:10; Tr. 11-53:19-54:4; Tr. 12-52:10-14; Tr. 15-74:13-75:4. Daley and Chambers then traveled to Seattle the next day to meet with other Cynosure sales representatives, including Murrell and a DSM named Jason Kalso. See Tr. 7-153:17-21, 154:19-21, 155:7-9; Tr. 8-53:2-4, 54:14-55:2; Tr. 11-54:9-17; Tr. 12-53:3-7, 57:3-20; Tr. 13-21:6-11, 22:3-9. As with the previous meetings, Daley and Chambers had the attendees in Seattle sign NDAs, showed them a presentation about Reveal Ltd.,

---

admitted that they discussed Reveal Ltd. with the other sales representatives. See Tr. 7-150:4-12; Tr. 11-42:17-43:1, 46:20-22, 47:11-13, 49:3-19. They testified, however, that they discussed the new venture only after conducting real QBRs about Cynosure business; that they did not present written employment offers for Reveal Ltd.; that they showed at most a slide or two about Reveal Ltd.'s products only in response to a question rather than a full presentation; and that they discussed employment opportunities with other companies as well. See Tr. 7-129:12-130:2, 130:11-21, 132:16-20, 136:17-25, 139:18-25, 142:3-8, 146:15-16, 147:7-13, 148:17-20; Tr. 9-54:24-55:3, 55:4-16, 58:15-59:3; Tr. 11-42:17-43:1, 46:20-22, 47:11-13, 47:24-48:14, 49:3-19. Given the documentary evidence and the consistent testimony from many sales representatives about what occurred, the Court does not credit Daley's and Chambers' version of events.

and gave them employment agreements to sign but not date. See Tr. 7-155:13-15; Tr. 8-54:10-13; Tr. 13-22:20-23:8, 23:18-23. Later in May, Daley flew to Chicago to recruit another DSM for Reveal Ltd.; that employee also signed, but did not date, an employment agreement. See Tr. 7-160:20-162:23; Exs. 46, 167H. As part of his efforts to recruit this DSM, Daley told him that the future at Cynosure was miserable. See Tr. 7-161:8-20. Other sales representatives whom Daley and Chambers had recruited also spoke with their Cynosure colleagues in May and June 2022 about leaving the company for Reveal Ltd. See Tr. 8-59:23-60:13; Exs. 142, 443.

Besides Daley and Chambers, twenty-six other Cynosure sales and marketing employees resigned between May 3 and June 30, 2022. See Ex. 46.[8] Among these employees were Murrell, the area VP for the western United States and Canada; Brogan Chambers, the director of sales practice development for North America; two members of Brogan Chambers' team; an RBD; eight DSMs; six ASMs; and four TMs. See id. Cynosure lost multiple members of many of its district sales teams, namely those in the Pacific Northwest, New York, New England, Florida, the Carolinas and Georgia, and in a district encompassing Tennessee, Kentucky, Alabama, and Mississippi. See id. There were discussions among at least some of these departing

---

[8] Robertson and Caballero, two of the employees whom Daley, Chambers, and others tried to recruit for Reveal Ltd., ultimately decided not to leave Cynosure. See Tr. 7-28:5-7; Tr. 12-132:7-9.

employees about resigning on the same day, but they did not end up doing so. See Tr. 7-14:22-15:7; Tr. 11-100:9-12; Ex. 518. Some of these individuals were already looking to leave Cynosure when they were recruited by Daley and Chambers, see Tr. 11-144:24-145:2; Tr. 12-99:24-100:1; Tr. 13-120:16-18; Tr. 15-90:22-25; Tr. 16-67:14-16, but others were not, see Padron Dep. 144:25-145:10; Calabrese Dep. 117:24-118:2.

Although Buchbinder originally planned to build up United States operations for Reveal Ltd. more slowly, Daley and Chambers convinced him to bring on most of the former Cynosure employees in May and June 2022. See Tr. 10-29:24-31:5; Ex. 593. As a result, all twenty-six individuals started working at Reveal LLC, Reveal Ltd.'s new subsidiary in the United States, soon after leaving Cynosure, and most assumed roles performing similar functions in similar geographic territories to their jobs at Cynosure. See Tr. 9-23:19-23; Ex. 46. At least some of these employees disclosed to Reveal Ltd. prior to beginning their new employment that they were parties to restrictive covenant agreements with Cynosure. See Exs. 695A-G.

## IX. Former Cynosure Employees' Transfer and Possession of Cynosure Documents and Information

Certain employees who left Cynosure made electronic copies of company files around the time they resigned. On February 21, 2022, Murrell copied around 960 files from his Cynosure laptop to a flash

drive. <u>See</u> Tr. 9-161:10-13; Ex. 230D. He transferred those files from the flash drive to a personal computer a few weeks after he resigned from Cynosure. <u>See</u> Tr. 9-161:14-162:15; Exs. 46, 230E. Among these files was a set of screenshots from a confidential presentation about "Project Tungsten," a new product Cynosure was developing. <u>See</u> Tr. 2-41:9-16, 42:7-14, 161:2-7; Tr. 8-71:4-14; Tr. 9-160:3-19, 161:1-9, 162:20-163:11; Ex. 249. This presentation included information shared only with high-level employees, such as details about the product's functions and a marketing and sales analysis. <u>See</u> Tr. 2-44:18-48:5. Cynosure had not launched this new product by the time of trial. <u>See</u> Tr. 5-185:22-25, 186:17-24. Murrell also copied confidential spreadsheets with 1) revenue figures for the sales regions he oversaw and prices for each sale made in those regions and 2) draft matrices of approved price ranges and commission percentages for the devices Cynosure sold, along with comments on the pricing from the company's chief financial officer. Tr. 5-75:10-76:2, 77:19-78:14; Ex. 238-39.

In late April 2022, Smith changed the email address associated with a Dropbox account from his Cynosure address to a Gmail one and then copied around 200 files from a Cynosure laptop into the account. <u>See</u> Tr. 10-94:20-95:19, 96:2-10; Ex. 230Q. One of those files was a Cynosure presentation called "Consolidated Competitive Overview 2021." Ex. 303; <u>see</u> Tr. 15-100:6-101:2; Ex. 230Q. This document, which was marked "Confidential" and "For Internal Use

Only," compared Cynosure's products to competitive devices sold by other companies. Ex. 303. Although this document contained mostly publicly available information, the summaries allow sales representatives to quickly pull up information they need about a competitor's product during a call or meeting. See Tr. 2-60:11-61:9, 122:2-123:3; Tr. 17-95:19-97:14, 98:25-99:17. On June 9, 2022, Smith offered to send "competitive decks from Cyno" to other Reveal LLC employees. Ex. 141. Smith's Dropbox account also contained approximately 10,000 files that previously had been synced from a Cynosure computer and that he shared with colleagues at the company. See Tr. 10-96:17-21; Tr. 15-45:11-46:6, 47:7-15, 57:9-13.

In May 2022, Kalso copied approximately 15,000 files from his Cynosure computer to a flash drive. See Tr. 9-164:6-165:21; Tr. 13-34:12-19; Ex. 230L. One such document was a spreadsheet listing providers in Idaho that Cynosure sales representatives had called about purchasing devices. Tr. 2-89:25-90:16; Exs. 230L, 264. The spreadsheet included notes about each provider, such as the services offered and their interest in purchasing Cynosure products. Ex. 264. Sales representatives use this type of customer information to develop leads and to determine which providers they will target with their sales efforts. See Tr. 2-74:2-17, 81:21-82:17, 101:1-13. While a sales representative could compile a list of providers from publicly accessible sources, this type of

39

prospective customer list contained information about the providers and their interest in buying Cynosure devices that was not readily available. See Tr. 2-92:23-94:3, 94:4-14; Tr. 9-76:9-77:17; Tr. 11-124:2-14, 125:9-20.

Three other Cynosure employees transferred files from their Cynosure computers to flash drives in May 2022. See Tr. 9-166:2-167:3; Tr. 10-91:2-19, 93:10-94:13; Exs. 230Z, 230AA, 230II. Among the files that one of these employees copied were a spreadsheet listing providers that had been credit approved to buy specific Cynosure products and a list of providers in Georgia and Florida with notes about which were promising leads. See Tr. 2-86:10-88:25, 9:23-100:16; Exs. 230II, 287-88.

A handful of the Cynosure employees transmitted company information via email as well. A few days before resigning, one employee forwarded to his personal account fourteen emails containing inquiries made by providers about purchasing Cynosure products, some of which listed a specific product the provider was considering. See Tr. 5-78:20-81:14; Exs. 46, 342-55. Another sent himself on the day he resigned lists of providers in certain regions, lists of providers that registered for Cynosure events and expressed interest in certain Cynosure products, and a "hot list" of prospective customers. See Tr. 5-81:20-83:15; Exs. 21, 370-72. On July 8, 2022 a former Cynosure employee sent Murrell copies of Cynosure's 2020 and 2021 sales compensation matrix and

its 2020 sales plan, which included the price ranges sales representatives could sell each product for and the resulting commission percentages. See Tr. 8-75:6-17, 76:15-18; Ex. 467.

Shortly after this lawsuit was filed, the Court ordered the parties to begin a remediation process to ensure the preservation and return of confidential Cynosure information in the possession of the former employees who had left for Reveal LLC. See Dkt. 33 ¶ 5; Tr. 5-187:3-188:2; Tr. 6-14:4-6. All of those individuals, except Chris and Brogan Chambers, returned Cynosure files as part of this process, see Tr. 10-99:12-100:7, including the documents and emails just described. In addition, Murrell returned screenshots of a presentation describing Cynosure's financial forecasts that was given to the company's high-ranking employees. See Tr. 5-74:10-75:4; Ex. 243. Another employee returned a confidential spreadsheet comparing Cynosure's devices with those of its competitors that the company used to train its sales force on how to position Cynosure's devices in the market. See Tr. 2-65:24-67:12, 3-67:19-68:13; Ex. 335. Employees also returned a variety of prospective customer lists with notes about conversations sales representatives had with providers and lists of providers that had registered for Cynosure marketing events (some of which noted specific products the provider had expressed interest in). See Tr. 2-70:19-71:2, 73:6-17, 74:18-75:13, 76:5-23, 78:15-79:16, 94:15-18, 95:13-21, 97:6-98:17, 98:24-99:10,

100:1-16; Tr. 9-124:21-24; Tr. 13-39:15-21; Exs. 270-71, 277, 285, 290, 292, 322-23, 327, 333, 336, 358.

As for Daley, Cynosure sent him a separation letter on May 5, 2022, asking him to "return any Company confidential information, proprietary and trade secret documents including copies and electronic copies or a confirmation of destruction of electronic copies." Ex. 204. A Cynosure policy also requires that when an employee disposes of confidential business information on a flash drive, he or she either wipe the data or physically destroy the device. See Ex. 2. On May 9, Daley had two flash drives professionally destroyed. See Tr. 8-174:24-176:9; Ex. 132. Those flash drives contained both personal and Cynosure files Daley had copied over in the eight months before he resigned. See Tr. 8-175:25-176:15. In addition, Daley performed a factory reset on his Cynosure laptop before returning it to the company, which wiped all files and data. See Tr. 4-53:6-18; 71:17-72:6; Tr. 8-169:1-7; Tr. 9-141:5-13. As a result, Cynosure was unable to determine whether Daley copied any files from his company computer onto his flash drives. See Tr. 9-142:11-18, 142:24-143:15.

Daley did possess Cynosure documents on his personal computer that he returned during the remediation process. See Tr. 9-79:9-80:7; Ex. 47. Among these documents were a training presentation with slides marked "for internal use only" comparing Cynosure's products to competing devices sold by other companies and listing

the pros and cons of those devices; a spreadsheet listing contact information for plastic surgeons across the United States that Cynosure had purchased for marketing purposes; and a slide deck about Cynosure's sales strategies. See Tr. 2-49:11-19, 51:5-53:1, 53:22-54:14, 56:9-57:2, 82:21-84:3, 84:24-85:24; Exs. 328, 330-31. Daley sent the plastic surgeons list to his personal email in October 2021. See Ex. 107.

Cynosure did not recover any data from Chambers' devices. Cynosure's information security department wiped Chambers' company computer in the ordinary course when he returned it following his resignation. See Tr. 4-53:22-54:8. And while Chambers was on vacation in August 2022, his personal computer became "BitLockered," meaning that a security anomaly encrypted the computer and rendered it accessible only via use of a recovery key in addition to a username and password. See Tr. 9-144:6-145:9, 146:1-14, 149:15-150:4, 150:18-151:16; Tr. 11-63:3-9. Chambers and his wife testified that they could not re-access the computer because Chambers did not know what email address he used to set up the BitLocker and that they tried to fix the BitLockered computer to no avail. See Tr. 11-65:10-23; Tr. 12-75:5-7, 79:1-13, 81:6-82:20, 83:22-84:1, 84:14-19; Tr. 16-59:2-7, 62:3-18; Exs. 894-95. I do not find this explanation credible because the Chambers explanation has shifted: at other times, they blamed a dogsitter. See Tr. 9-158:2-10; Tr. 12-104:5-19.

43

## X.    <u>Reveal LLC's Launch</u>

Reveal LLC, Reveal Ltd.'s United States subsidiary, publicly launched in July 2022. <u>See</u> Tr. 8-152:1-3. Daley and Chambers served as the company's CEO and CCO, respectively. <u>See</u> Tr. 8-39:6-10; Tr. 10-151:4-13.[9] All of Reveal LLC's initial employees came from Cynosure. <u>See</u> Tr. 9-130:22-24.

The sales representatives that left Cynosure for Reveal LLC began communicating with potential customers on behalf of the new venture in May 2022. <u>See</u> Tr. 8-151:22-152-10; Ex. 657. Some attempted to poach sales opportunities from Cynosure. For example, about a week after resigning from Cynosure, a DSM suggested to two Cynosure colleagues that they contact a doctor who was "a damn good prospect for the new thing." Ex. 446A. Another DSM instructed his former district team member to tell a provider asking about her pre-used Cynosure laser "that [he] no longer work[s] for cynosure and then pivot into selling the new opportunity and schedule a follow up for June." Ex. 135.

Others sought to capitalize on relationship they had developed with providers while at Cynosure. On June 9, 2022, Kalso texted the following to many of his Reveal LLC colleagues: "Our team is only meeting with very good customers with existing relationships in yhe [sic] metro areas that we live from June 20-

---

[9] Chambers was later promoted to the role of president and global CCO. <u>See</u> Tr. 10-148:25-149:6.

30 for keeping expenses low, getting at bats in and see if we can't get someone to buy sooner than later:)" Ex. 646; see Tr. 13-29:3-17. Kalso and Murrell discussed selling devices to a provider whom Cynosure considered to be a key opinion leader in her field and to whom Kalso had sold Cynosure products. See Tr. 8-69:17-70:8; Ex. 469. The following month, another employee sent a blast text message offering to discuss Reveal LLC to seventy-seven providers, some of whom were Cynosure customers or prospects he had cultivated while he worked at Cynosure. See Tr. 11-103:4-7, 103:22-105:9; Exs. 154-A to -YYY, 572.

After the filing of this lawsuit in mid-July 2022, Daley and Chambers made some efforts to stop Reveal LLC from soliciting Cynosure customers. On July 28, Chambers told a Reveal LLC employee "to double and triple check that no cyno customers are being sold." Ex. 885. A few weeks later, Daley warned others at Reveal LLC that they "c[ouldn't] contact any Cynosure customers." Ex. 826; see Tr. 9-94:11-96:2. And that October, Chambers told Reveal LLC employees not to send an email blast to individuals who had attended a company event due "to the lawsuit situation" and "in case it does go to a Cyno customer." Ex. 883; see Tr. 12-65:23-66:21. These efforts to stop Reveal LLC from soliciting Cynosure customers were not entirely successful: for instance, on August 30, Kalso reached out to a provider he met as a prospective customer while at Cynosure. See Tr. 13-126:12-127:17; Ex. 547.

After Reveal LLC launched, Chambers and Jason Steinhorn, another other former Cynosure employee, drafted sales pitches to promote Reveal LLC's devices. Chambers' pitch described how Reveal LLC was supplanting Cynosure as the leader in the industry and mentioned that "two former Cynosure executives" had helped Buchbinder launch Reveal LLC. Ex. 497A; see Tr. 11-74:22-78:11; Tr. 12-58:13-59:3. Steinhorn developed his pitch with input from others, including Chambers and Daley. See Steinhorn Dep. 185:5-18, 187:16-188:7, 190:5-191:5. His pitch, which was directed at doctors who he knew from his time at Cynosure, explained that Cynosure had made poor financial decisions that negatively impacted the company and that Reveal LLC had poached the top forty sales representatives from Cynosure. See Steinhorn Dep. 178:7-12, 179:25-180:9, 182:4-12, 191:10-13; Ex. 477A. The pitch also falsely stated that Reveal LLC had hired Cynosure's "lead engineer," that Steinhorn had received recruiting calls from Buchbinder, and that Steinhorn had invested his own money into Reveal LLC. Ex. 477A; see Steinhorn Dep. 184:22-185:4, 187:6-187:15, 194:11-21. Steinhorn and others at Reveal LLC used versions of this pitch with customers on at least a few occasions. See Steinhorn Dep. 180:15-19, 194:6-10, 197:8-23; Ex. 477A.

A number of providers agreed to purchase two of Reveal LLC's devices between July and November 2022. See Ex. 676. The company had to cancel these orders, however, once it learned that the FDA

had not cleared the devices. See Tr. 8-110:25-111:2, 160:4-21; Tr. 9-86:7-25, 87:8-16; Tr. 11-107:4-14. Unable to complete sales until November 2022, Reveal LLC struggled financially. See Tr. 8-109:4-11, 110:23-24; Tr. 9-83:10-16. Reveal LLC earned only about $1.5 million in revenue in 2022 and had a net loss of $10 million. See Tr. 9-84:7-20; Tr. 12-91:5-6.

During the first year of Reveal LLC's operations, Daley, Chambers, Buchbinder, and others talked about the possibility of buying Cynosure and other competitors. See Tr. 10-34:1-7, 46:11-47:19; Exs. 160, 509. Reveal Ltd. hoped that through a relationship with a Chinese customer of Cynosure, they could "cut [the] revenue of Cynosure by 80 percent" and put Cynosure "in a desperate situation to sell the company." Exs. 164-65. Buchbinder promised Daley and Chambers a $2.5 million bonus if they helped Reveal Ltd. buy Cynosure. See Tr. 8-184:1-185:2; Tr. 10-34:8-12; Ex. 508. Nothing came of these discussions about purchasing Cynosure.

## XI. Preliminary Injunctions and Reveal LLC's Subsequent Performance

As explained below, this Court issued a TRO in late July 2022 that barred the former Cynosure employees from soliciting the company's customers and prohibited the use of the company's confidential information. The Court subsequently issued preliminary injunctions in November 2022 and April 2023 barring sixteen of the individuals who left Cynosure for Reveal LLC from

competing with Cynosure within certain geographic areas on the basis of their restrictive covenants. Both Daley and Chambers were prohibited from competing with Cynosure throughout North America from November 9, 2022, to May 3, 2023. See Ex. 51. During this period, Daley worked on Reveal Ltd.'s non-United States operations, and Kalso, a former Cynosure DSM, became Reveal LLC's interim CEO. See Tr. 9-24:3-20, 26:3-9; Tr. 13-44:6-8. Chambers also ceased working in North America for this time. See Tr. 12-70:6-17. Certain Reveal LLC employees who were enjoined from competition in only portions of North America worked in different territories during the duration of the injunctions. See Tr. 9-25:17-26:2. Although one enjoined employee told a vendor to contact a colleague so that he could "work in the background," Ex. 555; see Tr. 15-91:17-92:6, the record does not reflect that any enjoined employee meaningfully violated the preliminary injunctions, see Tr. 15-85:9-11, 88:13-15, 88:24-89:8. The restrictions imposed by the injunctions expired for all of the employees between May and August 2023. See Ex. 51. Some of the twenty-eight former Cynosure employees left Reveal LLC during the period of the injunctions, and about half had done so as of trial. See Tr. 9-104:14-20.

Reveal LLC's sales ramped up 2023, as the company had a new device to sell each quarter of that year. See Tr. 9-83:17-23. Reveal LLC earned over $17 million in revenue in 2023 but still

48

ended up with a net loss of around $637,000. See Tr. 9-20:13-15, 104:2; Tr. 12-90:23-91:3; Ex. 603. In the first quarter of 2024, Reveal LLC was on pace for $100 million in annual revenue. See Ex. 454. As of trial, however, Reveal LLC had not achieved profitability. See Tr. 16-169:24-170:2.

## XII. Cynosure's Attrition and Revenue in 2022 and Beyond

In 2022, the year Cynosure lost twenty-eight employees to Reveal LLC, Cynosure had higher attrition among its sales force than it did in the preceding and following years. See Tr. 5-48:9-49:13; Tr. 14-33:23-34:1. Cynosure lost sixteen DSMs in 2022 versus only six and three in 2021 and 2023, respectively. See Tr. 3-118:2-119:2. Similarly, about 60% of Cynosure's ASMs left the company in 2022, higher than the 40% to 50% attrition in 2021 and the approximately 30% attrition in 2023. See Tr. 3-119:4-13. And Cynosure lost more TMs in 2022 than the company has TM positions (meaning some TMs were both hired and left during 2022), which was not the case in either 2021 or 2022. See Tr. 3-119:15-25. Twenty-eight was also an unusually high number of sales employees for Cynosure to lose over the course of two months. See Tr. 5-46:21-47:16. Cynosure made fewer sales in the months following these employees' departures, resulting in decreasing revenue from the first quarter to the second quarter of 2022 and the laying off about fifty people who worked in sales administration, research and development, and operations. See Tr. 5-45:21-46:8; Tr. 14-

25:1-11.

Cynosure's revenue decreased in 2022 and 2023 compared with 2021, and the company failed to achieve its revenue projections for those years. In 2021, Cynosure earned $135.2 million in total revenue in the United States, including $107 million from product sales. See Ex. 33. The following year, Cynosure originally forecast total revenue in the United States of $173.1 million, including $139.6 million from product sales. See id. In mid-2022, when the twenty-eight employees left to go to Reveal LLC, Cynosure updated its forecast for United States product revenue for the year to only $76.7 million. See id. A comparable reforecast of the company's revenue for all North American product sales reduced the estimate from $170.5 million to $108.4 million. See Tr. 5-33:13-34:22, 36:4-8; Ex. 450. The company ended up with actual 2022 revenue of $105.5 million in the United States, $77.6 million in United States product sales, and $108.9 million in North American product sales. See Tr. 5-36:8-10; Exs. 33, 450. Revenue fell further in 2023, when Cynosure earned $100 million in total revenue in the United States and $72.7 million from product sales. See Ex. 33.

## PROCEDURAL HISTORY

On July 20, 2022 -- within days of Reveal LLC's public launch -- Cynosure filed suit against the Reveal entities, Daley, Chambers, and ten of the other employees who left Cynosure for

Reveal LLC. The complaint asserted claims against all the defendants for misappropriation of trade secrets under federal and state law, civil conspiracy, tortious interference with contract and prospective business relations, and violation of Chapter 93A. Cynosure also alleged that Daley, Chambers, and the other individuals breached their restrictive covenant agreements with Cynosure, the implied covenant of good faith and fair dealing, and their fiduciary duties of loyalty. Lastly, Cynosure brought a claim for aiding and abetting breach of fiduciary duty against the Reveal entities.

As previously mentioned, Cynosure sought emergency injunctive relief against the defendants. Six days after Cynosure filed suit, and after an expedited hearing, the Court issued a TRO that, among other things, barred the defendants from disclosing or using Cynosure's confidential information, required them to participate in a remediation process to ensure the preservation and return of confidential information in their possession, prohibited them from soliciting Cynosure customers, and forbade Reveal LLC from soliciting or hiring any other Cynosure employees. In mid-August 2022, Cynosure filed an amended complaint adding as defendants the sixteen other former employees who left for Reveal LLC.

The Court issued preliminary injunctions in two phases. The Court first addressed the defendants sued in Cynosure's original complaint. The Court enjoined Daley, Chambers, and eight of the

ten original individual defendants from violating their noncompetition obligations for one year from the date of termination in specified geographic regions. See Cynosure LLC v. Reveal Lasers LLC, No. 22-cv-11176, 2022 WL 18033055, at *17 (D. Mass. Nov. 9, 2022). The Court also barred all defendants from soliciting Cynosure employees and three of the individuals from violating their customer nonsolicitation obligations. See id. Lastly, the Court required the individual defendants to return "devices, files, and accounts" they possessed in violation of confidentiality agreements and prohibited them from disclosing or using certain confidential information of Cynosure. Id. In a subsequent order in April 2023, the Court enjoined six of the individual defendants added in the amended complaint from violating their noncompetition obligations for a period of nine months. See Cynosure LLC v. Reveal Lasers LLC, No. 22-cv-11176, 2023 WL 3679046, at *9 (D. Mass. Apr. 21, 2023); Dkt. 244 ¶ 2.

Given the number of defendants in the case, the Court opted to try the Reveal entities, Daley, and Chambers first. The Court convened a nineteen-day jury trial in September 2024. Based on the trial record, the Court directed verdicts in Defendants' favor on Cynosure's claims that they tortiously interfered with prospective business relations, that Chambers misappropriated trade secrets, and that Reveal LLC aided and abetted Daley's and Chambers' breaches of fiduciary duty.

52

The jury returned a mixed verdict on the remaining claims. The jury found Daley and Chambers liable for 1) breaching noncompetition, employee nonsolicitation, and nondisclosure obligations and the implied covenant of good faith and fair dealing; 2) breaching their fiduciary duties of loyalty; 3) tortiously interfering with Cynosure's restrictive covenants with its employees; and 4) committing civil conspiracy. The jury returned a verdict in Daley's and Chambers' favor on Cynosure's claim that the two breached their customer nonsolicitation obligations. The jury found the Reveal entities liable for civil conspiracy and tortious interference with contract with regard to Cynosure's employees and Reveal Ltd. liable for aiding and abetting Daley's and Chambers' breaches of fiduciary duty. Finally, the jury determined that the Reveal entities and Daley had misappropriated Cynosure's trade secrets but that Cynosure suffered no harm as a result.[10]

The jury awarded Cynosure a total of $15 million in compensatory damages against the Reveal entities and held Daley and Chambers each also liable for separate $5 million subsets of

---

[10] The jury also returned a verdict in Reveal Ltd.'s favor on Cynosure's claim that Reveal Ltd. tortiously interfered with its contract with a customer in China called SinoPharm. Cynosure does not mention Cynosure's relationship with SinoPharm in its post-trial briefing on its Chapter 93A claim. Accordingly, the Court has made factual findings about SinoPharm only to the extent the issue is relevant to the Chapter 93A theories Cynosure does press.

that total. See Dkt. 731 (resolving the parties' dispute over the jury verdict). The jury also awarded Cynosure $225,000 in punitive damages against Daley for his breach of contract.

This opinion resolves the final claim against the Reveal entities, Daley, and Chambers for violation of Chapter 93A.

## CONCLUSIONS OF LAW

The Court first addresses whether Cynosure has proven that Defendants violated Chapter 93A, including Defendants' argument that the alleged unlawful conduct is not actionable pursuant to the intra-enterprise doctrine. The Court then resolves Defendants' argument that they cannot be held liable under Chapter 93A because the purported unfair or deceptive trade practices did not occur primarily and substantially in Massachusetts. Finally, the Court discusses the issues of damages, attorney's fees and costs, and post-judgment interest.

## I.    Chapter 93A Violation

### A.    Legal Standard

"Chapter 93A '"is a statute of broad impact" that prohibits "unfair methods of competition" and "unfair or deceptive acts or practices in the conduct of any trade or commerce."'" Anoush Cab, Inc. v. Uber Techs., Inc., 8 F.4th 1, 15 (1st Cir. 2021) (quoting Exxon Mobil Corp. v. Att'y Gen., 94 N.E.3d 786, 791 (Mass. 2018)); see Mass. Gen. Laws ch. 93A, § 2(a). The statute is "designed 'to encourage more equitable behavior in the marketplace . . . [and

impose] liability on persons seeking to profit from unfair practices.'" <u>Linkage Corp. v. Trs. of Bos. Univ.</u>, 679 N.E.2d 191, 208 (Mass. 1997) (alterations in original) (quoting <u>Poznik v. Mass. Med. Prof'l Ins. Ass'n</u>, 628 N.E.2d 1, 4 (Mass. 1994)).

Section 11 of Chapter 93A provides a cause of action to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property . . . as a result of" a prohibited act or practice. Mass. Gen. Laws ch. 93A, § 11. To prevail on a § 11 claim, a plaintiff must prove "three elements: (1) the defendant engaged in an unfair method of competition or committed an unfair deceptive act or practice; (2) a loss of money or property was suffered; and (3) the defendant's unfair or deceptive method, act or practice caused the loss suffered." <u>Anoush Cab, Inc.</u>, 8 F.4th at 16 (citing <u>Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.</u>, 17 N.E.3d 1066, 1074-75 (Mass. 2014)).

Chapter 93A itself does not define what constitutes an unfair or deceptive trade practice. <u>See</u> <u>id.</u> at 15. Instead, whether conduct counts as "unfair or deceptive . . . is best discerned 'from the circumstances of each case.'" <u>Id.</u> at 17 (quoting <u>Kattar v. Demoulas</u>, 739 N.E.2d 246, 257 (Mass. 2000)). To determine if "an act or practice is unfair," courts evaluate "whether the conduct: (1) 'is within at least the penumbra of some common-law, statutory, or other established concept of unfairness'; (2) 'is immoral, unethical, oppressive, or unscrupulous'; and (3) 'causes

substantial injury to consumers or other businesses.'" <u>Schuster v.</u>
<u>Wynn Ma, LLC</u>, 118 F.4th 30, 39 (1st Cir. 2024) (quoting <u>Columbia</u>
<u>Plaza Assocs. v. Ne. Univ.</u>, 227 N.E.3d 999, 1017 (Mass. 2024)).
Evaluating these factors requires an assessment of "the nature of
[the] challenged conduct," "the purpose and effect of that
conduct," "the equities between the parties," and "what a defendant
knew or reasonably should have known." <u>Id.</u> at 42 (cleaned up).
Conduct "is deceptive 'if it possesses a tendency to deceive' and
'if it could reasonably be found to have caused a person to act
differently from the way [they] otherwise would have acted.'" <u>Id.</u>
at 43 (alteration in original) (quoting <u>Walsh v. TelTech Sys.,</u>
<u>Inc.</u>, 821 F.3d 155, 160 (1st Cir. 2016)).

   "'Section 11 does not contemplate an overly precise standard
of ethical or moral behavior' but rather implies 'the standard of
the commercial marketplace.'" <u>Anoush Cab, Inc.</u>, 8 F.4th at 17
(quoting <u>Ahern v. Scholz</u>, 85 F.3d 774, 798 (1st Cir. 1996)). To
establish a Chapter 93A violation, a plaintiff generally must show
"extreme or egregious conduct" that goes beyond simple negligence.
<u>Id.</u> at 18; <u>see</u> <u>Walsh</u>, 821 F.3d at 160 ("To rise to the level of an
'unfair' act or practice, the defendant's conduct must generally
be of an egregious, non-negligent nature.").

   Finally, conduct may support liability under § 11 only when
it involves "a commercial transaction between a person engaged in
trade or commerce and another person engaged in trade or commerce,

such that they were acting in a 'business context.'" Governo L. Firm LLC v. Bergeron, 166 N.E.3d 416, 424 (Mass. 2021) (quoting Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d 244, 259 (Mass. 2008)); see Allstate Ins. Co. v. Fougere, 79 F.4th 172, 186 (1st Cir. 2023). As a corollary to this principle, "purely intra-enterprise disputes fall outside the reach of" § 11. Governo L. Firm, 166 N.E.3d at 424. This intra-enterprise doctrine means that "employer-employee disputes arising out of the employment relationship" are not actionable under Chapter 93A. Id.; see Allstate Ins. Co., 79 F.4th at 186 (explaining that § 11 does not apply to "strictly private transactions like those between . . . an employer and employee").

When a trial court decides a claim under Chapter 93A, it "is not bound by a jury's verdict on parallel common law claims." Baker v. Goldman, Sachs & Co., 771 F.3d 37, 49 (1st Cir. 2014); see BioPoint, Inc. v. Dickhaut, 110 F.4th 337, 350 n.6 (1st Cir. 2024) (explaining that "the court, when considering a chapter 93A claim, may adopt factual findings that contradict the jury's prior findings"). Nonetheless, "the court may, if it chooses, consider the verdict in reaching its conclusions, or adopt the verdict entirely." Baker, 771 F.3d at 49.

## B. Analysis

Cynosure's Chapter 93A claim against Defendants is laser-focused on two categories of allegedly unlawful trade practices:

1) Defendants' raid of Cynosure's sales force and 2) Defendants' misappropriation of Cynosure's trade secrets. The Court addresses these two categories of conduct in turn and then tackles Cynosure's remaining arguments about other purportedly unfair or deceptive acts undertaken by Defendants.

### 1. Raid of Cynosure's Sales Force

Cynosure first argues that Defendants committed unfair and deceptive conduct in violation of Chapter 93A when they raided Cynosure's sales force. Cynosure contends that Defendants engaged in a lengthy and calculated effort to recruit its top-performing sales representatives to facilitate the launch of Reveal LLC. This raid of its sale force, Cynosure continues, undergirded the jury's verdict that Defendants committed tortious interference with contract and that Reveal Ltd. aided and abetted Daley's and Chambers' breaches of fiduciary duty.

"In establishing an 'unfair or deceptive act or practice,' it is 'neither necessary nor sufficient that a particular act or practice violate common or statutory law.'" Schuster, 118 F.4th at 39 (quoting Anoush Cab, Inc., 8 F.4th at 16). That said, conduct amounting to certain common-law torts generally constitutes an unfair or deceptive act for purposes of Chapter 93A. As relevant here, if a plaintiff "can prove the elements of a tortious interference with contract, then it may also prevail in proving that these same acts constituted an unfair or deceptive act or

practice" under Chapter 93A. Fiorillo v. Winiker, 85 F. Supp. 3d
565, 575 (D. Mass. 2015) (quoting Guest-Tek Interactive Ent.
Inc. v. Pullen, 731 F. Supp. 2d 80, 91-92 (D. Mass. 2010)); see
KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC, 729 F. Supp. 3d
84, 114 (D. Mass. 2024); Piccicuto v. Dwyer, 586 N.E.2d 38, 39-40
(Mass. App. Ct. 1992). Similarly, courts usually treat conduct
that amounts to aiding and abetting a breach of fiduciary duty as
an unfair trade practice that violates Chapter 93A. See Prof'l
Servs. Grp., Inc. v. Town of Rockland, 515 F. Supp. 2d 179, 193
(D. Mass. 2007); Augat, Inc. v. Aegis, Inc., 565 N.E.2d 415, 419-
21 (Mass. 1991); Hanover Ins. Co. v. Sutton, 705 N.E.2d 279, 293-
94 (Mass. App. Ct. 1999).

As Cynosure stresses, the jury found Defendants liable for
tortiously interfering with its employees' restrictive covenant
agreements and Reveal Ltd. liable for aiding and abetting Daley's
and Chambers' breaches of fiduciary duty. Cynosure's theories of
liability on those claims rested on Defendants' raid of its sales
force to launch Reveal LLC. The jury also found that Defendants'
tortious conduct caused financial injury to Cynosure in the form
of lost profits. The Court adopts the jury's conclusions, see
Baker, 771 F.3d at 49, and need not make further findings on these
issues, see Makuc v. Am. Honda Motor Co., 835 F.2d 389, 394 (1st
Cir. 1987) (holding that a district court is "not required to make
specific findings of fact" for a Chapter 93A claim when a jury

verdict on parallel common-law claims "resolved all material, factual issues relating to the [Chapter] 93A claim"). Defendants' briefing on the Chapter 93A claim advances only a perfunctory and inadequately developed challenge to the Court's ability to rely on the jury verdict to conclude that Cynosure has proven a Chapter 93A violation. See Dkt. 686 at 11-12, 12 n.29; see also Groveland Mun. Light Dep't v. Phila. Indem. Ins. Co., 496 F. Supp. 3d 582, 586 (D. Mass. 2020) ("[T]he court need not consider any argument raised in only a perfunctory manner."); Photographic Illustrators Corp. v. Orgill, Inc., 118 F. Supp. 3d 398, 411 (D. Mass. 2015) (similar).

The jury verdict amply establishes that Defendants engaged in unfair trade practices in connection with their raid of Cynosure's sales force and that Cynosure suffered a monetary loss as a result of those unfair trade practices. Given the tortious and intentional nature of Defendants' conduct, it falls well within "the penumbra of some common-law . . . concept of unfairness" and is "unethical" and "unscrupulous." Schuster, 118 F.4th at 39 (quoting Columbia Plaza Assocs., 227 N.E.3d at 1017). As "top managerial employee[s]" at Cynosure, Daley and Chambers could not, "as . . . corporate pied piper[s], lead[] all [their] employer's employees away, thus destroying the employer's entire business." Augat, 565 N.E.2d at 420. Nor could Daley and Chambers "secretly solicit[] key managerial employees to leave their employment to join [them] in

60

a competitive enterprise." Id. at 421. Daley's and Chambers' unlawful inducement of a mass exodus of Cynosure's top-performing sales representatives and various key sales managers, the Reveal entities' unlawful role in that conduct, and Defendants' tortious interference with Cynosure's restrictive covenants with its employees were sufficiently "egregious" to amount to an unfair trade practice under Chapter 93A. Anoush Cab, Inc., 8 F.4th at 18; see Augat, 565 N.E.2d at 419-21 (affirming finding of liability under Chapter 93A against a company and its founder who participated in a competitor's general manager's solicitation of key managerial employees in breach of his duty of loyalty). And as the jury concluded, this unfair trade practice caused Cynosure to lose profits. Defendants' raid of Cynosure's sales force therefore violated Chapter 93A.

Defendants' sole developed rejoinder to this conclusion is that their recruitment of Cynosure's employees is not actionable under § 11 pursuant to the intra-enterprise doctrine. Defendants contend that Daley and Chambers undertook most of their recruitment efforts while still employed by Cynosure and, thus, that Cynosure's claim against them is a purely internal dispute between an employer and its employees. Defendants add that even Daley's and Chambers' post-resignation interference with Cynosure's restrictive covenant agreements with its employees is not actionable because that

conduct concerns employment agreements that fall outside the scope of § 11.

A threshold question is whether the intra-enterprise doctrine bars Cynosure's Chapter 93A claim against the Reveal entities. Some district courts have held that a claim that a third party tortiously interfered with restrictive covenants between an employer and employee is not actionable under § 11 because the claim arises from employment agreements. See Arbor Networks, Inc. v. Ronca, No. 12-cv-11322, 2012 WL 5610835, at *7-8 (D. Mass. Nov. 14, 2012); TalentBurst, Inc. v. Collabera, Inc., 567 F. Supp. 2d 261, 270-71 (D. Mass. 2008). But see Nat'l Econ. Rsch. Assocs., Inc. v. Evans, 24 Mass. L. Rptr. 436, at *13 (Mass. Super. Ct. 2008) (Gants, J.) (explaining that while a third party's inducement of a breach of a restrictive covenant normally is not actionable under § 11, the claim is viable if the plaintiff proves the improper motive or means sufficient to establish tortious interference). More recently, though, the Massachusetts Supreme Judicial Court ("SJC") has indicated that the intra-enterprise doctrine only applies to disputes between an employer and an employee. See Governo L. Firm, 166 N.E.3d at 424 & n.14 (explaining that § 11 "does not apply to employer-employee disputes arising out of the employment relationship" and that this rule "d[id] not preclude application of [Chapter] 93A to [a defendant], which was not [the plaintiff's] employee" (emphasis added)). Additionally,

a third party that participates in an employee's breach of fiduciary duty to his employer may be liable to that employer under § 11. See Augat, 565 N.E.2d at 419; Beninati v. Borghi, 61 N.E.3d 476, 485 (Mass. App. Ct. 2016). The intra-enterprise doctrine does not bar Cynosure's Chapter 93A claim against the Reveal entities.

Whether Daley and Chambers may be held liable to Cynosure under Chapter 93A for their recruitment of its employees presents a more difficult question. On the one hand, Massachusetts courts have long held that § 11 "does not apply to employer-employee disputes arising out of the employment relationship." Governo L. Firm, 166 N.E.3d at 424; see Manning v. Zuckerman, 444 N.E.2d 1262, 1264-66 (Mass. 1983). Accordingly, the SJC has indicated that an employer may not hold an employee liable under § 11 for breach of fiduciary duty. See Augat, 565 N.E.2d at 419; Manning, 444 N.E.2d at 1266. Moreover, an employer cannot base a § 11 claim against an employee solely on a breach of a restrictive covenant in an employment agreement, even when that breach occurs after the end of the employment relationship. See Informix, Inc. v. Rennell, 668 N.E.2d 1351, 1353-54 (Mass. 1996); see also Governo L. Firm, 166 N.E.3d at 425 n.15 (citing Informix's holding with approval).

On the other hand, the SJC recently clarified that "the inapplicability of [§ 11] to disputes arising from an employment relationship does not mean that an employee never can be liable to its employer under [§ 11]." Governo L. Firm, 166 N.E.3d at 425. In

Governo Law Firm, the SJC explained that "certain employment disputes" fall outside the scope of § 11 because they "are not 'marketplace transactions,' and instead concern 'the ordinarily cooperative circumstances of the employment relationship between an employee and the organization of which he [or she] is a member.'" Id. (alteration in original) (quoting Manning, 444 N.E.2d at 1265). But "[w]here an employee misappropriates his or her employer's proprietary materials during the course of employment and then uses the purloined materials in the marketplace, that conduct is not purely an internal matter; rather, it comprises a marketplace transaction that may give rise to a claim under [§ 11]." Id. One Massachusetts court has interpreted this language to mean that the intra-enterprise doctrine does not apply when "the defendant engaged in misfeasance that interfered with the plaintiff's ability to compete in the marketplace." Russo v. Manzoli, No. 2181CV01738, 2021 WL 6210647, at *4 (Mass. Super. Ct. Dec. 14, 2021).

The Court concludes that the intra-enterprise doctrine does not shield Daley and Chambers from liability under Chapter 93A for their roles in inducing a mass exodus of their Cynosure colleagues as agents of a competitive company. For one, under Governo Law Firm, the assessment of whether an employer-employee dispute is actionable under § 11 focuses on whether the employee's alleged misconduct is "purely an internal matter" or rather a "marketplace

transaction" involving distinct commercial actors. 166 N.E.3d at 425. Even while Daley and Chambers were still employed by Cynosure, their recruitment of their Cynosure colleagues was not purely an internal matter. As the jury found, Daley and Chambers engaged in a conspiracy with Reveal Ltd., which was a competitor of Cynosure, to breach their fiduciary duties and tortiously interfere with Cynosure's employment contracts with its employees. And both men had executed employment agreements with Reveal Ltd. before the fake meetings (QBRs) during which they gave other members of Cynosure's sales force their own employment agreements to sign. Whether in a conspiracy with, or as agents of, Reveal Ltd., Daley and Chambers conducted their unfair recruiting efforts to Cynosure's detriment on behalf of a third party that was itself engaged in competitive trade. See Juncker Assocs. & Co. v. Enes, 15 Mass. L. Rptr. 196, at *2-4 (Mass. Super. Ct. 2002) (rejecting application of the intra-enterprise doctrine to an employer's Chapter 93A claim against its employee for tortiously interfering with the employer's contracts and prospective relations with customers because the employee's acts were undertaken as an agent of another company he secretly formed to compete with his employer).

For another, Governo Law Firm clarifies that the intra-enterprise doctrine does not automatically shield an employee from liability to his employer under § 11 simply because the employee's

conduct occurred during the course of employment. See 166 N.E.3d
at 425. When the employee engages in unfair or deceptive conduct
both during his employment and "in the marketplace" after his
employment ceases, his actions "comprise[] a marketplace
transaction that may give rise to a claim under [§ 11]." Id. Here,
as in Governo Law Firm, Daley's and Chambers' recruitment of their
colleagues occurred both while the two men were still employed by
Cynosure and after they left the company to work for Reveal LLC.
The intra-enterprise doctrine therefore does not bar Cynosure's
§ 11 claim against Daley and Chambers related to this conduct.

In sum, the Court concludes that Defendants are liable to
Cynosure under § 11 of Chapter 93A for their raid of the company's
sales force.[11]

---

[11] It is worth noting that Reveal LLC only came into existence in
early May 2022 around the time Daley and Chambers left Cynosure
and their fiduciary duties to Cynosure ceased. For this reason,
the jury was asked only whether Reveal Ltd., and not Reveal LLC,
aided and abetted Daley's and Chambers' breaches of fiduciary duty.
Nonetheless, the jury found that Reveal LLC tortiously interfered
with Cynosure's restrictive covenant agreements with its
employees. While merely inducing a breach of a restrictive covenant
is not an unfair or deceptive act under Chapter 93A, see Evans, 24
Mass. L. Rptr. 436, at *13, it is unfair for a third party to
tortiously interfere with a restrictive covenant agreement and to
induce a mass exodus to cripple a competitor. In any event,
Defendants have not addressed this issue in their briefing.

2.   *Misappropriation of Cynosure's Trade Secrets*

Cynosure also asserts that Defendants violated Chapter 93A by misappropriating its trade secrets.[12] Cynosure points out that before their last day at the company, certain employees who left for Reveal LLC either copied confidential company documents onto flash drives or a Dropbox account or emailed themselves prospective customer leads. Cynosure notes that the copied documents included a presentation about a new product the company was developing, spreadsheets with financial and pricing information, prospective customer lists, and analyses comparing the company's devices to those sold by competitors.

---

[12] Massachusetts common law gives "protection" to certain "confidential and proprietary business information . . . , even if such information cannot claim trade secret protection," and the misappropriation of such information may constitute a loss of property for purposes of Chapter 93A. Warner-Lambert Co. v. Execuquest Corp., 691 N.E.2d 545, 547 (Mass. 1998). When deciding whether business information is confidential and subject to protection, Massachusetts courts consider factors similar to those that govern a trade secret analysis. See id. at 547 n.5. At trial, Cynosure framed its case as concerning misappropriation of trade secrets and violations of contractual nondisclosure provisions rather than misappropriation of confidential business information protected by the common law. Cynosure's briefing on its Chapter 93A claim does not discuss the common-law doctrine either. Thus, to the extent Massachusetts law treats confidential business information and trade secrets differently, see Foster-Miller, Inc. v. Babcock & Wilcox Can., 210 F.3d 1, 8 (1st Cir. 2000) (expressing "some doubt about whether and how the Massachusetts courts differentiate among confidential information, proprietary information, and trade secrets"), the Court assesses this aspect of Cynosure's Chapter 93A claim as solely involving the misappropriation of trade secrets.

The Court finds that Cynosure has failed to show that Chambers committed an unfair trade practice by misappropriating Cynosure's trade secrets. Cynosure's theory is that Chambers misappropriated trade secrets by either acquiring or using documents on his personal computer and then intentionally BitLockered the computer following the filing of this lawsuit to cover his tracks. While the Court does not credit the Chambers' the-dog-ate-my-homework explanation for how their computer became BitLockered, the Court granted Chambers a directed verdict on Cynosure's federal and state trade secrets claims during the jury trial because it would have been speculative to assume that any information he had on the computer amounted to a trade secret or that he had misappropriated any trade secrets. Cynosure's theory of Chapter 93A liability against Chambers premised on the misappropriation of trade secrets fails for the same reason.[13]

The Court submitted the trade secrets claims against Daley and the Reveal entities to the jury, however, and the jury found that those defendants misappropriated Cynosure's trade secrets. Again, Defendants do not offer a developed argument as to why the

---

[13] The fact that the jury found that Chambers breached non-disclosure provisions in his employment contracts with Cynosure is not enough to hold Chambers responsible for misappropriation of trade secrets. Even if Chambers disclosed information deemed confidential under the terms of those contracts, it would still require speculation to conclude that such information constituted a trade secret.

Court should not adopt the jury's findings on this point. <u>See</u> <u>Baker</u>, 771 F.3d at 49 (allowing a trial court resolving a Chapter 93A claim following "a jury's verdict on parallel common law claims" to "adopt the verdict entirely"). And there is no question that "misappropriation of trade secrets alone can constitute a violation of Chapter 93A." <u>Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.</u>, 412 F.3d 215, 243 (1st Cir. 2005); <u>see</u> <u>KPM Analytics</u>, 729 F. Supp. 3d at 114 ("A finding of trade secret misappropriation can constitute an unfair or deceptive act under Chapter 93A."); <u>Diomed, Inc. v. Vascular Sols., Inc.</u>, 417 F. Supp. 2d 137, 146 (D. Mass. 2006) (explaining that Chapter 93A "has been applied by Massachusetts courts to misappropriation of trade secrets" (quoting <u>Prescott v. Morton Int'l, Inc.</u>, 769 F. Supp. 404, 407 (D. Mass. 1990))). Daley's and the Reveal entities' misappropriation of trade secrets amounted to an unfair trade practice in violation of Chapter 93A.

Defendants' argument that any misappropriation of trade secrets is not actionable under the intra-enterprise doctrine because the Cynosure employees acquired the trade secrets while still employed by the company is unconvincing. As stated earlier, that doctrine does not apply to the Reveal entities, which were not Cynosure's employees. <u>See</u> <u>Governo L. Firm LLC</u>, 166 N.E.3d at 424 n.14. As for Daley, <u>Governo Law Firm</u> expressly addresses the application of the intra-enterprise doctrine to a Chapter 93A claim

based on an employee's misappropriation of trade secrets. See id. at 425. There, the SJC explained that "[w]here an employee misappropriates his or her employer's proprietary materials during the course of employment and then uses the purloined materials in the marketplace, that conduct is not purely an internal matter; rather, it comprises a marketplace transaction that may give rise to a claim under [§ 11]." Id. Because Daley misappropriated Cynosure's trade secrets while he was planning to launch a competing endeavor with Reveal Ltd., a reasonable inference is that he did so in order to use the information on behalf of the Reveal entities. And Daley's use of Cynosure's trade secrets was likely stymied by the emergency injunctive relief Cynosure secured immediately after filing this lawsuit, which prohibited Defendants from using Cynosure's confidential information. Under such circumstances, the intra-enterprise doctrine does not exempt Daley's conduct from liability under Chapter 93A.

Cynosure is not, however, entitled to damages under Chapter 93A for this unlawful conduct. As Defendants stress, when the jury resolved Cynosure's federal and state trade secrets claims, it found that the misappropriation of trade secrets did not cause harm to Cynosure. Cynosure did not present evidence sufficient to show that Defendants actually used any of its trade secret information to make a sale that otherwise would have gone to Cynosure or otherwise give the Reveal entities an advantage in the

marketplace at Cynosure's expense. Because a plaintiff bringing a § 11 claim for damages "must show that the defendant's alleged unfair or deceptive method, act, or practice caused a loss of money or property," LimoLiner, Inc. v. Dattco, Inc., 919 F.3d 86, 90 (1st Cir. 2019); see Auto Flat Car Crushers, Inc., 17 N.E.3d at 1076, no damages are warranted under Chapter 93A for Daley's and the Reveal entities' misappropriation of Cynosure's trade secrets.

Cynosure argues that the Court may nonetheless award attorney's fees under Chapter 93A based on the misappropriation of trade secrets. The Court addresses this argument below.

## II.  Primarily and Substantially Within Massachusetts

Defendants next argue that, even if they engaged in unfair trade practices, Cynosure cannot prevail under Chapter 93A because the unfair acts did not occur primarily and substantially within Massachusetts. See Mass. Gen. Laws ch. 93A, § 11 ("No action shall be brought or maintained under this section unless the actions and transactions constituting the . . . unfair or deceptive act or practice occurred primarily and substantially within [Massachusetts]."). In Defendants' view, Cynosure's theory of liability is that Defendants engaged in a national and even global scheme to poach the company's sales representatives, divert its customers, and steal its trade secrets in order to facilitate the launch of Reveal LLC across the United States. Defendants contend

71

that Daley and Chambers recruited only one of the twenty-six other Cynosure employees in Massachusetts, that the vast majority of those employees worked for Cynosure outside of Massachusetts, and that the trade secrets they purportedly misappropriated concerned sales and customers across the country. Defendants dispute that either the presence of Cynosure's headquarters in Massachusetts or Daley's status as a Massachusetts resident are enough to satisfy the geographic requirement under § 11.

The key question under § 11 is "whether the center of gravity of the circumstances that give rise to the [Chapter 93A] claim is primarily and substantially within" Massachusetts. Sonoran Scanners, Inc. v. Perkinelmer, Inc., 585 F.3d 535, 546 (1st Cir. 2009) (quoting Kuwaiti Danish Comput. Co. v. Digit. Equip. Corp., 781 N.E.2d 787, 799 (Mass. 2003)). To answer this question, courts conduct "a 'fact intensive' inquiry that is 'unique to each case.'" In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 194 (1st Cir. 2009) (quoting Kuwaiti, 781 N.E.2d at 798). This inquiry focuses on the unfair or deceptive conduct that undergirds the Chapter 93A claim rather than on other contacts the parties may have with Massachusetts. See Neural Magic, Inc. v. Meta Platforms, Inc., 659 F. Supp. 3d 138, 182 (D. Mass. 2023); Kuwaiti, 781 N.E.2d at 799-800.

The center-of-gravity test cannot "be reduced to any precise formula" or "factors." Kuwaiti, 781 N.E.2d at 798-99. That said,

courts often consider "(1) where the defendant commits the unfair or deceptive act or practice; (2) where the plaintiff receives or acts on the wrongful conduct; and (3) where the plaintiff sustained losses caused by the wrongful conduct." KPM Analytics, 729 F. Supp. 3d at 118 (quoting Kuwaiti, 781 N.E.2d at 798 n.13); see Arabian Support & Servs. Co. v. Textron Sys. Corp., 943 F.3d 43, 47 (1st Cir. 2019) (permitting courts to consider these factors as part of a broader fact-intensive inquiry regarding the location of the unfair or deceptive conduct); Uncle Henry's Inc. v. Plaut Consulting Co., 399 F.3d 33, 45 (1st Cir. 2005) (explaining that the SJC's Kuwaiti decision "did not hold or imply that [these] factors . . . are irrelevant to the Chapter 93A calculus"). The center-of-gravity test is not satisfied "[w]here wrongdoing is not focused on Massachusetts but has relevant and substantial impact across the country." Fishman Transducers, Inc. v. Paul, 684 F.3d 187, 197 (1st Cir. 2012). The burden of proof rests on the party claiming that the Chapter 93A violation did not occur primarily and substantially in Massachusetts. See Mass. Gen. Laws ch. 93A, § 11; Kuwaiti, 781 N.E.2d at 797.

Defendants have not met their burden of showing that the center of gravity of the unfair trade practices was not primarily and substantially in Massachusetts. As an initial matter, while the fact that a plaintiff suffered an injury in Massachusetts does not suffice by itself to satisfy the center-of-gravity test, see

Zyla v. Wadsworth, Div. of Thomson Corp., 360 F.3d 243, 255 (1st
Cir. 2004); Monahan Prods. LLC v. Sam's E., Inc., 463 F. Supp. 3d
128, 152 (D. Mass. 2020), the place of injury is a relevant factor
in the analysis, see Fishman Transducers, 684 F.3d at 197; KPM
Analytics, 729 F. Supp. 3d at 118-19. Defendants do not dispute
that the place of injury in this case is Massachusetts. Cynosure
is headquartered there, and about half of its employees work at
that location. Massachusetts is, therefore, where Cynosure
experienced the lost profits caused by the raid of the company's
sales force and faced a risk of financial harm from the
misappropriation of the company's trade secrets.

The circumstances surrounding Defendants' raid of Cynosure's
sales force also centered on Massachusetts. To be sure, most of
the recruited employees worked for Cynosure outside of
Massachusetts, and much of Daley's and Chambers' recruiting
efforts, including the fake QBR meetings, occurred elsewhere too.
However, the acts constituting the unfair trade practices are not
only Daley's and Chambers' efforts to recruit the other Cynosure
employees but also the Reveal entities' participation in those
efforts. This latter conduct was focused on Massachusetts.
Buchbinder reached into Massachusetts to recruit Daley, who both
lived and was employed by Cynosure in the state. Then, through
numerous email exchanges and other communications with Daley over
more than a year, Buchbinder encouraged and assisted Daley's (and

later Chambers') unlawful efforts to poach their Cynosure
colleagues. Although Defendants accurately note that there is no
direct evidence Daley was in Massachusetts when he sent and
received these communications, a reasonable inference is that
Daley was in-state. The burden on this issue rests on Defendants,
see Kuwaiti, 781 N.E.2d at 797, and they have not shown that Daley
was elsewhere. This planning for the recruitment of Cynosure's
employees with a Massachusetts-based individual was a crucial
aspect of the unfair trade practices in this case. See id. at 798-
99 (explaining that courts may consider the "significance" of the
acts of misconduct in different jurisdictions); cf. Neural Magic,
Inc., 659 F. Supp. 3d at 184 (emphasizing that the alleged Chapter
93A violation included a competitor's inducement of an employee to
misappropriate trade secrets and explaining that such inducement
did not occur in Massachusetts because the employee was hired in
New York and asked to engage in unlawful conduct there).[14]

Buchbinder's and Daley's planning of the recruitment efforts
was not the only instances of misconduct related to the raid of

---

[14] The fact that the Chapter 93A liability in this case arises in
part based on the Reveal entities' encouragement of and assistance
in acts undertaken by Daley and Chambers differentiates this case
from those cited by Defendants that hold that the mere planning in
Massachusetts of acts performed elsewhere is not enough to
demonstrate the applicability of § 11. See Camp Creek Hosp. Inns,
Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1410 (11th Cir.
1998) (applying Chapter 93A); Value Partners S.A. v. Bain & Co.,
245 F. Supp. 2d 269, 280 (D. Mass. 2003).

Cynosure's sales force that centered on Massachusetts. Among the employees that left Cynosure were three who worked in the state: Daley and two members of the New England district sales team (an DSM and an ASM). See Ex. 46. Daley recruited that ASM during a meeting in Massachusetts immediately following the fake QBRs.

Massachusetts is also the locus of the circumstances surrounding Daley's misappropriation of trade secrets. Daley was a Massachusetts-based employee at the time of his unlawful misappropriation, and he lived in the state as well. There is no evidence he was located elsewhere when he unlawfully copied Cynosure's trade secrets. Daley's misappropriation was centered in Massachusetts. See Koch Acton, Inc. v. Koller, No. 21-cv-10374, 2024 WL 1093001, at *14 (D. Mass. Mar. 13, 2024) (rejecting the argument that misappropriation of confidential information occurred primarily and substantially outside of Massachusetts because while the defendant copied the information in Vermont, "he was employed in Massachusetts, and the files were owned by a Massachusetts company").

Additionally, the record makes clear that Defendants' unfair trade practices were targeted at Cynosure. Defendants did not recruit sales representatives away from a number of companies, just some of whom happened to work at Cynosure; rather, they engaged in a scheme to specifically recruit Cynosure's employees. The fact that a defendant's unfair or deceptive acts were targeted

at a Massachusetts-based company supports the conclusion that a
Chapter 93A violation occurred primarily and substantially within
Massachusetts, as long as the plaintiff identifies some
significant wrongful conduct that took place or was received in
the state. Compare KPM Analytics, 729 F. Supp. 3d at 118-19
(finding the center-of-gravity test satisfied in part because "the
[plaintiff's] sales operations that [the defendants] repeatedly
targeted with wrongful conduct was based in Westborough,
Massachusetts"), with Neural Magic, Inc., 659 F. Supp. 3d at 184
(finding the center-of-gravity test not satisfied because "even
assuming arguendo that Defendants . . . targeted [the plaintiff]
with the intent to cause the company substantial injury in
Massachusetts, 'it did so without engaging in significant wrongful
conduct in Massachusetts'" (quoting EMC Corp. v. Pure Storage,
Inc., No. 13-cv-12789, 2016 WL 7826662, at *2 (D. Mass. Aug. 19,
2016))). Cynosure has identified significant wrongful conduct that
is connected to Massachusetts, including the Reveal entities'
encouragement of and assistance in Daley's and Chambers'
recruiting efforts, the recruitment of multiple employees who
worked in Massachusetts, and Daley's misappropriation of trade
secrets.

Given all the circumstances giving rise to Cynosure's Chapter
93A claim, this case is not one that fails the center-of-gravity
test because the "wrongdoing is not focused on Massachusetts but

has relevant and substantial impact across the country." <u>Fishman Transducers</u>, 684 F.3d at 197. Such cases usually involve conduct directed at a national or international market that was only incidentally received in Massachusetts. <u>See</u> <u>id.</u> at 197 (holding that an alleged Chapter 93A violation did not occur primarily and substantially in Massachusetts because the claim concerned advertising and sales across the country); <u>SonicSolutions Algae Control, LLC v. Diversified Power Int'l, LLC</u>, 722 F. Supp. 3d 16, 49-50, 50 & n.13 (D. Mass. 2024) (same where the crux of the claim related to purported misrepresentations made to the plaintiff's customers in various locations in the United States and abroad). While the unfair trade practices at issue in this case did involve acts and have effects outside of Massachusetts, those practices centered on a Massachusetts-based employee (Daley) and a Massachusetts-based company (Cynosure).

Accordingly, Defendants have not met their burden of showing that the actions and transactions amounting to the Chapter 93A violation did not occur primarily and substantially within Massachusetts.

## III. **Chapter 93A Damages**

Having concluded that Defendants are liable for damages to Cynosure under § 11 of Chapter 93A for their raid of Cynosure's sales force, the Court turns to the quantification of damages. A plaintiff that prevails under § 11 may recover its "actual

damages." Mass. Gen. Laws ch. 93A, § 11. This includes "all foreseeable and consequential damages arising out of conduct which violates the statute." Auto Flat Car Crushers, Inc., 17 N.E.3d at 1076 (quoting Brown v. LeClair, 482 N.E.2d 870, 873 (Mass. App. Ct. 1985)).

The jury awarded Cynosure a total of $15 million in compensatory damages on its common-law claims relating to the raid of its sales force. This award consisted of $5 million against Daley, $5 million against Chambers, and $15 million against the Reveal entities. The Court adopts this award as the appropriate measure of compensatory damages. See Baker, 771 F.3d at 49. As stated in the Court's order on Defendants' motion for clarification of the jury verdict, the awards against Daley and Chambers are subsets of the $15 million award against the Reveal entities. See Dkt. 731. The Court find that Cynosure is entitled to compensatory damages under Chapter 93A in line with this verdict.

Cynosure also seeks multiple damages on the basis that Defendants' Chapter 93A violation was "willful or knowing." Mass. Gen. Laws ch. 93A, § 11. "A subjectively culpable state of mind is required to establish a willful or knowing violation." Pizzo v. Gambee, 754 F. Supp. 2d 234, 238 (D. Mass. 2010). Willful or knowing violations include "conduct that is 'intentionally gainful' or demonstrates a wilful recklessness or conscious, knowing disregard for its likely results." Rass Corp. v. Travelers

Cos., 63 N.E.3d 40, 53 (Mass. App. Ct. 2016) (quoting McGonagle v. Home Depot U.S.A., Inc., 915 N.E.2d 1083, 1089 n.9 (Mass. App. Ct. 2009)); see Still v. Comm'r of Emp. & Training, 672 N.E.2d 105, 112 (Mass. 1996) (explaining that willful or knowing violations under Chapter 93A encompass "reckless conduct" and "intentional acts").

Cynosure has proven that all Defendants willfully and knowingly violated Chapter 93A when they raided the company's sales force.[15] The emails Daley and Buchbinder exchanged throughout the process of planning for Reveal LLC's launch make clear that they and Chambers were intentionally recruiting Cynosure's top-performing sales representatives and were well aware they were inducing Cynosure's employees to breach their restrictive covenant agreements. The surreptitious circumstances surrounding Daley and Chambers' recruiting trips at Cynosure's expense in late April 2022 -- which they undertook as agents of Reveal Ltd. after signing employment agreements with the company -- also show Defendants acted with subjectively culpable states of mind. Daley and Chambers falsely pretended that their recruiting meetings were QBRs meant to address Cynosure business. Daley asked Buchbinder to post job listings to "avoid non-solicitation issues," Ex. 651, while the

---

[15] Because there are no compensatory damages to multiply for Daley's and the Reveal entities' misappropriation of trade secrets, the Court does not address whether that misappropriation was willful or knowing.

Cynosure employees were informed that the applications they submitted did not matter. And Daley and Chambers told the Cynosure employees not to date their Reveal Ltd. employment contracts so that they could later add a date following each employee's resignation from Cynosure.

When, as here, a plaintiff proves a willful or knowing violation, Chapter "93A requires multiple damages." KPM Analytics, 729 F. Supp. 3d at 116; see Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 821 (Mass. 1991) (explaining that under such circumstances, the plaintiff "was entitled to multiple . . . damages" (emphasis added)). Multiple damages under Chapter 93A "are essentially punitive in nature" and "serve the twin 'goals of punishment and deterrence.'" H1 Lincoln, Inc. v. S. Wash. St., LLC, 179 N.E.3d 545, 565 (Mass. 2022) (quoting Kraft Power Corp. v. Merrill, 981 N.E.2d 671, 684 (Mass. 2013)). When awarding multiple damages, courts may impose "up to three, but no less than two, times" the plaintiff's actual damages. Mass. Gen. Laws. ch. 93A, § 11. Courts have substantial discretion in deciding the appropriate amount of multiple damages within this range and should consider "the egregiousness of each defendant's conduct" and what total award is "proportional to the wrongdoing at issue." KPM Analytics, 729 F. Supp. 3d at 116-17 (quoting Hug v. Gargano & Assocs., P.C., 923 N.E.2d 1065, 1071 (Mass. App. Ct. 2010)).

The Court concludes that only double damages are merited in this case. Although Defendants' Chapter 93A violation was willful and knowing, it is undisputed that sales representatives regularly jump from company to company in the medical aesthetic device industry, including when doing so violates restrictive covenants. This common industry practice mitigates the egregiousness of Defendants' unlawful conduct and renders treble damages unwarranted. Moreover, many of the sales representatives were open to Defendants' recruiting efforts because of internal problems with Cynosure's business and frustration with Kibbey's leadership. Finally, the record reflects that Reveal LLC had not achieved profitability in the two years following its launch, so trebling would be disproportionate.

Defendants contend that the Court should not award multiple damages "because such damages are punitive and the jury already had the opportunity to make such findings." Dkt. 686 at 18-19. A plaintiff is not entitled to multiple damages under Chapter 93A that are duplicative of punitive damages it received for other claims "aris[ing] out of the same bundle of facts" and causing the same injury. Borne v. Haverhill Golf & Country Club, Inc., 791 N.E.2d 903, 919 (Mass. App. Ct. 2003). Contrary to Defendants' contention, this principle has no application here. The jury was asked to consider punitive damages only for Cynosure's claims of misappropriation of trade secrets against Daley and the Reveal

entities and its claim for Daley's breach of the nondisclosure provision in certain of his employment contracts. See Dkt. 646 at 11-12.[16] The jury was not asked to consider, and did not award, punitive damages against Defendants for any of Cynosure's common-law claims arising from the raid of its sales force. An award of multiple damages under Chapter 93A is not duplicative.

The Court therefore awards Cynosure $15 million in compensatory damages against the Reveal entities, $5 million of which Daley is also liable for and a separate $5 million of which Chambers is also liable for. Having found Defendants' Chapter 93A violation willful and knowing, the Court also awards double damages under Chapter 93A in the same amounts. Cynosure asks that the award of double damages under Chapter 93A be joint and several, see Dkt. 672 at 20, so, as with the compensatory damages, the Court deems the $5 million awards of double damages against each of Daley and Chambers to be subsets of the $15 million award of double damages against the Reveal entities.

## IV.   Attorney's Fees and Costs and Prejudgment Interest

### A.   Attorney's Fees and Costs

Cynosure seeks attorney's fees and costs in connection with its Chapter 93A claim. Under § 11, "[i]f the court finds in any

---

[16] The jury awarded $225,000 in punitive damages against Daley for breach of his contractual nondisclosure obligations. The Court takes no position at this time as to whether the evidence supports this aspect of the jury's award.

action commenced hereunder, that there has been a violation of
section two [proscribing unfair or deceptive acts or practices],
the petitioner <u>shall</u>, in addition to other relief provided for by
this section . . . , be awarded reasonable attorneys' fees and
costs incurred in said action." Mass. Gen. Laws ch. 93A, § 11
(emphasis added). This provision requires an award of attorney's
fees when the plaintiff is "entitled to relief in some other
respect" under § 11. <u>NASCO, Inc. v. Pub. Storage, Inc.</u>, 127 F.3d
148, 153 (1st Cir. 1997) (quoting <u>Jet Line Servs., Inc. v. Am.</u>
<u>Emps. Ins. Co.</u>, 537 N.E.2d 107, 115 (Mass. 1989)).

There is no doubt that Cynosure is entitled to attorney's
fees incurred in connection with its Chapter 93A claim insofar as
the claim relates to the raid of its sales force. The Court is
awarding damages to Cynosure for lost profits caused by that
Chapter 93A violation, which triggers an entitlement to attorney's
fees. <u>See</u> <u>Star Fin. Servs., Inc. v. AASTAR Mortg. Corp.</u>, 89 F.3d
5, 15 (1st Cir. 1996) (explaining that courts award attorney's
fees under § 11 "when damages were awarded").

The more difficult question is whether Cynosure may also
receive attorney's fees incurred in connection with its trade
secrets theory of liability under Chapter 93A. Defendants argue
that Cynosure cannot because it failed to prove that the
misappropriation of trade secrets caused it any harm. Cynosure
responds that it suffered no provable harm as a result of the TRO

and preliminary injunction it secured in this lawsuit that barred Defendants from using its confidential information and required the former employees to engage in a remediation process to return Cynosure documents and files in their possession. In Cynosure's view, it is entitled to attorney's fees because it had to engage in litigation to avoid suffering economic harm from the misappropriation of trade secrets.

A court may not award attorney's fees under § 11 simply because a plaintiff has identified an unfair or deceptive act or practice. See A2Z Dental, LLC v. Miri Trading, LLC, 494 F. Supp. 3d 30, 33 (D. Mass. 2020); Jet Line Servs., Inc., 537 N.E.2d at 115. Rather, in keeping with the statutory requirement that the "plaintiff must be entitled to relief in some other respect," the plaintiff must show that "the unfair or deceptive conduct '. . . had some adverse effect on [it], even if [that effect] is not quantifiable in dollars.'" Chapman v. Katz, 862 N.E.2d 735, 749 (Mass. 2007) (quoting Chapman v. Katz, 844 N.E.2d 270, 275 (Mass. App. Ct. 2006)); see NASCO, Inc., 127 F.3d at 153. Thus, a plaintiff generally cannot recover attorney's fees when the unfair or deceptive conduct did not cause it any injury or loss. See, e.g., Chapman, 862 N.E.2d at 749; Martha's Vineyard Auto. Vill., Inc. v. Newman, 569 N.E.2d 401, 405 (Mass. App. Ct. 1991). But because the plaintiff need not show harm that is quantifiable in dollars, a damages award is not a prerequisite to an award of

attorney's fees under § 11. See A2Z Dental, LLC, 494 F. Supp. 3d at 33; Kiely v. Teradyne, Inc., 13 N.E.3d 615, 628 (Mass. App. Ct. 2014). For instance, a court may award attorney's fees to a plaintiff that receives only injunctive relief, see Star Fin. Servs., Inc., 89 F.3d at 15; Kiely, 13 N.E.3d at 627, which requires a showing that the unfair or deceptive "act or practice may have the effect of causing [a] loss of money or property." Mass. Gen. Laws ch. 93A, § 11.

The Court concludes that Cynosure is entitled to attorney's fees that it incurred to secure the aspects of the TRO and the preliminary injunction relating to the use and return of its trade secrets by Daley and the Reveal entities. The Court agrees with Cynosure that the TRO and the preliminary injunction were the reason it did not suffer any provable harm from the misappropriation of trade secrets. Multiple employees copied Cynosure trade secret information around the time they resigned from the company to start working at Reveal LLC. This information included valuable prospective customer lists and pricing information. Daley misappropriated a Cynosure training presentation that included confidential comparisons between Cynosure's products and those of its competitors. A reasonable inference is that these individuals intended to use these trade secrets to Reveal LLC's advantage in the market.

This "demonstrated risk of future actual loss constitutes an unquantifiable 'adverse effect'" that entitles Cynosure to attorney's fees. Star Fin. Servs., Inc., 89 F.3d at 15; see Adv. Sys. Consultants Ltd. v. Eng'g Plan. & Mgmt., Inc., 899 F. Supp. 832, 834 (D. Mass. 1995) (awarding attorney's fees where "but for the prompt action of [the plaintiff] in obtaining injunctive relief, [the plaintiff] would have suffered loss of money or property" from a Chapter 93A violation). Although the return of Cynosure's trade secrets has eliminated any basis to award a permanent injunction, Cynosure has shown that it was entitled to preliminary injunctive relief under Chapter 93A as a result of the risk of harm from the misappropriation, and Cynosure did in fact secure preliminary relief from the Court. Thus, this is not a case where the plaintiff received preliminary relief to maintain the status quo only to subsequently fail to prove that the defendant engaged in unfair or deceptive conduct that violated Chapter 93A. See SMS Fin. V, LLC v. Conti, 865 N.E.2d 1142, 1150 (Mass. App. Ct. 2007) (declining to award attorney's fees under such circumstances). Not awarding attorney's fees incurred to obtain the TRO and the preliminary injunction here would defeat the policy behind the fees provision, as it "would discourage victims of unfair trade practices from seeking legal redress until after actual loss of money or property occurred." Star Fin. Servs., Inc., 89 F.3d at 15.

**B.    Prejudgment Interest**

Finally, Cynosure requests prejudgment interest on any compensatory damages award in this case at a rate of 12% per annum from the date of the filing of the complaint (July 20, 2022) through entry of final judgment. Defendants do not dispute that Cynosure is entitled to prejudgment interest under these terms. See Mass. Gen. Laws ch. 231, § 6B (providing that for tort actions, "there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action"); see also Berkowitz v. Berkowitz, 817 F.3d 809, 814 (1st Cir. 2016) (explaining that prejudgment interest for state-law claims is governed by state law).[17] As Cynosure concedes, "[p]rejudgment interest is calculated on the compensatory -- not the punitive multiple -- amount of an award of damages under [Chapter] 93A." Greene v. Phillip Morris USA Inc., 208 N.E.3d 676, 692 n.22 (Mass. 2023). The Court therefore awards Cynosure prejudgment interest for the compensatory damages award at a rate of 12% per annum for the period between the filing of the lawsuit and the entry of final judgment against Defendants.

---

[17] In contract actions, Massachusetts law authorizes prejudgment interest "from the date of the breach or demand." Mass. Gen. Laws ch. 231, § 6C. The jury found Daley and Chambers liable for breach of contract, but Cynosure expressly waives any right to prejudgment interest starting before it filed this lawsuit.

## ORDER

For the foregoing reasons, the Court resolves Cynosure's Chapter 93A claim against the Reveal entities, Daley, and Chambers as follows:

1.  The Court finds in Cynosure's favor on its Chapter 93A claim relating to the raid of its sales force against the Reveal entities, Daley, and Chambers. The Court doubles the jury award in compensatory damages against the Reveal entities, Daley, and Chambers. The total amount of damages awarded to Cynosure is $30 million, double the jury award of $15 million. The Reveal entities are liable for the $30 million in total damages.

2.  The Court finds damages of $10 million, double the jury award of $5 million, in Cynosure's favor against Daley relating to the raid of its sales force as a subset of the $30 million award against the Reveal entities. Daley's liability for this $10 million in damages is joint and several with the Reveal entities.

3.  The Court finds damages of $10 million, double the jury award of $5 million, in Cynosure's favor against Chambers relating to the raid of its sales force as a subset of the $30 million award against the Reveal entities. Chambers' liability for this $10 million in damages is joint and several with the Reveal entities.

89

4.  The Court awards Cynosure reasonable attorney's fees and costs incurred in connection with its Chapter 93A claim relating to the raid of its sales force by the Reveal entities, Daley, and Chambers (and not the other defendants).

5.  The Court finds in Cynosure's favor on its Chapter 93A claim relating to the misappropriation of trade secrets only insofar as Cynosure is entitled to recover from Daley and the Reveal entities reasonable attorney's fees and costs it incurred to secure the aspects of the TRO and the preliminary injunction relating to the use and return of its trade secrets by those defendants (and not the other defendants).

Cynosure is also entitled to prejudgment interest for the $15 million compensatory damages award against the Reveal entities, Daley, and Chambers at a rate of 12% per annum for the period between the filing of the lawsuit and the entry of final judgment against these defendants.

Within fourteen days of entry of this order, the parties shall inform the Court whether they agree to 1) entry of a partial final judgment under Federal Rule of Civil Procedure 54(b) with regard to the claims against the Reveal entities, Daley, and Chambers; and 2) a stay of the claims against the remaining defendants pending any appeal that may follow entry of a partial final

judgment, subject to Cynosure's agreement to waive prejudgment interest from December 18, 2024, through the date of entry of judgment against each remaining defendant.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge